# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

TAL PROPERTIES OF POMONA, LLC AND AVRHOM :
MANES, :
                                      :
                     Plaintiffs, :
                                       :
           -against- :
                                       :     Docket No.: 19-cv-06838 (PMH)
VILLAGE OF POMONA, BRETT YAGEL, individually :
and in his official capacity as Mayor of the Village Of :
Pomona, DORIS ULMAN, individually and in her official :     **NOTICE OF INDIVIDUAL**
capacity as Attorney for the village of Pomona, :     **DEFENDANTS' MOTION TO**
LOUIS ZUMMO, individually and in his official capacity :     **DISMISS THE SECOND**
as Building Inspector for the Village Of Pomona, :     **AMENDED COMPLAINT**
NOREEN SHEA, individually and in her official capacity :
as Deputy Village Clerk for the Village Of Pomona, :
FRANCIS ARSA-ARTHA individually and in her official :
capacity as Clerk Treasurer for the Village Of Pomona, :
CHRISTOPHER RILEY, individually and in his official :
capacity as Special Prosecutor for the Village Of Pomona; :
JOSEPH CORLESS, individually and in his official :
capacity as Engineer for the Village Of Pomona LEON :
HARRIS, individually and in his official capacity as :
Deputy Mayor for the Village Of Pomona, IAN BANKS, :
individually and in his official capacities as Trustee, and :
Current Mayor for the Village of Pomona, and :
JOHN DOES and JANE DOES, :
                                       :
                          Defendants. :

------------------------------------------------------------------- x

TO:

     Albert Levy                          Daniel Ashburn, Esq.
     Law Offices of Albert A. Levy         Menachem Mendel Mishkelov 13/3
     Michaelangelo 2, Ste 14              Jerusalem, IS 9540213
     Tel Aviv- Jaffa                      Israel
     Israel                             (404) 939-1323
     972 053-339-4327                 Email: dashburn.ga@gmail.com
     Email: aalesq@gmail.com

PLEASE TAKE NOTICE that upon annexed declaration of Janine A. Mastellone, Esq., dated August 21, 2020 (and the exhibits annexed thereto); the accompanying memorandum of law, dated August 21, 2020; and all the prior proceedings herein, defendants, Brett Yagel, Doris Ulman, Louis Zummo, Francis Arsa Artha, and Leon Harris (collectively, the "Individual Defendants"), by their undersigned attorneys, will move this Court on August 21, 2020, or on such other date as may be stipulated or ordered, before the Hon. Philip M. Halpern, for an Order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissing Plaintiffs' second amended complaint with prejudice, and for such other, different and further relief as the Court in its discretion may deem just and proper.

Dated:    White Plains, New York
           August 21, 2020

                        WILSON, ELSER, MOSKOWITZ,
                        EDELMAN & DICKER LLP
                        Attorneys for the Individual Defendants

                        _____
                        Janine A. Mastellone, Esq.
                        Eliza M. Scheibel Esq.
                        1133 Westchester Avenue
                        White Plains, New York 10604
                        (914) 323-7000
                        Our File No.  00295.12564

WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
*Attorneys for Defendants*
*Brett Yagel, Doris Ulman, Louis Zummo,*
*Fran Arsa Artha, and Leon Harris*
1133 Westchester Avenue
White Plains, NY 10604
(914) 323-7000
Attn:   Janine A. Mastellone, Esq.
           Eliza M. Scheibel, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x
TAL PROPERTIES OF POMONA, LLC, and AVROHOM
MANES

                              Plaintiffs,

                    -against-

VILLAGE OF POMONA, BRETT YAGEL, individually
and in his official capacity as Mayor of the Village Of
Pomona, DORIS ULMAN, individually and in her official
capacity as Attorney for the village of Pomona, LOUIS
ZUMMO, individually and in his official capacity as
Building Inspector for the Village Of Pomona, NOREEN
SHEA, individually and in her official capacity as Deputy
Village Clerk for the Village Of Pomona, FRANCIS ARSA-
ARTHA individually and in her official capacity as Clerk
Treasurer for the Village Of Pomona, CHRISTOPHER
RILEY, individually and in his official capacity as Special
Prosecutor for the Village Of Pomona; JOSEPH CORLESS,
individually and in his official capacity as Engineer for the
Village Of Pomona LEON HARRIS, individually and in his
official capacity as Deputy Mayor for the Village Of
Pomona, IAN BANKS, individually and in his official
capacities as Trustee, and Current Mayor for the Village of
Pomona, and JOHN DOES and JANE DOES,

                              Defendants.

---------------------------------------------------------------------- x

Docket No. 7:19-cv-06838

**DECLARATION IN SUPPORT
OF MOTION TO DISMISS
PLAINTIFFS' SECOND
AMENDED COMPLAINT**

-1-

JANINE A. MASTELLONE, an attorney duly admitted to practice law before the Courts of the State of New York, and the United States District Court for the Southern District of New York, hereby declares pursuant to the penalty of perjury and 28 U.S.C. §1746 as follows.

1.      I am a partner in the law firm Wilson, Elser, Moskowitz, Edelman & Dicker LLP, attorneys for defendants Brett Yagel, who was formerly the Mayor of the Village of Pomona ("Yagel"), Doris Ulman ("Ulman"), who was formerly the Village Attorney of the Village of Pomona, Louis Zummo, Building Inspector for the Village of Pomona, Leon Harris, who was formerly Deputy Mayor of the Village of Pomona, and Fran Arsa Artha, the former Village Clerk/Treasurer of the Village of Pomona, (collectively, the "Individual Defendants") in the above-captioned action.

2.      I submit this declaration in support of the Individual Defendants' motion, pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 12(b)(6), to dismiss the second amended complaint (D.E. #99) filed by plaintiffs TAL Properties of Pomona, LLC ("TAL") and Avrohom Manes ("Manes") (collectively, "Plaintiffs"), a copy of which is annexed hereto as **Exhibit A**.

3.      Annexed hereto as **Exhibit B** is a copy of Plaintiffs' second amended complaint in a prior action against defendants. That prior action was filed with the New York State Supreme Court, Rockland County, and later removed to this Court under docket number 7:17-cv-02928-CS ("the Prior Action").

4.      Annexed hereto as **Exhibit C** is a copy of defendants' notice of motion to dismiss the second amended complaint in the Prior Action with prejudice.

5.      Annexed hereto as **Exhibit D** is a copy of defendants' memorandum of law in support of their motion to dismiss Plaintiffs' second amended complaint in the Prior Action.

8388445v.1

6.     Annexed hereto as **Exhibit E** is a decision and order of the Hon. Cathy Seibel dated January 10, 2018, dismissing the second amended complaint in the Prior Action in its entirety, pursuant to F.R.C.P. 12(b)(6), for failure to state a plausible cause of action.

7.     Annexed hereto as **Exhibit F** is a copy of the judgment, dated January 12, 2018, granting the defendants' motion to dismiss the Prior Action.

8.     Annexed hereto as **Exhibit G** is a proposed Third Amended Complaint proffered by Plaintiffs in the Prior Action.

9.     Annexed hereto as **Exhibit H** is a July 22, 2019 decision of the district dourt denying Plaintiffs' motion to reopen the Prior Action, *Tal Properties of Pomona, LLC v. Village of Pomona*, 2019 U.S. Dist. LEXIS 121729 (July 22, 2019 S.D.N.Y.) (Seibel, J.).

10.     Annexed hereto as **Exhibit I** is a copy of the docket from the appeal in the Prior Action (App. Dkt. 19-2247) reflecting that the appeal was dismissed on May 29, 2020 because Plaintiffs failed to pursue the appeal. *See* Dkt. Entry #61.

11.     Exhibits B through I are public documents filed in the Prior Action.  Consequently, this Court may take judicial notice of these documents.  *Perry v. Estates of Byrd*, 2014 U.S. Dist. LEXIS 91272, 2014 WL 2998542, at *3 (S.D.N.Y. July 3, 2014).

WHEREFORE, for the reasons set forth in the accompanying memorandum of law, the motion to dismiss plaintiffs' complaint, with prejudice, should be granted in its entirety.

I declare that the foregoing is true and correct.  Executed this 21st day of August 2020.

_____

Janine A. Mastellone

- 3 -

# Exhibit A

**_(to Exhibit B)_**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TAL PROPERTIES OF POMONA, LLC AND AVROHOM MANES, <br><br>                Plaintiffs, <br><br>         - against - <br><br> VILLAGE OF POMONA, BRETT YAGEL, individually and in his official capacity as Mayor of the Village of Pomona, DORIS ULMAN, individually and in her official capacity as Attorney for the Village of Pomona, LOUIS ZUMMO, individually and in his official capacity as Building Inspector for the Village of Pomona, NOREEN SHEA, individually and in her official capacity as Deputy Village Clerk for the Village of Pomona, FRANCIS ARSA-ARTHA individually and in her official capacity as Clerk and Treasurer for the Village of Pomona, CHRISTOPHER RILEY, individually and in his official capacity as Special Prosecutor for the Village of Pomona; JOSEPH CORLESS, individually and in his official capacity as Engineer for the Village of Pomona LEON HARRIS, individually and in his official capacity as Deputy Mayor for the Village of Pomona, IAN BANKS, individually and in his official capacities as Trustee, and current Mayor for the Village of Pomona, and JOHN DOES and JANE DOES, <br><br>               Defendants. | Case No.:    7:19-cv-06838 (PMH) <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

        Plaintiffs TAL Properties of Pomona, LLC ("TAL Properties") and Avrohom Manes ("Plaintiff Manes" or "Manes") (collectively, "Plaintiffs"), by and through their undersigned counsel, for their Second Amended Complaint against Defendants the Village of Pomona (the "Village" or "Pomona"), Brett Yagel ("Yagel" or "Mayor Yagel"), Doris Ulman ("Ulman"), Louis Zummo ("Zummo"), Ian Banks ("Banks" or "Mayor Banks"), Noreen Shea ("Shea"), Joseph Corless ("Corless"), Francis Arsa-Artha ("Arsa-Artha"), Christopher Riley ("Riley") and Leon Harris ("Harris") (collectively, "Defendants"), allege as follows:

1

## NATURE OF THE ACTION

1.      This action seeks redress for Defendants' longstanding and ongoing intentional discrimination against Plaintiffs Manes and TAL Properties, and against the Orthodox Jewish community. Defendants' discriminatory anti-Orthodox-Jewish intent and disparate treatment is so pervasive that it infuses the official and unofficial policy of the Village. Plaintiff Manes, an Orthodox Jewish homeowner and local real estate developer, and his company, Plaintiff TAL Properties, have suffered economic and other harm as a result of Defendants' anti-religious actions. Plaintiffs bring this action to hold Defendants accountable to Plaintiffs and to rid the Village of Pomona government of the bigotry with which it is thoroughly saturated.

2.      Plaintiff Manes is a practicing Orthodox Jew and a resident of Pomona. As a developer-investor seeking to engage in real estate transactions in Pomona via TAL Properties, Manes sought to own and develop multiple properties. Manes has personally been damaged from Defendants' discriminatory and unlawful acts. Defendants harnessed the power of the Village's municipal authority to harass and discriminate against Manes and to damage his company, TAL Properties, which sought to attract Orthodox Jewish residents to Pomona.

3.      Under color of law, the Village of Pomona, a local government of roughly three-thousand residents, used numerous official and non-official mechanisms – including building and zoning controls – to actively and systematically discriminate against Manes, TAL Properties, and against religiously observant Jews.

4.      As set forth below, Defendants committed multiple federal and state constitutional and statutory wrongs against Plaintiff Manes, damaging him and his company.

Through this action, Plaintiffs seek compensation for the damage Defendants have inflicted, and seek to put an end to Defendants' discriminatory practices once and for all.

5. Defendants Mayor Brett Yagel, Deputy Mayor Leon Harris, Village Attorney Doris Ulman, Village Clerk and Treasurer Francis Arsa-Artha, Building Inspector Louis Zummo and other Village employees (collectively, the "Yagel Administration") created and actively managed an anti-Orthodox-Jewish program in the Village of Pomona. This program enlisted various governmental departments and subdivisions, including the building department, code enforcement, Board of Trustees, zoning and planning board, village clerks, treasury, village attorney and village engineer. The Village's local government intentionally discriminated – in numerous and pervasive ways as set forth herein – against the religiously observant Jewish religious minority. It enacted new laws and ordinances and discriminatorily and disparately invoked local code enforcement and zoning laws to target Orthodox Jews, while denying basic municipal services to Orthodox Jewish residents.

6. Defendants' illegal discriminatory acts were designed to, and did, hinder and dissuade Orthodox Jews from relocating into Pomona and prevented the integration of Orthodox Jews into Pomona's social fabric as equal citizens. The Village's goal was clear: keep them out. These discriminatory tactics were used against Plaintiffs, causing them the substantial economic harm described below. Official action by Defendants was designed to deter and prevent Orthodox Jews, such as Manes, from selling homes to Orthodox Jews.

7. To prevent Orthodox Jews from moving into Pomona and to drive out Orthodox Jews, the Yagel Administration: (i) applied facially neutral laws in a manner that discriminates and is designed to discriminate against Orthodox Jews; (ii) discriminatorily, in a

substantial departure from normal procedure, denied and delayed services to Orthodox Jews; (iii) discriminatorily harassed and humiliated existing Orthodox Jewish residents, in public and private spaces, preventing the full use and enjoyment of the public space and their properties; (iv) obstructed and otherwise blocked lawful access to the property records of Orthodox Jews who sought such records in the ordinary course of Village business, in freedom-of-information requests, and in other litigation with the Village; and (v) interfered multiple times with efforts by Plaintiffs to buy, sell, build, and develop properties in Pomona, by enlisting non-Orthodox-Jewish residents to disrupt existing deals and thwart prospective property sales to and from Orthodox Jewish parties and interfere with the terms and conditions of previously approved real estate developments.

8. Defendants Yagel, Harris, Ulman, Arsa-Artha and Zummo, jointly with the other Defendants and severally, have prevented and burdened Orthodox Jews, including Plaintiff Manes, from freely exercising their fundamental religious beliefs. As set forth below, Defendants have targeted core Orthodox Jewish religious practices by, among other things: (i) preventing the establishment of a minimally required infrastructure, including synagogues, ritual baths and other fundamental religious requirements; (ii) harassing Orthodox Jews, like Plaintiff Manes, while they are practicing their religion, and (iii) otherwise limiting and/or attempting to limit their religious freedoms.

9. Plaintiffs possess recordings of unguarded conversations during working hours among Village employees at the Village's administrative offices, known as Village Hall. Members of the Yagel Administration are heard repeatedly disparaging Orthodox Jews and the religion, rituals, and way of life of Orthodox Jews.

4

10.     Village employees, including Defendant Mayor Yagel, are heard agreeing with degrading and discriminatory remarks about individual Jews and Orthodox Jews collectively. These statements are made in the course of discussions of official decisions and actions such as: (i) ticketing and fining Orthodox Jews; (ii) denying and delaying the requests of Orthodox Jews for basic municipal services; (iii) blocking the access of Orthodox Jews to property and other public records; and (iv) intentionally discriminating in the provision of municipal services to Orthodox Jews.

11.     A whistleblower complaint by Defendant Noreen Shea, a former Village clerk who participated in Defendants' unlawful program, and a scorching Human Rights Division Report also describe in detail the rampant anti-Orthodox-Jewish bias in the Village government.

12.     The Village of Pomona was recently found, in a comprehensive court decision, to have enacted and enforced laws with the discriminatory intention to keep Orthodox Jews out of Pomona. *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83 (2d Cir. 2019) ("*Tartikov*").

13.     The United States Court of Appeals for the Second Circuit in *Tartikov* invalidated land use regulation that is generated by "bias against the *religious faith or practices of the developer* or of likely residents of new development *whether overt or hidden* by legitimate-seeming pretext." 945 F.3d at 88 (emphasis added).

14.     Hostility and bias practiced by Defendants against Orthodox Jews and their ethnicity and way of life was the "but for" cause of the damage suffered by Plaintiffs. If not

for the unlawful conduct motivated by Defendants' discrimination, Plaintiffs would not have been damaged.

15.     In the spring of 2019, then-Village Trustee Defendant Ian Banks defeated Defendant Yagel in Village elections, becoming mayor of the Village on April 1, 2019. Despite promising in his campaign to on clean up the anti-Jewish practices of the Yagel Administration, Defendant Banks, upon becoming mayor, claimed that Orthodox Jews now have too much power in the Village. As mayor he has continued many of the same practices followed by the Yagel Administration. Among other things for example, after the Village's Board of Directors voted to terminate Defendant Zummo, Defendant Banks defied the Board and re-hired Defendant Zummo to head the Village's Building Department and code enforcement. Defendant Banks has refused to remedy and has continued the discriminatory actions taken against Plaintiffs and other Orthodox Jews in Pomona.

## THE PARTIES

16.     Plaintiff Avrohom Manes is the sole owner of TAL Properties. He is an Orthodox Jew and resides in the County of Rockland. Through his company, he is also an investor in, and developer of, real estate.

17.     Plaintiff TAL Properties is a limited liability company formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district. TAL Properties was formed as a limited liability company to conduct real estate business in Pomona, with intent to purchase land and build, develop and sell homes within the Village of Pomona.

18.     Defendant Village of Pomona is a municipal corporation formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district.

19.     From 2011 until April 1, 2019, Defendant Brett Yagel was the duly elected Mayor of the Village. At all relevant times, he was and is the final policy maker for Defendant Village. He is sued in his official and individual capacities.

20.     At all relevant times, Defendant Doris Ulman was the Village Attorney. She is sued in her official and individual capacities.

21.     At all relevant times, Defendant Louis Zummo was and is the Building Inspector of Pomona. He is sued in his official and individual capacities.

22.     At all relevant times, Defendant Joseph Corless was the Acting Village Engineer of Pomona. He is sued in his official and individual capacities.

23.     At all relevant times, Defendant Francis Arsa-Artha was the Village Clerk and Treasurer of Pomona. She is sued in her official and individual capacities.

24.     At all relevant times, Defendant Noreen Shea was the Deputy Village Clerk. She is sued in her official and individual capacities.

25.     At all relevant times, Defendant Ian Banks was the Trustee and is the current Mayor of Pomona. He is sued in his official and individual capacities.

26.     At all relevant times, Defendant Leon Harris was the Deputy Mayor. He is sued in his official and individual capacities.

27.     At all relevant times, Defendant Christopher Riley was the Special Prosecutor. He is sued in his official and individual capacities.

28.     Defendants' acts alleged in this Complaint were undertaken under color of state law.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(3) & (4) and 42 U.S.C. §§ 1983 and 1988.

30.     This Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000cc-2(a) to enforce Plaintiffs' rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, *et seq.*

31.     This Court has jurisdiction under 28 U.S.C. § 1331 to enforce Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. §§ 3601 – 3619.

32.     This Court has supplemental jurisdiction, under 28 U.S.C. § 1367(a), over Plaintiffs' state law claims.

33.     Venue is proper in this district under 28 U.S.C. § 1391(b) in that all claims arose in this district.

## PROCEDURAL HISTORY

34.     Plaintiffs filed a prior action in state court related to the Village's discriminatory conduct on March 16, 2017. That action was removed to this Court on April 21, 2017, and docketed as Civil Action No. 7:17-cv-02928 (CS) ("TAL1"). On January 10, 2018,

District Judge Seibel dismissed TAL1 for failure to adequately plead a *LeClair* disparate treatment equal protection claim or a free exercise claim.

35.    On November 2, 2018, Plaintiffs filed a motion under Fed. R. Civ. P. 60(b) to reopen the dismissal of TAL1, based upon new information and evidence as well as new developments after the original TAL1 dismissal. Among other developments, in June 2018 the New York Human Rights Division issued its report of its investigation of Defendant Noreen Shea's complaint against the Village (described below). Plaintiffs also obtained new information via admissions by Defendants Zummo and Ulman during 2018.

36.    On July 22, 2019, Judge Seibel denied the motion to reopen TAL1, and emphasized that her denial of the motion was not a determination of the merits of Plaintiffs' allegations, but was dictated by the limitations of Fed. R. Civ. P. 60(b).

37.    Judge Seibel noted in her decision that Plaintiffs had not attempted to plead a *Pyke* Equal Protection Claim (which, crucially, does not require explicit pleading of comparators who were treated more favorably). Judge Seibel also noted that she had *not* determined the merits of a potential *Pyke* equal protection claim by Plaintiffs or other possible legal claims and theories not previously pled and dismissed. Judge Seibel declared that she was *not* precluding the filing of a new action. She said:

> "Defendants should take little comfort in this outcome. The allegations presented on this motion, if even half true, are disturbing I am obliged to stay within the confines of Rule 60(b), which in my judgment does not allow for this lawsuit to be reopened, but should Plaintiffs commence a new lawsuit, they may well be able to state a claim. And I do not see how Defendants will "suffer immense prejudice" (D's Opp. at 9), if they have to defend themselves on the merits. They may well be able to do so; I have no opinion as to what the outcome of such a case would be, nor

could I at this stage. But should Plaintiffs find it in their interest to pursue a case, airing the allegations and getting to the truth would hardly be a bad thing."

*TAL Props. of Pomona, LLC v. Village of Pomona*, 2019 U.S. Dist. LEXIS 121729 * 26 (S.D.N.Y. July 22, 2019).

38.    Plaintiffs immediately commenced this action on July 23, 2019. This action was assigned to U.S. District Judge Briccetti, who at the time was presiding over a similar case alleging discrimination against the Village. *See Shmuel Indig et al. v. The Village of Pomona et al.*, S.D.N.Y No. 7:2018-cv-10204 ("*Indig*"). Both this case and the *Indig* case were re-assigned to U.S. District Judge Halpern on March 17, 2020. Plaintiffs filed their first Amended Complaint on March 27, 2020.

39.    Only recently in 2000, Plaintiffs obtained new information and evidence related to their claims and the wrongful actions of Defendants. Among other things, these include copies of certain recordings made by Defendant Shea in Village Hall in 2016 and 2017, and recently filed deposition transcripts and affidavits in Defendant Shea's federal lawsuit against the Village currently pending in this District. *See Noreen Shea v. Village of Pomona, et al.*, S.D.N.Y. No. 17:18-cv-11170 (CS) ("*Shea*").

40.    Additional evidence is now in Plaintiffs' possession as well as proof of continuing and ongoing unlawful conduct by Defendants, resulting in additional damages.

## FACTUAL ALLEGATIONS

## DISCRIMINATION AGAINST THE PLAINTIFFS

41.    Defendants' discriminatory practices have: (i) interfered with Plaintiff Manes' property rights; (ii) denied him basic services that delayed and/or prevented him from

developing and selling homes to Orthodox Jewish families who wish to freely practice their Orthodox Jewish lifestyle in their homes and community; (iii) caused Manes to suffer humiliation and discrimination when conducting business with the Village; and (iv) made it impractical and impossible to establish the minimally basic infrastructure for a functioning Orthodox Jewish lifestyle.

42.     Plaintiff Manes owns investment properties in the Village through his wholly owned company, TAL Properties of Pomona, which was formed to acquire, develop, sell, and otherwise engage in real estate development within the local Pomona market.

43.     Upon information and belief, before the arrival of Orthodox Jews in Pomona, the property values of Pomona real estate were in steady decline. As Orthodox Jews moved in, the trend promptly reversed. When Plaintiff Manes contemplated moving into and investing in Pomona, he sought to take advantage of the developmental and personal opportunities, living with his family in a bucolic setting.

44.     Manes envisioned designing and developing properties - well-built and spacious one-family homes, with modern amenities, conforming to and complementing an Orthodox Jewish lifestyle. He reasonably expected a healthy return on his investment.

45.     Such amenities include kosher kitchens; larger dining rooms to accommodate family Sabbath and holiday meals; study areas; two sinks, and other meat and dairy separations; Passover kitchens; and balconies conforming to requirements for the Sukkot holiday. In addition, certain communal resources are necessary to support fundamental Orthodox Jewish religious practices, and families often pay a premium for a home in such a community.

46.     Minimally required communal infrastructure includes synagogues, ritual baths, access to kosher food, private religious schooling and daycare. It also includes *eruvim* – a thin string or wire, often attached to elevated utility poles, symbolically integrating private and public spaces into one "private domain," thus enabling Orthodox Jews to avoid Sabbath transgressions of transferring and carrying objects in the public domain.

47.     Plaintiff Manes, standing by his religious and real estate development visions, moved with his wife and three daughters to Pomona.

48.     Defendants administer and enforce the Village's zoning ordinances.

49.     Defendants are "government" as defined by 42 U.S.C. § 2000cc-5(4)(A).

50.     The Village zoning ordinances are "land use regulation" as defined by 42 U.S.C. § 2000cc-5(5).

51.     As part of their program and plan to prevent Orthodox Jews from living in Pomona, and thereby impose a substantial burden on the religious exercise of Plaintiff Manes, as well as on the religious exercise of current and potential Orthodox Jewish residents of Pomona, Defendants harassed Plaintiffs in the administration and enforcement of the Village's zoning ordinances and other land use regulation.

52.     Manes did not anticipate, and was not prepared for, the systematic and non-stop level of official disturbance of, and resistance to, his use and enjoyment of his property, his development projects, and his and his family's Orthodox Jewish way of life.

12

53.     As an investor-developer of properties with an Orthodox Jewish client base, Manes was victimized by the Village's denial of community-wide religious freedoms and the Village's denial of fundamental Orthodox Jewish infrastructure including the Village's resistance to synagogues and ritual baths (*mikvehs*) and harassment at places of worship and during Sabbath observances.

54.     Because Defendants harassed and humiliated current Orthodox Jewish residents and invoked pretextual policy and laws to prevent Orthodox Jews from moving in, the demand for Plaintiffs' properties substantially diminished.

55.     Defendants' treatment of Manes was a weaponized utilization of neutral laws and procedures driven by overt religious animus. Defendants' conduct described herein was designed to deter Orthodox Jewish people from moving to Pomona. It thereby deprived Manes of customers for his real-estate development businesses.

56.     Because Defendants were hostile to Plaintiffs' development plans directed to potential Orthodox Jewish customers, they discriminated against Manes and subjected him and TAL Properties to heightened scrutiny.

A.     **22 High Mountain Road**

57.     In late 2015, Manes purchased a residential home at 22 High Mountain Road in Pomona ("22 High"), and other subdivided but underdeveloped properties (the "Subdivided Properties"). Manes intended to develop and market the Subdivided Properties to purchasers, including Orthodox Jews.

13

58.     Over the next few years, continuing to this date, Defendants conducted a concerted, multi-faceted and ongoing effort to harass Manes in order to prevent him from selling to, and attracting, Orthodox Jewish residents to reside in Pomona.

59.     In January 2016, Plaintiffs made repairs to 22 High. Defendant Zummo, the Village Building Inspector, then inspected 22 High on behalf of the Village. On concluding his inspection, Defendant Zummo advised Manes that the repairs met applicable building codes and other regulations and that a certificate of occupancy ("C of O") would issue shortly.

60.     However, at the direction of Defendants Yagel and Ulman, Defendant Zummo delayed issuance of a C of O for 22 High for several months.

61.     Defendants' actions contravened the Village's Construction Code [Chapter 47- 10], which requires prompt issuance of a C of O where, as here, the applicant has complied with applicable code requirements.

62.     Defendants' delay in issuing the C of O was a discriminatory substantial departure from normal procedure.

63.     Defendants Yagel and Ulman ordered the delay in order to prevent Plaintiffs from attracting additional Orthodox Jewish residents to Pomona.

64.     As a pretext to justify the Village's delay in issuing the C of O, Defendants Yagel and Ulman falsely asserted that a prior owner of the property owed the Village $6,379.34 and demanded Plaintiffs pay the prior property owner's alleged outstanding debt as a condition for issuing the C of O.

65.   The purported debt was asserted by Defendants Yagel and Ulman, discriminatorily invoking the Village's land use regulations, to prevent and burden Orthodox Jews, including Manes, from engaging in Orthodox Jewish religious exercise in Pomona.

66.   At no time did Defendants claim that Plaintiffs had incurred this alleged debt. Nor was there any basis for any such claim.

67.   Defendants Yagel and Ulman did not seek to collect the alleged outstanding debt of $6,379.34 from the property's prior owner, a Village of Pomona real estate developer who was not Jewish. Defendants had permitted the prior owner's development bond to lapse without collection although he had failed to develop and complete projects within the Village of Pomona secured by the bond.

68.   The Village's laws do not authorize denial of a C of O because a prior property owner failed to satisfy a debt, particularly where, as was true of 22 High, the property is purchased at a foreclosure sale from a bank.

69.   The Village failed to record the prior property owner's alleged debt as a lien against 22 High before Plaintiffs purchased the property or at any time before nonpayment was asserted as a justification for delaying issuance of the C of O to Plaintiffs.

70.   In August 2018 Defendant Zummo met with Manes and discussed, on tape, various discriminatory actions Defendants had taken against Manes (the "August 2018 Admissions"). In the August 2018 Admissions, Defendant Zummo admitted that Defendants discriminated against Plaintiffs and that the discriminatory treatment departed from normal Village law and policy. Defendant Zummo said that the discriminatory treatment Manes received

was directed by Defendant Yagel, who feared that Manes would bring more Orthodox Jews to Pomona through his real-estate development business.

71.     In August 2018 Admissions, Defendant Zummo admitted to Manes that the alleged bill of $6,379.34 never existed and was a fraud concocted by Defendants.

72.     Defendant Zummo also told Manes that pages had been "added" to his property's file by Defendants Yagel and Ulman, and acknowledged to Manes that Defendant Zummo had informed Ms. Ulman that if the bill had been legal, the fee should still have been no more than approximately $1,500.

73.     Upon information and belief, Defendant Ulman acknowledged to Defendant Zummo that the bill was fraudulent and excessive but that she would not retract it.

74.     Defendants continued through 2016 to invoke land use regulations discriminatorily against Plaintiffs as they sought to sell 22 High, repeatedly concocting false explanations for delay in the issuance of the C of O, which Plaintiffs needed to realize the value of their property.

75.     Plaintiffs sought to grade out steep slopes on 22 High, thereby creating useable backyard space. This would enhance the value of 22 High. Plaintiffs spent substantial time, effort, and expense, in conjunction with Defendant Joseph Corless, the Village Engineer, to develop a grading plan to address the steep slopes.

76.     Defendant Corless initially approved Plaintiffs' grading plan in an email sent to Plaintiffs' engineer. However, at the request of Defendants Yagel and Ulman, Defendant

Corless departed discriminatorily from ordinary procedure and retracted his approval. He imposed costly conditions upon Plaintiffs.

77.     At the direction of Defendants Yagel and Ulman, Defendant Corless administered the Village's land use regulations discriminatorily against Plaintiffs Manes and TAL Properties by imposing costly conditions on Plaintiffs' plan to grade out steep slopes at 22 High.

78.     These conditions were not imposed on the similarly sloped and neighboring properties at 6, 8, 10 High Mountain Road, and 2 Riverview in Pomona, owned by residents who were not Orthodox Jews.

79.     Defendant Corless departed discriminatorily from normal procedure, including but not limited to, requiring Plaintiffs: (i) to post a bond for possible damage to neighboring property; (ii) to conduct unusually complex and expensive tests of the compressed fill they used for grading; and (iii) to pay a heavy application fee in connection with obtaining the grading permit.

80.     Defendant Corless also discriminatorily demanded and required Plaintiffs to prove that Plaintiffs had obtained authorization from the original land surveyor to include a report that was publicly available in the Village property file as part of Plaintiffs' permit application. Such land surveys are routinely relied upon without such authorization. On information and belief, no other residents of Pomona were required to make such a showing.

81.     Even after Plaintiff Manes agreed to satisfy these discriminatory conditions, Defendant Corless still rejected Manes' application and denied Plaintiffs a permit for the grading work.

82.     In a February 6, 2017 conversation recorded at Village Hall, Defendant Yagel and several Village clerks admitted that they are, in fact, legally obligated to refund the exorbitant application fees Plaintiffs paid for the grading permit, but Defendant Yagel said he will not reimburse the fees to Plaintiffs because no formal request for a refund had been made by Plaintiffs' attorney.

83.     Discriminatory delays in issuing required documents and the discriminatory imposition of onerous grading requirements caused a substantial decline in the sales price for Plaintiffs' property at 22 High.

84.     If not for these delays and the incomplete nature of the work occasioned by the Village's selective requirements and enforcement, Plaintiffs would have sold 22 High in early 2016 and used the proceeds so realized for other profitable business opportunities and investments.

85.     Because of Defendants' unlawful discriminatory conduct, Plaintiffs were unable to sell 22 High for the price expected or to recoup the profit anticipated from the purchase and sale of 22 High.

86.     Defendants Zummo, Yagel, and Ulman delayed the issuance of a Certificate of Occupancy in order to delay or prevent Manes from being able to market the property for sale to potential Orthodox Jewish buyers. It was not until late fall 2016, after

Plaintiffs entered into a contract for the sale of 22 High, that Defendants dropped their false claim that Plaintiffs owed fees incurred by the prior property owner and gave Plaintiffs a C of O, without payment of this alleged debt.

87.     Defendants also tried to restrict Plaintiffs' ability to sell 22 High by threatening to retroactively revoke the C of O. Defendants also harassed Plaintiff's Orthodox Jewish buyer, Mr. Lowenbein, by denying him a permit for renovations to the property needed to accommodate his disabled children.

## B.     Subdivided Properties

88.     In addition to 22 High, Plaintiffs also purchased the Subdivided Properties in the same area.

89.     The Subdivided Properties purchased by Plaintiffs Manes and TAL Properties had already been approved for residential use at the time they were purchased.

90.     After purchasing parcels of land in Pomona, Plaintiff Manes went to Village Hall to discuss developing the Subdivided Properties by building homes on them. Plaintiff Manes was told by Defendants Zummo and Ulman that Manes and TAL Properties would never receive permits for residences in Pomona that the Village believed would be sold to Orthodox Jews. Defendant Zummo did not even allow Manes to fill out the building permit application for the Subdivided Properties, telling Manes that it was "a waste of time" and "not happening."

91.     Defendants have denied Plaintiffs the permits necessary for building on the Subdivided Properties on multiple false grounds.

92.     Defendants denied permits and Certificates of Occupancy with respect to the Subdivided Properties in order to prevent Orthodox Jews from residing in Pomona and engaging in religious exercise of the Orthodox Jewish faith within Pomona.

93.     Following the sale of 22 High, Defendants, in a substantial departure from normal procedure, threatened to retroactively withdraw 22 High's Certificate of Occupancy, unless Plaintiffs would sign an agreement falsely acknowledging, *inter alia*, that the road accessing 22 High was not a village road and that its maintenance (and the maintenance of other roads) was the sole responsibility of the property owner.

94.     This was done in order to impede and delay Plaintiffs' ability to sell the Subdivided Properties.

95.     The road accessing 22 High and the Subdivided Properties is, and since before Plaintiffs purchased 22 High and the Subdivided Properties has always been, a public road. Defendants claimed otherwise in order to limit Plaintiffs' ability to develop and market the affected properties to sell to Orthodox Jews and thus to keep Orthodox Jews out of Pomona.

96.     Invoking Plaintiff Manes' refusal to sign such a false document, Defendants prevented Plaintiffs from selling and developing the Subdivided Properties.

97.     The signing of such an agreement was not required by Defendants for the sale and development of any other property in Pomona.

98.     In 2017, Plaintiff TAL Properties filed a lawsuit for declaratory and other relief concerning ownership of the roads in the New York Supreme Court of Rockland County,

*TAL Properties of Pomona, LLC v. Village of Pomona, et al.*, Index No. 031216/2017, which is still pending ("Plaintiffs' *Roads* Case").

99.     Upon information and belief, for at least a decade prior to Plaintiffs' purchase of the Subdivided Properties, the Village exercised dominion and control over the roads leading to the Subdivided Properties and never claimed to previous owners during this time that these were private or that the owner of the Subdivided Properties would be responsible for repairing and maintaining them.

100.    The Village had permitted the prior developer's bond to lapse in January 2007 and the developer had declared bankruptcy. The Village's documented position was that the roads were not owned by individuals.

101.    Prior to Plaintiffs' purchase of 22 High and the Subdivided Properties, Defendant Ulman, the Village Attorney, and her daughter as Assistant Village Attorney, issued a memorandum documenting the Village's legal opinion that Trustco Bank, the prior owner of the Subdivided Properties, did not own the roads. Defendant Ulman also represented to Village trustees that the previous owner, Trustco Bank, did not own the roads.

102.    Only after Plaintiffs purchased the Subdivided Properties from Trustco Bank, Defendants reversed their position and falsely claimed that Plaintiffs owned the roads due to the purchase of the Subdivided Properties. This contradicted the Village's treatment of prior and current owners of similarly situated property on the same and/or similar roads.

103.    Specifically, the Subdivided Properties were only a portion of the properties that adjoined the roads in question, yet no other owner of properties on these roads

was charged by the Village with ownership or responsibility for maintenance for these roads. Only Plaintiff TAL Properties, a company with a business plan to market to Orthodox Jews, and its Orthodox Jewish owner, Plaintiff Manes, were charged by Defendants with ownership and responsibility for these roads.

104.    A developer in a separate part of Pomona failed to complete roads adjoining his properties and defaulted on his bond. Yet the Village maintains those roads as public roads and has never charged the owners of properties adjoining those roads with ownership or responsibility for maintenance of those roads.

105.    Defendant Ulman acknowledged in a deposition that there was no difference between Plaintiffs' properties and similarly situated properties owned by persons who were not Orthodox Jews, and there was no reason to discriminate against Plaintiff Manes in the treatment of the roads. She blamed the Village's Board of Trustees for such disparate treatment.

106.    In Plaintiffs' *Roads* Case litigation the Village has refused to turn over files to Plaintiff Manes that prove Village ownership of the roads. Plaintiff Manes has requested documents under the Freedom of Information law ("FOIL") and by subpoena and other discovery demands. The Village has claimed that such documents do not exist.

107.    At enormous additional time and expense, Plaintiff Manes has tracked over 200 documents that the Village denied existed, including documentation from other villages, towns, municipalities, the highway department, sewage and utility records, to document the falsity of the Village's claims that Manes owns any Village roads.

108.    Defendants also claim falsely that Plaintiff Manes owes for a bill they claim the Village paid for snow removal on these roads. The snow removal bill is a complete fabrication.

109.    The Village has a contract with the Town of Haverstraw for snow removal services on public roads. No portion of the bill is itemized for the roads for which the Village now claims Plaintiffs are responsible.

110.    Defendant Zummo has acknowledged that he reviewed the file and found no evidence of such a snow removal bill. Defendant Zummo asserts that he learned of it from Defendant Ulman and, at the direction of Ulman, there were "notes added" to the file reflecting the supposed bill. Defendant Ulman was requested to submit the snow bill in discovery demands in Plaintiffs' *Roads* Case. She represented that she would do so. To this date, she has not.

111.    Defendants fabricated a snow-removal obligation in order to prevent and delay the use, development and sale of the Subdivided Properties by Plaintiffs and other Orthodox Jews.

112.    The Village of Pomona also submitted a document in Plaintiffs' *Roads* Case that falsely reflected the (changed) Village opinion that the ownership of its roads now belonged to Manes.

113.    Defendants' discriminatory treatment of Plaintiffs has made it impossible for them to exercise their property rights by improving and/or selling the Subdivided Properties, causing Plaintiffs continuing and ongoing harm.

114.     But for the aforesaid false and/or frivolous claims, harassment and other disturbances attributable to Defendants' animus against religious observance of Orthodox Jews, Plaintiffs would have profited from selling and developing already owned properties and purchasing additional properties.

115.     Due to the foregoing actions of Defendants, Plaintiffs lost millions of dollars in anticipated profit and other gain. Plaintiffs continue to this date to be deprived of access to, use, and enjoyment of the Subdivided Properties.

**C.     Other Discriminatory Conduct**

116.     As part and parcel of Defendants' ongoing harassment of Manes, and reflective of a broader pattern of discrimination, Plaintiffs have suffered several other acts of discrimination at the hands of Defendants.

117.     In mid-December 2017, Defendant Zummo, the Village Building Inspector, issued a baseless stop work order ("SWO") for a project on the driveway at Plaintiff Manes' home at 8 East Court in Pomona. A permit had been issued for the project, and no work was being performed when Defendant Zummo came to deliver the SWO. The SWO had already been filled out at Defendant Yagel's request before Defendant Zummo even came to the site.

118.     Upon information and belief, Defendant Zummo saw no work performed, but nonetheless served the SWO based upon hearsay from a neighbor.

119.     Upon information and belief, there was no expiration date on the original work permit, and such a date was fraudulently entered by someone in the Village administration.

Armed with a doctored "expiration date," and under the pretext that the permit issued for the driveway project had "expired," Defendant Zummo issued the SWO.

120.    Defendant Zummo has acknowledged that Defendant Mayor Yagel directed Defendant Zummo to issue the SWO against Plaintiff's property at the behest of Salman Dar, a non-Jewish neighbor of Plaintiff Manes.

121.    Upon information and belief, Mr. Dar gained considerable favor with Defendant Mayor Yagel when he expressed his intention to keep Orthodox Jews out of Pomona and attempted to purchase five lots in Pomona to achieve that end. Upon information and belief, the seller of the five lots canceled the sale after hearing of Dar's discriminatory motive.

122.    Defendants took no action when Mr. Dar constructed two large pillars with his name and address at the entrance to a road that leads to his neighbor's home, in violation of the Village Code.

123.    Defendant Zummo acknowledged that the Village Code did not permit Mr. Dar to place the pillars there, and that no permit had been issued for the pillars. At Defendant Yagel's instruction, Defendant Zummo stood by and did not issue a violation to Mr. Dar.

124.    Defendants also refused, in contrast to the state and county, to issue a property tax refund to Plaintiff Manes, even after the Village received court orders directing it to reduce the assessment on the property.

125.    Plaintiff Manes inquired by email why he had not received the court-ordered tax reassessment and refund. The Village responded that the tax grievance was

applicable only prospectively and not to current and/or past fiscal years. On information and belief, this discriminatorily contradicted previous and current practice with residents of the Village who are not Orthodox Jews.

126.     Defendants used numerous tactics as part of their discriminatory efforts to hinder and prevent Orthodox Jews from moving into Pomona and developing a larger practicing Orthodox Jewish community. Among other things, these tactics included harassing and intimidating existing Orthodox Jewish residents, discouraging Orthodox Jews from purchasing property in Pomona, interfering with real estate professionals who are Orthodox Jews or who develop or market property to Orthodox Jews, and discouraging property owners from selling property in Pomona to Orthodox Jews.

127.     Aware that Plaintiff Manes is an Orthodox Jew and that Plaintiffs' business objective was to purchase, develop and sell property in Pomona to Orthodox Jews, Defendants engaged in all of these tactics and more against Plaintiffs.

128.     At some point, Defendants learned that Plaintiffs were negotiating to purchase property in Pomona from Janet Chernikov. Plaintiffs sought to purchase the property to develop, market and sell to Orthodox Jews. When the negotiations for the property became serious were on the verge of closing, Ms. Chernikov abruptly broke off the negotiations.

129.     Ms. Chernikov explained to Plaintiff Manes that Defendant Ulman had contacted her and told her Plaintiff Manes owned certain Village roads, and that he intentionally caused land to be undervalued in order to purchase it at a lower price from Ms. Chernikov. Of course, the information Defendant Ulman conveyed to Ms. Chernikov was false. Nevertheless,

Ms. Chernikov refused to continue negotiating with Plaintiffs, and she sold her property to non-Orthodox-Jewish buyers.

130. Defendant Ulman acknowledged in a deposition of July 19, 2018 in Plaintiffs' *Roads* Case that she had contacted Ms. Chernikov about the proposed sale of property to Plaintiffs, and asserted that Defendant Ulman had never previously done this in other transactions.

131. As a result of Defendant Ulman's interference, Plaintiffs lost out on a transaction worth millions of dollars.

132. As described below, at the direction of Defendant Yagel, Defendants Arsa-Artha and Defendant Shea discriminatorily delayed and impeded Plaintiffs' and other Orthodox Jews' requests for services from the Village.

133. Defendant Yagel instructed Defendants Zummo, Arsa-Artha, and Shea to delay service to Orthodox Jewish residents, including by pushing off and rescheduling building inspections, and waiting as long as possible to release records requested by Orthodox Jews.

134. Defendant Shea testified that Defendant Arsa-Artha commented to her repeatedly that Orthodox Jewish residents were impatient and wanted service more quickly than she wished to provide it.

135. Defendants also discriminated against Plaintiffs in deliberately delaying and refusing to provide documents to Plaintiffs in response to FOIL requests needed for business and other purposes.

136. Defendant Shea testified that Defendants Yagel and Zummo repeatedly directed her to slow down the processing of applications, responses to FOIL requests or any other service she was engaged in performing for Hasidic or Orthodox Jewish people. She testified that: "In many instances, including but not limited to, [Plaintiff Avrohom] Manes, [Orthodox Jewish developer] Hirskowitz, [and Orthodox Jewish residents] Indig and Klein, Jewish applicants had to wait extensively for approval of permits."

137. Defendant Shea testified that her complaints of anti-Semitism "went to the core of the Village," and that she "understand[s] that some in the Village were deeply concerned that Pomona would be 'overtaken' by Orthodox/Hasidic families."

138. When explaining the backlog in permits at the Village, Defendant Shea testified: "You felt this anti-semitism. They're taking over. They're taking over the village. The Orthodox are taking over the village. It was a slow-down process."

139. In a March 21, 2017 recording in Village Hall, Defendants criticized Defendant Shea for being "friendly and nice" to Plaintiff Manes on one occasion when he sought documents from the Village.

140. On another occasion, Defendant Shea called Plaintiff Manes to tell him that she could not process his requests without pre-payment in person because she could not "trust [Manes] with money." Plaintiff Manes heard laughter in the background when Defendant Shea made this statement to him. Defendant Shea later told Plaintiff Manes that Defendants Yagel, Zummo, Corless and others had seen Plaintiff's FOIL request and told her to humiliate him, and that Defendant Yagel and others were laughing in the background when she made the antisemitic statement to Plaintiff that she could not trust him with money.

28

141.    Collectively and individually, Defendants' discriminatory actions against Plaintiffs constituted intentional unlawful discrimination under color of law motivated by religious animus against a member of a statutorily protected class.

142.    Defendants' discriminatory conduct towards Plaintiffs was part of Defendants' program of hostility to Orthodox Jews designed to suppress and burden religious exercise of Orthodox Judaism in Pomona, as described herein.

**DISCRIMINATION AGAINST POMONA'S ORTHODOX JEWISH RESIDENTS**

143.    Defendants' conduct against Plaintiffs was caused and driven by anti-Orthodox Jewish animus.

**A.      The Anti-Orthodox-Jewish Agenda**

144.    Pomona is a small village nestled next to the Cheesecote Mountain in a bucolic section of Rockland County. Founded in 1967, the Village, which is located partly in the town of Ramapo and partly in the town of Haverstraw, occupies a total of approximately 2.4 square miles and has an estimated population of 3,353, of which, upon information and belief, a minority are Orthodox Jews.

145.    The Village has had a history of taking actions to discourage and prevent the building of Orthodox Jewish institutions and growth of an Orthodox Jewish community within the Village and in nearby areas.

146.    As early as 1996, the Village opposed the expansion of Bais Yaakov, an Orthodox Jewish yeshiva in Ramapo. The Village wrote a letter in opposition to the expansion,

attended a Ramapo meeting and read an opposition statement, challenged the expansion in court, and encouraged Village residents to object to the expansion.

147.    In 1999, the Village did not object to the "Anna Mann" property becoming an assisted living facility, but then when it was later proposed that the property be used for an Orthodox Jewish yeshiva, the Village did oppose the development.

148.    In 2004, when Ramapo adopted the Adult Student Housing Law ("ASHL"), which permitted married adult student multi-family housing for Orthodox/Hasidic Jews in residential zones throughout the unincorporated portion of Ramapo, the Village opposed and challenged the law, claiming that the ASHL "pandered" to Orthodox Jewish voters.

149.    The Village also opposed the development of three Orthodox Jewish yeshivot outside of the Village.

150.    Recently, District Judge Kenneth M. Karas determined that the Village intentionally discriminated against Orthodox Jews in an effort to deter them from moving into Pomona by enacting unconstitutional local laws in 2001, 2004, and 2007. *Cong. Rabbinical College of Tartikov v. Village of Pomona*, 280 F.3d. 426 (S.D.N.Y. 2017), *aff'd in part*, 945 F.3d 83 (2d Cir. 2019).

151.    Before becoming mayor of the Village of Pomona, Defendant Yagel was elected a Village trustee in 2007 on an express platform of preventing the Tartikov Orthodox Jewish rabbinical college from building in the Village. In the run-up to the election, Defendant Yagel co-authored a letter to a local newspaper lamenting the arrival of "homogeneous

individuals," meaning Orthodox Jews, which he said was not a "natural progression" for the Village.

152. After becoming mayor, Defendant Yagel used his position to implement a program and policies to discourage and deter the growth of an Orthodox Jewish community in Pomona.

153. Over the past decade, and increasingly in or around 2015, Hasidic and other Orthodox Jews have moved to Pomona from neighboring communities. This triggered a hostile reaction from the Yagel Administration. Orthodox Jews did not, and do not, receive equal treatment from Defendants, as described in detail below. Instead, they faced persistent and intentional discrimination from Yagel and other Village employees, acting at his direction.

154. As detailed in the Court of Appeals' *Tartikov* decision, Village personnel disparaged how Orthodox Jews run their businesses. Code words were employed in the Yagel Administration, such as "homogeneous individuals" and "the make-up of the village." In fact, Defendant Mayor Yagel and his associates simply did not want to see Orthodox Jews moving to, and living in, Pomona.

155. Defendant Noreen Shea, formerly Deputy Village Clerk in the Yagel Administration, was initially a participant in this anti-Orthodox-Jewish campaign, following the instructions of Defendants Yagel, Arsa-Artha and Zummo to discriminate against and delay services to Orthodox Jews.

156. Even in her own recordings, Defendant Shea frequently participated in the stereotypical and derogatory rhetoric against Orthodox Jews, and by her own admissions she

herself carried out discriminatory actions against Plaintiff Manes and other Orthodox Jews. She claims she was doing so at the direction of Defendants Yagel, Arsa-Artha and Zummo and was only following orders.

157.    Defendant Shea later became a whistleblower, revealing that code words and phrases were employed by various Defendants to describe Orthodox Jews, their property, and their religious observances. These coded references included referring to Orthodox Jews as "corporation members" and "people living on the hill," calling their properties "LLCs," and designating their prayer groups as "business meetings."

158.    Defendant Yagel referred to Orthodox Jews as "them" or "those people."

159.    Defendants distinguished between Orthodox Jewish residents and non-Jewish residents. For example, in a recording of February 6, 2017, at Village Hall, Defendants described Birch Street as a "sea of yarmulkes," while lamenting that a non-Jewish resident of that street was "the last one on the block."

160.    Defendant Yagel and other Village personnel threatened, with no factual basis, among other things: (i) to call the police, health and fire departments and send Orthodox Jews to jail; and (ii) to impose severe fines and violations against Orthodox Jews on false and frivolous code citations.

161.    Defendant Yagel himself, without any legitimate basis, contacted the United States Internal Revenue Service to request the Government to conduct an audit of Plaintiffs.

162.    The Village, under the direction of Defendant Mayor Yagel and through the actions of Yagel and the other Defendants, actively sought to prevent the increase of Orthodox Jewish residents in Pomona.

163.    Defendants Yagel and Harris often received complaints against Orthodox Jews from long-time residents of Pomona. Defendants Yagel and Harris conveyed these complaints to Defendant Zummo and other Defendants with direction to investigate and take action against the Orthodox Jews who were the subjects of the complaints. Many of these complaints related to Orthodox Jewish prayer meetings or other religious practices.

164.    The Defendants' anti-Orthodox-Jewish agenda resulted in the discriminatory application and enforcement of the laws, policies, and procedures of the Village.

165.    At Defendant Yagel's direction, Orthodox Jewish residents were subjected to discriminatory ticketing for minor, unusual and even false code violations such as leaf disposal, dog waste, and a ticket for a plastic Toys 'R' Us pool (ostensibly for constructing an illegal pool without proper approval). When two residents on the same block had the same amount of leaves on their yard, the Orthodox Jew was ticketed while the non-Orthodox-Jew was not. An Orthodox Jew ticketed for dog-waste did not even own a dog. The overall list of violations and enforcement disproportionately targeted Orthodox Jews.

166.    Village Clerk Lisa Thorsen has acknowledged that before the influx of Orthodox Jewish residents in or around 2015, the Village did not routinely enforce minor code violations.

167.    Defendant Ulman testified in Plaintiffs' *Roads* Case that the Village had no code enforcer and did not enforce tickets, and that she refused initially to prosecute such violations when the Village decided to start enforcing them and targeted Orthodox Jews.

168.    Defendant Yagel then recruited and hired Defendant Christopher Riley to prosecute code tickets as "Special Prosecutor," despite the fact that, upon information and belief, the expense of paying Defendant Riley to prosecute tickets far exceeded the sums that could be collected from the fines collected.

169.    Defendant Riley also carried out many other tasks at Defendant Yagel's direction unrelated to his official position as "Special Prosecutor." Defendant Riley effectively became Defendant Yagel's agent to engage in discriminatory tactics against Orthodox Jews, particularly the more openly dishonest tactics that Defendant Ulman was not comfortable carrying out.

170.    For example, at Defendant Yagel's direction, Defendant Riley appeared at a Pomona Zoning Board of Appeals ("ZBA") hearing in June 2018. Defendant Ulman had refused to advise the ZBA improperly and falsely to dismiss as untimely an appeal brought by Orthodox Jewish resident Robert Klein regarding a stop work order on construction at his home. As Village Attorney, Defendant Ulman was the official attorney for the ZBA, but Defendant Riley made an appearance at the hearing without prior notice to Defendant Ulman to circumvent her refusal and to falsely assert that Mr. Klein's appeal was untimely. As a result, the appeal was dismissed.

171.    [Deleted]

172.     In an "off-the-record" conversation at her deposition in Plaintiffs' *Roads Case*, Defendant Ulman conceded that there had been discriminatory acts administered by Defendant Village of Pomona and Mayor Yagel, that certain residents' lives were made miserable by Defendants' discriminatory tactics, and that Defendant Ulman had resigned from the Zoning Board because of those tactics.

173.     Defendant Zummo also personally admitted this targeted enforcement to Plaintiff Manes in a recorded conversation in or around August 2018.

174.     As the Orthodox Jewish community grew, the Village accelerated its targeted enforcement against Orthodox Jews. It enlisted and deputized Defendant Zummo, the Village Building Inspector, and deputized and hired another special code enforcer, Fred Voile, to target and harass Orthodox Jewish residents with intentionally discriminatory ticketing and prosecution.

175.     Upon information and belief, after Mr. Voile refused to continue selective enforcement against Orthodox Jews, Defendant Yagel then hired Katherine Tolf, who was also directed by Defendant Mayor Yagel to target Orthodox Jews for violations.

176.     Upon information and belief, in one instance Ms. Tolf trespassed upon the property of Orthodox Jewish resident David Horowitz on 108 Overlook, entering the house without permission. She threatened to issue violations for "illegal kitchen renovations." Ms. Tolf's "proof" was a cardboard oven box found outside the home. There was, in fact, no illegal renovation and no basis for any violation. Upon information and belief, Ms. Tolf was directed by Defendant Yagel to subject Mr. Horowitz to increased scrutiny and possible violations because he was hosting an Orthodox Jewish prayer gathering next door at 110 Overlook.

177. Upon information and belief, Ms. Tolf and Mr. Voile ultimately resigned because they did not want to continue issuing code violations against Orthodox Jews in a discriminatory fashion as Defendant Yagel had directed.

178. By making many of the amenities central to Orthodox Jewish life impractical and financially unfeasible, Defendants discouraged and hindered Orthodox Jews who would have moved to Pomona from doing so.

179. An Orthodox Jewish lifestyle depends upon being within walking distance of a synagogue and proximity to others practicing Orthodox Judaism. Orthodox Jews seek "a Torah Community" to facilitate compliance with *Halacha*, Jewish religious law.

**B.     Recorded Conversations**

180. Plaintiffs possess tapes demonstrating the extent of anti-Orthodox-Jewish animus within the Yagel Administration.

181. Nearly sixty (60) hours of conversations among Defendants were recorded at Village Hall. They were recorded by whistleblower Defendant Shea and confirm the Yagel Administration's discriminatory intent and discriminatory actions vis-a-vis Orthodox Jewish residents, including Plaintiff Manes.

182. Defendant Shea testified that Defendant Yagel told her to record the Orthodox Jews when they came into the office. After doing so on several occasions, Defendant Shea also began recording the other Village employees in the office as well.

183. On October 5, 2016, Defendant Shea recorded an extensive conversation between herself, Defendant Zummo and Defendant Arsa-Artha, in which the three disparagingly

described Orthodox Jews in demeaning and stereotypical ways, denigrating not only Orthodox Jews but their religion and religious practices as well.

184.    The statements of Defendants Shea, Zummo, and Arsa-Artha in the October 5, 2016 recording include, among others, the following descriptions of Orthodox Jews:

- Orthodox Jews are referred to as having "irritating customs"; "disgusting" practices; and "many rules and obligations", due to their adherence to "ancient," "Old Testament" laws;

- Orthodox Jews are disparaged for "archaic" practices, such as: (a) men avoiding certain bodily contact with women (ritual family purity laws); (b) having two sinks in the house, for separating meat and dairy foods (Jewish dietary laws ("Kashrut")) (also discussed by Defendants with respect to an application by a Jewish family to enlarge its kitchen to conform to Kashrut, April 26, 2017); and (c) disparaging the appearance of Jewish women, who wear wigs that make them look "identical" (modest religious dress);

- Orthodox Jews are mocked for adhering to religious strictures on the Sabbath, described by Defendants as "the dumbest [expletive] thing ever heard" and "pure stupidity"; and

- Orthodox Jews are ridiculed as maintaining poor personal hygiene and needing to shower more frequently.

185.    In the October 5, 2016 recording, Defendants Shea and Arsa-Artha discussed "touching" Orthodox Jewish men. Defendant Shea remarked, "You know you can't touch, like, if I touch a Hasidic [Shea makes alarming noise]...I mean that's just crazy, but even if I just bump into them by accident..." Defendant Arsa-Artha interrupted: "They have to shower for seven days if you touch them." Defendant Shea responded: "Well they should shower every day, so we should run around and touch them all!" Defendant Arsa-Artha then stated: "I told you I had a friend who used to pay girls to go up to Hasidic men in the mall to touch them and pay them twenty bucks just to watch them freak out."

186.    In the October 5, 2016 recording, Defendant Zummo exclaimed "how stupid Jews are" and stated that "half of" the Orthodox Jews "are inbred morons with retarded babies." Defendant Arsa-Artha stated that Orthodox Jews are "genetically unstable."

187.    In the October 5, 2016 recording, Defendant Zummo bragged that he argued with a Jewish fire inspector over whether Jews are the "Chosen People," and that Defendant Zummo stated: "I'm Italian...the Italians have been around forever...the Italians came mostly from the Egyptians...your people were our slaves...didn't they live in the desert with the Egyptians whooping the [expletive] out of them?"

188.    In other recordings, Defendants described Orthodox Jews as a "sea of yarmulkes" (February 6, 2017), Defendants stated that Orthodox Jews "work in groups" to "take over and control" (April 10, 2017), and Defendants stated that Orthodox Jew are "unintelligent," and "they don't read." (March 3, 2017).

189.    In the recordings, Defendants talked about a "Jewish mentality," that they perceived as contrary to Village interests ("Jews are all interconnected and don't do anything outside the tribe") (March 3, 2017), and Defendants repeated anti-semitic canards about Jews' collective and individual love of money (October 5, 2016).

190.    The recordings reflect Defendants' hostility to Orthodox Jews and reveal Defendants' motive in discriminatorily administering the Village's laws against Orthodox Jews including Plaintiff Manes.

191.    In a February 13, 2017 recording, Defendant Zummo discussed an upcoming meeting with the United Talmudical Association ("UTA"), an Orthodox Jewish

organization that was seeking approval for a school at the site of a former camp. Defendant Zummo described himself as "the mean [expletive] stopping them from doing it," and mocked the UTA representatives in a stereotypical Orthodox Jewish accent.

192.    Defendant Zummo bragged about using his position as Building Inspector to block Jewish institutions, even stating wearing a "Hitler-was-right hat."

193.    In a recorded discussion with Defendant Yagel on March 1, 2017 concerning giving multiple violations to a Jewish woman, Defendant Zummo stated: "The Jewish mentality works that way – you can be told every day and they go back and do what they want to do anyway...you are restricting them...they are like six-year-olds."

194.    In a recording from March 3, 2017, after receiving a complaint regarding an ambulance parked in Pomona, Defendants Arsa-Artha and Zummo stated that Orthodox Jews use ambulances as a "chauffeur" to shuttle rabbis around to bring them from Brooklyn to Kiryas Joel.  Defendant Zummo stated that "they use the lights and sirens to pass everybody" and "they get away with it all the time." He stated that on certain highways on Fridays, "if you stops an ambulance and open the back, you'll find a rabbi inside."

195.    Many of the recorded conversations regarding Orthodox Jews concerned their building requests, applications for municipal services, and requests by Orthodox Jews for access to public information.

196.    Village employees "found" code violations in apartments of Orthodox Jews, stating it was "just like them" to use a residence as an "illegal apartment." Onerous tree removal ordinances were created to be enforced only against Jews (even when the trees were

diseased and a threat to safety): "Jews hate trees … do not want to maintain anything around there." (March 31, 2017 recording).

197.    Defendants' harassment of Orthodox Jewish residents was designed to dissuade Orthodox Jews from coming to Pomona. In a March 21, 2017 recording, a Village official said of one Orthodox family requesting leave to have a spa pool and trampoline in their yard: "We need to deny it or we will have 4000 Orthodox coming up from Brooklyn."

198.    Defendants invoked the Village's building and code ordinances as a means of discouraging current residents from selling their properties to Orthodox Jews. "Physical interior inspection" was introduced as a means of hindering sales of property to Orthodox Jews.

199.    Before there was an influx of interested Orthodox Jewish home purchasers, title companies or prospective buyers did only a "violation search" on property. There was only a review of records and a limited exterior inspection. Interior inspection became a condition to clear title in order to thwart or delay the sale of homes to Orthodox Jews.

200.    Defendants overlooked basements or renovations of long-term Pomona residents until they attempted to sell their property to an Orthodox Jew. At that time, they were subjected to an invasive and potentially costly code-enforcement process in order to hinder their sale to Orthodox Jews.

201.    A February 1, 2017 recording contains a discussion between Defendants Yagel and Zummo regarding the house of non-Jewish resident Peter Obey at 2 Riverview Court. Mr. Obey was in the process of selling his property to Dr. Friedman, an Orthodox Jew.

202.    Defendant Yagel directed Defendant Zummo to issue a stop work order ("SWO"). When Defendant Zummo advised that "we did not issue it to Obey," Defendant Yagel replied, "We did not know he [Obey] was selling."

203.    According to the New York State Division of Human Rights ("HRD") investigation into Defendant Shea's whistleblower complaint, a long-time resident who was not an Orthodox Jew was allowed to continue using her renovated basement so long as she does not "sell the property." Robert Klein, the Village's first Orthodox Jewish member of the Board of Trustees, was denied permission to build a basement because it would purportedly be "just like them" to use it as an "illegal apartment." (March 31, 2017 recording).

204.    Defendants enacted and applied other facially neutral laws to discriminate against Orthodox Jews.

205.    For example, Defendant Zummo saw Local Law 121 (the "Tree Law"), which prohibited any tree removal activity without obtaining a permit from the Village, as an ordinance that was particularly effective as a tool to harass and/or intimidate Orthodox Jews. In a conversation with Defendant Yagel regarding the Tree Law, Defendant Zummo stated: "Jews hate trees . . . do not want to maintain anything around there." Defendant Zummo added that Orthodox Jews "clear anything that grows," and asserted: "This is the way of the Orthodox . . . don't want anything near my house, nice big yard for kids to play in."

206.    Among other things, the Tree Law also had the effect of preventing Orthodox Jewish families from extending and/or renovating their homes to meet their families' needs, including enlarging their kitchens to conform to the dietary-law kashrut requirements of Orthodox Jewish practice. To actively enforce the Tree Law, Defendant Yagel personally drove

41

around the Village, searching for any potential tree violations at Orthodox Jewish homes. He threatened one such Orthodox Jewish homeowner with imprisonment.

207.     The Tree Law was motivated by discriminatory animus against Orthodox Jews and their religious observance. It deterred Orthodox Jews from residing in Pomona and thereby damaged Plaintiff's real estate development business because it depended on sales to Orthodox Jewish buyers.

208.     Another example is the Village's Local Law 104, which requires Village homeowners to declare if 10% or more of the house is owned by a limited liability company ("LLC"). The disclosure must state whether the property was being rented, and to whom.

209.     Plaintiff Manes and other Orthodox Jewish residents of Pomona viewed Local Law 104 as unconstitutional and in excess of state disclosure requirements.

210.     Local Law 104 had the intended effect of harassing Orthodox Jewish owners of homes in Pomona because the Yagel Administration believed that "LLC" was the preferred corporate form of Orthodox Jewish property ownership. The required public disclosure would enable Defendants to identify, scrutinize and prosecute Orthodox Jewish property owners and enable Defendant Zummo to impose large fines on Orthodox Jews for failure to comply.

211.     Upon information and belief, the purpose of the law was to threaten and harass Orthodox Jews, via exceedingly large fines for ongoing non-registration, to be enforced in a discriminatory way by Defendant Zummo, the Village Building Inspector. The law was designed and based on discriminatory animus and was intended to keep out, harass, and intimidate Orthodox Jews.

C.      **Impeding Sabbath Observance**

212.    Maintaining the Sabbath's sanctity and tranquility, including communal prayer services and other communal observances from sundown on Friday to nightfall on Saturday, is a fundamental component of Orthodox Jewish practice and belief.

213.    Orthodox Jews may not drive (or even move their cars) on the Sabbath or use any form of motorized transportation. Pomona's Orthodox Jewish residents have to walk in the street on Saturdays because many Pomona streets have no sidewalks. Cars owned by Orthodox Jews are likely, therefore, to be parked overnight on Fridays, in violation of overnight parking ordinances in Pomona.

214.    Defendants targeted the Orthodox Jewish community for disparate treatment through selective ticketing of Orthodox Jewish residences and synagogues.

215.    The HRD report notes that the investigator reviewed emails from Defendant Yagel to Defendant Zummo ordering Defendant Zummo to issue violations on Saturdays.

216.    Defendant Zummo acknowledged to the HRD inspector that Defendant Yagel instructed him to perform garbage inspections "on the weekend." This had the desired effect of targeting Orthodox Jews for petty garbage violations because lavish Sabbath meals generate more garbage. One Orthodox Jewish resident received a ticket for a garbage/recycling violation at 4:25 am on Saturday as part of a pre-dawn ticketing blitz ordered by Defendant Mayor Yagel to target Orthodox Jewish residents.

217.     Defendant Zummo acknowledged in the August 2018 Admissions, and in a September 13, 2018 telephone conversation, that Defendant Mayor Yagel had ordered Defendant Zummo to perform "shul patrols" on Saturdays to selectively target Orthodox Jews. In an email dated Saturday, July 16, 2017, 8:43AM, Defendant Zummo reported to Defendant Yagel that he had issued 19 garbage and 18 parking violations that morning.

218.     Cars of non-Orthodox-Jewish residents, including those of Village officials, were, on information and belief, not ticketed even though they violated the parking ordinance. The Village has not engaged in *any* overnight enforcement activities in general or against any group other than Sabbath-observing Jews.

219.     Aside from "shul patrols" Defendant Zummo was a part time building inspector on contract to work only 15-17 hours per week, and never on weekends. Defendant Zummo acknowledged in the August 2018 Admissions that the Village did not have enough money to pay him for his routine building department work, but Defendant Yagel threatened to terminate his employment if he failed to harass Orthodox Jewish residents on the Sabbath.

220.     Defendant Mayor Yagel directed Village personnel to call police to cite Orthodox Jews for "jay walking" on the Sabbath even though many streets had no sidewalks or crosswalks.

221.     Defendant Zummo informed Plaintiff Manes that Defendant Yagel became extremely irritated whenever he saw Orthodox Jews walking on the streets in Pomona on Saturdays in traditional Orthodox Jewish dress, particularly when they were leaving prayer groups held in private homes.

222.    The Yagel Administration: (i) actively harassed and discriminatorily targeted Orthodox Jewish owned residences; (ii) targeted prayer groups held in Orthodox Jewish homes with selective enforcement of code violations, and (iii) asked police to intimidate Orthodox Jews walking or congregating in public space on the Sabbath with jay-walking violations.

### D.    Whistleblower's Disclosures

223.    In June 2018 the New York State HRD issued a report corroborating many allegations of this complaint.

224.    Defendant Noreen Shea is a non-Jewish former Deputy Clerk in the office of Pomona's Village Clerk. She participated initially with the Village's discriminatory treatment of Orthodox Jewish residents, but ultimately objected. Shea is seeking damages before the HRD for being fired by Defendant Mayor Yagel.

225.    The HRD found "probable cause to support" Defendant Shea's allegations and ordered the matter to proceed to a public hearing before an administrative law judge. Defendant Shea elected instead to pursue her claims in a federal employment discrimination lawsuit, currently pending in this District. *Noreen Shea v. Village of Pomona*, S.D.N.Y. No. 18-CV-11170 (CS) (filed Dec. 13, 2018).

226.    Defendant Shea revealed to the HRD what she described as Defendants' "hidden agenda against Jewish residents." She stated, "***If anyone dares tell me there is no religious discrimination in the Village of Pomona, they have not worked a day in the building department***." (emphasis added).

227.    Defendant Shea itemized the following:

- Defendant Mayor Yagel suggested that Defendant Shea place non-kosher pork rinds on the public counter of the Village clerk's office to deter Orthodox Jews from seeking access to municipal services;

- Village building inspector Defendant Zummo mocked Orthodox Jewish residents through "comical" imitations of them, disparaging them as "carrying on" when they were denied services; and

- The Village government targeted the Orthodox Jewish community "for disparate treatment" through "selective ticketing of Jewish residences" and prayer gatherings.

228.    Defendant Shea alleged that her refusal to further participate in such discriminatory treatment of Orthodox Jewish residents led Defendant Mayor Yagel to retaliate against her.

229.    Defendant Shea described the Village office under Yagel as being an "anti-semitic atmosphere."

230.    Defendant Shea testified that Defendant Zummo explained to her that there are four of five levels of Jews, and "the lowest are the real Hasids" and he did this "whole impression" of them.

231.    Defendant Shea testified that she heard Defendant Yagel make derogatory comments about a number of Hasidic/Orthodox developers and landowners, including but not limited to Plaintiff Avrohom Manes, Indig, Klein and Hirskowitz, including stereotypical comments that typically involved the desire to violate the law for the sake of making money.

232.    Defendant Shea alleged that Defendant Mayor Yagel disparaged her to Defendant Ian Banks as a "***Jew Lover.***"

233.    Defendant Shea and Defendant Ian Banks, previously a Village Trustee and now Mayor, acknowledged that Orthodox Jewish residents faced arbitrary and unjustified delays in the issuance of building permits and Certificates of Occupancy.

**E.    Judicial Findings**

234.    In another recent federal lawsuit alleging discrimination by the Village against Orthodox Jews, United States District Judge Kenneth M. Karas conducted a bench trial and entered factual findings that are similar to and support many of the allegations in this Complaint. *See Congregation Rabbinical College of Tartikov v. Village of Pomona*, 280 F. Supp. 3d 426 (S.D.N.Y. 2017).

235.    Judge Karas found that the Village passed local ordinances to prevent a rabbinical college from coming to Pomona, and that the purpose of the local ordinances was to prevent the growth of Pomona's Orthodox Jewish community. Judge Karas said: "There is no escaping the fact that . . . Defendants passed the Challenged Laws to thwart the spread of the Orthodox/Hasidic Jewish community" into Pomona. *Id*. at 455.

236.    Judge Karas' findings of discrimination by the Village were affirmed, in part, by the United States Court of Appeals for the Second Circuit. *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83 (2d Cir. 2019)

237.    Defendant Mayor Yagel was a named defendant in the *Tartikov* lawsuit, and Defendants Yagel and Ulman were both trial witnesses. Judge Karas found that the defendants' "intended purpose was to thwart the development of the rabbinical college because it was proposed by Orthodox/Hasidic Jews." *Congregation Rabbinical College of Tartikov*, 280 F. Supp. 3d at 493.

238.     In his ruling, Judge Karas stated that he did not credit Defendant Yagel's testimony "that the law was not adopted to discriminate against Tartikov because Yagel made discriminatory comments leading up to the adoption of the law." *Id.* at 465. Judge Karas further stated that he did not credit Defendant Yagel's testimony that he was not aware of the wetlands on the property at issue, noting that Yagel's testimony was "demonstrably false" because Yagel has discussed the existence of wetlands on the property prior to his election. *Id.*

239.     Judge Karas also found less than credible Defendant Ulman's testimony as a trial witness in *Tartikov*, claiming that the Village's motivation behind its enactment of laws was neutral and not intended to discriminate against Orthodox Jews. *Id.* at 463-465.

240.     In an earlier ruling in the *Tartikov* case, Judge Karas found that Defendant Yagel participated in directing Village employees to destroy evidence of discrimination. Judge Karas held that this was the "rare case where bad faith and a clear intent to deprive Plaintiffs of the evidence... is sufficiently clear." *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 389 (S.D.N.Y. 2015).

241.     Judge Karas' findings in the *Tartikov* action regarding Defendants' discriminatory actions towards Orthodox Jewish residents in building and code enforcement, willful destruction of evidence, and other findings of discrimination affirmed on appeal by the Court of Appeals are binding on the Defendants under the doctrine of non-mutual collateral estoppel.

242.     Decisions in other litigation also establish anti-Orthodox-Jewish animus by officials of the Village government. For example, the *Indig* case, the HRD proceedings, the *Shea* case, and Plaintiffs' *Roads* Case (collectively, the "Related Actions") all provide substantial

evidence documenting the anti-Orthodox-Jewish animus and discriminatory application of Village laws.

## **DEFENDANTS' COVER-UP AND CONCEALMENT**

243.    Defendants Yagel, Ulman and Zummo, assisted by other Defendants, have: (i) destroyed, falsified, hidden and otherwise denied access to incriminating information; (ii) denied meritorious building permits arbitrarily and discriminatorily, and (iii) given false testimony at depositions.

244.    The HRD investigation of Defendant Shea's complaint, discovery in Related Actions, recordings at Village Hall, and Admissions from Defendants Shea, Zummo, Ulman, Yagel, and Banks, prove that the Village maintained an unofficial standing policy of making it expensive, time consuming, burdensome and humiliating for Orthodox Jews to conduct Village business with Village Hall, including obtaining unaltered records of their public property files.

245.    The HRD findings of probable cause support the conclusion that the Yagel Administration instructed Village employees to obstruct and delay freedom-of-information requests and access to property and other Village records.

246.    Village officials (i) deleted, (ii) altered and (iii) forged public records, including Plaintiff Manes' property records.

247.    Defendants' motive was to prevent and hinder Orthodox Jews' purchase of homes or property in Pomona.

248. In a February 24, 2017 recording at Village Hall, Defendants Yagel, Zummo, Arsa-Artha and Shea openly discussed not providing documents to Orthodox Jews in response to FOIL requests and the potential legal consequences of refusing to provide documents and lying to Orthodox Jews about whether the documents existed or regarding reasons for delays. Defendant Yagel responded: "You will be protected by the insurance and receive attorneys."

249. Defendant Zummo acknowledged in August 2018 Admissions that Defendants Ulman and Yagel advised Defendant Zummo to delete text messages. Defendant Yagel also instructed Village personnel to delete Facebook posts by Village employees. Defendant Yagel was sanctioned by Judge Karas in the *Tartikov* litigation for spoliation of evidence by instructing employees to delete antisemitic Facebook posts.

250. In his August 2018 Admissions, Defendant Zummo acknowledged instructions from Defendants Ulman and Yagel to destroy or otherwise alter evidence while the HRD investigation was ongoing. Defendant Zummo also acknowledged that Defendant Ulman had directed him to delete text messages from Zummo's phone anticipating that the phone might be searched for documents relevant to discrimination claims.

251. Defendant Zummo repeated his admissions in a September 13, 2018, phone call to Plaintiffs' then-attorneys, Messrs. Bradley Nash and Solomon Klein, while Zummo's attorney, Glenn Jones, and Plaintiff Manes were listening. In the same conversation, Defendant Zummo apologized for lying at the urging and instruction of Defendants, including, lying under oath at depositions during the HRD investigation and during Plaintiff's *Roads* Case.

252.     On information and belief, before leaving office in April 2019, while in litigation on discrimination allegations, Defendant Yagel deleted data on Village computer servers. Defendant Yagel hired a cloud computing company and computer technicians to upload back-up files and official Village employee email records, and to segregate them on the "Blue Host" server, for which the Village paid but was under Yagel's dominion and control.

253.     The Blue Host server contains data and metadata that Defendant Yagel and compatriots wish to hide, including files that were intentionally made inaccessible to the incoming, and now current, Banks Administration.

254.     Defendants Yagel and Harris have refused to turn over passwords to incoming Mayor Defendant Banks in order to deny Village officials and others access to relevant and incriminating data and metadata.

255.     Trustee and now-Mayor Defendant Banks informed Plaintiff Manes that, in order to further obstruct and delay discrimination investigations of the Village, Defendant Yagel used a personal cell phone for official business so that it would not be subject to discovery as a Village record.

256.     Defendants Shea and Banks both separately informed Plaintiff Manes that Defendant Mayor Yagel, personally or with others, removed meeting minutes to a private residence down the block from Village Hall.

257.     These acts of concealment were designed to enable Defendant Yagel to claim "deniability" in responding to FOIL requests and "truthfully" declaring Village records were searched and requested documents were not found.

258.     Defendant Banks and Lisa Thorsen informed Plaintiff Manes, who had been thwarted in obtaining meeting minutes from the Village, how the Village secreted such documents. Manes was introduced to Mrs. May Pang who showed Plaintiff Manes how meeting minutes could be removed or altered.

## BURDENS PREVENTING FREE EXERCISE OF RELIGION

### A.     Harassment of Orthodox Prayer Groups

259.     Defendants interfered deliberately with the rights to assemble and worship of the Village's Orthodox Jewish residents.

260.     The Yagel Administration: (i) prevented the establishment of synagogues; (ii) actively harassed Orthodox Jewish owned residences where worshipers held prayer groups; (iii) harassed Orthodox Jewish worshippers by discriminatorily issuing tickets; and (iv) prevented the establishment of a ritual bath - *mikveh* - in Pomona.

261.     The Village's zoning law authorized synagogues on at least 3.0 acres of land. *See* Village of Pomona Zoning Regulations Article IV, Use Regulations, Section 130-10.G.

262.     The 3.0-acre minimum zoning provision was enacted with discriminatory animus against Orthodox Jews. Village authorities knew that there is no 3.0-acre lot in Pomona within walking distance of the homes of Orthodox Jews in Pomona, and that Orthodox Jews must walk to prayer services on Sabbaths and Jewish holidays.

263.     Orthodox Jewish resident Ronny Schwartz attempted to build a synagogue at 12 Beaver Dam in Pomona. In a February 1, 2017 conversation that was recorded, Defendants discussed the denial of Mr. Schwartz's permit: "Don't have to let him know every detail…Let us

bolster it with as many facts so can bury him in, so he can't have *'super shul'* on 12 Beaver Dam." (Emphasis added.)

264.    Because no synagogue could be built, Orthodox Jewish residents of Pomona held prayer groups in private homes.

265.    Plaintiff Manes regularly worshipped in a prayer group at 60 Halley Street in Pomona. Defendants Yagel, Harris and Zummo subjected that prayer group and others to much scrutiny and harassment.

266.    Referring to the prayer group at 60 Halley Street, Defendant Zummo said to Defendant Shea in a recorded conversation on March 1, 2017: "Brett wanted the shul torn down." In a recorded conversation of March 21, 2017, Defendants Yagel and Zummo acknowledged they have no right to prevent worship at that location.

267.    The recorded conversation of March 21, 2017 continues with discussion of the possibility of invoking a fire-safety law imposing restrictions if there are more than 27 occupants of a building.

268.    Defendants Yagel, Harris, and Zummo exchanged emails on February 29 - March 2, 2016, concerning an appearance ticket issued by Defendant Riley to 60 Halley Street for operating a House of Worship. Defendant Riley issued the ticket based upon a complaint reported by Defendant Harris on behalf of a resident of Pomona, but asked Defendant Zummo who should be identified in the supporting affidavit as the witness.

269.    Defendant Zummo disputed the legality of "violating" a property based solely upon hearsay and innuendo from a neighbor. He expressed concern that Defendant

Christopher Riley, the Village Special Prosecutor could not draft an affidavit for the court to prosecute such a non-violation and warned that it will "make us look stupid in the end."

270.    Defendant Yagel then told Defendant Zummo to "take a play out of Fred Viohl's playbook when he publicly reported during a BoT Mtg about an issue, which he personally observed on Route 306, where he walked in and observed some type of religious service taking place." Defendant Zummo understood Mayor Yagel to be directing him to falsely testify that Defendant Zummo himself had witnessed the alleged "violation" at 60 Halley Street, to which Defendant Zummo replied that he would not "perjure himself" for the Village of Pomona.

271.    Defendant Mayor Yagel once baselessly claimed that a commercial kitchen was being operated at 60 Halley Street. Defendant Yagel called the health department to prosecute this claim even though he had not entered the home, and no one witnessed such "business" activity.

272.    Upon information and belief, Defendant Harris directed Defendant Zummo to "violate" or ticket people walking to "shul," meaning Orthodox Jewish prayer groups or synagogues, and stated that he wanted a shul to be torn down.

**B.**    **Prevention of a *Mikveh***

273.    With the invidious discriminatory purpose of hindering and preventing religious observance by the Village's Orthodox Jewish residents and deterring the purchase of property in Pomona by Orthodox Jews, Defendants tried to prevent ritual baths in Pomona.

274.     A local ritualarium – *mikveh* - is essential in an Orthodox Jewish community. The laws of ritual purity forbid sexual activity between husbands and wives during the wife's menstrual period and for seven days thereafter. Wives must then immerse in a *mikveh* before resuming contact with their husbands.

275.     Orthodox Jewish men, and particularly Hasidic men, also frequently immerse in a *mikveh* on weekday mornings prior to prayer, on Fridays before Sabbath, on the eve of Jewish holidays, and on Sabbath and holiday mornings.

276.     Orthodox Jewish residents of Pomona conducted preliminary inquiries into the possibility of building a *mikveh* in Pomona.

277.     The Village's Building Code would permit the construction of a *mikveh.*

278.     Defendant Zummo acknowledged in August 2018 Admissions that he had been instructed by Defendant Ulman to prevent construction of a *mikveh.* Defendant Zummo reported that Defendant Ulman had acknowledged that the Village's Building Code permits the building of a *mikveh* and that *mikvehs* have been constructed, used, and maintained in neighboring villages.

279.     Defendant Ulman's instructions to Defendant Zummo were designed to burden religious exercise of the Orthodox Jewish residents of Pomona, including Plaintiff Manes, and to prevent and deter Orthodox Jews from moving into Pomona.

280.     The religious exercise and observance of Plaintiff Manes and other Orthodox Jewish residents of Pomona is substantially burdened by Defendants' denial of permission to construct a *mikveh* in Pomona. Men and women who wish to use a *mikveh* during

the week must drive to a location outside Pomona, to villages in Rockland County that have such a facility.

281.    On the Sabbath and many Jewish holidays, Jewish law forbids driving or riding in a vehicle, even in order to fulfill the important positive commandment of *mikveh*. Orthodox Jewish men and women who need a *mikveh* for their religious observance, including Plaintiff Manes, are totally unable to visit such a facility on Sabbaths and certain Jewish religious holidays.

282.    The absence of a *mikveh* in Pomona has burdened and hindered the religious observance of Plaintiff Manes and other Orthodox Jewish residents of Pomona and deprived them of the free exercise of fundamental religious beliefs and practices.

## CONTINUATION OF UNLAWFUL DISCRIMINATION

283.    Defendant Ian Banks was a member of the Board of Trustees of the Village of Pomona for approximately 20 years before he was elected to replace Defendant Yagel as mayor in the spring of 2019.

284.    For several years leading up his election as mayor in 2019, Defendant Banks as Trustee publicly and privately opposed the Yagel Administration's illegal actions, including the willful destruction, alteration, and concealment of evidence.

285.    Defendant Banks expressed support for Pomona's Orthodox Jewish residents in informal gatherings and in Board of Trustees meetings and objected to the Yagel Administration's actions against Orthodox Jewish residents, including Plaintiffs Manes and TAL Properties.

286.    Defendant Banks told Plaintiff Manes that, to his understanding, the Village owned the roads adjoining the Subdivided Properties owned by Plaintiffs. Defendant Banks pledged that, as Mayor, he will concede longstanding Village ownership of the roads, accordingly formally dedicate the roads, and ultimately move to resolve Plaintiffs' *Roads* Case.

287.    Defendant Banks advised Plaintiff Manes that the Yagel Administration had obstructed Plaintiffs' freedom-of-information requests and other discovery demands during Plaintiffs' *Roads* Case. Defendant Banks provided Plaintiffs with some of the documents that the Village had falsely claimed did not exist and documents showing discrimination and evidence-tampering that Plaintiffs could use in federal court in this lawsuit.

288.    Defendant Banks, as Trustee, commenced Article 78 proceedings the New York Supreme Court of Rockland County and other administrative actions with the New York Department of State's Committee on Open Government to challenge the Yagel Administration's destruction and concealment of evidence.

289.    Defendant Banks, as Trustee, had filed complaints against Defendant Zummo, and requested the Rockland County District Attorney to open an investigation of Defendant Zummo, asserting that Defendant Banks hired Defendant Zummo illegally and that Defendant Zummo could not work for the Village.

290.    Defendant Banks personally sued Defendant Zummo for illegal and improper zoning tactics.

291.    Seeking Orthodox Jewish support when he ran for Mayor in 2019 with Trustee Robert Klein, Defendant Banks campaigned to "drain the swamp" and to "Make Pomona

Great Again." He represented publicly and privately to Plaintiff Manes that he would, "as the first order of business," terminate the employment of Defendants Ulman, Zummo, Arsa-Artha and other personnel who had carried out the discriminatory policies against Orthodox Jews under the Yagel Administration.

292. Defendant Ulman resigned and Defendant Zummo's employment was terminated by the Board of Trustees. Brian Nugent was democratically elected Village Attorney and a new building inspector was appointed.

293. Defendant Banks reneged on his promises after being elected Mayor. He sought to undo personnel changes and he continued to discriminate against Orthodox Jews.

294. Over the Board of Trustees' objections, Defendant Banks fired the new building inspector appointed by the Board of Trustees when the new building inspector made clear that he would evaluate and approve permits based solely upon merit and not in a manner that discriminates against Orthodox Jews.

295. In defiance of the Board of Trustees, Defendant Banks re-hired Defendant Zummo to lead the Village Building Department and employed Zummo to harass, intimidate, and discriminate against Orthodox Jews with false and frivolous code violations.

296. Defendant Banks fired Brian Nugent, who had been duly elected, and replaced him with Banks' "personal attorney," Roger Bernstein.

297. Defendant Mayor Banks justified his about-face in recorded conversations with Plaintiff Manes and Trustee Klein, saying, "You people now have too much power."

298.    Defendant Mayor Banks has continued, under his administration, to discriminate against Orthodox Jews, including Plaintiff Manes and others.

299.    Robert Klein is a plaintiff in a separate federal-court action against the Village government. Mr. Klein is an Orthodox Jew who was an elected Village Trustee under Defendant Mayor Yagel. Mr. Klein was the only trustee denied a key to Village Hall. He was often shut out of Village government business by Defendant Yagel and others. He was excluded from performing certain government functions during the Yagel Administration that non-Orthodox Jews performed in their elected capacities and was excluded from discussions at Village Hall and denied documents needed to conduct official trustee business. Village meetings were scheduled for Saturdays and Jewish holidays, with knowledge that Mr. Klein would be unable to attend. Defendant Mayor Yagel refused, because Mr. Klein was "one of them," to show Trustee Klein the town attorney's billable hours in the *Tartikov* case.

300.    Defendant Mayor Banks threatened Plaintiff Manes and Robert Klein that Defendant Zummo would continue to enforce code and building violations against Orthodox Jewish residents of Pomona unless they dropped their lawsuits against the Village.

301.    Defendant Mayor Banks also stated that neither Plaintiff Manes nor Mr. Klein would receive permits to develop or continue building projects in Pomona unless they dismissed their lawsuits for discrimination against the Village.

302.    Defendant Mayor Banks reneged on his pre-election promise to dedicate the Village roads notwithstanding his acknowledgement to Plaintiff Manes that Manes does not own the roads, thereby continuing litigation by the Village with a defense that Defendant Banks acknowledged as unmeritorious.

303.    Defendant Mayor Banks has, with the assistance of Defendant Zummo, continued the baseless prosecution of cases that, as a trustee in the Yagel Administration, he criticized and pledged to drop as false and discriminatory against Orthodox Jewish residents of Pomona.

304.    Plaintiff Manes does not, as of this date, have access to most of his properties. He is still prevented and limited from alienating or building on his properties without a substantial loss to his investments.

305.    Plaintiffs Manes and TAL Properties continue to be injured by the acts of Defendants. As developers engaged in selling and developing properties to an Orthodox Jewish clientele in Pomona, Plaintiffs have suffered substantial financial harm by Defendants' unlawful burdens on religious exercise and by the violation of Orthodox Jews' constitutional rights, religious freedoms, and housing rights.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (VIOLATIONS OF THE EQUAL PROTECTION CLAUSE UNITED STATES CONSTITUTION, FOURTEENTH AMENDMENT 42 U.S.C. § 1983)

306.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

307.    By the conduct described herein, Defendants' actions deprived and continue to deprive Plaintiffs of their right to equal protection of the laws by discriminating against and targeting Plaintiffs for disfavor in, among other things, the application of local zoning laws, and the enforcement of alleged code violations.

308.     These discriminatory acts by Defendants against Plaintiffs violated the right to equal protection of the laws, guaranteed to Plaintiffs by the Fourteenth Amendment, and were motivated and caused by Defendants' animus to the religious beliefs and practices of Orthodox Judaism.

309.     Defendants' discriminatory actions were taken under the color of state law and through the unlawful exercise of governmental authority assigned to them by local statutes and ordinances.

310.     Plaintiffs have suffered and continue to suffer damage caused by Defendants' violations of their constitutional rights.

311.     Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their constitutional rights.

## SECOND CLAIM FOR RELIEF

### (VIOLATIONS OF THE FREE EXERCISE CLAUSE UNITED STATES CONSTITUTION, FIRST AMENDMENT 42 U.S.C. § 1983)

312.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

313.     By the conduct described herein, Defendants' actions deprived and continue to deprive Plaintiffs of their right to the free exercise of religion by targeting Plaintiffs for mistreatment and disfavor because of their religious identity as Orthodox Jews and by denying to Plaintiffs the ability to exercise the Orthodox Jewish religion and its religious observances and practices.

314.    Defendants' discriminatory actions were taken under the color of state law and through the unlawful exercise of governmental authority assigned to them by local statutes and ordinances.

315.    Plaintiffs have suffered and continue to suffer damage caused by Defendants' violations of their constitutional rights.

316.    Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their constitutional rights.

## THIRD CLAIM FOR RELIEF

### (VIOLATIONS OF THE FAIR HOUSING ACT
### 42 U.S.C. §§ 3604(A), 604(B) AND 3617)

317.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

318.    By the conduct described herein, Defendants have discriminated on the basis of Plaintiffs' religion against Plaintiffs with unjustified delays, imposition of discriminatory conditions, and refusal to provide building permits, and by making housing within Pomona unavailable to Orthodox Jews, thereby subjecting Plaintiffs to discrimination "in the provision of services or facilities" on the basis of their religion in violation of 42 U.S.C. § 3604(a) and § 3605(b).

319.    Defendants' conduct has also "interfere[d]" with Plaintiffs' "exercise or enjoyment" of rights protected by 42 U.S.C. §§ 3604(a) and 3604(b), in violation of 42 U.S.C. § 3617.

320.     Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i), and they have suffered damage as a result of Defendants' conduct.

321.     Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Fair Housing Act.

322.     Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their rights.

## FOURTH CLAIM FOR RELIEF

## (VIOLATIONS OF RLUIPA SECTION (A)(1))

323.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

324.     By the conduct described herein, Defendants have imposed and implemented the Village's land use regulations that make individualized assessments in a manner that imposes substantial burdens on the religious exercise of Plaintiff Manes, is not in furtherance of a compelling governmental interest, and is not the least restrictive means of furthering a compelling governmental interest.

325.     Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Religious Land Use and Institutionalized Persons Act.

326.    Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their rights.

## FIFTH CLAIM FOR RELIEF

## (VIOLATIONS OF RLUIPA SECTION (B)(1))

327.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

328.    By the conduct described herein, Defendants imposed and implemented the Village's land-use regulations on less than equal terms for Plaintiffs, who purchased property in Pomona to develop and market residences for Orthodox Jews, by delaying and denying Certificates of Occupancy and other preconditions for residences to be occupied by Orthodox Jews while not delaying or denying Certificates of Occupancy and other legal preconditions to residents of Pomona who do not engage in the religious exercise of Orthodox Jews.

329.    Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Religious Land Use and Institutionalized Persons Act.

330.    Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violation of their rights.

## SIXTH CLAIM FOR RELIEF

## (VIOLATIONS OF RLUIPA SECTION (B)(2))

331.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

332.   By the conduct described herein, Defendants imposed and implemented Pomona's land-use regulations on the basis of religion and the religious denomination of Plaintiff Manes and his potential customers by imposing on Manes and Orthodox Jewish purchasers and owners of property in Pomona disparate and costly conditions that were not imposed on non-Orthodox-Jewish owners of property in Pomona such as the owners of 6, 8, 10 High Mountain Road and 2 Riverview.

333.   Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Religious Land Use and Institutionalized Persons Act.

334.   Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violation of their rights.

## SEVENTH CLAIM FOR RELIEF

## (VIOLATIONS OF RLUIPA SECTION (B)(3)(B))

335.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

336. By the conduct described herein, Defendants have imposed and implemented the Village's land-use regulations in a manner that unreasonably limits Orthodox Jewish religious assemblies, institutions, and structures within Pomona.

337. Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Religious Land Use and Institutionalized Persons Act.

338. Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violation of their rights.

## EIGHTH CLAIM FOR RELIEF
## (TORTIOUS INTERFERENCE)

339. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

340. Defendants intentionally and tortiously interfered with Plaintiffs' purchase, development and sale of property in Pomona as part of Plaintiffs' business.

341. Defendants' wrongful and tortious actions prevented Plaintiffs' from purchasing property from third parties, developing and enhancing the value of property, and realizing economic gain from selling property to third parties at a profit.

342. As a result of Defendants' wrongful actions, Plaintiffs have been damaged in an amount to be determined at trial.

343.     Plaintiffs demand damages in an amount to be determined at trial, and payment of their attorneys' fees and costs.

### NINTH CLAIM FOR RELIEF

### (IMPOSITION OF UNCONSTITUTIONAL CONDITIONS, IN VIOLATION OF DUE PROCESS, EQUAL PROTECTION, AND THE TAKINGS CLAUSE, UNITED STATES CONSTITUTION, FOURTEENTH AMENDMENT 42 U.S.C. § 1983)

344.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

345.     By the conduct described herein, Defendants' imposed unconstitutional conditions on the provision of governmental benefits and services to Plaintiffs.

346.     Defendants conduct against Plaintiffs constituted an unconstitutional taking and violated Plaintiffs' rights to due process of law and equal protection of the laws, guaranteed to Plaintiffs by the Fifth and Fourteenth Amendments.

347.     Defendants' unlawful and unconstitutional actions were taken under the color of state law and through the unlawful exercise of governmental authority assigned to them by local statutes and ordinances.

348.     Plaintiffs have suffered and continue to suffer damage caused by Defendants' violations of their constitutional rights.

349.     Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their constitutional rights.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

(i)      Awarding Plaintiffs compensatory, consequential and punitive damages in an amount to be determined at trial.

(ii)     Enjoining Defendants from discriminating against Plaintiffs in the manners described in this complaint.

(iii)    Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(iv)    Granting such other and further relief to Plaintiffs as the Court deems just and proper.

Dated:   July 27, 2020

By: /S  Daniel G. Ashburn
Daniel G. Ashburn, Esq.
ASHBURN LAW OFFICE, LLC
1300 Carolyn Drive
Atlanta, GA 30329
404-939-1323
*Attorney for Plaintiffs*

OF COUNSEL:
LEWIN & LEWIN, LLP
Nathan Lewin, Esq.
888 17th Street NW, 4th Floor
Washington, DC 20006
(202) 828-1000

Albert A. Levy, Esq.
94 Roselle Court
Lakewood, NJ 08701
(917) 589-3737
*Attorney for Plaintiffs*

# Exhibit B

***(to Exhibit B)***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
TAL PROPERTIES OF POMONA, LLC,                     17 cv 02928 (CS)

                         Plaintiff,               **SECOND AMENDED COMPLAINT**

vs.

VILLAGE OF POMONA, BRETT YAGEL,
MAYOR OF THE VILLAGE OF POMONA,

                         Defendants.
-------------------------------------------------------x

        By and through its counsel, Michael H. Sussman, Esq., plaintiff alleges as against
defendants as follows:

        **I.      PARTIES**

1.  Plaintiff TAL PROPERTIES OF POMONA, LLC is a limited liability company formed
    pursuant to the laws of the State of New York and conducting business in the County of
    Rockland, within this judicial district.

2.  Plaintiff Avrohom Manes is the sole owner of TAL Properties of Pomona, LLC is an
    Orthodox Jew and resides in the County of Rockland.

3.   Defendant Village of Pomona [hereinafter "the Village"] is a municipal corporation formed
    pursuant to the laws of the State of New York and conducting business in the County of
    Rockland, within this judicial district.

4.  Defendant Brett Yagel [hereinafter "Yagel"] is the duly elected Mayor of the Village and, as
    and for the matters alleged herein, the final policy maker for defendant Village.  He is sued
    both in his official and individual capacities.

5.  At all relevant times, defendant Doris Ullman [hereinafter "Ullman"] is and has been the
    duly appointed Village Attorney.  She is sued in her official and individual capacities.

6.  The complained of acts by defendants Yagel and Ullman were undertaken under color of
    state law and their efficacy forwarded by the cloak of state authority with which they acted.

## II.      JURISDICTION

7. As plaintiff alleges that defendants discriminated against it based on religion in violation of the First and Fourteenth Amendments to the United States Constitution, this Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1331 & 1343(3) & (4) and 42 U.S.C. secs. 1983 and 1988.

## III.      FACTUAL AVERMENTS

8. In December 2015, plaintiff purchased a residential home [hereinafter "the home" or "the property"] at 22 High Mountain Road within the Village of Pomona.

9. In January 2016, plaintiff made repairs to the property.

10. In January 2016, the village building inspector, Louis Zummo [hereinafter "Zummo"] inspected the property on behalf of the village.

11. Zummo concluded and advised plaintiff that plaintiff had completed the referenced repairs in accordance with applicable building codes and other applicable regulations and that a certificate of occupancy should issue.

12. During his interactions with Zummo, plaintiff's principal, Avrohom Manes, met defendants Yagel and Ullman, both of whom knew he was Jewish

13. Despite plaintiff's qualifying for the issuance of a certificate of occupancy, defendants Yagel and Ullman directed Zummo to not issue the certificate of occupancy.

14. In so acting, defendants Yagel and Ulman made municipal policy with regard to the circumstances disallowing the issuance of such permits.

15. Defendants' direction contravened the village's Construction Code [chapter 47-10] which *required* issuance of a certificate of occupancy where, as here, the applicant complied with applicable code requirements.

16. In seeking to justify the village's refusal to issue the Certificate of Occupancy, defendant Mayor, acting by and through defendant Ullman, claimed that a prior owner of the property owed the Village $6,379.34 and demanded payment of said sum from plaintiff in exchange for the issuance of a Certificate of Occupancy; at no time did the village claim that plaintiff had incurred said debt.

17. At no time did defendants claim that plaintiffs had incurred said debt or have any basis for any such claim.

2

18. Village law and the village code do not permit denial of a certificate of occupancy because a prior property owner failed to satisfy a debt the village failed to record as a lien against the property by the time plaintiff purchased the same or at any time preceding its assertion of this as the basis for denial of a certificate of occupancy.  This is particularly true where, as here, plaintiff purchased the property at a foreclosure sale.

19. Refusing to grant a certificate of occupancy on this ground not only finds no basis in law, but it did not represent the village's general practice and was unprecedented in the village; however, it did represent the policy dictated by the defendants as and against these plaintiffs.

20. Indeed, out of animus for plaintiffs based on the religion of plaintiff's principal, defendants Yagel and Ullman dictated this result to delay, block and prevent plaintiffs from gaining benefit from its purchase of the home.

21. By comparison, defendants Yagel and Ullman failed to take any action to collect the sum of $6,379.34 from the home's prior owner, who was not Jewish, and, on behalf of the Village, permitted that same developer's bond to lapse without collection though the developer failed to develop and complete roads secured by said bond.

22. Through calendar year 2016, defendants Yagel, Ullman and the Village imposed other disparate and discriminatory conditions upon plaintiff as it sought to sell the home, repeatedly concocting and then using false explanations for delays in the issuance of Certificate of Occupancy without which plaintiffs could not alienate their property.

23. In the summer of 2016, again at defendant Yagel's direction and contrary to the treatment afforded similarly-sloped and neighboring properties on High Mountain Road owned by non-Jews, the village required plaintiffs to fulfill costly conditions before being permitted to grade out steep slopes on the property and thereby created useable backyard space, enhancing the value of the property.

24. When plaintiff submitted the grading plan, the village engineer initially approved it.

25. However, under pressure from defendants Yagel and Ullman, the village engineer retracted his approval and imposed costly conditions upon plaintiffs.

26. Specifically, plaintiff's engineer and Joe Corless, the village engineer, together developed the first set of plans to address the steep slopes.

27. Defendants then intervened and directed Corless to disavow the plan he had helped develop.

3

28. The building inspector, Zummo, then advised the engineer that he would no longer participate in selective enforcement against the plaintiffs.

29. Despite the building inspector's position, the village continued to insist that plaintiff complete costly requirements which other similarly-situated property owners did not have to satisfy, further delaying plaintiffs' alienation of their property and reducing its market value.

30. Specifically, defendants required plaintiffs to post a bond to insure that they did not damage their neighbor's property; such a requirement was highly unusual in the village in like circumstances.

31. In addition, defendants required plaintiff to show that the original land surveyor whose work product plaintiffs used in their submission had authorized such use; this, too, was highly unusual as such land surveys are typically relied upon without such authorization.

32. In additions, defendants required plaintiffs to test the compressed fill they used for grading in a manner inconsistent with requirements imposed on others using such fill for similar projects.

33. After plaintiffs agreed to comply with these unusual and costly requirements imposed by defendants, the village still rejected his application and did not issue a permit for the grading work.

34. Due to the incomplete nature of this work, plaintiffs were unable to sell the property for the price expected or recoup the profit anticipated from the property.

35. Zummo and the village clerk have both expressly told plaintiff's principal that defendants Yagel and Ullman advised them to give plaintiff a hard time with anything they needed.

36. The village engineer's selective requirements explained above, as dictated by defendants Yagel and Ullman, caused a substantial delay in the sale of plaintiffs' property and a significant decline in the sales price.

37. In the late fall 2016, plaintiff entered into a contract for the property's sale.

38. By this time, further demonstrating the baselessness of this claim which had delayed plaintiffs for months, defendant village dropped any claim that plaintiffs owed fees incurred by the prior property owner and gave plaintiffs a certificate of occupancy without payment of this alleged debt.

39. Following sale of the property, the Village of Pomona threatened to withdraw the certificate of occupancy if plaintiff failed to sign an agreement acknowledging, *inter alia*, that the road

accessing the property was not a village road and that its maintenance was the sole responsibility of the property owner.

40. Requiring the signing of this agreement was again contrary to village practice, not authorized by any section of the village code and another *ultra vires* action undertaken by the village, as dictated by defendants Yagel and Ullman, to impede and complicate plaintiffs' alienation of the property.

41. The delays in issuing the required certificate of occupancy and the discriminatory imposition of grading requirements caused plaintiff to incur a substantial decline in the sales price for the property.

42. But for said delays, the plaintiff would have been able to sell the property in early 2016 and used the proceeds so realized for other profitable business opportunities.

43. The religiously-motivated discrimination to which defendants subjected plaintiff stymied plaintiff from timely proceeding with other projects and caused actual economic loss.

44. In engaging in the conduct set forth above, defendant Yagel repeatedly consulted with defendant Ullman, an attorney in good standing in the State of New York, shared with her his discriminatory design and enlisted her support in each of the methods he dictated to stymie and impeded plaintiff's project.

45. Though aware that the impositions placed upon plaintiff were contrary to Village law and not authorized by any provision of the local building or zoning codes, defendant Ullman fronted for defendant Yagel, knowingly implementing and defending his discriminatory dictates and impeding plaintiff's business venture to delay alienation of the plaintiff's property.

46. As a consequence of the treatment outlined above, defendants collectively caused plaintiff Manes emotional distress, anxiety and humiliation.

## IV.   CAUSES OF ACTION

47. Plaintiff incorporates paras. 1-46 as if fully re-written herein.

48. By intentionally engaging in selective enforcement against plaintiff based on the religion of its principal, defendants violated the Fourteenth Amendment to the United States Constitution as made actionable by 42 U.S.C. section 1983.

49. By intentionally imposing harsher conditions upon plaintiff than it did upon other non-Jewish developers, defendants burdened the free exercise of the religion of plaintiff's principal

in violation of the First Amendment to the United States Constitution as made actionable by 42 U.S.C. section 1983.

## V.    **PRAYER FOR RELIEF**


WHEREFORE, plaintiff prays that this Honorable Court accepts jurisdiction in this matter, empanels a jury to hear and decide all issues within its jurisdiction, awards to plaintiff compensatory damages as against all defendants, punitive damages as against defendants Yagel and Ullman, all with pre-and post-judgment interest, and the reasonable attorneys' fees and costs arising from the prosecution of this matter and enter any order necessary in the interests of justice and equity.

Dated:  September 6, 2017

Respectfully submitted,


MICHAEL H. SUSSMAN [3497]

SUSSMAN & ASSOCIATES
PO BOX 1005
1 RAILROAD AVENUE
SUITE 3
GOSHEN, NY 10924
(845)-294-3991

Counsel for Plaintiff

# Exhibit C

***(to Exhibit B)***

WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
Attorneys for Defendants
*Village of Pomona, Brett Yagel and Doris Ulman*
1133 Westchester Avenue
White Plains, NY 10604
(914) 323-7000
Attn:  Janine A. Mastellone, Esq.
        John B. Martin, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x

TAL PROPERTIES OF POMONA, LLC,

               Plaintiffs,

       -against-

VILLAGE OF POMONA, BRETT YAGEL, MAYOR OF THE
VILLAGE OF POMONA,

               Defendants.

--------------------------------------------------------------------- x

Docket No. 7:17-cv-02928-CS

NOTICE OF MOTION
TO DISMISS SECOND-
AMENDED COMPLAINT

TO:

SUSSMAN & ASSOCIATES
Attorneys for Plaintiff
P.O. Box 1005
Suite 3
Goshen, NY 10924
(T): (845) 294-3991
Attn:  Michael H. Sussman, Esq.

      PLEASE TAKE NOTICE that upon annexed declaration of Janine A. Mastellone, Esq.,

dated October 16, 2017 (and the exhibits annexed thereto); the accompanying memorandum of

law, dated October 16, 2017; and all the prior proceedings herein, defendants Village of Pomona,

Brett Yagel, Mayor of the Village of Pomona, and Doris Ulman, Village Attorney of the Village

of Pomona (collectively, "defendants"), by their undersigned attorneys, will move this Court on

October 16, 2017, or on such other date as may be stipulated or ordered, before the Hon. Cathy

Seibel, for an Order, pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil

Procedure, dismissing plaintiffs' second amended complaint with prejudice, and for such other,

different and further relief as the Court in its discretion may deem just and proper.

Dated:    White Plains, New York
         October 16, 2017

                  WILSON, ELSER, MOSKOWITZ,
                  EDELMAN & DICKER LLP
                  Attorneys for Defendants

                  Janine A. Mastellone, Esq.
                  John B. Martin, Esq.
                  1133 Westchester Avenue
                  White Plains, New York 10604
                  (914) 323-7000
                  Our File No.  00295.12564

# Exhibit D

*(to Exhibit B)*

WILSON, ELSER, MOSKOWITZ
EDELMAN & DICKER LLP
Attorneys for Defendants
*Village of Pomona, Brett Yagel and Doris Ulman*
1133 Westchester Avenue
White Plains, NY 10604
(914) 323-7000
Attn: Janine A. Mastellone, Esq.
      John B. Martin, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
TAL PROPERTIES OF POMONA, LLC,                             :
                                                          :
                              Plaintiff,                   :   Docket No. 7:17-cv-02928-CS
                                                          :
              -against-                                    :
                                                          :
VILLAGE OF POMONA, BRETT YAGEL, MAYOR OF :
THE VILLAGE OF POMONA,                                     :
                                                          :
                              Defendants.                  :
                                                          :
                                                          :
-------------------------------------------------------------- x


### MEMORANDUM OF LAW


Wilson, Elser, Moskowitz, Edelman & Dicker LLP
1133 Westchester Avenue
White Plains, New York 10604
(914) 323-7000

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

Introduction ........................................................................................................................... 1

Preliminary Statement ........................................................................................................... 1

Facts and Procedural History ................................................................................................ 2

              Procedural History: .................................................................................................... 5

Argument ............................................................................................................................... 5

Motion to Dismiss Standard ................................................................................................. 5

Point I      Plaintiffs Cannot Seek Relief for the Village's Demand that They
             Reimburse the Debt to the Village Because they Never Paid the Debt ............ 6

Point II    Plaintiffs' Complaint Should be Dismissed for Failure to Allege Facts
             Establishing The Existence of a Similarly Situated Comparator ...................... 8

       1.    Plaintiffs' Allegations Fail to Establish the Similar Comparator and
            Disparate Treatment Elements of a Selective Enforcement Claim ........... 10

       2.    The Second Amended Complaint Fails to State a Cause of Action
            for Violation of the First Amendment ........................................................ 21

       3.    The Individual Defendants Are Entitled to Qualified Immunity,
            and the Village is Shielded from Liability under Monell ........................... 21

Conclusion ........................................................................................................................... 23

6728550v.1

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adler v. Kent Village Hous. Co.,*
123 F. Supp. 2d 91 (E.D.N.Y. 2000) ............................................................. 9

*Amid v. Vill. of Old Brookville,*
2013 U.S. Dist. LEXIS 129447 (E.D.N.Y. Feb. 7, 2013) ............................ 20

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................................. 6, 15

*AYDM Associates, LLC v. Town of Pamelia,*
205 F. Supp. 3d 252 (N.D.N.Y. 2016)...................................................... 9

*Bolden v. Village of Monticello,*
344 F. Supp. 2d 407 (S.D.N.Y. 2004) ...................................................... 21

*Bowles v. New York City Transit Auth.,*
2006 U.S. Dist. LEXIS 32914, (S.D.N.Y. May 23, 2006) ...................... 10, 21

*Brown v. Daikin Am., Inc.,*
756 F.3d 219 (2d Cir. 2014) ...................................................................... 20

*Bloomingburg Jewish Educ. Ctr v. Vill. of Bloomingburg,*
111 F. Supp. 3d 459 (S.D.N.Y. 2015) ...................................................... 21

*Gregory v. Inc. Vill. of Ctr. Island,*
2016 U.S. Dist. LEXIS 98076 (E.D.N.Y. July 27, 2016)........................ 20

*County Of Nassau ex rel. Nassau County Planning Com v. Eagle Chase Assoc., Inc.,*
144 Misc. 2d 641 (N.Y. Sup. Ct. Nassau County 1989)............................ 7

*Danahy v. Buscaglia,*
134 F.3d 1185 (2d Cir. 1998) .................................................................. 21

*Delbene v. Alesio,*
2001 U.S. Dist. LEXIS 2150 (S.D.N.Y. Feb. 21, 2001)............................ 9

*Dilworth v. Goldberg,*
914 F. Supp. 2d 433 (S.D.N.Y. 2012) .................................................. 22, 23

*Hafez v. City of Schenectady,*
894 F. Supp. 2d 207 (S.D.N.Y. 2012) ...................................................... 20

6728550v.1

*In the Matter of the Application of Hampshire Recreation, LLC v. Vill. of Mamaroneck,*
   2016 U.S. Dist. LEXIS 39496 (S.D.N.Y. March 25, 2016) (Seibel, J.) ................. 17, 18, 19, 20

*Khaled v. Dearborn Heights Police Dep't,*
   2017 U.S. App. LEXIS 19590 (6th Cir. Oct. 4, 2017) ................................................ 9

*Lieberman v. City of Rochester,*
   2011 U.S. Dist. LEXIS 46295 (S.D.N.Y. Apr. 29, 2011).......................................... 9, 20

*Lisa's Party City, Inc. v. Town of Henrietta,*
   185 F.3d 12 (2d Cir. 1999) ......................................................................................... 8

*Malley v. Briggs,*
   475 U.S. 335 (1986).................................................................................................... 22

*Martine's Service Center, Inc. v. Town of Wallkill,*
   554 Fed. Appx. 32 (2d Cir. 2014)............................................................................... 8

*McFarlane v. Roberta,*
   891 F. Supp. 2d 275 (D. Conn. 2012)......................................................................... 6

*Missere v. Gross,*
   826 F. Supp. 2d 542 (S.D.N.Y. 2011) ....................................................................... 8

*Monell v. New York City Dep't of Social Servs.,*
   436 U.S. 658 (1978)................................................................................................... 22

*New York Pet Welfare Association v. City of New York,*
   143 F. Supp. 3d 50 (E.D.N.Y. 2015) ...................................................................... 8, 11

*Nunez v. Hamdan,*
   2013 U.S. Dist. LEXIS 138625 (D. Utah Sept. 25, 2013).......................................... 9, 20

*Oklahoma City v. Tuttle,*
   471 U.S. 808 (1985).................................................................................................... 22

*Palacio v. City of New York,*
   2008 U.S. Dist. LEXIS 14891 (S.D.N.Y. Jan. 15, 2008) ...................................... 22, 23

*Palm Beach Strategic Income v. Stanley P. Salzman, P.C.,*
   2011 U.S. Dist. LEXIS 46867 (E.D.N.Y. May 2, 2011) ............................................ 16

*Panzella v. City of Newburgh,*
   231 F. Supp. 3d 1 (S.D.N.Y. 2017) ......................................................................... 8, 11

*Pembaur v. City of Cincinnati,*
   475 U.S. 469 (1986).................................................................................................... 22

*People United for Children, Inc. v. City of New York*,
108 F. Supp. 2d 275 (S.D.N.Y. 2000) ................................................................... 10

*Rheingold v. Harrison Town Police Dep't*,
568 F. Supp. 2d 384 (S.D.N.Y. 2008) .................................................................... 6

*Rodriguez v. Margotta*,
2000 U.S. App. LEXIS 16260 (2d Cir. 2000) ....................................................... 9

*Ruston v. Town Bd. for the Town of Skaneateles*,
610 F.3d 55 (2d Cir. 2010) ................................................................................ 21

*Seiber v. United States*,
364 F.3d 1356 (Fed. Cir. 2004) ............................................................................ 7

*Snyder v. Pugliese*,
144 Fed. Appx. 174 (2d Cir. 2005) ................................................................. 8, 12

*Sponaugle v. First Union Mortg. Corp.*,
40 Fed. Appx. 715 (3d Cir. 2002) ...................................................................... 6, 7

*Staples v. Gerry*,
2015 U.S. Dist. LEXIS 86629 (D.N.H. May 11, 2015) ......................................... 9

*Tarantino v. City of Hornell*,
615 F. Supp. 2d 102 (W.D.N.Y. 2009) .................................................................. 9

*Witt v. Vill. of Mamaroneck*,
992 F. Supp. 2d 350 (S.D.N.Y. 2014) .................................................................... 6

**Statutes**

42 U.S.C § 1983 ..................................................................................................... 2, 4

Education Law § 7209 ........................................................................................ 14, 16

Education Law § 7209(1)-(2) .................................................................................... 14

Title VII of the Civil Rights Act of 1964 ......................................................... 20, 21

Village Code § 119-1 .............................................................................................. 13

Village Code § 119-2(A) .......................................................................................... 13

Village Code § 119-4 ............................................................................................... 23

Village Code § 119-5(B)(1) ..................................................................................... 13

Village Code § 119-5(B)(2) ................................................................................ 13, 16

6728550v.1

Village Code § 119-5(B)(3) ............................................................................................ 13

Village Code § 119-5(B)(4) ............................................................................................ 13

Village Code § 119-5(C) ............................................................................................ 13, 16

Village Code § 119-6(B) ............................................................................................ 13

Village Code § 119-6(B)(2) ............................................................................................ 13, 15

Village Code § 119-6(B)(3) ............................................................................................ 13, 15

Village Code § 119-6A ............................................................................................ 13

Village Code § 119-7(C)(4) ............................................................................................ 14, 15

Village Code § 119-7(C)(6) ............................................................................................ 14, 15

Village Code § 119-7(D) ............................................................................................ 14

Village Code § 16-1 ............................................................................................ 23

Village Code § 20-1 ............................................................................................ 23

Village Code § 20-12 ............................................................................................ 23

**Rules**

F.R.C.P. 12(b)(1) ............................................................................................ 1, 6, 23

F.R.C.P. 12(b)(6) ............................................................................................ 1, 5, 6, 18, 23

6728550v.1

## Introduction

Defendants Village of Pomona, Brett Yagel ("Mayor Yagel"), as Mayor of the Village of Pomona, and Doris Ullman ("Ms. Ulman"),[1] as Village Attorney of the Village of Pomona (collectively "the Village" or defendants), respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 12(b)(6) and 12(b)(1), to dismiss the second amended complaint filed by plaintiffs TAL Properties of Pomona, LLC ("TAL"), and Avrohom Manes ("Mr. Manes") (collectively, "plaintiffs").[2]

### Preliminary Statement

This is a civil rights action in which plaintiffs allege that the defendants: (1) delayed the issuance of a certificate of occupancy for property that was allegedly owned by plaintiff TAL, and managed by plaintiff, Manes; (2) requested that plaintiffs pay approximately $6,300.00 in consulting fees, which ultimately were not paid by plaintiffs; (3) required plaintiffs to post a bond and test their grading materials in order to obtain a grading permit for their property without imposing similar requirements on other land owners who, unlike Mr. Manes, were not Jewish; and (4) requested that plaintiffs sign an agreement that was allegedly in exchange for keeping the certificate of occupancy and acknowledged that a road accessing plaintiffs' former property was not a Village road. Plaintiffs assert that, by undertaking these actions, the Village engaged in selective enforcement of the Village Code of the Village of Pomona ("Village Code") against the plaintiffs based on Mr. Manes's religion, thereby violating their rights under the

---

[1] The caption of the second amended complaint does not include Ms. Ullman as a defendant; however, the body of the complaint identifies her as such. Further, the second amended complaint misspells Ms. Ulman's name, adding a second "L." For purposes of this motion, Ms. Ulman will be identified by the proper spelling of her name. Plaintiffs should be required to amend the caption accordingly.

[2] The caption of the second amended complaint does not name Mr. Manes as a plaintiff. *Compare* First Amended Complaint. Mr. Manes, however, is described as a plaintiff in the body of the Second Amended Complaint. For purposes of this motion, he will be identified as a plaintiff, though TAL should still be required to properly amend the caption accordingly.

Equal Protection Clause of the Fourteenth Amendment. Plaintiffs further claim that the Village's actions infringed on Mr. Manes's right to the free exercise of religion under the Free Exercise Clause of the First Amendment. Based on these claims, plaintiffs seek damages pursuant to 42 U.S.C § 1983. However, as will be detailed below, plaintiffs' claims should be dismissed because they have no standing to complain of the debt that was never collected from them, have failed to allege the similar comparator element of a selective enforcement claim and have failed to allege any cognizable violation of Mr. Manes's free exercise rights.

## Facts and Procedural History

According to the second amended complaint, prior to December 2015, the owner of the residential property at 22 High Mountain Road, Village of Pomona, New York owed $6,379.34 in connection with that property to the Village. *See* Ex. A at ¶¶ 8, 16, 21.[3] The prior owner had taken out a bond to develop roads, but the bond lapsed and he did not complete roads secured by the bond. *See* Ex. A at ¶ 22. The Village did not collect the roughly $6,379.34 debt or collect on the bond from the owner, who was allegedly not Jewish. *See* Ex. A at ¶ 22.

In December 2015, plaintiff Manes, and/or plaintiff TAL, which is owned by Mr. Manes, bought the property at 22 High Mountain Road at a foreclosure sale. Mr. Manes is an Orthodox Jew, and alleges that he is known as such by Mayor Yagel and Ms. Ulman. *See* Ex. A at ¶¶ 2, 8, 12 18. In January 2016, plaintiffs made repairs to the property, and after an inspection, it is alleged that Village Building Inspector Louis Zummo ("Mr. Zummo") told plaintiffs that the repairs satisfied applicable codes and regulations and that a certificate of occupancy ("CO") should be issued. *See* Ex. A at ¶¶ 9-11. Nonetheless, it is alleged that during plaintiffs' meetings

---

[3] References designated "Ex." are to the exhibits annexed to the declaration of Janine A. Mastellone in support of defendants' motion to dismiss.

6728550v.1

with Mr. Zummo, Mayor Yagel, "acting by and through" Ms. Ulman, told Mr. Zummo not to issue a CO because of the unpaid $6,379.34 debt related to the property. Ex. A at ¶¶ 12-13, 16.

In or about the summer of 2016, plaintiffs sought to "grade out steep slopes" in the back of the subject property, and plaintiffs' engineer and Village Engineer Joe Corless worked together to develop the first set of plans for that work, thereby indicating Mr. Corless's approval of that first set of plans. Ex. A at ¶¶ 23, 26.  However, Mayor Yagel and Ms. Ulman allegedly directed Mr. Corless to "disavow" plaintiffs' plan. Ex. A at ¶¶ 23, 25, 27.  Thus, Mr. Corless required that, to obtain a permit for the grading work, plaintiffs had to post a bond to insure that they did not damage their neighbor's property, demonstrate that the original surveyor of the land had authorized plaintiffs to use his work in support of their grading plan, and test the compressed fill that they used for grading. See Ex. A at ¶¶ 23, 25, 29-32, 36.  The Village allegedly did not impose these conditions on "neighboring properties on High Mountain Road" that were "owned by non-Jews" and "similarly-sloped," and the conditions were "highly unusual in the village in like circumstances." Ex. A at ¶¶ 23, 29-32.

Plaintiffs "agreed to" comply with the Village's conditions, but the Village rejected his application for a permit for the grading work. Ex. A at ¶ 33.  At some point, Mr. Zummo "advised the engineer [Mr. Corless] that he would no longer participate in selective enforcement against plaintiffs." Ex. A at ¶ 28.  At another unspecified point, it is alleged that Mr. Zummo and the village clerk both told Mr. Manes that Mayor Yagel and Ms. Ulman "advised them to give plaintiff a hard time with anything they needed." Ex. A at ¶ 35.

Sometime prior to the fall of 2016, and despite plaintiffs' failure to pay the $6,379.34 debt, the Village issued a CO to plaintiffs without collecting the debt. See Ex. A at ¶ 38.  In late fall of 2016, plaintiffs sold the subject property. See Ex. A at ¶¶ 37-39.  After the sale, it is

3

alleged that the Village threatened to withdraw the CO unless plaintiffs signed an agreement acknowledging that the road accessing the subject property was not a Village road and that its maintenance was the sole responsibility of the property owner. *See* Ex. A at ¶¶ 39-40.

The second amended complaint raises two causes of action under 42 U.S.C. § 1983. *See* Ex. A at ¶ 48. In the first cause of action, plaintiffs assert that the Village's actions denied them their constitutional right to equal protection of the laws based on a selective enforcement theory. See Ex. A at ¶ 48. In the second cause of action, plaintiffs contend that the Village's actions violated Mr. Manes's right to the free exercise of religion under the First Amendment. *See* Ex. A at ¶ 49. Specifically, plaintiffs assert that the Village violated Village Construction Code chapter 47-10 when it did not immediately issue a CO in January 2016 because the repairs on the property complied with applicable regulations and the Village Code did not allow the Village to deny a CO based on the prior owner's failure to pay his debt. *See* Ex. A at ¶¶ 16-18. Plaintiffs further posit that the Village had no legal basis to demand payment of the $6,379.34 debt because the Village never recorded the debt as a lien and Mr. Manes did not incur the debt. *See* Ex. A at ¶¶ 17-18. In plaintiffs' view, when the Village denied them permission to complete grading work and delayed issuing a CO, plaintiffs were prevented from selling the property as expected in early 2016 at the anticipated level of profit. *See* Ex. A at ¶¶ 22, 36, 42. Plaintiffs additionally claim that the Village's demand for the signing of an agreement to accept responsibility for the road to the property was not authorized by the Village Code. *See* Ex. A at ¶ 40. Plaintiffs contend that, because the Village undertook the foregoing actions against Mr. Manes and not against allegedly similarly situated non-Jewish property owners, such as the prior owner of the subject property or the property owners on High Mountain Road, they engaged in selective enforcement of local laws in violation of the Equal Protection Clause. *See* Ex. A at ¶¶

4

21, 23, 43-46. Through the same actions, plaintiffs urge, the Village infringed on Mr. Manes's right to the free exercise of religion. *See* Ex. A at ¶ 49. As plaintiffs' see it, Mayor Yagel and Ms. Ulman cooperated with each other in taking these unlawful actions and shared the same discriminatory intent. *See* Ex. A at ¶ 44. And, plaintiffs aver, as a result of the Village's actions, Mr. Manes suffered emotional distress. *See* Ex. A at ¶ 46.

*Procedural History:*

On March 17, 2017, plaintiff TAL commenced this action in New York State Supreme Court, Rockland County, under index number 031215/2017, by filing a complaint against the Village, Mayor Yagel, Ms. Ullman and various other Village officials. *See* Ex. B. On April 21, 2017, defendants removed this action to the United States District Court for the Southern District of New York by filing a notice of removal. *See* Ex. C (D.E. #1). On July 5, 2017, plaintiffs TAL and Manes filed their first amended complaint in this Court against defendants. See Ex. D (D.E.# 10). At a pre-motion conference held on August 25, 2017, the Court granted plaintiffs leave to file a second amended complaint and defendants permission to move to dismiss or answer such second amended complaint. *See* D.E. for Minute Entry 8/25/17. On September 6, 2017, plaintiffs filed their second amended complaint. *See* Ex. A.

### Argument

### Motion to Dismiss Standard

Under F.R.C.P. 12(b)(6), a defendant may move to dismiss a complaint for failure to state a cause of action. *See* F.R.C.P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  Although facts as alleged in the complaint should be accepted as true on a motion to dismiss, mere conclusions or formulaic recitations of the elements of a claim in the complaint are not presumed to be true and will not suffice to shield the complaint from dismiss. *See Iqbal*, 556 U.S. at 678; *Witt v. Vill. of Mamaroneck*, 992 F. Supp. 2d 350, 360 n.10 (S.D.N.Y. 2014); *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 389 (S.D.N.Y. 2008).  Indeed, under F.R.C.P. 12(b)(6), "a plaintiff armed with nothing more than conclusions" should not be allowed to proceed to discovery.  *Iqbal*, 556 U.S. at 679.  Finally, under F.R.C.P. 12(b)(1), the defendant's motion to dismiss should be granted if the facts alleged in the complaint fail to demonstrate that the plaintiff has standing to bring his or her claim.  *See* F.R.C.P. 12(b)(1); *McFarlane v. Roberta*, 891 F. Supp. 2d 275, 282-283 (D. Conn. 2012).

### Point I

### Plaintiffs Cannot Seek Relief for the Village's Demand that They Reimburse the Debt to the Village Because they Never Paid the Debt

In the second amended complaint, plaintiffs raise a claim for damages arising from the Village's request that, in exchange for a CO, they reimburse the Village for $6,379.34 in outstanding fees on the subject property -- what the second amended complaint labels a "debt." Ex. A at ¶¶ 16-19, wherefore clause.  But, as a threshold matter, plaintiffs lack standing to raise that claim.

Where a plaintiff brings a claim for damages based on the defendants' efforts to collect a debt from the plaintiff, the plaintiff must show that he or she has paid the debt in order to establish a concrete injury-in-fact as a prerequisite to standing.  *See generally Sponaugle v. First Union Mortg. Corp.*, 40 Fed. Appx. 715, 716 (3d Cir. 2002).  In addition, a plaintiff's claim that a municipality delayed issuing a land-use approval is generally analyzed as a due process or takings claim, and under the relevant analysis, a plaintiff cannot maintain such a claim unless he

6

or she offers non-conclusory allegations demonstrating that the delay lasted for an extraordinary period of time and caused more than market fluctuations in the value of the property. *See Seiber v. United States,* 364 F.3d. 1356, 1364-65 (Fed. Cir. 2004); *see also County Of Nassau ex rel. Nassau County Planning Com v. Eagle Chase Assoc., Inc.,* 144 Misc. 2d 641, 642-644 (N.Y. Sup. Ct. Nassau County 1989).

Here, plaintiffs' claims for damages based on the Village's request for reimbursement of $6,379.34 and the resulting delay in the issuance of a CO are not viable. Regarding the demand for payment of the debt, plaintiffs have no standing to demand damages for the Village's efforts to collect that debt because they acknowledge that they never paid it and that they nonetheless received the CO. *See* Ex. A at ¶ 38; *Sponaugle,* 40 Fed. Appx. at 716. And, while plaintiffs try to skirt the limits of a claim of municipal delay by assailing the delay under the rubric of equal protection rather than due process, the fact remains that the delay did not harm them in a manner that could legally support damages. Indeed, the allegations in the second amended complaint reveal that the Village delayed the issuance of a certificate of occupancy by no more than about 9 months, *see* Ex. A at ¶¶ 10, 37-38, which does not constitute an extraordinary delay supporting a claim for damages, and plaintiffs set forth a mere conclusion that the delay caused a "significant decline in the sales price of the property," Ex. A at ¶ 36, which does not suffice as a pleading of concrete facts demonstrating more than market fluctuations in the sales price. *See Eagle Chase Assoc., Inc.,* 144 Misc. 2d at 642-644 (delay of about 7 months in processing subdivision application was not extraordinary and did not support takings claim). Accordingly, plaintiffs' claims stemming from the Village's demand for payment of the debt and delay in issuing a CO should be dismissed for lack of standing.

7

## Point II

### Plaintiffs' Complaint Should be Dismissed for Failure to Allege Facts Establishing The Existence of a Similarly Situated Comparator

To prevail on a Section 1983 claim alleging that a government agent has violated the Equal Protection Clause of the Fourteenth Amendment by selectively enforcing a facially neutral law against the plaintiff, the plaintiff must show that "'(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999), quoting *LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994); *see Martine's Service Center, Inc. v. Town of Wallkill*, 554 Fed. Appx. 32, 35 (2d Cir. 2014).

Under the first prong of the analysis, the plaintiff must identify a comparator who was "similarly situated in all material respects" to the plaintiff and yet was treated differently by the defendant. *Missere v. Gross*, 826 F. Supp. 2d 542, 561 (S.D.N.Y. 2011) (internal quotation marks omitted); *see Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 8-10 (S.D.N.Y. 2017). In doing so, the plaintiff cannot rely on similarities between himself and a comparator that exist at "a high level of generality," but must instead show his or her similarity to the comparator in all material respects related to the defendant's conduct toward the plaintiff. *New York Pet Welfare Association v. City of New York*, 143 F. Supp. 3d 50, 64-65 (E.D.N.Y. 2015). Furthermore, because the plaintiff must demonstrate that the defendant's treatment of the plaintiff was "actually disparate" from his or her treatment of the comparator, *Snyder v. Pugliese*, 144 Fed. Appx. 174, 174 (2d Cir. 2005), "the [m]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection." *AYDM Associates, LLC v. Town of Pamelia*, 205 F.

8

Supp. 3d 252, 265 (N.D.N.Y. 2016), quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980). *See Delbene v. Alesio*, 2001 U.S. Dist. LEXIS 2150, *31 (S.D.N.Y. Feb. 21, 2001). Rather, to establish actual disparate treatment, the plaintiff must show not only that the defendant did not enforce the pertinent law against the comparator, but also that the defendant was aware that the comparator, like the plaintiff, had violated the law. *See Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 114 (W.D.N.Y. 2009).

Under the second prong of the selective enforcement analysis, the plaintiff must demonstrate that the defendant's selective treatment of the plaintiff was motivated by religion or a comparable impermissible consideration. *See Rodriguez v. Margotta*, 2000 U.S. App. LEXIS 16260, *2 (2d Cir. 2000); *Adler v. Kent Village Hous. Co.*, 123 F. Supp. 2d 91, 97-99 (E.D.N.Y. 2000). Where, as here, the plaintiff claims that the defendant's enforcement of the pertinent regulation or law was motivated by the plaintiff's religion, the plaintiff must affirmatively demonstrate that similarly situated individuals of a different religion were not penalized for violating the relevant law and that the plaintiff, by contrast, was prosecuted for the pertinent offense based on his religion. *See Khaled v. Dearborn Heights Police Dep't*, 2017 U.S. App. LEXIS 19590, *15 (6th Cir. Oct. 4, 2017); *Staples v. Gerry*, 2015 U.S. Dist. LEXIS 86629, *41- 42 (D.N.H. May 11, 2015). In this context, the defendant's use of a stray comment demeaning the plaintiff, while unfortunate, does not in itself suffice to show that the defendant selectively enforced the law against the plaintiff based on animus or the plaintiff's group membership. *See, e.g., Lieberman v. City of Rochester*, 2011 U.S. Dist. LEXIS 46295, *9-14 (S.D.N.Y. Apr. 29, 2011); *Nunez v. Hamdan*, 2013 U.S. Dist. LEXIS 138625, *19-20 (D. Utah Sept. 25, 2013).

Finally, where the plaintiff has asserted a claim under the Free Exercise Clause arising from the government's alleged disparate treatment of the plaintiff based on his or her religion,

the plaintiff's claim should be analyzed under the same standards as a religious discrimination claim under the Equal Protection Clause. *Bowles v. New York City Transit Auth.*, 2006 U.S. Dist. LEXIS 32914, *54-57 (S.D.N.Y. May 23, 2006). Therefore, if the plaintiff claims religiously-motivated selective enforcement, the plaintiff's failure to allege facts establishing the similar comparator and discriminatory motive elements described above compels dismissal of the plaintiff's claim, regardless of whether it is framed as an equal protection or free exercise claim. *See People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 297-299 (S.D.N.Y. 2000) (the lack of factual allegations in the complaint sufficiently demonstrating disparate treatment of similarly situated offenders of different religions required dismissal of both equal protection and free exercise claims).

1. *Plaintiffs' Allegations Fail to Establish the Similar Comparator and Disparate Treatment Elements of a Selective Enforcement Claim*

Here, plaintiffs' selective enforcement claim should be dismissed because plaintiffs have failed to set forth non-conclusory allegations of fact that, if true, would demonstrate that there was a similarly situated, non-Jewish property owner in the Village who received more favorable treatment from the Village than plaintiffs. Specifically, in the second amended complaint, plaintiffs identify two putative comparators: (1) the prior owner of the subject property at 22 High Mountain Road; and (2) unknown owners of unidentified properties that are on High Mountain Road and therefore "neighboring" the subject property. Ex. A at ¶¶ 21, 23. But those alleged comparators are not similarly situated in all material respects relating to the Village's conduct.

Plaintiffs claim that the prior owner was similarly situated to them because both were alleged to owe a $6,379.34 debt to the Village and yet, when plaintiffs applied for a CO, the Village demanded that only plaintiffs, not the prior owner, pay the debt. However, in relation to

10

the Village's CO requirements and debt collection activities, the prior owner differed considerably from plaintiffs.

Significantly, the complaint does not allege that the prior owner ever applied for a CO, much less that he applied for and received one after he had incurred the $6,379.34 debt. *See* Ex. A at ¶¶ 16, 21. Consequently, as far as the complaint indicates, the Village had no occasion to require the prior owner to pay the debt in exchange for a CO because he never applied for one. By contrast, the complaint alleges that plaintiffs did apply for a CO, and that they did so after the debt had been incurred and become past due. *See* Ex. A at ¶¶ 13, 16, 18. As a result, plaintiffs and the prior owner were quite dissimilar because plaintiffs were applicants for a CO on a property subject to an unpaid debt and the prior owner was not an applicant for a CO at all, much less at a time when the debt had been incurred. Therefore, when the Village required plaintiffs to pay the debt in order to obtain the CO, the Village did not treat plaintiffs differently than any similarly situated property owner who sought a CO on a property involving an unpaid debt. *See* Ex. A at ¶¶ 16-19. Of course, regarding the matter of actual collection of debt, the Village treated plaintiffs and the prior owner identically: the Village ultimately did not collect the debt from either of them. *See* Ex. A at ¶¶ 21, 38. Accordingly, plaintiffs and the prior owner were not similarly situated or subject to disparate treatment in most material respects. *See New York Pet Welfare Association*, 143 F. Supp. 3d at 64-65; *Panzella*, 231 F. Supp. 3d at 8-10. And, at any rate, as will be explained hereinafter, the Village Code authorized the Village to seek reimbursement for the debt from any owner of the property as a condition of obtaining a CO.

In addition, the second amended complaint fails to allege facts showing that other property owners on High Mountain Road were similarly situated to plaintiffs and yet received more favorable treatment than plaintiffs pursuant to the Village's efforts to enforce the grading

11

requirements of the Village Code. In that regard, the complaint accuses the Village of imposing unique burdens on plaintiffs compared to neighboring property owners because the Village required only plaintiffs to post a bond, verify their authorization to use a surveyor's drawings and test fill in order to obtain a permit to perform grading work. *See* Ex. A at ¶¶ 30-32. However, plaintiffs fail to allege disparate treatment with respect to enforcement of permit requirements because they do not allege that any neighboring properties ever applied for a permit or received one. Specifically, while plaintiffs offer the mere conclusions that there were "similarly-situated property owners" who "did not have to satisfy" these requirements or received "contrary . . . treatment" regarding their ability to grade their properties, they do not allege, or even claim, that other property owners *actually applied for* grading permits from the Village and received them without meeting the requirements imposed on plaintiffs. Ex. A at ¶¶ 23, 29-32. Thus, plaintiffs fail to allege that the Village granted such permits to neighboring properties on more favorable terms than those offered to plaintiffs, and their selective enforcement claim fails for lack of factual allegations supporting the disparate treatment element of that claim. *See generally Snyder*, 144 Fed. Appx. at 174.

Furthermore, the allegations in the second amended complaint fail to establish that other property owners on High Mountain Road were similarly situated in all material respects regarding the Village Code's requirements for a grading permit. Significantly, the availability of a grading permit under the Village Code depends on a variety of characteristics of a property and the conduct of the property's owner, and plaintiffs fail to allege facts showing that other property owners on High Mountain Road are similarly situated to them with respect to those critical matters.

For steep-sloped properties, the Village Code requires any development proposal to

12

account for three different categories of slope on the property: moderately steep slope (between 15% and 25% topographical gradient); very steep slope (between 25% and 35% topographical gradient); and extremely steep slope (50% slope and above). *See* Village Code § 119-1.  To obtain approval to do any work on a steep-sloped property, the property owner must submit an application for site plan approval to the Village Planning Board. *See* Village Code § 119-2(A). An application for approval of any such plan must include a written narrative about the proposal and a site development plan prepared by a qualified architect, engineer or other qualified professional, which plan must include detailed topographical information, a soil erosion control plan, locations of each category of slope on the property, a landscape plan prepared by an architect and landscaping data. *See* Village Code §§ 119-5(B)(1); 119-5(B)(2).

The application must also include payment of all applicable fees and a list of necessary permits. *See* Village Code §§ 119-5(B)(3); 119-5(B)(4). The applicable fees include an application fee, an inspection fee, and fees or reimbursements for consultants working with the Planning Board. *See* Village Code §§ 119-6A; 119-6(B).  "A building permit or certificate of occupancy or use shall not issue unless all application fees and consultants' fees charged in connection with the application have been paid to the Village," and the inspection fees must be paid regardless of whether the inspection occurs during the pendency of the application or after approval. Village Code §§ 119-6(B)(2); 119-6(B)(3). The Planning Board may also require the applicant to submit detailed information about the existing soil on the property and reports about the quality of the soil and proposed fill. *See* Village Code § 119-5(C).  During the approval process, the Planning Board must require the posting of a letter of credit to cover damages resulting from the work, and it must require different grading angles and practices depending on the degree of slope on the property. *See* Village Code §§ 119-7(C)(4); 119-7(C)(6).  Then, the

13

applicant must proceed through a public hearing process. *See* Village Code § 119-7(D). Additionally, the applicant must meet the requirements of any other applicable law aside from the Village Code, such as Education Law § 7209, which forbids any municipality to approve plans or drawings of a professional land surveyor that are not stamped with proof that they are authorized and have not been altered. *See* Education Law §§ 7209(1)-(2).

Here, plaintiffs fail to allege relevant facts necessary to determine that they are similarly situated to other sloped property owners under the aforementioned requirements for approval of grading work, including: (1) whether plaintiffs and/or the owners of other properties on High Mountain Road applied to the Planning Board to perform grading work; (2) whether plaintiffs and/or the owners of other properties on High Mountain Road submitted the requisite written narrative, application fees and erosion control plans in support of any such application; (3) whether the other property owners submitted surveyors' drawings in support of any application, so as to trigger the requirement of a stamp proving their authorization to use such drawings and the absence of alteration to those drawings; (4) whether plaintiffs' property and the other properties on High Mountain Road had the same specific mix of slope types which would have to be addressed during the application process; and (5) whether the amounts and angles of fill involved in any fill projects prepared by plaintiffs or other property owners were the same. Far from alleging these facts that would be necessary to support an inference that other property owners are similarly situated to them in all material respects, plaintiffs merely allege that there are property owners on High Mountain Road whose properties are "similarly-sloped" and who were not asked to meet any of the requirements that the Village asked plaintiffs to meet. *See* Ex. A at ¶¶ 23, 29-32. Tellingly, plaintiffs allege only that they met with the Village Engineer about their plan to perform grading work and do not indicate that they submitted their plan to the

14

Planning Board as required by the Village Code, and plaintiffs do not allege facts showing that the other property owners similarly failed to submit an application to the Planning Board and to fulfill the legal requirements for such an application. *See* Ex. A at ¶¶ 24-27. In fact, plaintiffs fail to identify any particular neighboring property by address, specific location or name of owner, thereby depriving the Village of notice of even basic details of their claims. Clearly, plaintiffs' mere conclusions that other property owners are "similarly situated," had "similarly sloped" properties or undertook "similar projects" do not meet *Iqbal*'s requirement of alleging facts establishing that plaintiffs and these other unidentified property owners are similarly situated in all material respects for purposes of the Village's grading approval process.

It should be noted that the Village Code provisions cited above also disprove a major premise of plaintiffs' position here, namely that the Village Code did not authorize the Village to enforce the disputed requirements against plaintiffs. In reality, the facts alleged in the complaint demonstrate that the Village acted properly in all respects. For example, the Village Code forbids the issuance of a CO unless all outstanding fees and reimbursements owed to the Village have been paid, regardless of whether the right to such reimbursement is secured by a lien, and here it is alleged that there was an unpaid reimbursement and fee of $6,379.34 owed to the Village in connection with the subject property, requiring denial of a CO. *See* Village Code §§ 119-6(B)(2); 119-6(B)(3). Additionally, the Village Code requires an applicant for grading approval to submit a letter of credit – basically, a bond -- to insure against damage to neighboring properties, and here, as alleged in the complaint, the Village properly demanded such a bond or letter of credit from plaintiffs. *See* Village Code §§ 119-7(C)(4); 119-7(C)(6). The Village Code also empowers the Village to demand an erosion control plan and detailed information about soil and fill involved in the proposed grading work, and here the Village

15

allegedly required plaintiffs to test fill and submit the results, as it was entitled to do. *See* Village Code §§ 119-5(B)(2); 119-5(C). Moreover, the Education Law forbids a municipality to approve any development project supported by a surveyor's drawing that do not include proof of authorized use, and here the complaint alleges facts showing that the Village properly demanded that plaintiffs submit proof of their authorization to use the surveyor's drawings which they submitted. *See* Education Law § 7209; *see generally* Ex. A at ¶¶ 16-19, 21, 23, 29-32, 38. In fact, given that plaintiffs allege that they submitted their application to the Village Engineer rather than the Planning Board, they made no effort to satisfy any of the relevant requirements for grading approval via the proper process, and therefore the Village was well within its rights to deny them permission to grade their property. Since there is no allegation that other similar property owners submitted an application to grade steep slopes exclusively to the Town Engineer (not the Planning Board) and obtained approval to without meeting the aforementioned requirements, plaintiffs' selective enforcement claim fails as a matter of law.[4]

Furthermore, while plaintiffs complain of the Village's request that they execute an agreement acknowledging responsibility for maintenance of the roads connecting to their property, plaintiffs fail to identify any similarly situated property owner who also owned property connected to the same type of road and did not have to sign such an agreement to get a CO. *See* Ex. A at ¶¶ 39-40. Hence, no selective enforcement claim can be maintained on this

---

[4]   Moreover, while plaintiffs allege in the second amended complaint that the Village offered no basis for its claim that plaintiffs owed the $6,379.34 debt, this allegation should be disregarded because it directly contradicts plaintiffs' averments in the original complaint, wherein they claimed that the Village showed them documents supporting its claim for collection of the debt and that plaintiffs simply believed, without any apparent basis, that the documents were forged. *See* Ex. A at ¶¶ 16-17; Ex. B at ¶ 45; *see also Palm Beach Strategic Income v. Stanley P. Salzman, P.C.*, 2011 U.S. Dist. LEXIS 46867, *13-22 (E.D.N.Y. May 2, 2011).

6728550v.1

basis.[5]

This Court's decision in *In the Matter of the Application of Hampshire Recreation, LLC v. Vill. of Mamaroneck*, 2016 U.S. Dist. LEXIS 39496 (S.D.N.Y. March 25, 2016) (Seibel, J.), illustrates the inadequacy of plaintiffs' allegations.  In *Hampshire Recreation*, the plaintiffs owned and operated a country club on a 106-acre parcel, and the plaintiffs sought to re-zone their property in order to build a 121-unit residential building on part of the property.  *See Hampshire Recreation*, 2016 U.S. Dist. LEXIS 39496, at *3-4.  In response, a coalition of local residents, who opposed the development, filed complaints about noise violations, traffic violations and the holding of improper non-member events without a permit against the plaintiffs with the defendant village, and the village brought legal proceedings against the plaintiffs based on the lack of a permit.  *See id.* at *4-6.  The plaintiffs sought a special permit from the ZBA for non-member events and also petitioned for re-zoning of their property to accommodate their planned development, resulting in a lengthy series of proceedings, hearings and requests for the special permit and re-zoning.  *See id.* at *6-11.  The plaintiffs received only a probationary special permit.  *See id.* at *8.  Eventually, the plaintiffs sued the village, asserting that the village selectively enforced its permitting and zoning requirements against the plaintiffs.  *See id.* at 16-17.  In support of their claim, the plaintiffs identified three other specifically named clubs as similarly situated comparators who, unlike the plaintiffs, received a special permit from the village.  To demonstrate the similarity of these clubs, the plaintiffs alleged that, like the plaintiffs' club: they were located along the same specific area adjacent to single-family residential neighborhoods; they held non-member events of similar size and character; and they

---

[5] Notably, plaintiffs do not allege that they actually signed the agreement or that, in the time between the Village's request for the execution of the agreement and the service of the second amended complaint, the Village revoked or attempted to revoke their CO as a consequence of their failure to sign the agreement.  *See* Ex. A at ¶¶ 39-40.

held the events in facilities located in the same zone as a part of the plaintiffs' property. *See id.* at *20-21.

On the village's motion in *Hampshire Recreation*, this Court dismissed the complaint under F.R.C.P. 12(b)(6), finding that the plaintiffs' complaint failed to include sufficient factual allegations to establish the similar comparator element of their selective enforcement claim. *See id.* at 20-25. In particular, this Court observed that the putative competitors' property fell entirely within a zone that allowed non-member events, whereas only part of the plaintiffs' property fell within that zone, creating a relevant distinction between them. *See id.* at 20-21. And, the Court also ruled that, because the plaintiffs did not allege that the other clubs had received the same number of citations or complaints from neighbors and others, the plaintiffs had not submitted sufficient factual allegations to show that the other clubs were truly similarly situated when they applied for special permits. *See id.* at *21-22, citing *Amid v. Vill. of Old Brookville*, 2013 U.S. Dist. LEXIS 129447, at *6-7 (E.D.N.Y. Feb. 7, 2013) ("[W]here a plaintiff claims to have been treated unfairly in a zoning/building context, he must plead specific examples of applications and hearings that were similar to plaintiff's application and demonstrative of the disparate treatment alleged," including specific characteristics or traits permitting court to find similarity plausible). Hence, the Court stated that the plaintiffs' complaint did "not identify salient characteristics of the alleged comparators that are necessary to plausibly allege the necessary degree of similarity." *Hampshire Recreation*, 2016 U.S. Dist. LEXIS 39496, at *23. Moreover, the Court determined that the plaintiffs had failed to satisfy the disparate treatment element of their claim, as another club, like the plaintiffs, also received a probationary permit. *See id.* at *23.

In *Hampshire Recreation*, the Court also found that the plaintiffs and another club were

18

not similarly situated in relation to the village's repeated citations of the plaintiffs for holding noisy non-member events because, while the plaintiffs asserted that the other club held noisy non-member events as well, they failed to allege that the other club, like the plaintiffs, lacked the requisite permit to hold such events. *See id.* at *26-27. Additionally, in the Court's view, the village's efforts to enforce its laws against the plaintiffs based on their acknowledged violations of those laws established that the village had no discriminatory motive for its actions. *See id.* at *24-27. Accordingly, the Court dismissed the complaint for failure to state a cause of action. *See id.* at *52. Subsequently, the Second Circuit affirmed this Court's decision. *See id.*, 2016 U.S. App. LEXIS 20650 (2d Cir. Nov. 18, 2016).

Here, plaintiffs' allegations are even more deficient than the allegations in *Hampshire Recreation*. Indeed, at least the plaintiffs in *Hampshire Recreation* identified, by name and address, owners and properties that were purportedly similar to the plaintiffs and their property. More to the point, just as the plaintiffs in *Hampshire Recreation* alleged that other property owners should have been subject to the same permitting rules and enforcement actions because those owners had properties in the same area, used those properties for the same purpose and held the same types of events, plaintiffs here make similar -- though more conclusory -- allegations that unidentified individuals with land in the same general area and similarly sloping properties were not subjected to the same restrictions as plaintiffs. Furthermore, like the plaintiffs in *Hampshire Recreation*, plaintiffs here do not allege whether the purported comparators have a history of land-use violations and permit applications which is comparable to plaintiffs'. And, just as the plaintiffs in *Hampshire Recreation* acknowledged a relevant difference between themselves and other property owners -- not all of the plaintiffs' property shared the same zoning as the comparators -- plaintiffs' allegations here indicate that there are

19

relevant differences between themselves and the putative comparators because plaintiffs erroneously applied only to the Town Engineer for permission to grade the slopes and apparently had unfinished roads connecting to their property, which necessitated arrangements for maintenance. Significantly, too, plaintiffs here, like the plaintiffs in *Hampshire Recreation*, cannot satisfy the discriminatory intent element of a selective enforcement claim because their own allegations show that the Village simply engaged in neutral enforcement of the text of applicable local laws. Moreover, like the plaintiffs in *Hampshire Recreation*, plaintiffs here received equal treatment to their comparators in some respects; in *Hampshire Recreation*, the plaintiffs and a comparator were both issued probationary permits, and here, plaintiffs and the prior owner of the subject property were both spared from having to pay the $6,379.34 reimbursement.[6] Therefore, here, as in *Hampshire Recreation*, the Court should dismiss plaintiffs' selective enforcement claim. *See id.* at *20-27, 52; *see also Amid*, 2013 U.S. Dist. LEXIS 129447, at *16-19; *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 225-227 (S.D.N.Y. 2012); *cf. Gregory v. Inc. Vill. of Ctr. Island*, 2016 U.S. Dist. LEXIS 98076, *18-22 (E.D.N.Y. July 27, 2016).[7]

---

[6] In this respect, Mr. Zummo's alleged statement that he would not participate in selective enforcement of the Village Code against plaintiffs, *see* Ex. A at ¶ 28, and the secondhand report that Mayor Yagel and Ms. Ulman told Village employees to "give plaintiff a hard time," Ex. A at ¶ 35, add nothing to plaintiffs' baseless claims. As noted above, stray comments about a plaintiff, such as the comments here, are legally insufficient to support a selective enforcement claim, and they do not show that any selective enforcement actually occurred, notwithstanding Mr. Zummo's purported opinion. *See, e.g., Lieberman*, 2011 U.S. Dist. LEXIS 46295, at *9-14; *Nunez*, 2013 U.S. Dist. LEXIS 138625, at *19-20.

6, *Brown v. Daikin Am., Inc.*, 756 F.3d 219 (2d Cir. 2014), which pre-dates the Second Circuit's affirmance of this Court's decision in *Hampshire Recreation*, is not to the contrary. In Brown, the issue was whether, under Title VII of the Civil Rights Act of 1964, the plaintiff had set forth sufficient allegations to support an inference of racial discrimination based on alleged disparate treatment of Japanese workers who were indisputably similarly situated to the plaintiff, save for the fact that they had rotational shifts. See Brown, 756 F.3d at 228-231. Relying on the rule in title VII cases that a plaintiff is similarly situated for purposes of that statute as long as they are subject to the same standards of job performance and discipline, the Second Circuit concluded that the plaintiff did not have to allege detailed facts about job functions, qualifications and pay to demonstrate that he was similarly situated to other employees, for those details were not required to satisfy the requirements of title VII jurisprudence. See id. By contrast, here, plaintiffs raise an equal protection claim, not a title VII claim. And, although both types of claims require some showing that the plaintiff is similarly situated to a comparator, the Second Circuit applies the more

20

2. *The Second Amended Complaint Fails to State a Cause of Action for Violation of the First Amendment*

In addition, plaintiffs' free exercise claim should also be dismissed. Because plaintiffs rely on the same allegations of discrimination described above to support their free exercise claim and do not allege that the Village substantially burdened any particular religious observance, such as a worship service or religious land use, their free exercise claim should be analyzed under the same standards as their selective enforcement claim. *See Bowles*, 2006 U.S. Dist. LEXIS 32914, at *54-57; *cf. Bloomingburg Jewish Educ. Ctr v. Vill. of Bloomingburg*, 111 F. Supp. 3d 459, 484-485 (S.D.N.Y. 2015). Therefore, plaintiffs' free exercise claim must fall with their selective enforcement claim.

3. *The Individual Defendants Are Entitled to Qualified Immunity, and the Village is Shielded from Liability under Monell*

Even if there were any constitutional violation here, Mayor Yagel and Ms. Ulman would be entitled to qualified immunity. "Qualified immunity shields a public official from civil liability when his conduct 'does not violate a clearly established statutory or constitutional right.'" *Bolden v. Village of Monticello*, 344 F. Supp.2d 407, 410 (S.D.N.Y. 2004), quoting *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). And, "even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Danahy v. Buscaglia*, 134 F.3d 1185, 1190 (2d Cir. 1998) (internal quotation marks and citation omitted). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Here, even if Mayor Yagel and Ms. Ulman's

---

relaxed "same discipline and performance" rule only to title VII claims, not to equal protection claims like the one raised by plaintiffs here. In fact, the Second Circuit has emphasized that, in the equal protection context, particularized factual allegations are necessary, and plaintiffs here have failed to meet that requirement. *See Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 58-60 (2d Cir. 2010).

actions had been technically unconstitutional – they were not – the circumstances alleged in the second amended complaint made it objectively reasonable for them to believe that they were not violating plaintiffs' rights. As discussed above, Mayor Yagel and Ms. Ulman were engaged in proper, fact-specific enforcement of the Village Code, which has numerous technical provisions, and it was reasonable for them to believe that plaintiffs had violated that Code and hence were obligated to pay the debt on the property, submit their proposal for grading work to the Planning Board, and meet the legal requirements for such work. Consequently, Mayor Yagel and Ms. Ulman deserve qualified immunity.

Finally, the Village cannot be vicariously liable for the alleged unconstitutional actions of Mayor Yagel or Ms. Ulman. To prevail on a Section 1983 claim against a municipality, a plaintiff must establish that his injuries were directly caused by a municipal policy, custom or practice, or else the plaintiff must demonstrate that the defendant was a policy maker for the municipality. *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 692-94 (1978); *see Dilworth v. Goldberg,* 914 F. Supp. 2d 433, 452-459 (S.D.N.Y. 2012). A municipality cannot be liable under 42 U.S.C. §1983 under the theory of *respondeat superior. Id.* at 690-91; *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 478 (1986). A single incident, complained of by the plaintiff, does not constitute a "policy" for purposes of liability under Section 1983. *Oklahoma City v. Tuttle,* 471 U.S. 808, 823-824 (1985); *Palacio v. City of New York,* 2008 U.S. Dist. LEXIS 14891, at *13 (S.D.N.Y. Jan. 15, 2008).

Here, although plaintiffs set forth the mere conclusion that Mayor Yagel's and Ms. Ulman's actions in delaying the issuance of a CO and enforcing requirements for grading work constituted the Village's official policy, they acknowledge that this conduct was unusual. *See* Ex. A at ¶¶ 14, 19, 30. And, at bottom, plaintiffs identify just two isolated instances of purported

22

unconstitutional misconduct -- the refusal to immediately issue a CO and the demand for compliance with grading requirements of the Village Code – which cannot constitute a policy or custom of constitutional violations rendering the Village liable. *See* Ex. A at ¶¶ 13-15, 29-32; *see generally Palacio*, 2008 U.S. Dist. LEXIS 14891, at *13. Furthermore, because the Board of Trustees, not the Mayor, sets policy for the Village and neither the Mayor nor the Town Attorney has any direct role in setting land use policy, Mayor Yagel and Ms. Ulman did not act as municipal policy makers in delaying plaintiffs' bid for land-use approval and hence could not create liability for the Village in this context. *See* Village Code §§ 16-1 (Board approves legislation); 20-1 (Mayor cannot fire officials without Board approval); 20-12; 119-4 (Engineer or Planning Board makes land use decision depending on circumstances); *see generally Dilworth*, 914 F. Supp. 2d 433, 452-459.

In sum, plaintiffs' second amended complaint should be dismissed for alleging facts that fail to state a cause of action, fail to demonstrate the existence of a relevant municipal policy responsible for their alleged injury and fail to show that the individual defendants are not qualifiedly immune.

### Conclusion

For the reasons stated above, this Court should grant defendants' motion to dismiss pursuant to F.R.C.P. 12(b)(1) and 12(b)(6), and dismiss the second amended complaint in its entirety.

Dated:     White Plains, New York
           October 16, 2017


                                          Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Attorneys for Defendants

Janine A. Mastellone
**John B.** Martin

1133 Westchester Avenue
White Plains, NY 10604
(914) 323-7000
Our File No. 00295.12564

24

# Exhibit E

*(to Exhibit B)*

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   TAL PROPERTIES of POMONA LLC,

 4                  Plaintiff,

 5        -against-                          17 Civ. 2928(CS)

 6   VILLAGE of POMONA, et al.,

 7                  Defendants.

 8   ------------------------------------x

 9
                                  United States Courthouse
10                                White Plains, New York

11                                January 10, 2018

12
     B e f o r e:
13
                        HON. CATHY SEIBEL,
14                                 District Court Judge

15   A P P E A R A N C E S:

16   SUSSMAN & WATKINS
               Attorney  for Plaintiff
17             1 Railroad Avenue 3
               Goshen, New York 10924
18   BY:  MICHAEL H. SUSSMAN (By phone)

19

20   WILSON ELSER MOSKOWITZ EDELMAN & DICKER
               Attorneys for Defendants
21             1133 Westchester Avenue
               White Plains, New York 10604
22   BY:  JANINE A. MASTELLONE

23

24

25
```

Angela O'Donnell, RPR, 914-390-4025

1                    P R O C E E D I N G S

2          THE COURT:  Hi, Mr. Sussman.

3          MR. SUSSMAN:  Yes, your Honor.

4          THE COURT:  You sure you want to do this,

5   Mr. Sussman?  You can always order the transcript.

6          MR. SUSSMAN:  I haven't heard anything.  I'll stay on

7   the line.  Thank you.  Has anybody spoken?  I haven't heard

8   anything.

9          THE COURT:  Nobody said anything.  I understand

10  you're dealing with a personal matter, if you would --

11         MR. SUSSMAN:  I'm sorry I'm not there.  Thank you.

12         THE COURT:  I'm giving you an out if you --

13         MR. SUSSMAN:  I understand.  I appreciate it.

14         THE COURT:  All right.

15         MR. SUSSMAN:  I'm okay just sitting here talking.

16         THE COURT:  And Ms. Mastellone, you can have a seat.

17         MS. MASTELLONE:  Thank you, your Honor.

18         THE COURT:  Any last words anybody wants to add

19  beyond what's in the motion papers?

20         MS. MASTELLONE:  No.  Thank you, your Honor.

21         THE COURT:  All right, so I'm just going to read my

22  decision.

23         It's a motion the dismiss the second amended

24  complaint or SAC.  I accept as true the facts, although not the

25  conclusions in the SAC.  Plaintiff is TAL Properties of Pamona,

                Angela O'Donnell, RPR, 914-390-4025

1    which is an LLC that conducts business in Rockland County.  The

2    sole owner of TAL is Avrohom Manes, who's an Orthodox Jew

3    residing in Rockland County.  He's not named in the caption as

4    a plaintiff, but he is named in the body.  So I am assuming it

5    is intended he is a plaintiff.

6            The defendant, Village of Pomona, is in Rockland

7    County.  The defendant, Brent Yagel is the mayor of the Village

8    and the defendant Doris Ulman is the Village attorney.  The

9    caption doesn't name her as a defendant, but the body does, so

10   I assume she's meant to be a defendant.

11           Plaintiffs sue both Yagel and Ulman in both their

12   official and individual capacities.  Plaintiffs allege that

13   both individual defendants knew that Manes was Jewish.

14           In December 2015, plaintiffs bought a residential

15   home, which I'm going to call the property, at 22 High Mountain

16   Road in the Village.  In January 2016, they made repairs to the

17   property.  The same month the Village building inspector, Louis

18   Zummo, inspected the property and advised plaintiffs that the

19   work had been completed in accordance with the applicable codes

20   and regs and that a C of O should be issued, a certificate of

21   occupancy should be issued.  Despite plaintiffs qualifying for

22   the issuance of a C of O, Yagel and Ulman are alleged to have

23   directed Zummo not to issue the certificate.  They are alleged

24   to have acted in contravention of the Village Construction

25   Code, Chapter 47-10, which, according to plaintiffs, requires

Case 7:19-cv-06608-PMH Document 179-6 Filed 11/23/20 Page 41 of 87

1   the issuance of the CO because the property complied with the

2   applicable code requirements.

3            In seeking to justify the Village's refusal to issue

4   the CO, Yagel, acting through Ulman, claimed that a previous

5   owner of the property owed the Village $6,379.34 and demanded

6   that plaintiffs pay this debt in exchange for the CO.  At no

7   time did defendants claim the plaintiffs incurred the debt or

8   have any basis for such a claim.  Plaintiffs allege that

9   refusing to grant the CO on that basis is not based in law,

10  does not represent the Village's general practice and is

11  without precedent.  Yagel and Ulman allegedly failed to take

12  any action to collect the sum of 6300 and change from the

13  previous owner, who is not Jewish, and that they allegedly

14  permitted the previous owner's developer bond to lapse without

15  collection even though the developer failed to develop and

16  complete roads secured by the bond.

17           During the time plaintiffs sought to sell the home,

18  defendants are alleged to have repeatedly used unspecified

19  false explanations for delays in the issuance of the CO, thus

20  preventing plaintiffs from alienating their property.

21  Plaintiffs attempted to grade slopes on the property to create

22  usable backyard space and to enhance the property's value.  The

23  Village engineer worked with plaintiff's engineer to develop a

24  plan to address the slopes and initially approved the plan.

25  But after being pressured by Yagel and Ulman, the Village

1  engineer retracted his approval, disavowed the plan and imposed
2  costly conditions on plaintiffs.
3          Zummo then advised the engineer, although the SAC
4  does not say whether that refers to the Village engineer or
5  plaintiff's engineer, that he would longer participate in this
6  allegedly selective enforcement against plaintiffs.  Zummo and
7  the Village clerk have both told Manes that Yagel and Ulman
8  advised them to give Manes a hard time with anything he needed.
9  The conditions imposed, which owners of "similarly sloped"
10 properties allegedly did not have to satisfy, required
11 plaintiffs to post a bond to insure that plaintiffs did not
12 damage their neighbor's property, which plaintiffs claim was
13 highly unusual; show that the original surveyor whose work
14 product plaintiffs used in their submission authorized
15 plaintiff to use his work; which, according to plaintiffs, was
16 highly unusual, as land surveys are typically relied upon
17 without such authorization; and test the compressed fill they
18 used for grading in a manner inconsistent with requirements
19 imposed on others using such fill for similar projects.
20         Although plaintiffs agreed to comply with these
21 requirements, the Village still rejected plaintiff's
22 application and did not issue a permit for the grading work.
23         In the fall of 2016, plaintiffs entered into a
24 contract to sell the property.  By this point, the Village had
25 dropped any claim that plaintiffs owed the debt incurred by the

Angela O'Donnell, RPR, 914-390-4025

1    previous owner and the Village had issued a CO.  Following the

2    sale of the property, the Village threatened to withdraw the CO

3    if plaintiffs failed to sign an agreement acknowledging, among

4    other things, that the road accessing the property was not a

5    Village road and that its maintenance was the sole

6    responsibility of the property's owner.  Plaintiffs allege this

7    requirement was contrary to Village practice, not authorized by

8    the Village code and another *ultra vires* action taken by the

9    Village dictated by Yagel and Ulman to impede and complicate

10   plaintiff's alienation of the property.

11          Plaintiffs allege that the delays in issuing the

12   required CO and the discriminatory imposition of grading

13   requirements cost plaintiff to incur a substantial decline in

14   the sales price of the property and prevented plaintiffs from

15   using the proceeds from a sale for other profitable business

16   opportunities.

17          TAL filed this lawsuit in state Court on March 16,

18   2017 and defendants removed it to federal court on April 21,

19   2017.  Defendant sent a letter requesting a premotion

20   conference on May 12 and plaintiffs responded by filing the

21   first amended complaint on July 5th.  The first amended

22   complaint added Manes as a plaintiff and removed many

23   defendants.  Defendants then asked for a premotion conference

24   again on July 26.  Plaintiff responded by letter on July 31,

25   and we had a conference on August 25.  Plaintiffs then filed

1    the SAC on September 7, it contains two claims, both under

2    Section 1983, one for violation of the Equal Protection Clause

3    of the Fourteenth Amendment based on the theory that defendants

4    engaged in selective enforcement against plaintiffs based on

5    Manes' religion; and, second, a claim that by intentionally

6    imposing harsher conditions on plaintiffs than on non-Jewish

7    developers, defendants burdened the free exercise of Manes's

8    religion.  Defendants moved to dismiss on October 16.

9          On a Rule 12(b) motion, the familiar standards of

10   *Iqbal* and *Twombly* apply.  Defendants raise four grounds for

11   dismissal:  One that plaintiffs lack standing to demand

12   damages; two, that they failed to sufficiently plead the

13   elements of both constitutional violations; three, that the

14   individual defendants are entitled to qualified immunity, and,

15   four, that plaintiffs failed to sufficiently plead *Monell*

16   liability.

17         The first argument is that plaintiffs lack standing

18   to sue at least insofar as they allege claims arising from the

19   Village's unsuccessful attempt to collect the debt incurred by

20   the previous property owner.  If the claim in this case were

21   that the Village's collection attempt violated state law or a

22   federal statute, defendants might be right that plaintiffs had

23   suffered no concrete injury.  But plaintiffs are not alleging

24   concrete injury from having had to make a wrongful payment.

25   Plaintiffs are alleging that they suffered concrete injury,

1   that is, lost money, from being subjected to unfair impediments

2   in connection with their CO on the basis of plaintiff, Manes's,

3   religion and that the claim that plaintiffs owed the prior

4   owner's debt was a pretext for that discrimination.  If they

5   could so prove, the violation of their equal protection rights

6   would be a sufficient injury.  Likewise, contrary to

7   defendants' argument, plaintiffs are not claiming injury from

8   an otherwise proper land use approval process that just took

9   too long as one would in a due process or takings case.

10   Plaintiffs are alleging discrimination based on religion, so

11   the loss of money and emotional stress they allege suffice to

12   demonstrate standing.

13          I will now address each alleged constitutional

14   violation in turn.

15          First, the selective enforcement claim.  A plaintiff

16   can bring a 1983 claim under the Equal Protection Clause which,

17   among other things, bars the government from selective adverse

18   treatment of individuals compared with other similarly situated

19   individuals if such selective treatment was based on

20   impermissible considerations such as race, religion, intent to

21   inhibit or punish the exercise of constitutional rights or

22   malicious or bad faith intent to injure a person.  *Bizzarro*

23   *versus Miranda*, 394 F.3D 82, 86.  To properly state a claim for

24   selective enforcement, plaintiff has to show, not surprisingly,

25   that, one, the person compared with others similarly situated

1   was selectively treated; and, two, that the selective treatment

2   was based on impermissible consideration such as religion.

3   *LeClair versus Saunders*, 627 F.2d 606, 609-10; *accord Zahra*

4   *Town of Southold*, 48 F.3d 674, 683.  To satisfy the first prong

5   plaintiffs must, at a minimum, plausibly allege comparators

6   that are similarly situated in all material respects.  *Sharp*

7   *versus City of New York*, 2013 WL 2356063 at *4 (E.D.N.Y.,

8   May 29, 2013) *aff'd* 560 F.App'x 78.  Exact correlations are not

9   required, but at least a rough similarity is.  *Mosdos Chofetz*

10  *Chaim Inc. versus Wesley Hills*, 815 F.Supp. 2d 679, 698

11  (S.D.N.Y., 2011), where the Court said that, at the motion to

12  dismiss stage, the court must still determine whether, based on

13  the plaintiff's allegations in the complaint, it is plausible

14  that a jury could ultimately determine that the comparators are

15  similarly situated.  Conclusory allegations of selective

16  treatment are insufficient to state an equal protection claim.

17  *Bishop versus Best Buy* 2010 WL 4159566 at *11 (S.D.N.Y.,

18  October 13, 2010), *on reconsideration* 2011 WL 4011449,

19  (September 8, 2011), *aff'd* 518 F.App'x 55.  *See Segreto versus*

20  *Town of Islip*, 2014 WL 737531 at *7 (Eastern District of New

21  York, February 24, 2014) where the court dismissed an equal

22  protection claim where plaintiffs merely alleged that others

23  were allowed to get permits but it was unclear whether those

24  properties had any circumstances similar to plaintiff.  To

25  satisfy the second prong, plaintiff can offer both direct and

1   circumstantial evidence of discriminatory intent. *Chabad*
2   *Lubavitch of Litchfield County versus Litchfield Historic*
3   *District*, 768 F.3d 183, 199, but must offer more than
4   conclusory allegations of disparate treatment and personal
5   opinions that such treatment was motivated by discriminatory
6   intent. *Morales versus New York* F.Supp. 3d 256, 275 (S.D.N.Y.,
7   2014).

8          Plaintiffs appear to have alleged three incidents of
9   selective treatment: One, defendants' delay in issuing a CO,
10  including defendants' request that plaintiffs pay the debt on
11  the property incurred by the previous owner; two, defendants'
12  requirement that plaintiffs fulfill certain conditions before
13  receiving a grading permit for their property; and, three,
14  defendants' request the plaintiff sign an agreement in exchange
15  for maintaining the certificate of occupancy. Other property
16  owners on High Mountain Road are similarly situated and were
17  not subject to similar treatment.

18          Plaintiff's allegations regarding similarly situated
19  persons are conclusory. Although the SAC details plaintiff's
20  travails in obtaining a certificate of occupancy and a grading
21  permit, it does not provide specific examples of similarly
22  situated persons applying for a CO or a grading permit, much
23  less examples of similarly situated persons receiving
24  preferential treatment. *See Amid versus Village of Old*
25  *Brookville*, 2013 WL 52772 at *6 (E.D.N.Y., February 7, 2016),

Angela O'Donnell, RPR, 914-390-4025

1    where the Court said, "Where a plaintiff claims to have been

2    treated unfairly in a zoning/building context, he must plead

3    specific examples of applications and hearings that were

4    similar to plaintiff's application and demonstrative of the

5    disparate treatment."

6              Although the similarly situated standard for

7    selective enforcement claim is less stringent than the one for

8    a class of one claim, *see, e.g., New Page at 63 Main versus*

9    *Incorporated Village of Sag Harbor*, 2016 WL 8653493 at *20-21

10   (E.D.N.Y., March 19, 2016); *Mosdos*, 815 F.Supp. 2d at 695-96,

11   plaintiffs must still provide more than conclusory allegations

12   and speculation that they were treated less favorably.

13   *Rodrigues versus Incorporated Village of Mineola*, 2017 WL

14   2616937 at *6 (E.D.N.Y., June 16, 2017) is an example of a

15   court holding the plaintiffs adequately alleged that a

16   similarly situated comparator was treated differently than

17   plaintiffs.   In that case, plaintiffs listed six neighboring

18   businesses that engaged in the same activities as plaintiffs

19   that is operating outdoor facilities on their property, but

20   unlike plaintiffs, the other businesses operated outdoor

21   facilities without frequent visits from Village inspectors and

22   some operated without permits.   The plaintiffs also allege that

23   the Village issued plaintiffs a summons for allowing the

24   accumulation of filth, dirt, concrete dust and stones on a

25   public place, but the Village did not issue a summons to a

1   neighboring business even though that same business had spilled

2   concrete onto public streets.  That's *Rodrigues* at *6.

3           In another case, in contrast, *Joglo Realties Inc.*

4   *versus Seggos*, 229 F.Supp. 3d 146, 157 (E.D.N.Y., 2017), the

5   court dismissed plaintiff's selective enforcement claim where

6   plaintiffs allege their neighbors had violated the same

7   environmental regulations plaintiffs were accused of violating,

8   because the plaintiffs "failed to provide the Court with

9   factual details that would allow the Court to infer that their

10  neighbors have violated the relevant laws and regulations to

11  such an extent that the violations could be fairly be compared

12  with plaintiff's alleged infractions."

13          Plaintiff's allegations in this case are not nearly

14  as detailed as the allegations in *Rodrigues* or even *Joglo*.  As

15  to the previous owner, plaintiffs do not allege that the

16  previous owner ever applied for a certificate of occupancy.  As

17  to the other property owners on High Mountain Road, even if the

18  conclusory allegations that their properties were, "similarly

19  sloped," were sufficient, which it's not, plaintiffs do not

20  allege that these property owners ever applied for grading

21  permits or that they received grading permits with preferential

22  conditions as compared to those imposed on plaintiffs.

23  Likewise while plaintiffs allege that it was not Village

24  practice to require an agreement that plaintiffs access road

25  was not a Village road, they do not allege -- first they don't

1   allege that they were not properly responsible for that road,

2   but moreover they don't allege that any other property owner

3   had a similar access road or that responsibility for another

4   access road was ever in dispute.   Plaintiffs provide no facts

5   about the comparator's properties or activities from which the

6   court could infer they were, in fact, similarly situated but

7   treated better in their interactions with defendants.   *See New*

8   *Page* at *21, where the court dismissed an equal protection

9   claim under either selective prosecution or class-of-one

10  theories where the plaintiff neither identified a similarly

11  situated restaurant nor offered any non-conclusory allegations

12  suggesting all the neighboring in all material respects.

13  *Segreto* at *7, where vague allegations regarding the neighbors

14  were insufficient given that there were no allegations that the

15  neighbors had received permits that were denied to plaintiff

16  and it was unclear whether the properties were similar.

17  *Parkash versus Town of Southeast*, 2011 WL 5142669 *8 (S.D.N.Y.,

18  September 30, 2011) where the conclusory reference to

19  unspecified similarly situated persons without accompanying

20  examples was insufficient to state a selective enforcement

21  claim, *aff'd* 468 F.App'x 80; and *cf. Whittle versus County of*

22  *Sullivan*, 2017 WL 5197154 at *7-8, one of my cases from

23  November 8th of last year, where allegations of the similarly

24  situated comparator were inadequate in an employment

25  discrimination case where the plaintiff failed to provide facts

1   as to which colleagues submitted similar acts but were not

2   fired, what those acts were, to whom those employees reported,

3   what their responsibilities were and how their disciplinary

4   histories compared to plaintiffs.  By merely saying the

5   comparators are similar without facts rendering that conclusion

6   plausible, plaintiffs here have alleged but have not shown

7   entitlement to relief.  See Iqbal 566 U.S. 679.  Accordingly

8   they failed to plausibly allege the first prong of the

9   selective enforcement claim.

10         They've also failed to plausibly allege the second

11  prong; namely, that the defendants' actions were motivated by

12  religious-based animus.  The allegations in that regard are

13  conclusory, e.g., paragraph 20 says, "Indeed, out of animus for

14  plaintiffs based on the religion of plaintiff's principal..."

15  Paragraph 43 says, "The religiously motivated discrimination to

16  which defendant subjected plaintiff..."  But there are no facts

17  supporting these conclusions.  They are nothing more than a

18  personal opinion that defendants' conduct was motivated by

19  intent to discriminate on the basis of religion, which is not

20  enough to carry a selective enforcement claim past the motion

21  to dismiss claim.  See Morales, 22 F.Supp. 3d at 275.

22  Plaintiffs must do more than allege that defendants knew Manes

23  was Jewish and that something bad happened to plaintiffs.

24  Plaintiffs do not allege that the defendants made comments to

25  or about Manes suggesting discriminatory animus.  Plaintiffs

Angela O'Donnell, RPR, 914-390-4025

1   fail to even allege circumstantial evidence of discriminatory
2   intent, such as allegations suggesting history of religious
3   discrimination or, as discussed above, facts suggesting that
4   defendants favored similarly situated non-Jewish people, *cf.*
5   *Hamzik versus Office for People with Developmental*
6   *Disabilities*, 859 F.Supp. 2d 265, 279 (Northern District,
7   2012).  Plaintiffs have therefore failed to state a plausible
8   selective enforcement claim.
9            Turning now to the free exercise claim.  The SAC
10  alleges that the defendants' burdened the free exercise of
11  religion in violation of the First Amendment which is
12  applicable to the states through the Fourteenth Amendment.
13  *Central Rabbinical Congress versus New York City* 763 F.3d 183,
14  193.  The protections of the free exercise clause pertain if
15  the law at issue discriminates against some or all religious
16  beliefs or regulates or prohibits conduct because it is
17  undertaken for religious reasons.  *Church of the Lukumi Babalu*
18  *Aye versus City of Hialeah*, 508 U.S. 520, 532.  The government
19  may, however, enact generally applicable laws that happen to
20  burden religious practice.  *Newdow versus Peterson*, 753 F.3d
21  105, 108.  A law that is neutral and of general applicability
22  need not be justified by a compelling governmental interest
23  even if it has the incidental effect of burdening a particular
24  religious practice.  *Lukumi* 508 U.S. at 531.
25           Defendants argue that the First Amendment claim rises

1   or falls with the equal protection claim, and plaintiffs do not

2   dispute or even address this argument.  I agree with the

3   parties that on the facts here the claims do rise and fall

4   together, because both depend on plaintiffs having plausibly

5   alleged religious-based animus, which they failed to do.

6   Plaintiffs have not alleged that the conditions and

7   requirements imposed by defendants are not neutral or of

8   general applicability or that they are designed to interfere

9   with religious observation.  Plaintiffs have merely set forth

10  the conclusory allegations of religious-based animus that I

11  discussed earlier and the conclusory assertion that the

12  defendants burdened the free exercise of Manes's religion.  See

13  paragraph 49.  Plaintiffs failed to allege that the conditions

14  and requirements imposed by defendants substantially burden

15  religious freedom or interfere with religious observation.  See

16  *Skoros versus City of New York*, 437 F.3d 1, 39, where the court

17  said, absent a showing that the purpose of the challenged

18  action was to impugn religious beliefs or restrict religious

19  practices, free exercise claim will only be sustained if the

20  government has placed a substantial burden on the observation

21  of a central religious belief without a compelling governmental

22  interest justifying the burden.  A substantial interest exists

23  where the state puts substantial pressure on an adherent to

24  modify his behavior and violate his beliefs.  *Newdow* 753 F.3d

25  at 109; see *Jolly versus Coughlin*, 468, 476-77.  Plaintiffs

 1   make no attempt aside from the conclusory allegations mentioned

 2   earlier to allege a substantial burden on religious freedom.

 3   Even their sole conclusory allegation in paragraph 49 alleges

 4   only a burden, not a substantial one, and there are no facts

 5   rendering that conclusion plausible.

 6          Accordingly, plaintiffs have failed to state a

 7   plausible free exercise claim.

 8          In light of my disposition, I do not need to address

 9   of the qualified immunity or *Mcnell*.

10          In this case, taking the allegations of the SAC as

11   true, as I must, plaintiffs have done a fine job of showing

12   that the defendants indeed gave plaintiffs a hard time as

13   alleged in paragraph 35 and treated them unfairly in ways for

14   which they might have been entitled to address in an

15   appropriate state court, but they have not alleged facts

16   suggesting that they were treated unfairly because Manes was

17   Jewish.  They are fallen victim to the fallacy that, because

18   they belong to a protected class, it is plausible that anything

19   negative that happens to them is because of their membership in

20   that class.  *See Grillo versus New York City Transit Authority*,

21   291 F.3d 231, 235, where the circuit said that, even if

22   plaintiff's highly dubious claim that he was unfairly singled

23   out for punishment by the instructors is credited, plaintiff

24   has done little more than cite to his alleged mistreatment and

25   asked the Court to conclude that it must have been related to

1    his race; and *Varughese versus Mount Sinai*, 2015 WL 1499618 at

2    *42 (S.D.N.Y., March 27, 2015), where the Court said it was a

3    fallacy for the plaintiff to say, I belong to a protected

4    class, something bad happened to me at work, therefore it must

5    have occurred because I belong to a protected class.  Those

6    cases are equally applicable here.  That reasoning is not

7    sufficient.  While it's conceivable that plaintiff's treatment

8    here was based on religion, plaintiffs have not provided

9    sufficient facts to nudge that conclusion over the line from

10   the conceivable to the plausible.  *See Iqbal* at 680.

11   Plaintiffs must provide specifics showing a plausible

12   constitutional violation in order to overcome the otherwise

13   proper reluctance of federal courts to get involved in local

14   land use disputes, *cf. Filipowski versus Village of Greenwood*

15   *Lake*, 2013 WL 3357174 at *9 (S.D.N.Y., July 3, 2013).

16         I in no way intend to condone the imposition of

17   unfair roadblocks in connection with land use, but such

18   roadblocks are not necessarily redressable in federal court as

19   civil rights violations.  Just saying that there are other

20   properties that are similar in some respect does not suffice to

21   plausibly allege that those properties are roughly equivalent

22   or similar in all material respects.  If a plaintiff cannot be

23   bothered to provide facts as opposed to conclusions regarding

24   other purportedly similarly situated properties and how their

25   owners were treated by the defendants, or if a plaintiff cannot

1   do so because no such facts exist, that plaintiff will have to

2   confine itself to the ordinary state law remedies available to

3   aggrieved property owners rather than a federal civil rights

4   remedy.

5           Finally, as to leave to amend, it should be given

6   freely when justice so requires.  It's within the sound

7   discretion of the Court to grant or deny leave to amend, and

8   though liberally granted, it may properly be denied for undue

9   delay, bad faith or dilatory motive, repeated failure to cure

10  deficiencies by amendments previously allowed, undue prejudice

11  or futility.  *See McCarthy versus Dunne and Bradstreet*, 482

12  F.3d 184, 200; *Ruotolo versus City of New York*, 514 F.3d 184,

13  191.

14          Here plaintiffs have already amended twice after

15  having the benefit of two premotion letters from defendants

16  outlining their proposed ground for dismissal and my

17  observations during the August 25, 2017 conference which

18  focused on the complaint being strong on allegations of

19  unfairness but weak on that unfairness being religiously based.

20  Plaintiff's failure the fix deficiencies in the previous

21  pleadings after being provided notice of them is alone

22  sufficient ground to deny leave to amend *sua sponte*.  *See In Re*

23  *Eaton Vance* 380 F.Supp. 2d 222, 242 (S.D.N.Y., 2005) *aff'd* 481

24  F.3d 110, 118 and *Payne versus Malemathew*, 2011 WL 3043920 at

25  *5 (S.D.N.Y., July 22, 2011).

                Angela O'Donnell, RPR, 914-390-4025

1          Further, plaintiffs have not asked to amend again or

2   otherwise suggested that they are in possession of facts that

3   would cure the deficiencies identified in this opinion.

4          Accordingly, I decline to grant leave to amend *sua*

5   *sponte*.   See *TechnoMarine versus Giftports*, 758 F.3d 493, 505;

6   *Gallop versus Cheney*, 642 F.3d 364, 369; *see also Loreley*

7   *Financial versus Wells Fargo*, 797 F.3d 160, 190.

8          So, for the reasons just discussed, the motion to

9   dismiss is granted.

10          The clerk of the court is to terminate motion number

11   17 and close the case.

12          Sorry to drop bad news on you, Mr. Sussman, while

13   you're in a bad place, but I think that takes care of our

14   business here.   I'll do a brief order of the saying that, for

15   the reasons set forth on the record today, the motion is

16   granted.

17          All right, thank you both.

18          MS. MASTELLONE:   Thank you, your Honor.

19          THE COURT:   Best of luck, Mr. Sussman.

20          (Proceedings concluded)

21

22

23

24

25

            Angela O'Donnell, RPR, 914-390-4025

# Exhibit F

### *(to Exhibit B)*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

TAL PROPERTIES OF POMONA, LLC,
                              Plaintiff,

      -against-

 

VILLAGE OF POMONA, BRETT YAGEL,
MAYOR OF THE VILLAGE OF POMONA,
                              Defendants.
-------------------------------------------------------X

17 **CIVIL** 2928 (CS)

# **JUDGMENT**

      Defendants Village of Pomona, Bret Yagel, and Doris Ulman's having moved to dismiss

pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and the matter having come before the

Honorable Cathy Seibel, United States District Judge, and the Court, on January 10, 2018,

having rendered its Order that for the reasons stated on the record at today's conference, granting

Defendants Village of Pomona, Brett Yagel, and Doris Ulman's Motion to Dismiss pursuant to

Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and directing the Clerk of Court to close the casse, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated on the

record at the January 10, 2018 conference, and in the Court's Order, Defendants' Village of

Pomona, Brett Yagel, and Doris Ulman's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1)

and 12(b)(6) is granted and the case is closed.

**Dated:** New York, New York
        January 12, 2018

          **RUBY J. KRAJICK**
            Clerk of Court

BY:

            Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON 1/12/2018

# Exhibit G

***(to Exhibit B)***

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TAL PROPERTIES OF POMONA, LLC and AVROHOM MANES,<br><br><div align="right">*Plaintiffs,*</div><br>-*against*-<br><br>VILLAGE OF POMONA, BRETT YAGEL, individually and in his official capacity as Mayor of the Village of Pomona, and DORIS ULMAN, individually and in her official capacity as Attorney for the Village of Pomona,<br><br><div align="right">*Defendants.*</div> | **Case No. 17-cv-02928 (CS)**<br><br>**[PROPOSED]**<br>**THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs TAL Properties of Pomona, LLC ("TAL Properties") and Avrohom Manes ("Manes"), by and through their counsel, Schlam Stone & Dolan LLP, for their Third Amended Complaint against Defendants the Village of Pomona (the "Village"), Brett Yagel ("Yagel" or the "Mayor"), and Doris Ulman ("Ulman"), allege as against defendants as follows:

## NATURE OF THE ACTION

1.      This action seeks to hold accountable a village government thoroughly rotted with bigotry.  The deeply disturbing facts alleged herein were uncovered in a whistleblower complaint to the New York Division of Human Rights and a months-long investigation by counsel.

2.      The Mayor, the Village Attorney and other leaders in the Village of Pomona, Rockland County, have orchestrated a campaign of harassment and exclusion against Orthodox Jewish residents.  Defendants have turned Pomona's local government against a discrete religious minority, weaponizing local code enforcement and zoning laws to target Orthodox Jews for disparate treatment, while conspiring to deny basic municipal services to them.  Defendants' thinly-veiled agenda is clear:  to make life intolerable for current Orthodox residents of Pomona,

1

and in the long term, to deter more of "them" or "those people" (as the Mayor derisively refers to Orthodox Jews) from moving to the community.

3.      Plaintiff Avrohom Manes is one of the many victims of Defendants' animus against Pomona's Jewish community.  Mr. Manes is an Orthodox Jew and resident of Pomona. He also owns investment properties in the Village through his wholly-owned company, Plaintiff TAL Properties.

4.      In late 2015, Mr. Manes purchased a residential home at 22 High Mountain Road in Pomona (the "22 High Mountain Property"), as well as other subdivided but undeveloped properties (the "Subdivided Properties").   Over the next year, Defendants engaged in a concerted effort to harass Mr. Manes with the goal of preventing him from potentially selling to and attracting additional Orthodox Jewish residents to the Village.

5.      For example, at the direction of Defendants Yagel and Ulman, the Building Inspector, Louis Zummo, delayed for months in issuing a certificate of occupancy for the 22 High Mountain Property – even though he had confirmed in early 2016 that Plaintiffs had completed all necessary repairs and were in compliance with applicable building codes, and promised at that time that a certificate of occupancy would be issued promptly.  To justify their actions, Defendants Yagel and Ulman claimed falsely that Plaintiffs were responsible for a $6,000 debt that was supposedly owed to the Village by a prior owner of the 22 High Mountain Property.  Defendants had no right to do this, since among other things they never recorded this supposed debt as a lien against the 22 High Mountain Property prior to Plaintiffs' purchase. Tellingly, Defendants never made any effort to collect the debt from the prior (non-Jewish) owner, even permitting a bond he had posted to lapse without collection, though he had failed to complete a construction project secured by the bond.  Defendants were looking for any excuse to

2

deny a certificate of occupancy to Plaintiffs. It was later discovered that the supposed "bill" was a fabrication.

6. Additionally, Defendants withheld a grading permit from Plaintiffs that would have permitted them to create useable backyard space out of steep slopes on the 22 High Mountain Property, thus enhancing its value. Plaintiffs spent time and money developing a grading plan in conjunction with the Village engineer, but Defendants Yagel and Ulman pressured the engineer to retract his approval of the plan, and to insist that Plaintiffs comply with costly prerequisites that were never imposed on other similarly-situated owners – requiring, among other things, that Plaintiffs post a bond for possible damage to neighboring property and conduct unusually complex and expensive tests of the compressed fill they used for grading. And even after Plaintiffs agreed to these conditions, Defendants still denied them the grading permit.

7. Moreover, the Village has prevented Mr. Manes from building on the other Subdivided Properties he purchased in the Village by making a frivolous claim that the roads accessing those properties are private roads (and thus Mr. Manes' obligation to maintain). Although the roads at issue are clearly public roads, Defendants have seized on their false claim as an excuse to deny Mr. Manes the permits necessary to develop the Subdivided Properties (lest the properties attract or be sold to additional Orthodox Jewish residents to the Village). This has made it impossible for Mr. Manes to exercise his property rights by improving or selling the Subdivided Properties. In addition, Defendants have made a frivolous claim that Mr. Manes owes money for a bill they claim to have paid for snow removal on the access roads. Not only is there no basis to make Plaintiffs pay for the cost of maintaining the roads, but the snow removal bill is a complete fabrication. The Village has a contract with Town of Haverstraw for snow

removal services on public roads. However, there is no portion of the bill that is itemized for the access roads for which the Village is now claiming Plaintiffs are responsible.

8.  Still more instances of Defendants' discriminatory treatment of Plaintiffs are set forth below.

9.  A bombshell report by an investigator from the New York State Division of Human Rights, issued in June 2018, reveals that Defendants mistreatment of Mr. Manes is not an isolated incident, but rather part of a concerted "agenda against Jewish residents" of Pomona. Plaintiffs are among the many victims of Defendants' illicit agenda. In this action, Plaintiffs seek damages for the discriminatory treatment they suffered, as well as injunctive relief to prevent further such misconduct, and ultimately to ensure that Defendants respect the fundamental constitutional right of equal treatment under the law for all residents of Pomona.

10.  Founded in 1967, Pomona is a small village in Rockland County with a growing population. Over the past decade, and more so in the last five years, Hasidic and other Orthodox Jews have moved to Pomona from neighboring communities. Defendant Yagel was elected a Village trustee in 2007 on a platform of opposing the establishment of an Orthodox rabbinical college in Pomona. He served as Mayor from 2011 until he stepped down in 2019.

11.  The Village, acting at the direction of Yagel and Leon Harris, the Deputy Mayor, and with the assistance of Building Inspector Zummo, and Village attorney Doris Ulman, actively sought to prevent the increase of Jewish residents.

12.  Defendants have employed a range of discriminatory techniques to achieve their unlawful agenda – 1) enacting unconstitutional new zoning laws and practices; 2) pretextual delays and denials of permits and certificates of occupancy to Jewish homeowners and developers; 3) harassing real estate brokers (and their customers) known for selling to Orthodox

clients; 4) targeting Jewish-owned residences for selective enforcement of code violations – for example, executing pre-dawn Saturday morning ticketing blitzes (referred to by Yagel as "shul patrols"); and 5) accepting and encouraging deranged and blatantly anti-semitic "complaints" from non-Jewish residents as legitimate justifications for intrusive inspections and harassment (*e.g.*, complaints referring to Orthodox Jews as "Corporation members" and prayer groups as business meetings and "the people living on the hill").

13.    For several years, Mr. Manes and other Orthodox residents have observed anecdotal examples of such unfair treatment of Orthodox Jews by the Village authorities.  For example, Orthodox Jewish residents have been subjected to discriminatory ticketing for minor and often odd alleged code violations – relating to issues such as dog waste (without owning a dog); leaf disposal tickets (with far worse violators on the same block left unticketed); and a ticket for a Toys 'R' Us pool – when similarly-situated non-Jewish residents have not been ticketed for the same infractions.

14.    Indeed, before the influx of Orthodox Jewish residents, Pomona did not engage in routine enforcement of minor code issues at all.  But as the Jewish community has grown, the Village enlisted Building Inspector Zummo – and later deputized a special code enforcer – to target and harass Orthodox Jewish residents with discriminatory ticketing.

15.    Recent revelations have confirmed that Plaintiffs' experiences are not one-off incidents of unfair treatment, but part and parcel of Defendants' deliberate agenda of discrimination against Orthodox Jews.  Facts uncovered in the Division of Human Rights investigation sparked by the whistleblower complaint of a former Village employee, have laid bare the discriminatory animus underlying Defendants' mistreatment of Plaintiffs and other Orthodox Jewish residents.

16.     The Human Rights Report is the result of a whistleblower complaint filed by Noreen Shea, a non-Jewish former Deputy Clerk in the office of the Village Clerk, who objected to the discriminatory treatment of Orthodox Jewish residents – and was fired for that reason.

17.     Ms. Shea revealed to the Human Rights Division what she described as Defendants' "hidden agenda against [] Jewish residents," stating in stark terms: "*If anyone dares tell me there is no religious discrimination in the Village of Pomona, they have not worked a day in the building department*."

18.     Some of the more troubling examples of discriminatory animus described by Ms. Shea in the Human Rights Report – and the testimony of other victims and municipal officials who were prompted to come forward by her whistle-blowing – include the following:

- Mayor Yagel routinely referring to Orthodox Jews in the Village office with open hostility as "*Them*" or "*Those People*."

- Mayor Yagel directing his animus against Orthodox Jews to Mr. Manes in particular by chastising Ms. Shea for talking with Mr. Manes, and instructing her that she should have "very little conversation with '*those types*.'"

- Mayor Yagel confronting a long-time Village resident who had sold her home, and demanding to know if she had sold the property to one of "*Them.*"

- Mayor Yagel suggesting that Ms. Shea place pork rinds on the public counter of the village clerk's office to deter the growing Orthodox Jewish population from seeking access to municipal services.

- The Village building inspector, Louis Zummo, *admitting* to the Human Rights Division that he mocked Orthodox Jewish residents, in the course of performing his official duties, through "comical" imitations of their manner of talking, while disparaging them as "carrying on" when they were denied services.

- Building Inspector Zummo advising the Village zoning board not to issue a construction permit to an Orthodox Jewish resident, Robert Klein, to build a basement because it would be "just like them" to then use it as an illegal apartment.

- Building Inspector Zummo refusing to issue a permit requested by an Orthodox Jewish family to accommodate his two severely disabled children – and commenting: "maybe he should stop having children".

- Orthodox Jewish residents facing arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to by a non-Jewish village trustee, Ian Banks, who spoke to the Human Rights Division investigators.

- Village Attorney Doris Ulman admitting to Mr. Manes and his attorney in another action that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village," and attempting to justify her involvement with the excuse that, "it's my job to represent Mayor Yagel," when in fact she represents the Village, including its Jewish residents.

- The Village government "target[ing] the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and prayer gatherings.

19. Ms. Shea alleges that her refusal to participate in such discriminatory treatment of Orthodox Jewish residents led Defendant Yagel to retaliate against her. In a shocking example, Ms. Shea alleges that Mayor Yagel referred to her as a "***Jew Lover***" – an accusation that was reported to Trustee Banks at the time (Mr. Banks confirmed that Ms. Shea contemporaneously reported this slur to him prior to her termination). Ms. Shea also reported that there was an "an overall attitude in the Village of Government to be unresponsive to requests from Orthodox Jewish residents for access to property records." Ms. Shea was ultimately terminated when she refused to heed Yagel's instructions to "stop being too cooperative with Jewish residents."

20. The Human Rights Division found "probable cause to support" Ms. Shea's allegations and took the unusual step of ordering the matter to proceed to a public hearing before an administrative law judge. Ms. Shea elected instead to pursue her claims in this Court.

21. Plaintiffs respectfully ask this Court to put an end to Defendants' discriminatory practices once and for all and to restore the rule of law to the Village of Pomona.

## THE PARTIES

22.     Plaintiff TAL Properties is a limited liability company formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district.

23.     Plaintiff Avrohom Manes is the sole owner of TAL Properties and is an Orthodox Jew and resides in the County of Rockland.  He is also an investor in real estate.

24.     Defendant Village of Pomona is a municipal corporation formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district.

25.     Until April 1, 2019, Defendant Brett Yagel was the duly elected Mayor of the Village and, as and for the matters alleged herein, he the final policy maker for defendant Village. He is sued both in his official and individual capacities.

26.     At all relevant times, defendant Doris Ulman is and has been the duly appointed Village Attorney.  She is sued in her official and individual capacities.  In another lawsuit in this Court, Judge Karas found that Ulman authored local ordinances that were intended to discriminate against Orthodox Jews by preventing a rabbinical seminary from entering the community.

27.     The complained of acts by defendants Yagel and Ulman were undertaken under color of state law.

## JURISDICTION AND VENUE

28.     As Plaintiffs allege that Defendants discriminated against them based on religion in violation of the First and Fourteenth Amendments to the United States Constitution, this

8

Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1331 & 1343(3) & (4) and 42 U.S.C. secs. 1983 and 1988.

29.     In addition, this Court has supplemental jurisdiction, under 28 U.S.C. § 1367(a), over Plaintiffs' state law claims.

30.     Venue is proper in this district under 28 U.S.C. § 1391(b) in that all claims arose in this district.

## THE FACTS

### A.     Pomona's Hostility to a Growing Orthodox Jewish Population

31.     Pomona is a small village nestled next to the Cheesecote Mountain in a bucolic section of Rockland County.  Founded in 1967, the Village, which is located partly in the town of Ramapo and partly in the town of Haverstraw, occupies a total of approximately 2.4 square miles and has an estimated population of 3,235.

32.     Over the past decade, and increasingly in the last five years, Hasidic and other visibly Orthodox Jews have begun moving into Pomona.  Their arrival has been met with hostility by the Village government.  Defendant Yagel was elected a Village trustee in 2007 on an explicit platform of preventing a rabbinical college from building a seminary with housing for Orthodox rabbinical students and their families in the Village.  In the run-up to the election, Yagel co-authored a letter to a local newspaper, lamenting the arrival in the Village of what he called "homogenous individuals" (i.e., Orthodox Jews), a development that Yagel protested was not a "natural" progression for the Village.  At around the same time, Yagel was quoted in the *New York Times* calling the rabbinical college "disgusting."  Another candidate, who ran on the same ticket as Yagel, warned in a campaign video that the seminary threatened to change "the make-up of the village."

33.     Although they employed code words, such as "homogeneous individuals" and "the make-up of the village," the harsh reality is that Yagel and his associates simply did not want to see Orthodox Jews moving to Pomona.  Judge Karas reached this conclusion in a lawsuit challenging local ordinances the Village passed to prevent the rabbinical college from coming to Pomona.  In a decision issued on December 7, 2017, Judge Karas found that in enacting the laws the Village was motivated by an illicit agenda to prevent the growth of Pomona's Orthodox Jewish community.  Specifically, Judge Karas held: "There is no escaping the fact that . . . Defendants passed the Challenged Laws to thwart the spread of the Orthodox/Hasidic Jewish community into the Village."

34.     Both Defendants Yagel and Ulman were implicated in Judge Karas' decision. Yagel was a named defendant in the lawsuit and both Yagel and Ulman were trial witnesses. Judge Karas observed that he did not credit Yagel's testimony because of his discriminatory comments.  Judge Karas similarly held that he "credits very little of Ulman's testimony about what motivated the adoption of the laws," since "Plaintiffs have proven that their intended purpose was to thwart the development of the rabbinical college because it was proposed by Orthodox/Hasidic Jews."

35.     After serving on the board of trustees for four years, Yagel was elected Mayor of Pomona in 2011.  Despite the damning findings by a federal judge, the same individuals that expressly violated civil rights of Orthodox residents remained in their respective positions in Pomona for years.  Yagel ultimately stepped down as Mayor in April 2019, although Ulman remains the Village Attorney.

36.     Over the course of Yagel's tenure in office, he treated the growing number of Orthodox Jewish residents with hostility.

10

37.     Consistent with the tone of his original campaign for Village Trustee, Yagel responded to this demographic development by using the local government to target current Orthodox Jewish residents for harassment, and taking steps to deter Orthodox Jews from moving to Pomona – including by discouraging current residents from selling property to them.

38.     At the direction of Yagel and Ulman, the Village has habitually denied permits and certificates of occupancy to current Jewish residents, such as Plaintiff Manes to prevent him from creating new housing on previously-subdivided property that could attract additional Jewish residents to the Village.

39.     Defendants have also harassed real estate brokers known for selling to Orthodox clients, by ticketing them for supposedly placing for sale signs too close to the road, although non-Jewish brokers were not similarly ticketed.  In an email obtained by the Human Rights Division, Yagel himself directed the code enforcer to ticket the Orthodox Jewish brokers.

40.     Defendants have also targeted Jewish owned residences and synagogues for selective enforcement of code violations.  Code enforcement did not exist at all in Pomona until Orthodox Jews began arriving in the Village – Yagel wielded the power to issue code violations to harass Jewish residents.

41.     Pomona has also used building ordinances as a means of discouraging current residents from selling their properties to Orthodox Jews.  In most municipalities, when a title company or prospective seller inquiries about outstanding violations on a property, there is no physical inspection, merely a review of records to determine if there is an outstanding violation.

42.     As Orthodox Jews began moving into Pomona, Defendants introduced an onerous policy – without passing any authorizing law or ordinance – that makes it more difficult to sell property or to assess whether closing will be possible.  Under the new policy, internal

inspections of each home for code violations are required as a matter of course in almost any property sale, adding another roadblock to selling properties to the Orthodox Jewish buyers.

43.    The message this sends is clear:  if long term residents have illegal basements or renovations, they are overlooked.  However, as soon as they attempt to sell their property they will be subjected to an invasive and potentially costly code enforcement process – a significant roadblock to efficiently selling a property, and in particular to selling to a group that Mayor Yagel has made perfectly clear is disfavored by the local authorities.

44.    Indeed, email correspondence uncovered by the Human Rights Division shows that one long-time, non-Orthodox resident was given a pass and allowed to continue using her illegally-renovated basement, so long as she does not "sell the property."  (At the same time, an Orthodox Jewish resident, Robert Klein, was denied permission to build a basement because it would purportedly be "just like them" to use it as an "illegal apartment".)

45.    The individual acts of discrimination might have seemed unrelated until a whistle-blower came forward and exposed Defendants' intentional discriminatory scheme.

**B.    Whistle Blower Noreen Shea Exposes a Widespread "Hidden Agenda Against Jewish Residents" of Pomona**

46.    In June 2018, the New York State Division of Human Rights issued a report, following an investigation of alleged discrimination against Orthodox Jewish residents by the Village government.  The non-public investigation was sparked by a whistleblower complaint filed by Noreen Shea, a former non-Jewish employee in the Village Clerk's office, who alleges that she was terminated because she was unwilling to be complicit in "an ongoing hidden agenda against [] Jewish residents" of Pomona.  Ms. Shea's revelations – and other evidence uncovered by the Human Rights investigator – paints a disturbing picture of a local government targeting a segment of its residents for mistreatment on the basis for their religious identity.

12

47.     The revelations from the Human Rights Report (including documents obtained by the investigator), as well as witnesses that have come forward as a result, are summarized below.

48.     **<u>"Us vs. Them" Culture.</u>**  Ms. Shea described an "Us vs. Them" culture cultivated by Mayor Yagel in the Village offices with respect to Orthodox Jewish residents. According to Ms. Shea, Mayor Yagel routinely referred to Orthodox Jews with contempt as "Them" or "Those People."  Ms. Shea explained that Yagel's animus against Orthodox Jews was directed to Mr. Manes in particular.   In one instance, he chastised Ms. Shea from being pleasant to Mr. Manes, warning her she was to have "very little conversation with '*those types*.'"

49.     In another instance, he berated a long-standing resident who had sold her home through a broker known for working with Orthodox Jews, demanding to know whether she had sold the property to one of "Them."  At the same time, according to emails obtained by the investigator, Yagel went out of his way to help a potential resident (with a non-Jewish sounding surname) locate an acceptable rental property.

50.     In another troubling incident, Mayor Yagel suggested that pork rinds be placed on the public counter of the Clerk's office to deter Orthodox Jews who come in the office seeking municipal services.

51.     Mayor Yagel criticized Ms. Shea for responding too quickly to FOIL requests from Orthodox Jewish residents, instructing her that they should be made to wait until the last day of the deadline even when records were readily available – although Yagel told her to provide records immediately to a non-Jewish man who came to the office.

52.     The open hostility to Orthodox Jews was not limited to Mayor Yagel.  Building Inspector Louis Zummo admitted to the Human Rights Division that he openly mocked

Orthodox Jews complaining about the denial of municipal services through Jackie Mason-style "impersonations" of Orthodox Jewish residents "carrying on."

53.     Because she did not want to participate in the unequal treatment of the Village's Orthodox Jewish residents, the Mayor referred to Ms. Shea as a "*Jew Lover*."  A non-Jewish Village Trustee, Ian Banks confirmed to the Human Rights Division investigator that, prior to her termination, Ms. Shea had reported the use of the terms "*Jew Lover*" (to refer to her) and "*Those People*" (to refer to Orthodox Jews).

54.     **Zoning and Construction Permit Issues.**  The Human Rights Report reveals that the Village abused its authority by withholding certificates of occupancy and construction permits as part of a broader effort to discriminate against Orthodox Jewish residents.

55.     The Human Rights Division investigator reports testimony that other Orthodox Jewish residents faced arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to not only by Ms. Shea but also by a non-Jewish village trustee, Ian Banks.

56.     Ms. Shea described how Zummo refused to issue a permit requested by an Orthodox Jewish family to accommodate the needs of two severely disabled children.  Upon information and belief, before this resident moved to the Village, Zummo had informally approved the changes he planned to make.  However, Zummo refused to issue the necessary permit, and was overheard by Ms. Shea saying, "maybe he should stop having children".  In another incident, Zummo advised the Village zoning board not to allow an Orthodox Jewish resident to renovate his basement because it would be "just like them" to then use the basement as an illegal apartment.

14

57.     Ulman herself told Mr. Manes that she ultimately resigned from representing the Village zoning board because it was discriminating against Orthodox Jewish residents.  Upon information and belief, this was after Ms. Ulman learned that counsel for Plaintiffs was conducting an investigation regarding discrimination in the Village and that residents of the Village had obtained the files of the Division of Human Rights investigation.

58.     **Code Enforcement and Selective Ticketing.**  The Human Rights Report also reflects evidence that Defendants improperly "targeted the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and synagogues.  The Human Rights Report notes that the investigator reviewed emails from Defendant Yagel to building inspector Zummo ordering him to issue violations.  In addition, when interviewed by the Human Rights investigator, Building Inspector Zummo admitted that Defendant Yagel directed him to perform garbage inspections "on the weekend."

59.     One Orthodox Jewish resident received a ticket for a garbage/recycling violation at 4:25 am on the Sabbath, which was part of a pre-dawn ticketing blitz, ordered by Mayor Yagel, targeting Jewish residents.

60.     The Village at the time did not have a dedicated code enforcer.  Yagel directed Building Inspector Zummo to target the Jewish community referring to the overnight enforcement as "shul patrols".

61.     In addition, upon information and belief, Yagel assumed that since Orthodox Jews do not drive after sunset on Fridays, there would be Jewish cars parked overnight in violation of the overnight parking ordinances in Pomona.

62.     Upon information and belief, based on Zummo's discussions with residents at the time, the only cars violating the parking ordinance belonged to Village officials and their friends.

Undeterred, Zummo then issued garbage violations to a number of Jewish residents living next to shuls (synagogues). Upon information and belief, Pomona has not engaged in any overnight enforcement activities in general or against other groups.

63. Mayor Yagel has also directed Village personnel to call the police to complain about Jewish residents walking home from synagogue on the Sabbath – falsely claiming that these residents walking on the side of the street is somehow blocking traffic.

64. Orthodox Jewish residents have also been subjected to discriminatory ticketing for minor and often odd alleged code violations – relating to issues such as dog waste (without owning a dog); leaf disposal tickets (with far worse violators on the same block who were not ticketed at all); and a ticket for a small pool purchased at Toys 'R' Us.

65. Upon information and belief, two former Village employees (Zummo's predecessor and a separate code enforcer) resigned their positions because they were unwilling to heed Yagel's directives to selectively target members of the Orthodox Jewish community.

**C.**     **Plaintiffs' Fall Victim to Defendants' "Hidden Agenda Against Jewish Residents"**

66. Plaintiffs have fallen victim to the discriminatory "agenda against Jewish residents" of the Village that was exposed by the Human Rights Report.

67. In December 2015, Mr. Manes purchased a residential home at 22 High Mountain Road within the Village of Pomona (as noted, the "22 High Mountain Property").

68. Plaintiffs also purchased other subdivided but undeveloped properties in the same area. At the time of purchase, these properties were subdivided and approved by the Village for residential use – something that occurred years before Mr. Manes' purchase. Nevertheless, the Village denied permits and certificates of occupancy with respect to these properties to prevent Manes from creating new housing that could attract additional Jewish residents to the Village,

16

unless Plaintiffs agreed to maintain the roads as private roads, even though the roads are and have always been treated as Village roads.

1.  **The 22 High Mountain Property**

69.    In January 2016, Plaintiffs made repairs to the 22 High Mountain Property.

70.    In January 2016, Building Inspector Zummo inspected the 22 High Mountain Property on behalf of the Village.

71.    Zummo concluded and advised Plaintiffs that they had completed the referenced repairs in accordance with applicable building codes and other applicable regulations and that a certificate of occupancy should issue.

72.    During his interactions with Zummo, Mr. Manes met defendants Yagel and Ulman, both of whom knew he was Jewish.

73.    Despite Plaintiffs qualifying for the issuance of a certificate of occupancy, defendants Yagel and Ulman directed Zummo not to issue the certificate of occupancy.

74.    In so acting, defendants Yagel and Ulman made municipal policy with regard to the circumstances disallowing the issuance of such permits.

75.    Defendants' direction contravened the Village's Construction Code [chapter 47-10], which required issuance of a certificate of occupancy where, as here, the applicant complied with applicable code requirements.

76.    In seeking to justify the Village's refusal to issue the Certificate of Occupancy, defendant Yagel, acting by and through defendant Ulman, claimed that a prior owner of the property owed the Village $6,379.34 and demanded payment of that sum from Plaintiffs in exchange for the issuance of a Certificate of Occupancy.

77. At no time did Defendants claim that Plaintiffs had incurred this debt, nor was there a basis for any such claim.

78. Village law and the Village code do not permit denial of a certificate of occupancy because a prior property owner failed to satisfy a debt the Village failed to record as a lien against the 22 High Mountain Property by the time Plaintiffs purchased the same or at any time preceding its assertion of this as the basis for denial of a certificate of occupancy. This is particularly true where, as here, Plaintiffs purchased the 22 High Mountain Property at a foreclosure sale.

79. Indeed, out of animus for Mr. Manes' religious faith, Defendants Yagel and Ulman dictated this result to delay, block and prevent Plaintiffs from potentially attracting additional Orthodox Jewish residents to the Village and gaining benefit from their purchase of the 22 High Mountain Property.

80. By comparison, defendants Yagel and Ulman failed to take any action to collect the sum of $6,379.34 from the home's prior owner, who was not Jewish, and, on behalf of the Village, permitted that same developer's bond to lapse without collection though the developer failed to develop and complete projects secured by the bond.

81. Through calendar year 2016, defendants Yagel, Ulman and the Village imposed other disparate and discriminatory conditions upon Plaintiffs as they sought to sell the 22 High Mountain Property, repeatedly concocting and then using false explanations for delays in the issuance of Certificate of Occupancy without which Plaintiffs could not alienate their property.

82. In the summer of 2016, again at defendant Yagel's direction and contrary to the treatment afforded similarly-sloped and neighboring properties on High Mountain Road owned by non-Jews, the Village required Plaintiffs to fulfill costly conditions before being permitted to

grade out steep slopes on the 22 High Mountain Property, and thereby create useable backyard space, enhancing the value of the 22 High Mountain Property.

83.     When Plaintiffs submitted the grading plan, the Village engineer initially approved it.

84.     However, under pressure from defendants Yagel and Ulman, the Village engineer retracted his approval and imposed costly conditions upon Plaintiffs.

85.     Specifically, Plaintiffs' engineer and the Village engineer (Joseph Corless), together developed the first set of plans to address the steep slopes.

86.     Defendants Yagel and Ulman then intervened and directed Corless to disavow the plan he had helped develop.

87.     Building Inspector Zummo acknowledged that Corless was reneging on his prior approval.  Yet the Village continued to insist that Plaintiffs complete costly requirements which other similarly-situated and non-Jewish property owners did not have to satisfy, further delaying Plaintiffs' alienation of their property and reducing its market value.

88.     Specifically, Defendants required Plaintiffs to post a bond to insure that they did not damage their neighbor's property; such a requirement was highly unusual in the Village in like circumstances and, upon information and belief, was not imposed on non-Jews.

89.     In addition, Defendants required Plaintiffs to show that the original land surveyor whose work product Plaintiffs used in their submission had authorized such use; this, too, was highly unusual as such land surveys are typically relied upon without such authorization, and, upon information and belief, no non-Jews were required to make a such a showing.

90.     In additions, Defendants required Plaintiffs to test the compressed fill they used for grading in a manner inconsistent with requirements imposed on others using such fill for similar projects on property owned by non-Jews.

91.     After Plaintiffs agreed to comply with these unusual and costly requirements imposed by Defendants, the Village still rejected their application and did not issue a permit for the grading work.

92.     Due to the incomplete nature of this work, Plaintiffs were unable to sell the 22 High Mountain Property for the price expected or recoup the profit anticipated from the 22 High Mountain Property.

93.     Zummo and the Village Clerk, Ms. Shea, have both expressly told Manes that defendants Yagel and Ulman advised them to give Plaintiffs a hard time with anything they needed.

94.     The Village engineer's selective requirements explained above, as dictated by defendants Yagel and Ulman, caused a substantial delay in the sale of Plaintiffs' 22 High Mountain Property and a significant decline in the sales price.

95.     In the late fall 2016, plaintiffs entered into a contract for the 22 High Mountain Property's sale.

96.     By this time, further demonstrating the baselessness of this claim which had delayed Plaintiffs for months, defendant Village dropped any claim that Plaintiffs owed fees incurred by the prior property owner and gave Plaintiffs a certificate of occupancy without payment of this alleged debt.

97.     Following sale of the 22 High Mountain Property, the Village of Pomona threatened to withdraw the certificate of occupancy if Plaintiffs failed to sign an agreement

acknowledging, *inter alia*, that the road accessing the 22 High Mountain Property was not a village road and that its maintenance was the sole responsibility of the property owner.

98.     There was no basis to requiring the signing of this agreement. This was simply another effort by Defendants to impede and complicate Plaintiffs' alienation of the 22 High Mountain Property.

99.     The delays in issuing the required certificate of occupancy and the discriminatory imposition of onerous grading requirements caused Plaintiffs to incur a substantial decline in the sales price for the 22 High Mountain Property.

100.     But for these delays, the Plaintiffs would have been able to sell the 22 High Mountain Property in early 2016 and use the proceeds so realized for other profitable business opportunities.

**2.     The Subdivided Properties**

101.     In addition to the 22 High Mountain Property, Defendants have prevented Mr. Manes from building on the other Subdivided Properties he purchased in the Village by making a frivolous claim that the roads accessing those properties are private roads (and thus Mr. Manes' obligation to maintain). The Subdivided Properties had been approved for development by the Village long ago and there was never any claim that the roads leading to them were private or that the owner of the Subdivided Properties would be responsible for repairing and maintaining them. Indeed, the roads at issue are clearly public roads, and have always been treated as such, but Defendants, due to their animus against Orthodox Jews and based on their concern that the Subdivided Properties could be sold to and would attract additional Orthodox Jews to the Village, have seized on their false claim as an excuse to deny Mr. Manes the permits necessary

21

to develop the Subdivided Properties, making it impossible for him to realize a return on his investment.

102.     As an example of just one aspect of this discrimination, the Village has made a frivolous claim that Manes owes money for a bill they claim to have paid for snow removal on the access roads leading to Subdivided Properties.  Leaving aside the fact that there is no basis to make Plaintiffs pay for the cost of maintaining these roads, which are and always have been treated as Village roads, the snow removal bill is a complete fabrication.  The Village has a contract with Town of Haverstraw for snow removal services on public roads.  However, there is no portion of the bill that is itemized for the access roads for which the Village is now claiming Plaintiffs are responsible.

### 3.     Defendants' Additional Acts of Discrimination Against Plaintiffs

104.     Plaintiffs have suffered other acts of discrimination at the hands of Defendants.

105.     *First*, in mid-December 2017, the Village Building Inspector Louis Zummo issued a baseless stop work order for a project on the driveway at Manes' home.  A permit had been issued for the project, and no work was being performed when Zummo came to deliver the order, which had already been filled out at the Mayor's request in the Village Office before Zummo even came to the site.  Zummo told Manes that Mayor Yagel directed him to issue the order at the behest of a non-Jewish neighbor of Manes, who is Yagel's friend.

106.     Ironically, the Village refused to take any action when that same neighbor constructed two large pillars with his name and address on the at the entrance to a road that leads to his and Plaintiff's homes and a third neighbor's home.  Zummo admitted that the Village code did not permit the neighbor to place the pillars there, and that no permit had been issued for this.

22

However, at Mayor Yagel's instruction, Zummo stood by and allowed this, and did not issue a violation.

107. **Second**, the Village has refused to issue a property tax refund to Manes, even after it received Court orders directing it to reduce the assessment. In defiance of these orders, the Village has to date refused to issue the refund.

108. **Third**, Defendant Ulman admitted to Manes, in the last year, that she urged a local land owner, who at the time was in serious negotiations with Manes to sell various parcels in the Village, not to sell to Manes, and rather to sell the property to another buyer who is not an Orthodox Jew. As a result of Ulman's interference, the owner backed out of the transaction and refused to sell to Manes, thus causing Manes to lose out on a transaction worth millions of dollars.

109. **Fourth**, Defendants discriminated against Plaintiffs in failing to provide documents in response to Manes' requests for access to public land and building records under New York's FOIL statute. Prior to this Court's entry of the Order dismissing his Complaint for failure to state a claim, Manes made numerous attempts to obtain records from the Village regarding similarly-sloped properties that would serve as comparators in support of his selective enforcement claim, including the properties located at 6, 8 and 10 High Mountain and 2 Riverview Court. However, he was either told there was "no file", or the relevant documentation was missing from the file.

110. The Human Rights Report shows that Plaintiffs' inability to obtain evidence of comparators was not a coincidence but the result of Defendants' deliberate misconduct. The Human Rights Division investigator heard testimony from Ms. Shea and Village Trustee Ian Banks that the "building files were in disarray"; that Ms. Shea complained of an inability to

23

access records and a lack of training in how to do so; and that two memorandums Ms. Shea sent

to the Trustees reporting on these issues went unheeded.  Even worse, Ms. Shea reported that she

was chastised for being "too cooperative" with Orthodox Jewish residents in responding to their

record requests, and that she was instructed to "make them wait" for a response even if it could

be provided expeditiously.  Further, as noted, Ms. Shea describes "an overall attitude in the

Village of Government to be unresponsive to requests from Orthodox Jewish residents for access

to property records" – although, when a non-Jewish person came to the Village office to make a

FOIL request, Mayor Yagel instructed her to provide the records immediately.

111.    Moreover, Ms. Shea explained that only files located on the ground floor of the

Village office were served in response to FOIL requests – other records stored in the basement

were not searched.

112.    Building Inspector Zummo has likewise admitted to Mr. Manes that the Village

files were in disarray and that files stored in the basement of the Village Office were not

searched in response to FOIL requests. In particular, he admitted that relevant documents on the

22 High Mountain Property (i.e., the documents relating to the slope) were missing.  And he

acknowledged that the files necessary to show comparators elsewhere on the street or nearby

streets were either missing entirely, or the relevant portion was missing.

## C.     <u>Other Orthodox Jewish Residents, Who Were Subjected to Similar Mistreated Have Filed Suit in This Court</u>

113.    In November 2018, three other Orthodox Jewish residents of Pomona, Robert

Klein, Samuel Indig and Meir Kahana, filed suit in this Court alleging similar acts of intentional

discrimination, *Indig v. Pomona*, Case No. 7:18-cv-10204-VB.

114. In particular, Mr. Indig was improperly denied permission to complete grading work on his backyard that the building inspector initially approved, leaving him with an unsafe slope that makes his yard unusable by his family.

115. Mr. Klein was denied construction permits and subjected to serial stop work orders that have prevented him for years from completing renovations to his house, and also faced discriminatory ticketing for supposed leaf disposal violations, when non-Jewish neighbors were not similarly ticketed. In addition, after Mr. Klein was elected to the Village board of trustees, he was treated as a second-class member. Yagel denied him a key to the Village offices that other non-Jewish board members have, and withheld records from him that are necessary to perform his duties. The Village also refused to update its website to include Mr. Klein in the list of trustees.

116. Finally, Mr. Kahana was targeted by Defendants for discriminatory code enforcement, including a ticket he received for a Toys 'R' Us pool he temporarily placed in his yard and a warning notice for dog waste, though he has no dog.

**D.** **Defendants and Other Village Personnel Have Admitted That The Treatment of Plaintiffs Is Due to Mr. Manes' Religion**

    **1.** **Admissions by Building Inspector Zummo**

118. Following the issuance of the Human Rights Report, Manes had several conversations with Building Inspector Zummo (some of which are recorded), during which Zummo admitted that Defendants discriminated against Plaintiffs on the basis of Manes' religion.

119. Specifically, Zummo admitted that Yagel and Ulman intentionally caused delays in the issuance of a certificate of occupancy for the property Plaintiffs owned at 22 High Mountain Road by imposing requirements that were not applied to other non-Jewish property

owners. He admitted that Ulman caused the property file for the 22 High Mountain Property to be altered in an effort to substantiate the claim, as discussed above, that there was a $6,000 bill for work associated with the property. Zummo reviewed the file and found no evidence of such a bill, and learned that, at the direction of Ulman, Village staff added "notes" to the file reflecting the supposed bill.

120. Zummo further stated that the reason for the disparate treatment Plaintiffs suffered was that Mayor Yagel does not tolerate change and feels threatened by the Orthodox Jewish community moving into the Village. Zummo said that Yagel would make comments such as "We don't want this element" in reference to Orthodox Jews.

121. Zummo also told Mr. Manes that Defendant Ulman had directed him to delete email messages from his phone in anticipation that the phone might be searched for documents relevant to discrimination claims.

### 2. Admissions by Defendants Ulman

122. On July 19, 2018, Manes had a conversation with Defendant Ulman during a break in a deposition in a separate land use litigation between the Village and TAL Properties.

123. During that conversation, Ulman admitted to Manes that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village." She attempted to absolve herself of responsibility by stating that "it's my job to represent Mayor Yagel" – when, in fact, she represents the Village – and by claiming that she eventually resigned from representing the Village zoning board because of its discriminatory treatment of Robert Klein and other Orthodox Jewish residents. These statements were made in front of Mr. Manes and his attorney in the other litigation.

26

124. Ulman also admitted that the Village board of trustees improperly targeted Plaintiffs by pursuing a claim that Plaintiffs were responsible for maintaining the roads accessing their properties, when defendants did not make such claims against other similarly-situated, non-Jewish property owners.

125. The religiously-motivated discrimination to which defendants subjected Plaintiffs stymied Plaintiffs from timely proceeding with other projects and caused actual economic loss. In engaging in the conduct set forth above, defendant Yagel repeatedly consulted with defendant Ulman, an attorney in good standing in the State of New York, shared with her his discriminatory design and enlisted her support in each of the methods he dictated to stymie and impeded Plaintiffs' projects.

126. Though aware that the impositions placed upon Plaintiffs were contrary to Village law and not authorized by any provision of the local building or zoning codes, defendant Ulman fronted for defendant Yagel, knowingly implementing and defending his discriminatory dictates and impeding Plaintiffs' business venture to delay alienation of the Plaintiff's properties.

127. As a consequence of the treatment outlined above, Defendants collectively caused Mr. Manes economic losses, as well as emotional distress, anxiety and humiliation.

## FIRST CLAIM FOR RELIEF

### (Violations of the Equal Protection Clause
### United States Constitution, Fourteenth Amendment
### 42 U.S.C. § 1983)

128. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

27

129.    Defendants' actions deprived and continue to deprive all Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution by discriminating against and targeting Plaintiffs for disfavor in, among other things, the application of local zoning laws, and the enforcement of alleged code violations.

130.    Defendants' contemporaneous actions and statements show that Defendants mistreatment of Plaintiffs is motivated by discriminatory animus against Orthodox Jews.

131.    The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

132.    Plaintiffs are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

### SECOND CLAIM FOR RELIEF
**(Violations of the Free Exercise Clause**
**United States Constitution, First Amendment**
**42 U.S.C. § 1983)**

133.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

134.    By targeting Plaintiffs for mistreatment and disfavor because of their religious identity as Orthodox Jews, Defendants have improperly deprived Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment.

135.    The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

136.     Plaintiffs are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

## THIRD CLAIM FOR RELIEF
### (Violations of New York State Constitution Article 1, §§ 3 and 11)

137.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

138.     The Defendants, by their acts, have acted under color of law and have conspired and continue to conspire, in breach of the rights of all Plaintiffs under the New York State Constitution, *viz.* Article I, § 3 (freedom of worship; religious liberty) and Article 1 § 11 (equal protection of laws; discrimination in civil rights prohibited).

139.     The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

140.     Plaintiffs are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

## FOURTH CLAIM FOR RELIEF
### (Violations of Section 40-c of the New York Civil Rights Law)

141.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

142.    The Defendants, by their acts, have conspired under color of law and continue to conspire to abridge the rights of all Plaintiffs under Section 40-c(1) and (2) of the New York Civil Rights Law to be free from discrimination on the basis of their religion.

143.    The Plaintiffs shall duly serve notice of this claim on the Attorney General of the State of New York, pursuant to Civil Rights Law § 40-d.

**WHEREFORE,** Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

(1)    Awarding Plaintiffs compensatory, consequential and punitive damages in an amount to be determined at trial;

(2)    Enjoining Defendants from discriminating against Plaintiffs on the basis of their religion;

(3)    Appointing an independent third party to oversee code inspections and permit applications.

(4)    Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(5)    Granting such other and further relief to Plaintiffs as the Court deems just and proper.

Dated: May 22, 2019
      New York, New York

                                             **Respectfully submitted,**
                                             **SCHLAM STONE & DOLAN LLP**

                                             _____

                                             Bradley J. Nash
                                             Samuel L. Butt
                                             26 Broadway
                                             New York, New York 10004
                                           Telephone No.: (212) 344-5400
                                           Fax No.: (212) 344-7677
                                           bnash@schlamstone.com
                                           sbutt@schlamstone.com

                                           *Attorneys for Plaintiffs*

# Exhibit H

***(to Exhibit B)***


Neutral

As of: August 21, 2020 1:53 PM Z

## *TAL Props. of Pomona, LLC v. Vill. of Pomona*

United States District Court for the Southern District of New York

July 22, 2019, Decided; July 22, 2019, Filed

No. 17-CV-2928 (CS)

**Reporter**

2019 U.S. Dist. LEXIS 121729 *; 2019 WL 3287983

TAL PROPERTIES OF POMONA, LLC, and AVROHOM MANES, Plaintiffs, - against - VILLAGE OF POMONA, BRETT YAGEL, MAYOR OF THE VILLAGE OF POMONA, and DORIS ULMAN, Defendants.

**Prior History:** *Indig v. Vill. of Pomona, 2019 U.S. Dist. LEXIS 100190 (S.D.N.Y., June 14, 2019)*

## Core Terms

newly, misconduct, movant, religious, grading, discriminatory, reopen, non-Jewish, discovery, quotation, disarray, religion

**Counsel:** [*1] For Plaintiffs: Bradley J. Nash, Schlam Stone & Dolan LLP, New York, New York.

For Defendants: Janine A. Mastellone, John B. Martin, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, New York.

**Judges:** CATHY SEIBEL, UNITED STATES DISTRICT JUGDE.

**Opinion by:** CATHY SEIBEL

## Opinion

### OPINION & ORDER

Seibel, J.

Before the Court is the motion of Plaintiffs TAL Properties of Pomona, LLC, and Avrohom Manes (collectively, "Plaintiffs") seeking relief from judgment of dismissal and to reopen this case under *Federal Rule of Civil Procedure 60(b)*. (Doc. 28.)

### I. BACKGROUND

On March 16, 2017, Plaintiffs filed this action in state court, and on April 21, 2017, Defendants Village of Pomona, Brett Yagel, and Doris Ulman (collectively, "Defendants") removed the action to this Court. (Doc. 1.)[1] On July 5, 2017, Plaintiffs requested and obtained leave to file an Amended Complaint. (Docs. 10-11.)[2] Defendants requested a pre-motion conference in advance of a motion to dismiss, and at the conference, the Court granted Plaintiffs leave to file a Second Amended Complaint, (Minute Entry dated August 25, 2017), which Plaintiffs filed on September 7, 2017, (SAC).

### A. Plaintiffs' SAC

---

[1] Plaintiffs brought their state court action against Defendants and against Ian Banks, Alma Sanders Roman, Nicholas Wilson, Louis Zummo, and P. Joseph Corless, who were all associated with the Village of Pomona (the "Village"). But Plaintiffs dropped these individuals as Defendants in their Second Amended Complaint. (*See* Doc. 16 ("SAC").)

[2] Although the proposed Amended Complaint was attached to Plaintiffs' letter requesting leave, it was never filed.

Plaintiffs alleged in the SAC that Defendants selectively enforced certain building codes and [*2] regulations against them based on the religion of Plaintiff Manes, who is also the principal of Plaintiff TAL Properties, LLC. (*See id.* ¶¶ 12, 48.) Plaintiffs further alleged that Defendants burdened Plaintiffs' free exercise of religion by imposing harsher conditions on them than it did on non-Jewish building developers. (*Id.* ¶ 49.) In support they allege as follows.

Plaintiffs purchased a residential home at 22 High Mountain Road within the Village (the "Property") in December 2015. (*Id.* ¶ 8.) In January 2016, Plaintiffs made repairs to the Property, and Village Building Inspector Louis Zummo inspected it and advised Plaintiffs that the repairs were done in accordance with applicable building codes and regulations. (*Id.* ¶¶ 9-11.) Despite Plaintiffs' compliance, and despite Zummo's comments that a certificate of occupancy ("CO") would be issued, Defendants Yagel and Ulman directed Zummo to not issue the CO. (*Id.* ¶¶ 11, 13.) In seeking to justify the Village's refusal to issue the CO, Yagel, acting by and through Ulman, claimed that a prior owner of the Property owed the Village $6,379.34, and Ulman demanded payment from Plaintiffs in exchange for the CO. (*Id.* ¶ 16.) The Village generally [*3] does not refuse to provide a CO because a prior property owner failed to satisfy a debt that the Village failed to record as a lien against the property at the time the current owner purchased that property. (*Id.* ¶¶ 18-19.) Further, Yagel and Ulman did not collect or attempt to collect the debt from the Property's previous owner, who was not Jewish. (*Id.* ¶ 21.)

In the summer of 2016, Plaintiffs sought to grade out slopes on the Property and submitted a grading plan. (*Id.* ¶¶ 23-24.) The Village engineer initially approved it, but under pressure from Yagel and Ulman, retracted his approval and stated that costly measures needed to be undertaken before the grading could begin — measures that "similarly-situated property owners did not have to satisfy." (*Id.* ¶ 29; *see id.* ¶¶ 23-25, 30-32.)

After Plaintiffs agreed to comply with the costly requirements imposed by Defendants, the Village still rejected Plaintiffs' application and did not issue a permit for the grading work. (*Id.* ¶ 33.) Plaintiffs allege that Zummo and the Village clerk, whom they later identified as Noreen Shea, (*see* Doc. 52 ("TAC") ¶¶ 16, 93), told Manes that Yagel and Ulman advised them to give Plaintiffs "a hard time with [*4] anything they needed." (SAC ¶ 35.) Zummo also allegedly told the Village engineer that Zummo would "no longer participate in selective enforcement against the plaintiffs." (*Id.* ¶ 28.)

In the fall of 2016, Plaintiffs entered into a contract for the Property's sale, but at a lower price than if the grading work had been done. (*See id.* ¶¶ 34, 36-37.) By this time, the Village had dropped any claim that Plaintiffs owed fees incurred by the prior owner and had issued Plaintiffs a CO. (*Id.* ¶ 38.) Following the sale of the Property, however, the Village allegedly threatened to withdraw the CO unless Plaintiffs signed an agreement acknowledging, among other things, that the road accessing the Property was not a Village road and that maintenance of the road was the sole responsibility of the Property owner. (*Id.* ¶ 39.) Plaintiffs allege that the Village did not require other property owners to sign similar agreements. (*See id.* ¶ 40.)

## B. Defendants' Motion to Dismiss

On October 16, 2017, Defendants moved to dismiss Plaintiffs' SAC. (Doc. 17.) On January 10, 2018, I granted Defendants' motion. (Minute Entry dated Jan. 10, 2018; Doc. 24.) Regarding Plaintiffs' selective enforcement claim under the [*5] *Equal Protection Clause*, Plaintiffs failed to plausibly allege that they, compared with others similarly situated, were selectively treated, and even if they were selectively treated, that such treatment was based on Manes's religion. Specifically, Plaintiffs' allegations regarding similarly situated persons were conclusory, as Plaintiffs did not allege that the previous owner of 22 High Mountain Road ever applied for a CO or that other property owners on High Mountain Road ever applied for or were granted grading permits like the one Plaintiffs sought. Ultimately, Plaintiffs provided no facts about the comparators' properties or activities from which I could infer that others were similarly situated to Plaintiffs but treated better in their interactions with Defendants. Plaintiffs also failed to plead that any selective enforcement was motivated by religious-based animus. Plaintiffs had to do more than allege that Defendants knew Manes was Jewish and treated him badly, and in their SAC, Plaintiffs failed to provide facts supporting even circumstantially a conclusion of discriminatory intent.

I also dismissed Plaintiffs' free exercise claim on the ground that Plaintiffs' conclusory allegations of religious-based [*6] animus were insufficient to establish a *First Amendment* violation. Further, Plaintiffs failed to plausibly allege that the conditions and requirements imposed by Defendants substantially burdened Plaintiffs' religious freedom or interfered with their religious observation. Plaintiffs made a single allegation that their religious freedom was burdened, but it was not only conclusory but did not even claim that the burden was a substantial one.

Accordingly, I granted Defendants' motion, and on January 12, 2018, judgment was entered in favor of Defendants, and

the case was closed. (Doc. 25.) No appeal was taken.

## C. The New York State Division of Human Rights Report

On November 3, 2017, Noreen Shea, a non-Jewish former Deputy Village Clerk, filed a complaint with the New York State Division of Human Rights, alleging that she was unlawfully terminated for providing competent, equal, and professional services to Orthodox Jewish investors, builders, and residents, and for being too cooperative with certain Jewish residents of the Village. (Doc. 30 ("Manes Decl.") Ex. 2 ("Human Rights Complaint") ¶ 11.) A non-public investigation followed, during which Shea, in response to the Village's position, provided a [*7] more detailed account of the discrimination she witnessed. (*Id.* Ex. 3 ("Response").). In June 2018, six months after this Court dismissed Plaintiffs' SAC, the New York State Division of Human Rights issued a report of its findings. (Manes Decl. Ex. 1 ("the "Human Rights Report" or the "Report") at 1, 8; *see* TAC ¶ 46.) The Report included Shea's allegations that she was labeled as a "Jew Lover," (Report at 1, 5; *see* Response at 21), describing an "Us vs. Them" culture in the Village offices with respect to Orthodox Jewish residents, (Report at 1; Human Rights Complaint ¶ 10; Response at 34), and stating that Yagel often referred to Orthodox Jews as "them" or "those people" and told her to stop being "too cooperative" with Jewish residents, (*see* Report at 1, 5; Response at 13, 22; Human Rights Complaint ¶ 5.) Shea's submissions added that Yagel chastised her for being pleasant to Manes, (Human Rights Complaint ¶ 5; *see* TAC ¶ 48,) and that the Village Clerk told Shea to "not be so polite or kind to Tal Properties owner, Mr. Avorhom [*sic*] Manes because he had three law suits against the Village," (Response at 26.) Shea alleged that Zummo and Ulman unfairly delayed in issuing a permit to [*8] the Orthodox family that had bought 22 High Mountain Road and wanted to convert a garage into rooms for two handicapped children, and that Zummo commented, "[M]aybe he should stop having children." (Response at 16-17.) Shea also asserted that Yagel yelled at her for too quickly arranging an inspection for another Jewish property owner. (*Id.* at 32.) Further, Shea alleged that Yagel instructed her to buy pork rinds and place them on the counter in the Village office "as a deterrence against the growing Orthodox Jewish population." (Report at 1; *see* Human Rights Complaint ¶ 8; *see also* Response at 33 (alleging that Yagel instructed Shea's supervisor to buy and display pork rinds).)

Defendants also allegedly criticized Shea for responding too quickly to Freedom of Information Law ("FOIL") requests from Orthodox Jewish residents. (*See* Human Rights Complaint ¶¶ 4-5.) Yagel instructed Shea that she could wait until the last permissible date (which was five days after the request) to provide information to Jewish residents and developers. (*See* Response at 22.) The Report noted that a Village trustee said Shea sent two internal memoranda while working for the Village stating that the Village's "building [*9] files were in disarray" and she was not trained on how to access the files. (*See* Report at 5).

During the investigation, the Human Rights Division interviewed numerous Village employees, including Defendant Yagel and Zummo. (*Id.* at 2.) Yagel denied all of Shea's allegations. (*Id.* at 2-3.) He admitted only that he told Shea, "Don't you know we are in litigation?" after observing her interacting with "someone from Tal Properties." (*Id.* at 2.) Zummo denied most of Shea's allegations, but he admitted that Yagel had once directed him to work "during the weekend 'to do garbage,'" (*id.* at 3-4), possibly a reference to Shea's allegation that the Village engaged in "selective ticketing of Jewish residences related to their garbage cans," (*id.* at 2). Zummo further "acknowledged that he had done impressions/impersonations in the office of Jewish residents and said that he 'joked about how people were carrying on.'" (*Id.* at 4.) The investigator also reviewed emails in which Yagel directed Zummo to issue a violation to an unidentified property and to issue an immediate stop work order to an unidentified individual. (*Id.*)

At the conclusion of the investigation, the investigator recommended a hearing to "determine whether [Shea's] refusal to [*10] engage in unlawful discriminatory practices toward Jewish residents was the motivating factor behind [the Village's] refusal to reappoint her as Deputy Clerk." (*Id.* at 8.) The Report concluded that there was "probable cause to support the allegations of the complaint," (*id.*), but its author explained that he was required to resolve all factual disputes in favor of Shea, and "[a] determination of probable cause is not a final adjudication, but merely a determination that there should be a formal hearing on the matter," (*id*).

## D. Additional Lawsuits Stemming from Defendants' Alleged Discriminatory Conduct

Instead of proceeding via public hearing, Shea elected to pursue her claims in this Court. *See Shea v. Village of Pomona*, No. 18-CV-11170 (CS), (S.D.N.Y. Dec. 13, 2018), Doc. 8. Additionally, on November 2, 2018, three additional Jewish residents of Pomona — Samuel Indig, Meir Kahana, and Robert Klein — filed a complaint against the Defendants here (and Zummo and Deputy Mayor Leon Harris), bringing claims for, among other things, equal protection and free exercise violations. *See Indig v. Village of Pomona*, No. 18-CV-10204 (VB) (S.D.N.Y. Nov. 2, 2018), Doc. 1 ("Indig Complaint") ¶¶ 98-106; Manes [*11] Decl. Ex. 5. The *Indig*

plaintiffs alleged that Defendants

> employed a range of discriminatory techniques to
> achieve their unlawful agenda — 1) enacting
> unconstitutional new zoning laws and practices; 2)
> pretextual delays and denials of permits and certificates
> of occupancy to Jewish homeowners and developers; 3)
> harassing real estate brokers (and their customers)
> known for selling to Orthodox clients; 4) targeting
> Jewish-owned residences for selective enforcement of
> code violations — for example, executing pre-dawn
> Saturday morning ticketing blitzes (referred to by Yagel
> as "shul patrols"); and 5) accepting and encouraging
> deranged and blatantly anti-[S]emitic "complaints" from
> non-Jewish residents as legitimate justifications for
> intrusive inspections and harassment (e.g., complaints
> referring to Orthodox Jews as "Corporation members"
> and prayer groups as business meetings and "the people
> living on the hill").

(Manes Decl. Ex. 5 ¶ 8.)

### E. Plaintiffs' Motion to Reopen and Proposed Third Amended Complaint

On November 2, 2018, Plaintiffs moved to vacate the judgment of dismissal and reopen this case pursuant to *Federal Rule of Civil Procedure 60(b)*. (Doc. 28). Plaintiffs filed a memorandum in support of their motion, (Doc. 29 [*12] ("Ps' Mem.")), and supplied with that motion three declarations and numerous exhibits, (Docs. 30-32). Defendants filed an opposition brief, (Doc. 35 ("Ds' Opp.")), and Plaintiffs filed a reply, (Doc. 40 ("Ps' Reply")). On April 30, 2019, the Court ordered Plaintiffs to file a proposed Third Amended Complaint, (Doc. 44), which Plaintiffs did on May 29, 2019, (TAC).

In their TAC, Plaintiffs set forth many of the facts asserted by Shea in her Human Rights Complaint and by plaintiffs in the Indig Complaint. For example, Plaintiffs allege that Defendants fostered an "Us vs. Them" culture, (TAC ¶ 48), Yagel criticized Shea for complying too quickly with FOIL requests from Jewish residents, (*id.* ¶ 51), Yagel called Shea "Jew Lover," (*id.* ¶ 53), and Defendants refused to permit an Orthodox Jewish family to build accommodations for their children with disabilities, (*id.* ¶ 56) — all of which were alleged in Shea's Human Rights Complaint and Response, (Report at 1, Human Rights Complaint ¶ 10; Response at 17, 34). Further, Plaintiffs alleged that Defendants targeted Jewish residents via overnight enforcement, referred to as "shul patrols," (TAC ¶¶ 58, 60), which was similarly alleged in the Indig [*13] Complaint, (Manes Decl. Ex. 5 ¶ 8).

Plaintiffs also made new allegations not previously alleged in

the Human Rights or Indig Complaints. First, Plaintiffs alleged that following the release of the Human Rights Report, Zummo had several conversations with Manes during which Zummo allegedly admitted that Defendants discriminated against Plaintiffs on the basis of Manes's religion. (TAC ¶ 118.) Zummo allegedly admitted that Yagel would make comments such as "We don't want this element," in reference to Orthodox Jews, (*id.* ¶ 120), and that Yagel and Ulman intentionally caused delays in the issuance of a CO for the Property by imposing requirements that were not applied to other non-Jewish property owners, (*id.* ¶ 119). Further, Zummo allegedly stated that Ulman altered the file for the Property by adding "notes" regarding the alleged debt on the Property, (*id.*), and admitted that the Village's building files were in disarray and that the files stored in the basement of the Village office were not searched in response to FOIL requests, (*id.* ¶ 112). According to Plaintiffs, Zummo stated that the slope-related documents regarding the Property were missing, as were files necessary to show comparators [*14] elsewhere on High Mountain Road or nearby streets. (*Id.*)

Second, Plaintiffs state that on July 19, 2018, Manes had a conversation with Ulman during a break in a deposition in a separate land-use case, and during the conversation, Ulman allegedly admitted that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village." (*Id.* ¶¶ 122-123.) Plaintiffs assert that Ulman attempted to absolve herself of responsibility by stating, "[I]t's my job to represent Mayor Yagel" — when, in fact, she represents the Village — and by claiming that she eventually resigned from representing the Village zoning board because of its discriminatory treatment of Orthodox Jewish residents. (*Id.* ¶ 123; *see id.* ¶ 57.) Ulman also allegedly admitted that "the Village board of trustees improperly targeted Plaintiffs by pursuing a claim that Plaintiffs were responsible for maintaining the roads accessing their properties, when Defendants did not make such claims against other similarly-situated, non-Jewish property owners." (*Id.* ¶ 124.)

Plaintiffs' TAC asserts that the Defendants' actions violated (1) the *Equal Protection Clause of the Fourteenth Amendment*; (2) the *Free Exercise Clause of the First Amendment*; (3) the *New York State Constitution article 1*; and (4) *section 40-c of the New York Civil Rights Law*. (*Id.* ¶¶ 128-143.)

## II. LEGAL STANDARD [*15]

*Rule 60(b)* provides that a court may, in its discretion, relieve a party "from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in

time to move for a new trial under *Rule 59(b)*" or "(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." *Fed. R. Civ. P. 60(b)*. *Rule 60(b)(2)* and *60(b)(3)* motions must be made "no more than a year after the entry of the judgment or order or the date of the proceeding." *Fed. R. Civ. P. 60(c)(1)*.

*Rule 60* is intended to preserve "a balance between serving the ends of justice and ensuring that litigation reaches an end within a finite period of time." *Am. Tissue, Inc. v. Arthur Anderson, L.L.P., No. 02-CV-7751, 2005 U.S. Dist. LEXIS 4931, 2005 WL 712201, at *2 (S.D.N.Y. Mar. 28, 2005)* (quoting *Paddington Partners v. Bouchard, 34 F.3d 1132, 1144 (2d Cir. 1994))*. In striking this balance, a motion for relief from judgment is generally disfavored and granted only when "exceptional circumstances" exist. *United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 391 (2d Cir. 2001)*. The party seeking relief from the prior judgment has the burden of proof, *id.*, and that party "must meet an 'onerous standard,'" *Vector Capital Corp. v. Ness Techs., Inc., No. 11-CV-6259, 2012 U.S. Dist. LEXIS 75648, 2012 WL 1948822, at *10 (S.D.N.Y. May 24, 2012)* (quoting *Int'l Bhd. of Teamsters, 247 F.3d at 392*). *Rule 60* "is 'not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.'" *Edwards v. Rochester Inst. of Tech., No. 10-CV-6553, 2018 U.S. Dist. LEXIS 101619, 2018 WL 3017094, at *1 (W.D.N.Y. June 18, 2018)* (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012), as amended* (July 13, 2012)), *appeal docketed*, No. [*16] 18-2031 (2d Cir. July 10, 2018).

## III. DISCUSSION

### A. Timeliness

Before addressing the merits of Plaintiffs' motion, I address Defendants' assertion that Plaintiffs' *Rule 60(b)* motion must be denied because it is untimely. Defendants argue that even though the motion was brought within the one-year limitations period in *Rule 60*, it must be denied because Plaintiffs failed to file within a reasonable time after obtaining the evidence that forms the basis of their motion, and offer no explanation for that delay. (Ds' Opp. at 8-9.) Specifically, Defendants allege that Plaintiffs should not have waited five months after the release of the Human Rights Report, (*id.* at 9), while Plaintiffs argue that their motion is timely because it was filed within a year of dismissal, and they did not unreasonably delay after receiving the new evidence, (Ps' Reply at 9.) Plaintiffs state that they did not receive the full

record until less than four months before filing the motion and that the delay represents the time it took Plaintiffs' counsel to review and analyze the Human Rights Report and the documents on which the investigator relied in preparing the Report. (*Id.*).

Plaintiffs' motion is timely under *Rule 60(c)(1)*. While Defendants cite to some cases in **[*17]** which courts have denied *Rule 60* motions on timeliness grounds, none of them are analogous to the facts here. In *Hamzik v. Zale Corp./Del., Inc.*, the plaintiff did not state when he located the newly discovered evidence and in fact possessed it prior to judgment but assumed the evidence was lost or destroyed. *See No. 06-CV-1300, 2008 U.S. Dist. LEXIS 39234, 2008 WL 2073957, at *1-2 (N.D.N.Y. May 14, 2008)*. In *Henriquez v. Astrue*, the plaintiff possessed the newly discovered evidence prior to judgment, could not explain why she did not tell her lawyer about it, and could not explain why, once the lawyer was informed of the evidence, the lawyer did not move within the ten-day period for a *Rule 59* motion. *See 499 F. Supp. 2d 55, 56 (D. Mass. 2007)*. The facts here are simply not analogous, and in any event, those cases are not binding on this Court. Plaintiffs moved with reasonable diligence after obtaining the new evidence. Accordingly, I will not deny Plaintiffs' motion on timeliness grounds.

### B. *Rule 60(b)(2)*

*Rule 60(b)(2)* allows a court, in its discretion, to relieve a party from a final judgment or order based on "newly discovered evidence that, with reasonable diligence, could not have been discovered" within twenty-eights days of entry of judgment. *Fed R. Civ. P. 60(b)(2)*. For a *Rule 60(b)(2)* motion to succeed,

> the movant must demonstrate that (1) the newly discovered evidence was of facts **[*18]** that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*Int'l Bhd. of Teamsters, 247 F.3d at 392* (internal quotation marks omitted) (alteration omitted). Therefore, if the movant possessed or could have possessed the evidence before judgment was rendered, it is not newly discovered and does not entitle the movant to relief from judgment. *See Kurzweil v. Philip Morris Cos., No. 94-CV-2373, 1997 U.S. Dist. LEXIS 4451, 1997 WL 167043, at *4 (S.D.N.Y. Apr. 9, 1997)*.

The *International Brotherhood of Teamsters* factors were "written primarily with an eye towards judgments that have been entered following a trial or other factual hearing, but they have also been applied to relieve a party from a judgment entered without a trial." *Stage Presence, Inc. v. Geneve Int'l Corp. (In re Stage Presence, Inc.), No. 12-CV-10525, 2016 Bankr. LEXIS 2377, 2016 WL 3582650, at *4 (Bankr. S.D.N.Y. June 24, 2016)*. Where a dismissal was based on a deficiency in a pleading, the Court must determine whether the new evidence would have changed the prior outcome — *i.e.*, whether its inclusion would have altered the order on the motion to dismiss.[3] See *2016 Bankr. LEXIS 2377, [WL] at *5*; *Kurzweil, 1997 U.S. Dist. LEXIS 4451, 1997 WL 167043, at *5*.

Plaintiffs argue that the "evidence newly-revealed in the Human Rights Report — and . . . additional witnesses who came [*19] forward in its wake — meet[] each of the prerequisites for a *Rule 60(b)(2)* motion." (Ps' Mem. at 16.) Plaintiffs first argue that the Human Rights Report revealed evidence of discrimination against Jewish residents of Pomona that existed at the time their SAC was dismissed. (*Id.*) Defendants do not dispute this assertion, so Plaintiffs have satisfied the first factor above.[4]

The parties dispute whether Plaintiffs were justifiably

---

[3] Defendants repeatedly point out that Plaintiffs' newly discovered evidence is not admissible. (D's Opp. at 6, 9-12) Some of it is — such as admissions of Village employees and statements not offered for their truth. More fundamentally, the inquiry on a *Rule 60(b)(2)* motion is whether the evidence would have changed the outcome, and when the outcome is the granting of a motion to dismiss, that inquiry requires analysis of whether the newly discovered evidence would have allowed Plaintiffs to plausibly plead their claims, not prove them. See *Stage Presence, 2016 Bankr. LEXIS 2377, 2016 WL 3582650, at *5* ("The relevant question in this case is not whether the new evidence would result in a 'win' at a subsequent trial, but whether the new evidence would have altered the prior outcome — that is, whether its inclusion in a pleading would have . . . altered the dismissal order.").

[4] Plaintiff Manes in his declaration describes "additional acts of discrimination" he experienced "beyond those set forth in the [SAC]," (Manes Decl. ¶ 9), that occurred between December 2017 and November 2018, (*id.* ¶¶ 10-14). These events are irrelevant. To the extent these events occurred after the motion to dismiss was granted, evidence of them "is not newly discovered evidence that was in existence at the time of the order; it is simply new evidence." *Kurzweil, 1997 U.S. Dist. LEXIS 4451, 1997 WL 167043, at *5* (emphasis omitted). To the extent these events occurred before the motion to dismiss was granted, Plaintiff was aware of them and they are thus not newly discovered. See *1997 U.S. Dist. LEXIS 4451, [WL] at *4*.

ignorant of the newly discovered evidence,[5] but even

---

[5] Plaintiffs argue that "because the Human Rights Report was not issued until June 4, 2018, Plaintiffs were necessarily 'justifiably ignorant' of these facts before the Order and Judgment were entered on January 10 and 12, 2018." (Ps' Mem. at 16.) It is important to distinguish, however, between the newly discovered facts contained in the Report and those facts that were asserted in Shea's Human Rights Complaint and Response. A large portion of the Report, and indeed those parts that Plaintiffs assert are the most helpful to their motion, are simply recitations of allegations that Shea made in her Human Rights Complaint and Response. The only fact in the Report that came from someone or something other than Shea that directly involves Plaintiffs is that Yagel admitted that, after seeing Shea interacting with "someone from Tal Properties," he asked her, "Don't you know we are in litigation?" (Report at 2.) This innocuous admission hardly advances Plaintiffs' cause. The Report also found that Yagel instructed Zummo to "violate" an unidentified property (which Plaintiffs do not claim was the Property) and to issue a stop work order to an unidentified resident (who Plaintiffs do not claim was Manes), and that non-Defendant Zummo admitted that he impersonated Jewish residents and joked about how they "carri[ed] on," (*see id.* at 4).

Accordingly, nearly all of the newly discovered evidence on which Plaintiffs rely here is contained in Shea's Human Rights Complaint and Response. And to satisfy the second prong of *Rule 60(b)(2)* as discussed above, Plaintiffs must establish that they were justifiably ignorant of those facts despite due diligence when they brought their Complaint and SAC. Plaintiffs' showing on this score is weak, as discussed below.

In Plaintiffs' SAC, they mention that "the village clerk . . . expressly told [Manes] that defendants Yagel and Ullman [*sic*] advised [her] to give plaintiff[s] a hard time with anything they needed." (SAC ¶ 35.) Based on the TAC, it is clear that the "village clerk" is Shea. (*Compare* SAC ¶ 35 ( "[T]he village clerk . . . expressly told [Manes] that defendants Yagel and Ullman [*sic*] advised [her] to give plaintiff[s] a hard time with anything they needed."), *with* TAC ¶ 93 ("[T]he Village Clerk, Ms. Shea, . . . expressly told Manes that defendants Yagel and Ulman advised [her] to give Plaintiffs a hard time with anything they needed.").) (Although Ms. Shea was the Deputy Village Clerk, (Human Rights Complaint ¶ 2), Plaintiffs plainly regarded her as the Village Clerk.) Accordingly, Plaintiffs had spoken with Shea prior to filing their SAC and at that time knew, or should have known, of the facts Shea alleged in her Human Rights Complaint. "Even if some of the particular underlying facts that later came out in" Shea's complaint or the Human Rights Report "could be considered 'newly discovered,' it is clear that Plaintiffs were not justifiably ignorant of those facts." *In re Optionable Secs. Litig., No. 07-CV-3753, 2009 U.S. Dist. LEXIS 52592, 2009 WL 1653552, at *4 (S.D.N.Y. June 15, 2009)*. While it is true that Shea did not file the Human Rights Complaint until after judgment was entered, she was almost certainly armed with those same allegations when she spoke with Plaintiffs, as Shea filed her Human Rights Complaint less than two months after Plaintiff filed the SAC. (Human Rights Complaint

assuming they were, Plaintiffs fail to establish that the evidence would be of such importance that it probably would have changed the outcome. None of the newly discovered evidence cures the deficiencies that resulted in dismissal of the SAC. In their SAC, Plaintiffs failed to identify any comparators that were similarly situated but treated better in their interactions with Defendants, which warranted dismissal. *See New Page at 63 Main, LLC v. The Inc. Vill. of Sag Harbor, No. 15-CV-2433, 2016 U.S. Dist. LEXIS 189158, 2016 WL 8653493, at \*21 (E.D.N.Y. Mar. 19, 2016)* (dismissing equal protection claim under either selective enforcement or class-of-one theories where plaintiff neither identified a similarly situated restaurant nor offered "any non-conclusory allegations suggesting that all of the [neighboring] restaurants . . . were similarly situated to [plaintiff-restaurant] [\*20] in all material respects"), *aff'd, 674 F. App'x 23 (2d Cir. 2016)* (summary order); *Segreto v. Town of Islip, No. 12-CV-1961, 2014 U.S. Dist. LEXIS 23945, 2014 WL 737531, at \*7 (E.D.N.Y. Feb. 24, 2014)* (vague assertions regarding neighbors insufficient where no allegations that they received permits denied to plaintiff and unclear whether properties similar); *Parkash v. Town of Southeast, No. 10-CV-8098, 2011 U.S. Dist. LEXIS 128545, 2011 WL 5142669, at \*8 (S.D.N.Y. Sept. 30, 2011)* ("conclusory reference to unspecified similarly situated persons without accompanying examples" insufficient to state selective enforcement claims), *aff'd, 468 F. App'x 80 (2d Cir. 2012)* (summary order); *cf. Whittle v. Cty. of Sullivan, No. 16-CV-725, 2017 U.S. Dist. LEXIS 185524, 2017 WL 5197154, at \*7-8 (S.D.N.Y. Nov. 8, 2017)* (allegations of similarly situated comparator inadequate in employment discrimination case where "Plaintiff fail[ed] to provide facts as to which colleagues committed similar acts

---

at 3.) When drafting their SAC, Plaintiffs were apparently satisfied with the evidence that Shea provided to them, and instead of pressing her for more facts, "Plaintiffs chose to file on insufficient allegations." *In re Optionable Sec. Litig., 2009 U.S. Dist. LEXIS 52592, 2009 WL 1653552, at \*4* ("Plaintiffs knew of the investigations, but instead of waiting for more facts to emerge — or even requesting from [the court] more time to amend the complaint — Plaintiffs chose to file on insufficient allegations, perhaps to gain a tactical advantage."). Plaintiffs do not allege that Shea refused to speak further or that they were unable to seek more information from her.

The remaining "newly discovered evidence" contains statements made by Zummo and Ulman in post-judgment conversations with Manes, and allegations brought by other Jewish residents of Pomona in the Indig Complaint. Plaintiffs do not allege that they were unable to speak with Zummo, Ulman, or the Indig Complaint plaintiffs prior to filing their Complaint, or that those individuals were previously unwilling to share information with Plaintiffs. In any event, I need not decide whether the evidence on which Plaintiffs rely was newly discovered, because (as discussed below) none of it would have changed the outcome of this Court's previous Opinion and Order.

but were not fired, what those acts were, to whom those employees reported, what their responsibilities were, and how their disciplinary histories compared to his"). Plaintiffs also failed to state a plausible free exercise claim because they failed to allege a burden on their religious freedom, let alone a substantial one. *See Skoros v. City of N.Y., 437 F.3d 1, 39 (2d Cir. 2006)* ("Absent [a showing that the purpose of a challenged action was to impugn religious beliefs or restrict religious practices], a Free Exercise claim will be sustained only if the government has placed a substantial burden on the observation of a central religious belief, without a compelling governmental [\*21] interest justifying the burden.") (internal quotation marks and alteration omitted).

Despite all of the newly discovered evidence that Plaintiffs proffer, they still have not identified any similarly situated comparators or any substantial burdens on their free exercise of religion. In fact, Plaintiffs do not argue that the newly discovered evidence would have changed my mind as to whether Plaintiffs adequately pleaded similarly situated comparators or a substantial burden on religious freedoms. Rather, Plaintiffs argue that the newly discovered evidence would give rise to an equal protection claim under a different theory of liability altogether: a *Pyke* claim.[6] But, as discussed above, *Rule 60* "is not a vehicle for . . . presenting the case under new theories." *Edwards, 2018 U.S. Dist. LEXIS 101619, 2018 WL 3017094, at \*1* (internal quotation marks omitted); *see Walker v. Carter, No. 12-CV-5384, 2017 U.S.*

---

[6] There is a "difference between . . . [a] *Pyke* claim, which sounds in racially discriminatory treatment, and [a] *LeClair* claim of 'selective enforcement.'" *Doe v. Village of Mamaroneck, 462 F. Supp. 2d 520, 557 (S.D.N.Y. 2006)*. To plead a claim under *Pyke v. Cuomo, 258 F.3d 107, 110 (2d Cir. 2001)*, plaintiffs must allege "defendants applied a facially neutral law or policy to them in an intentionally discriminatory race-based manner." *Doe, 462 F. Supp. 2d at 543*. Under a *Pyke* theory, "discriminatory effects are either independently demonstrated or can readily be presumed," and therefore "plaintiffs are not obligated to identify a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection." *Id.* To plead a "selective enforcement claim" under *Le Clair v. Saunders, 627 F.2d 606 (2d Cir.1980)*, plaintiffs must allege "that they were treated differently than an identifiable, similarly situated group of individuals for malicious reasons, including but not limited to racial prejudice." *Doe, 462 F. Supp. 2d at 543*. The same set of facts may establish a *Pyke* claim while not giving rise to a selective enforcement claim. *See id. at 543-44* (finding Plaintiff established a *Pyke* claim but failed to make out a selective enforcement claim). Plaintiffs in their SAC explicitly denominated their due process claim as one for selective enforcement. (*See* SAC ¶ 48 (alleging Defendants violated *Fourteenth Amendment* "[b]y intentionally engaging in selective enforcement against plaintiff[s].")

*Dist. LEXIS 109070, 2017 WL 3641707, at \*2 (S.D.N.Y. July 12, 2017)* ("a motion for reconsideration is not the appropriate time to test new legal theories"), *aff'd sub nom. Walker v. Burke, 739 F. App'x 72 (2d Cir. 2018)* (summary order); *Winding v. Wells Fargo Bank, No. 11-CV-00555, 2012 U.S. Dist. LEXIS 24089, 2012 WL 603217, at \*9 (E.D. Cal. Feb. 23, 2012)* (denying relief under *Rule 60(b)(2)* because plaintiff's "seizure upon a new theory to amend his complaint does not alter the circumstances under which the complaint was dismissed"), *report and recommendation adopted, 2012 U.S. Dist. LEXIS 138665, 2012 WL 4468430 (E.D. Cal. Sept. 26, 2012)*, *aff'd sub nom. Winding v. Wells Fargo Bank, NA, 706 F. App'x 918 (9th Cir. 2017)*. Accordingly, while Plaintiffs **[\*22]** may be able to initiate a separate action under their new theory, they have failed to establish the third element of a *Rule 60(b)(2)* motion, and I deny Plaintiffs' motion to vacate my previous judgment or reopen the case under that Rule.

## C. *Rule 60(b)(3)*

Plaintiffs argue that the Court should grant them relief from judgment under *Rule 60(b)(3)* based on Defendants' failure to provide public land and building records in response to Plaintiffs' FOIL requests, which they claim prevented them from gathering information on potential comparators. (Ps' Mem. at 20.) Plaintiffs assert that they submitted FOIL requests for these records, but after multiple delays, were told that no files existed or that the relevant records were missing from the file. (*Id.* at 21.)

*Rule 60(b)(3)* provides that a court may grant relief from judgment for "fraud . . . , misrepresentation, or misconduct by an opposing party." *Fed. R. Civ. P. 60(b)(3)*. The movant must demonstrate by clear and convincing evidence that the non-movant engaged in fraud, misrepresentation, or misconduct and that the conduct in question prevented him from "fully and fairly presenting his case." *Catskill Dev., L.L.C. v. Park Place Entm't Corp., 286 F. Supp. 2d 309, 312 (S.D.N.Y. 2003)* (internal quotation marks omitted). A *Rule 60(b)(3)* motion is not an opportunity for the movant to attempt to relitigate **[\*23]** the merits of the case. *Id.*

The movant need only show that the non-movant's misconduct "substantially interfered" with the movant's ability to present his case, not that the outcome would have been different absent the misconduct. *Id. at 316*. "Substantial interference is established if a party shows that the concealment precluded inquiry into a plausible theory of liability, denied it access to evidence that could well have been probative of an important issue, or closed off a potentially fruitful avenue of direct or cross examination."

*Thomas v. City of N.Y., 293 F.R.D. 498, 504 (S.D.N.Y. 2013)* (internal quotation marks omitted), *aff'd sub nom. Thomas v. McAuliffe, 691 F. App'x 671 (2d Cir. 2017)* (summary order). Failure to disclose or produce requested materials in discovery can constitute misconduct, and such a failure does not need to rise to the level of nefarious intent; even accidental omissions may be sufficient. *Catskill Dev., 286 F. Supp. 2d at 314-15*.[7]

But there was no failure to provide discovery here, as the case was dismissed before any discovery occurred. Plaintiffs are thus left to argue that conduct occurring outside the scope of litigation, and in fact before any complaint was filed, should be treated like a discovery violation. They provide no authority for that position and the Court has found none. Thus, while inept or accidental **[\*24]** discovery violations could suffice under *Rule 60(b)(3)*, *see Catskill Dev., 286 F. Supp. 2d at 314*, it does not appear that other inept or accidental conduct — such as maintaining files in disarray — would suffice.

And that is all Plaintiff can really allege here. While it is reprehensible if Shea was encouraged to wait until the fifth day to respond to FOIL requests that she could have fulfilled on the spot, it cannot be said that that short delay substantially impeded Plaintiffs' ability to present their case. And while Plaintiffs allege that files stored in the basement of the Village Hall were not searched in response to FOIL requests, their own evidence shows that the property records they sought were not stored in the basement but rather were upstairs. (Doc. 31. ¶ 5 ("All the property files were right next to my desk upstairs.").) So Plaintiffs have also not shown that the failure to search the basement could have substantially impaired their ability to proceed.

That leaves the maintenance of the building files in disarray. I am not prepared to find that mere negligent maintenance of files (and perhaps the negligent failure to correct that situation) — as opposed to negligence in responding to a request — amounts to "misconduct" **[\*25]** within the meaning of *Rule 60(b)(3)*, at least in the absence of authority supporting that notion. There is simply no clear and

---

[7] Defendants assert that "[t]he movant must prove that the opposing party's conduct amounted to fraud or comparably egregious conduct, not mere missteps," and support the proposition with a four-case string cite. (Ds' Opp. at 7.) But none of those cases support that proposition (or even come close). In fact, one of the cases that Defendants cite on the same page as the string cite referenced above explains that "misconduct under *Rule 60(b)(3)* can cover even accidental omissions." *Halliburton Energy Servs., Inc. v. NL Indus., 618 F. Supp. 2d 614, 640 n.16 (S.D. Tex. 2009)* (internal quotation marks omitted).

convincing evidence of misconduct with regard to the documents Plaintiffs sought.

Nor have Plaintiffs shown, by clear and convincing evidence or otherwise, that any disarray in the property files prevented them from getting what they needed to make their case. They allege that the documents they sought are "missing," (Manes Decl. ¶ 29), but have not specified any record that existed at one time but no longer can be located. For example, they do not allege that the properties at issue, which apparently are situated on the same steep slope as the Property, (*Id.* ¶¶ 22-25), were given permission to grade the slope but the documentation of the same is missing. Indeed, Plaintiffs have not shown that any records exist that would have allowed them to show similarly situated comparators.[8] That may be a difficult showing to make when the Village has stated that it has no such records, but that is the case whenever a *Rule 60(b)(3)* movant argues that records have been withheld. The cases finding misconduct for withheld records involve the moving party showing that the records exist or existed, *see, [\*26] e.g.,* *Thomas, 293 F.R.D. at 504* (withheld items existed); *Catskill Dev., 286 F. Supp. 2d at 314* (same); *Monaghan v. SZS 33 Assocs., L.P., No. 89-CV-4900, 1992 U.S. Dist. LEXIS 7864, 1992 WL 135821, at \*4 (S.D.N.Y. June 1, 1992)* (same), but Plaintiffs here have made no such showing, and it is their burden to do so. The motion under *Rule 60(b)(3)* is therefore denied.

* * *

Defendants should take little comfort in this outcome. The allegations presented on this motion, if even half true, are disturbing. I am obliged to stay within the confines of *Rule 60(b)*, which in my judgment does not allow for this lawsuit to be reopened, but should Plaintiffs commence a new lawsuit, they may well be able to state a claim. And I do not see how Defendants will "suffer immense prejudice," (Ds' Opp. at 9), if they have to defend themselves on the merits. They may well be able to do so; I have no opinion as to the what the outcome of such a case would be, nor could I at this stage. But should Plaintiffs find it in their interest to pursue a

case, airing the allegations and getting to the truth would hardly be a bad thing.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to vacate judgment and reopen the case is DENIED. Plaintiffs' motion for oral argument is DENIED as moot. The Clerk of the Court is respectfully directed to terminate the pending motions. (Docs. 28, 43.)

**SO ORDERED**.

Dated: July 22, 2019

White Plains, **[\*27]** New York

/s/ Cathy Seibel

CATHY SEIBEL, U.S.D.J.

---

---

[8] Manes's summary statement that Zummo told him that documents relating to the slope at 22 High Mountain Road or necessary to show comparators were missing does not clearly and convincingly establish that such records existed. Zummo could have meant that the records once existed and were now gone, or he could have meant that no such records were there. Without more detail about exactly what he said, one cannot conclude with confidence that there were in fact such documents at one time. And even if one could, Zummo said nothing suggesting that such records were deep-sixed or that Shea (who was apparently responsible for responding to FOIL requests) did not search for them in good faith.

# Exhibit I

*(to Exhibit B)*

**General Docket**
**Court of Appeals, 2nd Circuit**

| | |
|---|---|
| **Court of Appeals Docket #:** 19-2247 | **Docketed:** 07/23/2019 |
| **Nature of Suit:** 3440 CIVIL RIGHTS-Other | **Termed:** 05/29/2020 |
| TAL Properties of Pomona, LLC v. Village of Pomona | |
| **Appeal From:** SDNY (WHITE PLAINS) | |
| **Fee Status:** Paid | |

**Case Type Information:**
  1) Civil
  2) Private
  3) -

**Originating Court Information:**
  **District:** 0208-7 : 17-cv-2928
  **Trial Judge:** Cathy Seibel, U.S. District Judge
  **Date Filed:** 04/21/2017
  **Date Order/Judgment:**                    **Date NOA Filed:**
  07/22/2019                                  07/23/2019

**Prior Cases:**
  None

**Current Cases:**
  None

**Panel Assignment:**    Not available

---

| | |
|---|---|
| TAL Properties of Pomona, LLC<br>          Plaintiff - Appellant | Robert S. Rosborough, IV, Esq., -<br>Direct: 518-487-7600<br>[COR LD NTC Retained]<br>Whiteman Osterman & Hanna LLP<br>1 Commerce Plaza<br>Albany, NY 12260 |
| Avrohom Manes<br>          Plaintiff - Appellant | Robert S. Rosborough, IV, Esq., -<br>Direct: 518-487-7600<br>[COR LD NTC Retained]<br>(see above) |

------------------------------

| | |
|---|---|
| Village of Pomona<br>          Defendant - Appellee | John Martin Flannery, Esq., -<br>Direct: 914-872-7111<br>[COR NTC Retained]<br>Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>1133 Westchester Avenue<br>White Plains, NY 10604<br><br>Janine A. Mastellone, Esq., -<br>Direct: 914-872-7230<br>[COR NTC Retained]<br>Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>1133 Westchester Avenue<br>White Plains, NY 10604<br><br>Eliza Mae Scheibel, Esq., -<br>Direct: 914-872-7303<br>[COR NTC Retained]<br>Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>1133 Westchester Avenue<br>White Plains, NY 10604 |
| Brett Yagel, Individually, Mayor of the Village of Pomona,<br>          Defendant - Appellee | John Martin Flannery, Esq., -<br>Direct: 914-872-7111<br>[COR NTC Retained]<br>(see above)<br><br>Eliza Mae Scheibel, Esq., -<br>Direct: 914-872-7303 |

|                                                                                                          |                                                                                   |
| -------------------------------------------------------------------------------------------------------- | --------------------------------------------------------------------------------- |
|                                                                                                          | [COR NTC Retained]<br>(see above)                                                 |
| Doris F. Ulman, Individually, in her official capacity as attorney for the Village of Pomona<br>Defendant - Appellee | John Martin Flannery, Esq., -<br>Direct: 914-872-7111<br>[COR NTC Retained]<br>(see above) |
|                                                                                                          | Eliza Mae Scheibel, Esq., -<br>Direct: 914-872-7303<br>[COR NTC Retained]<br>(see above) |
| Ian Banks, Ian Banks as Trustee of the Village of Pomona<br>Defendant                                    |                                                                                   |
| Alma Sanders Roman, as Trustee of the Village of Pomona<br>Defendant                                     |                                                                                   |
| Nicholas Wilson, as Trustee of the Village of Pomona<br>Defendant                                        |                                                                                   |
| Louis Zummo, as Building Inspector of the Village of Pomona<br>Defendant                                 |                                                                                   |
| P. Joseph Corless<br>Defendant                                                                           |                                                                                   |
| Leon Harris, Individually, as Deputy Mayor of the Village of Pomona<br>Defendant                         |                                                                                   |

TAL Properties of Pomona, LLC, Avrohom Manes,

        Plaintiffs - Appellants,

v.

Village of Pomona, Brett Yagel, Individually, Mayor of the Village of Pomona, Doris F. Ulman, Individually, in her official capacity as attorney for the Village of Pomona,

        Defendants - Appellees,

Ian Banks, Ian Banks as Trustee of the Village of Pomona, Alma Sanders Roman, as Trustee of the Village of Pomona, Nicholas Wilson, as Trustee of the Village of Pomona, Louis Zummo, as Building Inspector of the Village of Pomona, P. Joseph Corless, Leon Harris, Individually, as Deputy Mayor of the Village of Pomona,

        Defendants.

| 07/23/2019 | ☐ 1<br>13 pg, 75.52 KB | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED. [2616086] [19-2247] [Entered: 07/24/2019 12:21 PM] |
| 07/23/2019 | ☐ 2<br>21 pg, 225.59 KB | DISTRICT COURT OPINION & ORDER, dated 07/22/2019, RECEIVED.[2616091] [19-2247] [Entered: 07/24/2019 12:23 PM] |
| 07/23/2019 | ☐ 3 | PAYMENT OF DOCKETING FEE, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, district court receipt # ANYSDC-17298220, FILED.[2616092] [19-2247] [Entered: 07/24/2019 12:24 PM] |
| 07/23/2019 | ☐ 4<br>13 pg, 155.49 KB | ELECTRONIC INDEX, in lieu of record, FILED.[2616093] [19-2247] [Entered: 07/24/2019 12:25 PM] |
| 08/06/2019 | ☐ 7<br>34 pg, 1.03 MB | MOTION, to be relieved as attorney, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED. Service date 08/06/2019 by CM/ECF, email, US mail. [2625866] [19-2247] [Entered: 08/06/2019 05:08 PM] |
| 08/08/2019 | ☐ 9<br>1 pg, 9.66 KB | NOTICE, to Appellee Doris F. Ulman, Village of Pomona and Brett Yagel, for failure to file an appearance, SENT.[2627054] [19-2247] [Entered: 08/08/2019 09:18 AM] |
| 08/13/2019 | ☐ 10 | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellee Doris F. Ulman and Brett Yagel, FILED. Service date 08/13/2019 by CM/ECF.[2631360] [19-2247] [Entered: 08/13/2019 04:11 PM] |
| 08/13/2019 | ☐ 11<br>2 pg, 17.74 KB | DEFECTIVE DOCUMENT, Acknowledgment and Notice of Appearance, [10], on behalf of Appellee Doris F. Ulman and Brett Yagel, FILED.[2631378] [19-2247] [Entered: 08/13/2019 04:16 PM] |
| 08/15/2019 | ☐ 13 | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellee Village of Pomona, FILED. Service date 08/15/2019 by CM/ECF. [2632963] [19-2247] [Entered: 08/15/2019 11:42 AM] |
| 08/15/2019 | ☐ 14<br>2 pg, 17.71 KB | DEFECTIVE DOCUMENT, Notice of Appearance as Additional Counsel, [13], on behalf of Appellee Village of Pomona, FILED.[2632980] [19-2247] [Entered: 08/15/2019 11:53 AM] |
| 08/15/2019 | ☐ 15<br>1 pg, 90.97 KB | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellee Village of Pomona, FILED. Service date 08/15/2019 by CM/ECF. [2633041] [19-2247] [Entered: 08/15/2019 12:40 PM] |
| 08/15/2019 | ☐ 16 | ATTORNEY, John Martin Flannery for Village of Pomona, in case 19-2247, [15], ADDED.[2633074] [19-2247] [Entered: 08/15/2019 01:15 PM] |
| 08/15/2019 | ☐ 17 | CURED DEFECTIVE, Notice of Appearance as Additional Counsel, [15], on behalf of Appellee Village of Pomona, FILED.[2633075] [19-2247] [Entered: 08/15/2019 01:16 PM] |
| 08/21/2019 | ☐ 19<br>1 pg, 60.57 KB | MOTION ORDER, granting motion to be relieved as attorney [7] filed by Appellant TAL Properties of Pomona, LLC and Avrohom Manes, by RSP, FILED. [2638365][19] [19-2247] [Entered: 08/21/2019 03:17 PM] |
| 08/21/2019 | ☐ 20 | ATTORNEY, Bradley J. Nash, for Avrohom Manes and TAL Properties of Pomona, TERMINATED. [2638371] [19-2247] [Entered: 08/21/2019 03:18 PM] |
| 08/22/2019 | ☐ 21<br>1 pg, 73.03 KB | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellee Village of Pomona, Brett Yagel and Doris F. Ulman, FILED. Service date 08/22/2019 by CM/ECF.[2639302] [19-2247] [Entered: 08/22/2019 02:56 PM] |
| 09/04/2019 | ☐ 22 | CURED DEFECTIVE, Acknowledgment and Notice of Appearance, [21], on behalf of Appellee Doris F. Ulman, Village of Pomona and Brett Yagel, FILED.[2646241] [19-2247] [Entered: 09/04/2019 09:03 AM] |
| 11/18/2019 | ☐ 23<br>2 pg, 793.42 KB | NOTICE OF APPEARANCE AS SUBSTITUTE COUNSEL, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED. Service date 11/18/2019 by US mail. [2709107] [19-2247] [Entered: 11/18/2019 03:41 PM] |
| 11/18/2019 | ☐ 25 | ATTORNEY, Robert S. Rosborough IV for TAL Properties of Pomona, LLC Avrohom Manes, in case 19-2247, [23], ADDED.[2709350] [19-2247] [Entered: 11/18/2019 04:54 PM] |
| 12/05/2019 | ☐ 26<br>1 pg, 36.63 KB | ORDER, dated 12/05/2019, dismissing appeal by 12/19/2019, unless Appellant Avrohom Manes and TAL Properties of Pomona submits Form C, FILED.[2722545] [19-2247] [Entered: 12/05/2019 04:02 PM] |
| 12/05/2019 | ☐ 27<br>1 pg, 36.63 KB | ORDER, dated 12/05/2019, dismissing appeal by 12/19/2019, unless Appellant Avrohom Manes and TAL Properties of Pomona submits Form D, FILED.[2722575] [19-2247] [Entered: 12/05/2019 04:11 PM] |
| 12/05/2019 | ☐ 28<br>1 pg, 36.76 KB | ORDER, dated 12/05/2019, dismissing appeal by 12/19/2019, unless Appellant Avrohom Manes and TAL Properties of Pomona submits Acknowledgment and Notice of Appearance, FILED.[2722589] [19-2247] [Entered: 12/05/2019 04:15 PM] |
| 12/19/2019 | ☐ 29 | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED. Service date 12/19/2019 by CM/ECF, US mail.[2734580] [19-2247] [Entered: 12/19/2019 02:41 PM] |
| 12/19/2019 | ☐ 30<br>70 pg, 2.08 MB | FORM C, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED. Service date 12/19/2019 by CM/ECF, US mail.[2734583] [19-2247] [Entered: 12/19/2019 02:43 PM] |

| | | |
|---|---|---|
| 12/19/2019 | ☐ 31<br>2 pg, 622.77 KB | FORM D, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED. Service date 12/19/2019 by CM/ECF, US mail.[2734586] [19-2247] [Entered: 12/19/2019 02:44 PM] |
| 12/19/2019 | ☐ 32<br>2 pg, 664.5 KB | LR 31.2 SCHEDULING NOTIFICATION, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, informing Court of proposed due date 03/19/2020, RECEIVED. Service date 12/19/2019 by CM/ECF, US mail.[2734604] [19-2247] [Entered: 12/19/2019 02:48 PM] |
| 12/19/2019 | ☐ 33<br>2 pg, 17.4 KB | DEFECTIVE DOCUMENT, Acknowledgment and Notice of Appearance, [29], on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED.[2734650] [19-2247] [Entered: 12/19/2019 03:00 PM] |
| 12/19/2019 | ☐ 35<br>2 pg, 345.02 KB | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED. Service date 12/19/2019 by CM/ECF, US mail.[2734697] [19-2247] [Entered: 12/19/2019 03:13 PM] |
| 12/19/2019 | ☐ 36 | CURED DEFECTIVE, Acknowledgment and Notice of Appearance, [35], on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED.[2734706] [19-2247] [Entered: 12/19/2019 03:15 PM] |
| 12/20/2019 | ☐ 38<br>1 pg, 19.12 KB | CAMP ORDER, Type of Conference: Telephonic, Scheduled Date of Conference: 01/14/2020, Start Time: 11:00 AM, Required Attendees: Clients with Counsel, with Kathleen M. Scanlon, ENTERED.[2735459] [19-2247] [Entered: 12/20/2019 11:06 AM] |
| 12/20/2019 | ☐ 41<br>2 pg, 38.22 KB | SO-ORDERED SCHEDULING NOTIFICATION, setting Appellant Avrohom Manes and TAL Properties of Pomona, LLC Brief due date as 03/19/2020. Joint Appendix due date as 03/19/2020, FILED.[2735833] [19-2247] [Entered: 12/20/2019 01:41 PM] |
| 01/08/2020 | ☐ 42<br>1 pg, 108.42 KB | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of Appellee Village of Pomona, Brett Yagel and Doris F. Ulman, FILED. Service date 01/08/2020 by CM/ECF. [2746690] [19-2247] [Entered: 01/08/2020 11:56 AM] |
| 01/08/2020 | ☐ 43 | ATTORNEY, Eliza Mae Scheibel for Doris F. Ulman Village of Pomona Brett Yagel, in case 19-2247 , [42], ADDED.[2746715] [19-2247] [Entered: 01/08/2020 12:07 PM] |
| 01/13/2020 | ☐ 44<br>1 pg, 389.67 KB | LETTER, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, rescheduling of CAMP mediation RECEIVED. Service date 01/13/2020 by CM/ECF.[2750635] [19-2247]--[Edited 01/13/2020 by WD] [Entered: 01/13/2020 01:27 PM] |
| 01/13/2020 | ☐ 46<br>1 pg, 19.14 KB | CAMP ORDER, Type of Conference: Amended Telephonic, Scheduled Date of Conference: 02/26/2020, Start Time: 10:30 AM, Required Attendees: Clients with Counsel, with Kathleen M. Scanlon, ENTERED. [2750703] [19-2247] [Entered: 01/13/2020 02:20 PM] |
| 02/24/2020 | ☐ 47<br>1 pg, 105.87 KB | LETTER, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, request to adjourn mediation for 30 days, RECEIVED. Service date 02/24/2020 by CM/ECF.[2785120] [19-2247]--[Edited 02/24/2020 by WD] [Entered: 02/24/2020 12:59 PM] |
| 02/24/2020 | ☐ 49<br>1 pg, 19.15 KB | CAMP ORDER, Type of Conference: Amended Telephonic, Scheduled Date of Conference: 03/18/2020, Start Time: 10:30 AM, Required Attendees: Clients with Counsel, with Kathleen M. Scanlon, ENTERED. [2785697] [19-2247] [Entered: 02/24/2020 05:23 PM] |
| 03/17/2020 | ☐ 50<br>1 pg, 105.64 KB | LETTER, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, request to postpone CAMP conference for 03/18/2020 at 10:30am RECEIVED. Service date 03/17/2020 by CM/ECF.[2804132] [19-2247]--[Edited 03/18/2020 by WD] [Entered: 03/17/2020 11:28 PM] |
| 04/02/2020 | ☐ 53 | MOTION, to be relieved as attorney, on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED. Service date 04/02/2020 by CM/ECF, email. [2812718] [19-2247] [Entered: 04/02/2020 10:11 AM] |
| 04/02/2020 | ☐ 54 | DEFECTIVE DOCUMENT,Motion to be relieved as attorney, [53], on behalf of Appellant Avrohom Manes and TAL Properties of Pomona, LLC, FILED.[2812815] [19-2247] [Entered: 04/02/2020 11:08 AM] |
| 04/20/2020 | ☐ 55<br>2 pg, 38.17 KB | STRIKE ORDER, striking Appellant Avrohom Manes and TAL Properties of Pomona, LLC Motion to be relieved as counsel, [53], from the docket, FILED.[2822187] [19-2247]--[Edited 04/20/2020 by WD] [Entered: 04/20/2020 11:14 AM] |
| 05/29/2020 | ☐ 61 | ORDER, [41] appeal dismissed for Appellant Avrohom Manes failure to file brief and appendix, EFFECTIVE. [2850377] [19-2247] [Entered: 05/29/2020 11:49 AM] |
| 05/29/2020 | ☐ 62<br>1 pg, 9.42 KB | NEW CASE MANAGER, Ralph Obas, ASSIGNED.[2850381] [19-2247] [Entered: 05/29/2020 11:50 AM] |
| 06/15/2020 | ☐ 63<br>2 pg, 650.31 KB | CERTIFIED COPY OF ORDER, dated 12/20/2019, determining the appeal to SDNY, ISSUED.[Mandate] [2862306] [19-2247] [Entered: 06/15/2020 03:58 PM] |