# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TAL PROPERTIES OF POMONA, LLC
AND AVROHOM MANES,

                    Plaintiffs,

    - against -

VILLAGE OF POMONA, BRETT YAGEL, individually
and in his official capacity as Mayor of the Village of
Pomona, DORIS ULMAN, individually and in her
official capacity as Attorney for the Village of Pomona,
LOUIS ZUMMO, individually and in his official
capacity as Building Inspector for the Village of Pomona,
NOREEN SHEA, individually and in her official
capacity as Deputy Village Clerk for the Village of
Pomona, FRANCIS ARSA-ARTHA, individually and in
her official capacity as Clerk and Treasurer for the
Village of Pomona, CHRISTOPHER RILEY,
individually and in his official capacity as Special
Prosecutor for the Village of Pomona; JOSEPH
CORLESS, individually and in his official capacity as
Engineer for the Village of Pomona, LEON HARRIS,
individually and in his official capacity as Deputy Mayor
for the Village of Pomona, IAN BANKS, individually
and in his official capacities as Trustee, and current
Mayor for the Village of Pomona, and JOHN DOES and
JANE DOES,

                  Defendants.

Case No.: 7:19-cv-06838 (PMH)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................... i

INTRODUCTION ...................................................................... 1

RELEVANT PROCEDURAL AND FACTUAL BACKGROUND ............................................. 1

   I.   PLAINTIFFS' PRIOR LAWSUIT RE: 22 HIGH MOUNTAIN ................................. 1

   II.   POMONA VS. ORTHODOX JEWS ........................................................ 5

LEGAL STANDARD FOR DISMISSAL .............................................................. 6

ARGUMENT ............................................................................... 7

   I.   DISMISSAL OF PLAINTIFFS' EARLIER LAWSUIT IS NOT RES JUDICATA BECAUSE THAT DISMISSAL WAS BASED ON THE "CONCLUSORY" QUALITY OF THE ALLEGATIONS AND WAS NOT A DECISION ON THE MERITS .................................................................. 7

   II.   THE EARLIER LAWSUIT WAS LIMITED TO SPECIFIC CLAIMS INVOLVING THE 22 HIGH PROPERTY ............................................. 9

   III.   THE SAC MAKES ALLEGATIONS AND PRESENTS LEGAL ISSUES THAT AROSE AFTER THE OPERATIVE COMPLAINT IN THE EARLIER LAWSUIT WAS FILED .......................................................... 10

   IV.   THE SAC NEED NOT ALLEGE "SIMILARLY SITUATED COMPARATORS" FOR A VALID EQUAL PROTECTION CLAIM UNDER *PYKE v. CUOMO* ............ 11

   V.   THE SAC ALLEGES THAT DEFENDANTS IMPOSED SUBSTANTIAL BURDENS DISCRIMINATORILY DESIGNED TO IMPEDE THE PLAINTIFFS' FREE EXERCISE OF RELIGION .......................................................... 13

   VI.   THE SAC'S ALLEGATIONS STATE CLAIMS UNDER THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT ....................................... 14

   VII.   THE SAC ALLEGES TORTIOUS INTERFERENCE WITH THE PLAINTIFFS' PROSPECTIVE BUSINESS RELATIONS ................................................ 16

   VIII. THE SAC'S CLAIM REGARDING THE DEFENDANTS' DENIAL OF A GRADING PERMIT AT 22 HIGH IS RIPE FOR DECISION ................................. 18

   IX.   NONE OF THE INDIVIDUAL DEFENDANTS NAMED IN THE SAC MAY BE DISMISSED AT THIS JUNCTURE .......................................................... 19

A.    Defendants Artha, Harris, Riley, and Banks Personally Participated in the Constitutional Violations ............................................................................19

    1.   Defendants Artha, Harris, and Riley.............................................................20

    2.   Defendant Banks.............................................................................................22

B.    The Individual Defendants Are Not Entitled to Qualified Immunity .................22

X.    THE NINTH CLAIM IN THE SAC IS VALID.............................................................23

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

Cases

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003).................................................................................21

*Carvel Corp. v. Noonan,*
  3 N.Y.3d 182 (2004) ...........................................................................................16

*Central UTA of Monsey v. Village of Airmont,*
  2020 WL 377706 (S.D. N.Y. Jan. 22, 2020) ..................................................5, 13

*Colon v. Coughlin,*
  58 F.3d 865 (2d Cir. 1995)...................................................................................19

*Cong. Rabbinical College of Tartikov, Inc. v. Village of Pomona,*
  280 F. Supp. 3d 426 (S.D.N.Y. 2017)...................................................................5

*Cong. Rabbinical College of Tartikov, Inc. v. Village of Pomona,*
  945 F.3d 83 (2d Cir. 2019)...................................................................................14

*Curtis v. Citibank, N.A.,*
  226 F.3d 133 (2d Cir. 2000)............................................................................8, 10

*Doe v. Mamaroneck,*
  462 F. Supp.2d 520 (S.D.N.Y. 2006)...................................................................12

*Fedak v. Yimby, Inc.,*
  2018 WL 6697963 (S.D.N.Y. 2018).....................................................................9

*Federated Dep't Stores, Inc. v. Moiete,*
  452 U.S. 394 (1981)...............................................................................................8

*Flaherty v. Long,*
  199 F.3d 607 (2d Cir. 1999)..................................................................................8

*Fortress Bible Church v. Feiner,*
  694 F.3d 208 (2d Cir. 2012).................................................................................13

*Gardner v. Murphy,*
  613 F. App. 40 (2d Cir. 2015)..............................................................................23

*Godinger Silver Art Ltd. V. Hirschkorn,*
  433 F. Supp.3d 417 (E.D.N.Y. 2019) ..................................................................16

*Gonzalez v. City of Schenectady,*
    728 F.3d 149 (2d Cir. 2013)................................................................23

*Gronowski v. Spencer,*
    424 F.3d 285 (2d Cir. 2005)................................................................19

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)................................................................23

*Hernandez v. United States*,
    939 F.3d 191 (2d Cir. 2019)................................................................6

*Hill v. City of N.Y.,*
    45 F.3d 653 (2d Cir. 1995)................................................................22

*Hill v. City of New York,*
    2005 WL 3591719 (E.D.N.Y. 2005)................................................................18

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2nd Cir. 2019)................................................................16

*John Street Leasehold, LLC v. Capital Mgt. Resources, L.P.,*
    154 F. Supp. 2d 527 (S.D.N.Y. 2001)................................................................10

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006)................................................................16

*Koontz v. St. John River Water Mgmt. Dist.,*
    570 U.S. 595 (2013)................................................................23-24

*Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*,
    400 F.3d 139 (2d Cir. 2005)................................................................11

*Murphy v. New Milford Zoning Comm'n,*
    402 F.3d 342 (2d Cir. 2005)................................................................19

*Nielsen v. Rabin*,
    746 F.3d 58 (2d Cir. 2014)................................................................6

*Ningbo Prods. Import & Export Co., Ltd. v. Eliau,*
    2011 WL 5142756 (Oct. 31, 2011)................................................................10

*Pac. Capital Bank, N.A. v. Connecticut,*
    542 F.3d 341 (2d Cir. 2008)................................................................21

*Perry v. Sindermann,*
    408 U.S. 593 (1972)...................................................................................23

*Pyke v. Cuomo,*
    258 F.3d 107 (2d Cir. 2001)........................................................ 11-12, 23

*Rivet v. Regions Bank of Louisiana,*
    522 U.S. 470 (1998)....................................................................................8

*Saud v. Bank of New York,*
    929 F.2d 916 (2d Cir. 1991).....................................................................10

*Sherman v. Chester,*
    752 F.3d 554 (2d Cir. 2014)............................................................... 18-19

*Southern Pacific Co. v. Denton,*
    146 U.S. 202 (1892)..................................................................................24

*TAL Props. of Pomona, LLC v. Village of Pomona,*
    2019 WL 3287983 (S.D.N.Y. July 22, 2019) ...........................................4

*Tanvir v. Tanzin,*
    894 F.3d 449 (2d Cir. 2018).....................................................................15

*Valverde v. J.D. Folks,*
    2020 WL5849515 (S.D.N.Y. Sept. 30, 2020).........................................6

*Washington v. Gonyea,*
    731 F.3d 143 (2d Cir. 2013).....................................................................15

*Westchester Day School v. Village of Mamaroneck,*
    504 F.3d 338 (2d Cir. 2007).....................................................................14

Statutes

42 U.S.C. 1983 ................................................................................. 12-14, 19

42 U.S.C. § 2000cc et seq. ("RLUIPA") ................................................ 14-15

Rules

Fed. R. Civ. P. 12(b)(6).................................................................................6, 8

Fed R. Civ. P. 60(b) ....................................................................................4, 7

## INTRODUCTION

"The whole of government consists in the art of being honest." That was Thomas Jefferson's credo, expressed by him in a letter to John Adams. This case concerns a village government that has repeatedly flouted Jefferson's teaching in dealing with its Orthodox Jewish residents and has lied to conceal its bigotry. Seeking to reduce or minimize its Orthodox Jewish population, the Village of Pomona has dishonestly discouraged the sale of homes to Orthodox Jews, dishonestly obstructed their religious observances, and dishonestly harassed its Orthodox Jewish residents in multiple ways.

Avrohom Manes, an enterprising Orthodox Jewish merchant with a religious clientele, purchased a home and property in Pomona, believing he could market residences to co-religionists. The Village and its officials repeatedly obstructed his efforts and, invoking pretextual land-use rules, unjustly denied him peaceful use and enjoyment of his own home.

Mr. Manes and his wholly owned business have been seeking since March 2017 to bring the village and its officials to justice. His attorneys' efforts have heretofore failed because the allegations they have crafted have been deemed "conclusory."

The Second Amended Complaint now before the Court details the conduct of the defendants and forms the basis, we believe, for discovery and a trial. In order to avoid public disclosure of a pattern of official acts that a District Judge found "disturbing" if "even half true," the defendants are seeking to strangle this case at birth. This Court should reject that effort.

## RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

## I. PLAINTIFFS' PRIOR LAWSUIT RE: 22 HIGH MOUNTAIN ROAD

Avrohom Manes established TAL Properties of Pomona, LLC to develop and market housing in Pomona with custom features attractive to Orthodox Jewish families. As part of his

plan, the plaintiffs purchased several properties in Pomona in a foreclosure sale in December 2015. These included a home at 22 High Mountain Road ("22 High"), a home at 8 East Court ("8 East"), and ten other underdeveloped properties (the "Subdivided Properties").

In January 2016, Manes made repairs to 22 High. Defendant Louis Zummo ("Zummo") (Pomona's Building Inspector) inspected the home and told Manes the home passed and a Certificate of Occupancy ("CO") would be issued shortly. However, Defendants Brett Yagel ("Yagel") (Pomona's Mayor) and Doris Ulman ("Ulman") (Pomona's Attorney) directed Zummo not to issue the CO. Ulman falsely told Manes that the CO could not be issued unless plaintiffs paid a debt of $6,379.34 that she claimed a prior owner owed to the Village.

On June 28, 2016, the plaintiffs filed a lawsuit against Yagel in state court for illegally blocking the CO for 22 High based upon the alleged $6,379.34 debt. *TAL Properties of Pomona, LLC v. Brett Yagel, et al.*, Index No. 32336/2016 (N.Y.Sup.Ct. Rockland County). On December 9, 2016, two days after Yagel filed an answer, Zummo finally issued a CO for 22 High. The plaintiffs dismissed the lawsuit without prejudice a few months later.

Meanwhile, also during 2016, Yagel, Ulman, and Defendant Joseph Corless ("Corless") (Pomona's Engineer) illegally denied plaintiffs a permit to grade out steep slopes at 22 High to create useable backyard space and enhance the value and marketability of the property. Corless initially approved the grading plan, but at Yagel and Ulman's direction, he retracted his approval and imposed costly new conditions. Even after Manes agreed to satisfy the conditions, Corless refused the application and denied the permit for the grading work.

Shortly after the CO for 22 High was issued in December 2016, the Village threatened to withdraw the CO if Manes did not sign a false acknowledgement that the road accessing 22 High was not a Village road and that its maintenance was the sole responsibility of the property owner.

2

On March 16, 2017, the plaintiffs filed a lawsuit pertaining to the 22 High property against the Village in state court. That action was removed to this Court on April 21, 2017. *TAL Properties of Pomona, LLC, et al. v. Village of Pomona, et al.*, S.D.N.Y. No. 7:17-cv-02928 (CS) ("TAL1"). The plaintiffs' counsel at the time submitted a proposed amended complaint on July 5, 2017, and later filed a second amended complaint on September 7, 2017.

The TAL1 second amended complaint asserted claims against the Village of Pomona, Yagel, and Ulman relating to the 22 High property based upon three primary allegations:

1. The defendants refused to issue a CO for 22 High on the pretext that the prior owner owed the Village $6,379.34;

2. The defendants refused to issue a grading permit for 22 High; and

3. The defendants threatened to withdraw the CO for 22 High if the plaintiffs did not sign a false acknowledgement that the road accessing 22 High was not a Village road and that its maintenance was the sole responsibility of the property owner.

Based on these allegations, the plaintiffs in TAL1 asserted two claims: (1) "selective enforcement" based upon Manes' Jewish religion; and (2) violation of Manes' free exercise of religion. The defendants in TAL1 filed a Rule 12(b)(6) motion to dismiss on October 16, 2017.

On January 10, 2018, Judge Seibel held a conference at which she announced and read her decision to grant the defendants' motion to dismiss TAL1. With regard to both causes of action alleged in the TAL1 second amended complaint, Judge Seibel emphasized that the plaintiffs' allegations were insufficient because they were "conclusory" and the plaintiffs had not alleged sufficient facts to support those conclusions. Judge Seibel then filed a written order dismissing TAL "[f]or the reasons stated on the record in today's conference."

Following the dismissal of TAL1, the plaintiffs obtained new information and evidence that cast new light on the discriminatory actions of the Village and its officials against the

3

plaintiffs and other Orthodox Jews in Pomona. Among other things, New York's Human Rights Division issued a report in June 2018 finding "probable cause" of discrimination against Orthodox Jews by Pomona as claimed in a complaint by Defendant Noreen Shea ("Shea"). The plaintiffs also obtained new information via admissions by Zummo and Ulman during 2018.

Based upon this new information and ongoing discrimination, the plaintiffs filed a Rule 60(b) motion to reopen TAL1 on November 2, 2018. Without hearing argument, Judge Seibel issued an order on July 22, 2019, denying the motion. Judge Seibel emphasized that her denial of the motion was not a determination of the merits of the plaintiffs' allegations, but was dictated by the limitations of Fed. R. Civ. P. 60(b). She noted in her decision that the plaintiffs in TAL1 had not alleged a *Pyke* Equal Protection Claim (which, crucially, does not require explicit pleading of comparators who were treated more favorably). Judge Seibel also noted that she had not determined the merits of a potential *Pyke* Equal Protection claim by the plaintiffs or other possible legal claims and theories not previously pleaded and dismissed. Judge Seibel declared that she was not precluding the filing of a new action. She wrote:

> Defendants should take little comfort in this outcome. The allegations presented on this motion, if even half true, are disturbing. I am obliged to stay within the confines of Rule 60(b), which in my judgment does not allow for this lawsuit to be reopened, but should Plaintiffs commence a new lawsuit, they may well be able to state a claim. And I do not see how Defendants will "suffer immense prejudice" (D's Opp. at 9), if they have to defend themselves on the merits. They may well be able to do so; I have no opinion as to what the outcome of such a case would be, nor could I at this stage. But should Plaintiffs find it in their interest to pursue a case, airing the allegations and getting to the truth would hardly be a bad thing.

*TAL Props. of Pomona, LLC v. Village of Pomona*, 2019 WL 3287983, p. 26 (S.D.N.Y. July 22, 2019).

The plaintiffs immediately filed this case on July 23, 2019. This action was assigned to Judge Briccetti, who was also presiding over the related case of *Samuel Indig et al. v. The*

*Village of Pomona et al.*, S.D.N.Y No. 7:2018-cv-10204 ("*Indig*"). Judge Briccetti issued a

Decision and Order in *Indig* on November 19, 2019 ruling that the plaintiffs in that case

adequately stated claims against the Village and its officials for violation of Equal Protection

under *Pyke* and the New York State Constitution, and for violation of the Fair Housing Act

("FHA"). This case and *Indig* were both reassigned to Judge Halpern on March 17, 2020.

The plaintiffs filed an Amended Complaint on March 27, 2020, and new counsel filed the

Second Amended Complaint ("SAC") on August 13, 2020.

## II.   POMONA VS. ORTHODOX JEWS

The Village of Pomona and its officials have a history of animosity toward the Orthodox

Jewish community. *See Cong. Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 280 F.

Supp. 3d 426 (S.D.N.Y. 2017) ("*Tartikov*"), aff'd in part, 945 F.3d 83 (2d Cir. 2019). Defendant

Yagel, Pomona's mayor when this lawsuit was filed, was first elected to Pomona's Board of

Trustees in 2007 on a discriminatory platform opposing the building of an Orthodox Jewish

rabbinical college in Pomona. *Tartikov*, 280 F. Supp. 3d at 443-444. Yagel himself was a named

defendant in *Tartikov*, and was a central defense witness at the *Tartikov* trial in late May 2017.

Yagel's own discriminatory statements against Orthodox Jews played a major role in the court's

determination in *Tartikov* that defendants intentionally passed certain zoning laws "in order to

thwart the spread of the Orthodox/Hasidic Jewish community into the Village." *Id.* at 452-454.

Defendant Zummo, Pomona's part-time Building Inspector, also serves as the part-time

Building Inspector for the Village of Airmont. Judge Briccetti recently denied a motion to

dismiss claims against Zummo for discriminating, as Airmont's Building Inspector, against

Orthodox Jewish organizations in the building permitting process. *Central UTA of Monsey v.*

*Village of Airmont*, 2020 WL 377706 (Order of Jan. 22, 2020).

Also pending in this District is a lawsuit brought by former Pomona Deputy Clerk Defendant Noreen Shea ("Shea") alleging that was she fired by Yagel for refusing to comply with Pomona's discrimination against Orthodox Jews. *Noreen Shea v. Village of Pomona and Brett Yagel*, S.D.N.Y. No. 7:18-cv-11170 (CS). Shea filed her lawsuit after New York's Human Rights Division ("HRD") conducted an investigation and found probable cause that the Village had discriminated against Orthodox Jews and Shea. The evidence received by the HRD included claims that the Village discriminated against Manes and other Orthodox Jewish real estate professionals and residents of Pomona in building, code enforcement, and municipal services. In addition, Defendant Zummo admitted to the HRD that he would make mocking imitations of Orthodox Jews while working at Village Hall.

Plaintiffs also received many hours of Shea's recordings of her conversations with other Village officials in Village Hall (including, *inter alia*, Yagel, Zummo, Artha and Shea) in which the officials can be heard disparaging Orthodox Jews including Manes. Among these, Zummo can be heard describing Orthodox Jews as "inbred morons with retarded babies," bragging that he was "the mean [expletive]" responsible for denying an Orthodox Jewish school in Airmont, and describing himself as wearing a "Hitler-was-right" hat.

## <u>LEGAL STANDARD FOR DISMISSAL</u>

The applicable standard was stated, with citations omitted, as follows in *Valverde v. J.D. Folks*, 2020 WL5849515 (S.D.N.Y. September 30, 2020), in which the District Judge cited Supreme Court language and text in the recent Second Circuit decisions in *Hernandez v. United States,* 939 F.3d 191, 198 (2d Cir. 2019), and in *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014):

"To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that

is plausible on its face.' A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' While a sufficiently pleaded complaint 'does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' In ruling on a motion to dismiss, the Court must 'accept as true all factual allegations and draw from them all reasonable inferences; but [the Court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations.' The Court must also 'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.' The Court's role at this stage is 'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'"

## ARGUMENT

## I.

## DISMISSAL OF PLAINTIFFS' EARLIER LAWSUIT IS NOT *RES JUDICATA* BECAUSE THAT DISMISSAL WAS BASED ON THE "CONCLUSORY" QUALITY OF THE ALLEGATIONS AND WAS NOT A DECISION ON THE MERITS

The defendants' primary ground for dismissal of the Second Amended Complaint ("SAC"), emphasized in the first pages of their Memoranda, is that the "doctrine of *res judicata*" entitles them to dismissal of the SAC. Such a dismissal would prevent this Court's consideration of claims that Judge Seibel characterized in her opinion of July 22, 2019 as "disturbing" "if even half true." Judge Seibel said in her 2019 written opinion that her decision to dismiss the earlier lawsuit was based on "the confines of Rule 60(b), which in my judgment does not allow for this lawsuit to be reopened." Judge Seibel added that "should Plaintiffs commence a new lawsuit,

they may well be able to state a claim." She also noted that the defendants would not "suffer immense prejudice" if they are required to defend a new lawsuit "on the merits" against allegations such as those in the SAC.

Both the transcript of Judge Seibel's oral ruling of January 10, 2018, and her written opinion of July 22, 2019, establish that her decisions (a) to dismiss the earlier lawsuit and (b) to deny the motion to vacate her judgment were based on pleading deficiencies, not on any substantive appraisal of the plaintiffs' claims. She found the allegations that had been made in the amended complaint to be "conclusory," but did not rule that she would reject such allegations on their merits had they been supported by more specific factual details.

Second Circuit law is unequivocal that the doctrine of *res judicata* applies only if the dismissal of an earlier lawsuit is **on the merits**. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000), citing *Flaherty v. Long*, 199 F.3d 607, 613-615 (2d Cir. 1999). The Supreme Court said in *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998), quoting *Federated Dep't Stores, Inc. v. Moiete*, 452 U.S. 394, 398 (1981): "A final judgment **on the merits** of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." (Emphasis added.)

In their Memoranda the defendants cite six decisions of the Second Circuit applying the *res judicata* doctrine, but all six cases concern records in which the Rule 12(b)(6) dismissal that barred a second lawsuit was **on the merits**. Indeed, quoting the qualification articulated by the Supreme Court in the *Federated Dep't Stores* case (452 U.S. at 399, n.3), the defendants implicitly acknowledge that dismissal under Rule 12(b)(6) has *res judicata* effect "[u]nless the court in its order for dismissal otherwise specifies." The oral and written opinions of Judge Seibel indisputably specify otherwise – *i.e.*, that the dismissal and denial of the motion to vacate

8

were because she found the allegations of the earlier complaints and their amendments too "conclusory."

Defendants try to minimize the importance of Judge Seibel's reasons – stated both in her oral decision and in her later written opinion – for refusing to allow the plaintiffs to proceed with their earlier Amended Complaint. They demeaningly characterize her rationale as "dictum" and as not "supported by any pertinent legal authority." Memorandum of Law in Support of Motion To Dismiss on Behalf of Defendats [SIC] Ian Banks, Joseph Corless, Christopher Riley and the Village of Pomona, p.5. Judge Seibel went to great pains to explain her reasons for denying the relief requested by the plaintiffs. Those reasons were plainly not "dictum."

## II.

## THE EARLIER LAWSUIT WAS LIMITED TO SPECIFIC CLAIMS
## INVOLVING THE 22 HIGH PROPERTY

A second reason for rejecting the defendants' *res judicata* defense is that the earlier lawsuit was limited to specific claims involving the 22 High property, whereas the SAC alleges facts and presents causes of action that were not at issue in the earlier lawsuit. In *Fedak v. Yimby, Inc.*, 2018 WL 6697963, p. 5 (S.D.N.Y. 2018), District Judge Failla held that dismissal of a first complaint does not preclude, on *res judicata* grounds, a second complaint directed at "ongoing conduct of the *same type* alleged in the First Action." It only bars "new claims arising from the specific . . . acts previously alleged." (Emphasis original.)

The SAC contains many allegations of illegal conduct by the defendants unrelated to the 22 High property, which the plaintiffs sold in December 2016. The allegations specific to 22 High are limited to paragraphs 57, 59-69, 71-87 – a total of 29 paragraphs of a 349-paragraph

complaint. The remainder of the allegations in the SAC cannot be precluded on *res judicata* claims because they do not specifically involve 22 High.

Moreover, even with respect to claims regarding 22 High, *res judicata* would not apply because critical facts proving the defendants' liability were fraudulently concealed. A defendant who fraudulently conceals facts essential to a plaintiff's claim may not invoke *res judicata* to bar an action that the plaintiff lost because such facts were concealed by the defendant. *Saud v. Bank of New York*, 929 F.2d 916, 920 (2d Cir. 1991); *Ningbo Prods. Import & Export Co., Ltd. v. Eliau*, 2011 WL 5142756, p. 9 (Oct. 31, 2011); *John Street Leasehold, LLC v. Capital Mgt. Resources, L.P.*, 154 F. Supp. 2d 527, 540 (S.D.N.Y. 2001). The SAC alleges that in 2018 defendant Zummo admitted that the files were doctored and evidence was removed from them. SAC ¶ 70-73. In addition, defendant Shea had not revealed the recordings she had (*see* SAC ¶¶ 39, 180-203), and other defendants engaged in deliberate actions to conceal, withhold, and destroy evidence (SAC ¶¶ 243-258), thereby disabling the plaintiffs in their first lawsuit.

### III.

### THE SAC MAKES ALLEGATIONS AND PRESENTS LEGAL ISSUES THAT AROSE AFTER THE OPERATIVE COMPLAINT IN THE EARLIER LAWSUIT WAS FILED

Another independent reason for rejecting the defendants' *res judicata* defense is that the SAC alleges facts and presents legal issues that arose after September 7, 2017, the date on which the second amended complaint alleging the plaintiffs' claims was filed in federal court in the first lawsuit. The Second Circuit held in *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000), that claim preclusion "does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit." This legal principle was re-affirmed by the

Second Circuit in *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 400 F.3d 139, 141 (2d Cir. 2005).

The SAC contains many allegations of illegal conduct by the defendants after September 7, 2017, including ongoing violations. For example: SAC ¶¶ 91-92, 98-99, 102-115, 116-130, 283-305.

Moreover, the SAC alleges that the "same type" of illegal conduct in which the defendants engaged before September 7, 2017, continued thereafter to the date of the filing of the SAC, including delaying and denying municipal services to plaintiffs and other Orthodox Jews, improperly withholding permits, and interfering with plaintiffs' ability to do business in Pomona. Hence the allegations made in the SAC may proceed to discovery and trial regardless of the disposition of plaintiffs' earlier lawsuit.

## IV.

## THE SAC NEED NOT ALLEGE "SIMILARLY SITUATED COMPARATORS" FOR A VALID EQUAL PROTECTION CLAIM UNDER *PYKE v. CUOMO*

Some individual defendants[1] contend that the SAC's equal protection claim is defective because it fails to name "similarly situated comparators" – *i.e.*, residents of Pomona who are not Orthodox Jews and were not subjected to the intentional discrimination practiced by the defendants against Orthodox Jews, including plaintiff Manes and his wholly owned business which served Orthodox Jews. This argument is counter to, and is refuted by, the Second Circuit's decision in *Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001).

---

[1] These "individual defendants" include Yagel, Ulman, Zummo, Harris, and Artha. The Village of Pomona and defendants Banks, Corless, and Riley argue that the SAC should be dismissed based on the doctrine of *res judicata* but they <u>do not</u> challenge the sufficiency of the plaintiffs' claims under the Equal Protection Clause, the Free Exercise Clause, and the Fair Housing Act.

The Court categorically held in *Pyke* that "a plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus, is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection." 258 F.3d at 110. And in *Doe v. Mamaroneck*, 462 F. Supp.2d 520 (S.D.N.Y. 2006), a village was held liable under 42 U.S.C. 1983 for equal protection violations against Latino day laborers with no allegation or proof that there were "similarly situated comparators."

The SAC is chock-full of allegations that the plaintiffs and the Orthodox Jewish residents of Pomona were victimized by official conduct motivated by discriminatory animus against Orthodox Jews and against anyone who, like plaintiff Manes, sought to service Orthodox Jews and encourage them to live in Pomona. *See* SAC ¶¶ 1-15, 41, 51-56, 58, 60-66, 70-74, 76-81, 83-87, 90-97, 102-103, 108-114, 116-121, 124-125, 126-130, 132-133, 136-138, 140-143, 153, 155-165, 169-170, 172-178, 181, 183-193, 195-211, 214-217, 219-221, 227-233, 242, 243-248, 259-260, 263, 271-272, 273, 278-279, 295, 297-301.

Nor can it be claimed that the SAC alleges "selective prosecution" so that "special deference" must be afforded "to the executive branch in the performance of the 'core' executive function . . ." *See Pyke*, 258 F.3d at 109.The conduct of the defendants alleged in the SAC was not the exercise of governmental discretion in choosing when to proceed with criminal prosecution. It was blatant discriminatory animus in the administration of civil regulation that should be universally condemned.

## V.

## THE SAC ALLEGES THAT DEFENDANTS IMPOSED SUBSTANTIAL

## BURDENS DISCRIMINATORILY DESIGNED TO IMPEDE

## THE PLAINTIFFS' FREE EXERCISE OF RELIGION

In *Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012) – a precedent that the

defendants remarkably fail to cite or discuss even though we cited it in our reply to their pre-

motion letter – the Second Circuit held that the Free Exercise Clause has been violated and that a

town is liable under Section 1983 if "the reasons offered by the Town for delaying and denying

the project were pretextual" and if "the Town's proffered rational bases were not sincere and that

it was instead motivated solely by hostility toward the Church qua church." 694 F.3d at 221.

That is precisely what the SAC alleges against the Village of Pomona and the named

defendants who acted for the Village.[2] Discovery and a trial will establish, as the SAC alleges,

that the defendants were "motivated solely by hostility toward" the plaintiffs and other Orthodox

Jews residing in Pomona when they harassed Orthodox Jews by fining them for engaging in

religious observance and by hindering prayer services and a mikveh. The intended and necessary

effect of the discriminatory animus alleged in the SAC was to burden and impede the free

exercise of religion.

Relying on *Fortress Bible Church v. Feiner*, Judge Briccetti held in *Central UTA of

Monsey v. Village of Airmont*, 2020 WL 377706, pp. 15-16 (S.D. N.Y. January 22, 2020), that at

the pleading stage a complaint making similar allegations in support of a free exercise claim

---

[2] As noted *supra* at note 1, the Village of Pomona and defendants Banks, Corless, and Riley
argue that the SAC should be dismissed based upon the doctrine of *res judicata*. They do not
challenge the sufficiency of the plaintiffs' claims under the Equal Protection Clause, the Free
Exercise Clause, or the Fair Housing Act.

under Section 1983 is valid and should not be dismissed. His reasoning applies to this case as well.

## VI.

### THE SAC'S ALLEGATIONS STATE CLAIMS UNDER

### THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT

Decisions of the Second Circuit in *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83 (2d Cir. 2019), and in *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007), entitle the plaintiffs to proceed with RLUIPA claims on the allegations of the SAC.

Various invalid defenses are asserted in the defendants' memoranda:

(1)     Subsection (1)(a)(1) of RLUIPA protects "the religious exercise of ***a person***, including a religious assembly or institution." Subsection 2(a) entitles "a ***person***" to assert a violation. Subsection (5)(1) defines a "claimant" as "a ***person*** raising a claim or defense under this chapter." There is no basis in the statutory language to suggest that only institutions or assemblies may invoke its remedial provisions. The SAC is replete with descriptions of conduct by the defendants that burdened plaintiff Manes' religious exercise – *i.e.*, his observance of Orthodox Judaism – by discriminating against him because he is an Orthodox Jew and observes the Jewish faith.

(2)     The community of Orthodox Jews residing in Pomona is a "religious assembly." If government officials apply "less than equal terms" in the administration of zoning laws to this assembly because of the religion of its members as described in the Fifth Claim of the SAC, RLUIPA has been violated and any "person" who suffers injury may sue to remedy that violation.

14

(3)     Plaintiffs Manes and the Orthodox Jews who are the clientele of TAL Properties – his
wholly owned business – also constitute a "religious assembly." By discriminating
against them in the administration of Pomona's land-use regulations because of
religious animus against Orthodox Jews, the defendants violate RLUIPA as described
in the Sixth Claim of the SAC. Plaintiff Manes and TAL Properties may sue to
remedy that violation.

(4)     Contrary to the novel argument presented by the defendants, RLUIPA is not limited
to property that a plaintiff "intended to use for religious purposes." Memorandum of
Law in Support of Motion To Dismiss on Behalf of Defendats [SIC] Ian Banks,
Joseph Corless, Christopher Riley and the Village of Pomona, p. 8. Any plaintiff – be
it an individual, a religious assembly, or an institution, whether or not it owns
property "intended to use for religious purposes" – that suffers a substantial burden of
any kind to its religious exercise because of a land-use regulation administered in an
unlawful manner may institute a RLUIPA action if the "compelling interest" and
"least restrictive means" standards are not satisfied.

(5)     We acknowledge that the Second Circuit has held in *Washington v. Gonyea*, 731 F.3d
143 (2d Cir. 2013), that government prison officials may not be sued under RLUIPA
in their individual capacities. Compare *Tanvir v. Tanzin*, 894 F.3d 449, 465 (2d Cir.
2018) (*pending as* Sup. Ct. 19-71, argued October 6, 2020). If the *Gonyea* decision
applies in the land-use context as it does in the institutionalized-persons context, the
RLUIPA claims of the SAC should be understood as asserted against the individual
defendants in their official capacities only.

15

(6)     Plaintiffs Manes and TAL Properties indisputably have "an ownership" in land that is
"regulated" by the defendants. The Sixth Claim in the SAC does not depend, as the
defendants contend, on "property owned by others." Memorandum of Law in Support
of Individual Defendants' Motion To Dismiss the Second Amended Complaint, p. 22.
It relates to property that the plaintiffs themselves own.

## VII.

## THE SAC ALLEGES TORTIOUS INTERFERENCE
## WITH THE PLAINTIFFS' PROSPECTIVE BUSINESS RELATIONS

The defendants misstate the tort alleged in the Eighth Claim of the SAC as "tortious
interference with existing contracts" and then argue that no "existing contract" is alleged in the
SAC. In fact, the "tortious interference" claim alleges that the defendants tortiously interfered
not with any "existing contracts" but with the Plaintiffs' ***prospective business relations***. The
Second Circuit enumerated the elements of that tort in *Kirch v. Liberty Media Corp.*, 449 F.3d
388, 400 (2d Cir. 2006): A plaintiff must allege that "(1) it had a business relationship with a
third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the
defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the
defendant's interference caused injury to that relationship." See also *IQ Dental Supply, Inc. v.
Henry Schein, Inc.*, 924 F.3d 57 (2d Cir. 2019); *Godinger Silver Art Ltd. v. Hirschkorn*, 433 F.
Supp.3d 417, 426-427 (E.D.N.Y. 2019); *Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004).

The allegations of the SAC satisfy those elements. As an investor and developer in real
estate, Manes established TAL Properties of Pomona, LLC to buy, develop and sell properties in
Pomona with custom features attractive to an Orthodox Jewish client base. SAC ¶¶ 41-46, 53.
The defendants "were hostile to Plaintiffs' development plans directed to potential Orthodox

16

Jewish customers." SAC ¶ 56. The defendants "harassed and humiliated current Orthodox Jewish residents and invoked pretextual policy and laws to prevent Orthodox Jews from moving in." SAC ¶ 54. The defendants employed "a weaponized utilization of neutral laws and procedures driven by overt religious animus . . . designed to deter Orthodox Jewish people from moving to Pomona [and i]t thereby deprived Manes of customers for his real-estate development businesses." SAC ¶ 55. The plaintiffs have been and continue to be injured by the defendants' actions, as they have been prevented and limited in their ability to develop and sell properties they own and to purchase new properties. SAC ¶¶ 300-305.

The SAC describes multiple tactics that the defendants used "to deter and prevent Orthodox Jews, such as Manes, from selling homes to Orthodox Jews" and to "prevent Orthodox Jews from moving into Pomona and to drive out Orthodox Jews." They "interfered multiple times with efforts by Plaintiffs to buy, sell, build, and develop properties in Pomona" (SAC ¶¶ 6-7) by, *inter alia*, making false statements about Manes to a prospective property seller. SAC ¶¶ 126-131. Defendants Zummo and Ulman told Manes that the plaintiffs "would never receive permits for residences in Pomona that the Village believed would be sold to Orthodox Jews." SAC ¶ 90. Zummo even refused to allow plaintiffs to fill out building permits for the Subdivided Properties, telling Manes it was "a waste of time" and "not happening." *Id.*; *see also* SAC ¶ 58, 63, 93-96, 103, 111, 113-115. In August 2018, Defendant Zummo admitted to Manes that the discrimination against Manes "was directed by Defendant Yagel, who feared that Manes would bring more Orthodox Jews to Pomona through his real-estate development business." SAC ¶ 70.

Defendant Shea described the defendants' denial and discrimination of municipal services related to housing permits, FOIL requests, and more as "a slow-down process" because of the fear "that Pomona would be 'overtaken' by Orthodox/Hasidic families." SAC ¶¶ 132-138.

17

The defendants also discriminated against and harassed Orthodox Jewish residents and

prospective residents, as well as real-estate agents and developers who had an Orthodox Jewish

clientele, including the plaintiffs. SAC ¶¶ 126-127, 162-165, 174-178, 197-200, 207, 210-211,

279. Both Ulman and Zummo admitted such targeted enforcement to Manes in August 2018.

SAC ¶ 173.

Nor may the claim be dismissed at this juncture because plaintiffs failed to file a Notice

of Claim under New York's General Municipal Law Section 50-h. The defendants have not

offered any proof that they suffered any actual prejudice from the failure to file a Notice, and

there is no claim that the plaintiffs deliberately failed to file the Notice in bad faith. In these

circumstances, under Section 50-e(6), the plaintiffs' claim may be pursued in court

notwithstanding their failure to file the Notice. *Hill v. City of New York*, 2005 WL 3591719

(E.D.N.Y. 2005).

## VIII.

## THE SAC'S CLAIM REGARDING THE DEFENDANTS'

## DENIAL OF A GRADING PERMIT AT 22 HIGH

## IS RIPE FOR DECISION

The defendants claim that the plaintiffs may not complain of their participation in denial

of a grading permit on Plaintiff Manes' property because the SAC does not allege that he ever

submitted a formal application for such a permit. The defendants' assertion is factually incorrect.

*See* SAC ¶¶ 75-82.

Moreover, in light of the SAC's allegations concerning the defendants' religion-based

animus against Mr. Manes and their obstruction of his efforts regarding that property, a

factfinder could infer that any further formal requests would have been futile. *Sherman v.*

18

*Chester*, 752 F.3d 554 (2d Cir. 2014); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 349 (2d Cir. 2005) ("dug in its heels and made clear that all such applications will be denied").

## IX.

## NONE OF THE INDIVIDUAL DEFENDANTS

## NAMED IN THE SAC MAY BE DISMISSED

## AT THIS JUNCTURE

**A.     Defendants Artha, Harris, Riley, and Banks Personally Participated in the Constitutional Violations**

The defendants contend erroneously that the claims against Defendants Riley, Artha, Harris and Banks should be dismissed because there are insufficient allegations that these defendants were personally involved in the constitutional violations alleged in the SAC.[3]

To establish personal liability under § 1983, a plaintiff must show "that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005). Personal involvement may be demonstrated by proof that the defendant: (1) directly participated in the alleged violation; (2) failed to remedy the violation after learning about it; (3) created a policy or custom under which the violation occurred; (4) was grossly negligent in supervising the subordinates who caused the condition or event; or (5) exhibited deliberate indifference by failing to act on information that indicated that the violation was happening. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

---

[3] Defendants Yagel, Ulman, Zummo, and Corless do not make this claim.

1.     **Defendants Artha, Harris, and Riley**

The SAC alleges that the Yagel Administration (specifically including, *inter alia*, Deputy Mayor Leon Harris and Village Clerk and Treasurer Francis Arsa-Artha) "created and actively managed an anti-Orthodox-Jewish program in the Village of Pomona" in which the local government "intentionally discriminated" against Orthodox Jews.  SAC ¶ 5. The SAC alleges that the defendants' illegal discriminatory acts "were designed to, and did, hinder and dissuade Orthodox Jews from relocating into Pomona . . . deter and prevent Orthodox Jews, such as Manes, from selling homes to Orthodox Jews," and "prevent Orthodox Jews from moving into Pomona and to drive out Orthodox Jews." SAC ¶¶ 6-7. For example, when an Orthodox family requested permission to have a spa and trampoline in their yard, one Village official was recorded exclaiming: "We need to deny it or we will have 4000 Orthodox coming up from Brooklyn." SAC ¶ 197.

The SAC alleges that Defendant Artha "discriminatorily delayed and impeded Plaintiffs' and other Orthodox Jews' requests for services from the Village." SAC ¶ 132. Artha also instructed Deputy Village Clerk Shea to discriminate against and delay Village services to Orthodox Jews. SAC ¶ 155. Artha's own animus against Orthodox Jews was repeatedly demonstrated by the derogatory statements she made about Orthodox Jews and their religious practices. SAC ¶¶ 183-186, 190, 194-195.

The SAC alleges that Defendant Harris "often received complaints against Orthodox Jews from long-time residents of Pomona," and he "conveyed these complaints to Defendant Zummo and other Defendants with direction to investigate and take action against the Orthodox Jews who were the subjects of the complaints." SAC ¶ 163. The SAC states that "many of these complaints related to Orthodox Jewish prayer meetings or other religious practices." *Id.* The

SAC also alleges that Harris, Yagel, and Zummo subjected an Orthodox Jewish prayer group at which Manes worshipped to heightened "scrutiny and harassment," and describes Harris as the person who reported a resident's complaint against the group leading to a ticket issued by Defendant Riley. SAC ¶ 265-270. The SAC also alleges that Harris "directed Defendant Zummo to 'violate' or ticket people walking to 'shul' (Orthodox Jewish prayer groups or synagogues), and stated that he wanted a shul to be torn down." SAC ¶ 272.

The SAC alleges that Yagel hired Defendant Riley as a "Special Prosecutor" pursuant to Yagel's program of enforcing and targeting code violations against Orthodox Jews. SAC ¶ 167-168. Riley also "carried out many other tasks at Defendant Yagel's direction unrelated to his official position as 'Special Prosecutor' . . . [and] effectively became Defendant Yagel's agent to engage in discriminatory tactics against Orthodox Jews." SAC ¶ 169. In one instance, Riley attended a Village Zoning Board of Appeals ("ZBA") meeting at Yagel's direction and falsely argued to the ZBA that an Orthodox Jewish resident's appeal should be dismissed as untimely, contrary to the determination by Defendant Ulman (the ZBA's official attorney) that the appeal was timely. SAC ¶ 170. In another instance, Riley tried to fabricate evidence to support a ticket he issued to an Orthodox Jewish prayer group. SAC ¶ 268-270.[4]

---

[4] The defendants argue that plaintiffs Manes and TAL Properties lack standing to complain about Riley's illegal and discriminatory actions against an Orthodox Jewish resident in a ZBA appeal and against an Orthodox Jewish prayer group in which Manes participated. The SAC clearly alleges, however, that the discriminatory actions taken against Orthodox Jews were intended to prevent Orthodox Jews from moving into Pomona and to drive Orthodox Jews out of Pomona. Consequently, these defendants' acts directly injured the plaintiffs, who were seeking to develop and sell homes in Pomona to Orthodox Jews. *See Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008), which held that to satisfy Article III's standing requirements, a plaintiff must show: (1) he suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See also Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) ("at the pleading stage, standing allegations need not be crafted with precise detail").

21

## 2.      Defendant Banks

The SAC also sufficiently alleges personal involvement by Banks in the continuation of illegal discrimination against Orthodox Jews in Pomona. The SAC alleges that Defendant Banks was aware of and admitted that the Yagel Administration employed illegal and discriminatory tactics against plaintiff Manes. SAC ¶¶ 284-285, 291. Nevertheless, after he was elected mayor, Banks "re-hired Defendant Zummo to lead the Village Building Department and employed Zummo to harass, intimidate, and discriminate against Orthodox Jews with false and frivolous code violations." SAC ¶ 295. Banks justified his about-face, telling plaintiff Manes, "You people now have too much power." SAC ¶ 297. The SAC states that Banks "has continued, under his administration, to discriminate against Orthodox Jews, including Plaintiff Manes and others." SAC ¶ 298. Moreover, Banks told plaintiff Manes and *Indig* plaintiff Robert Klein that Zummo would continue to discriminatorily enforce code and building violations against Orthodox Jewish residents of Pomona and that neither Manes nor Klein would receive permits to develop or continue building projects in Pomona unless they dismissed their discrimination lawsuits against the Village. SAC ¶¶ 300-301.

## B.      The Individual Defendants Are Not Entitled to Qualified Immunity

There is no merit to the claim of individual defendants Yagel, Ulman, Zummo, Harris, and Artha that they are entitled to qualified immunity.[5]

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

The defendants also argue erroneously that Riley's actions are entitled to prosecutorial immunity. State prosecutors are entitled to prosecutorial immunity only for conduct that is "intimately associated with the judicial phase of the criminal process." *Hill v. City of N.Y.*, 45 F.3d 653, 660-61 (2d Cir. 1995) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Riley's appearance at the ZBA and his attempt to investigate and obtain false evidence were not "judicial phases of the criminal process."

[5] Individual defendants Banks, Corless, and Riley do not claim qualified immunity.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Each defendant bears the burden of establishing entitlement to qualified immunity. *Gardner v. Murphy*, 613 F. App. 40, 41 (2d Cir. 2015) (citing *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013)).

"The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).

The discriminatory actions taken by the defendants against Orthodox Jews, motivated by animus against the observance of Orthodox Jewish ritual and religion, surely violates the Constitution. It is inconceivable that the defendants believed otherwise. *Pyke, supra,* 258 F.3d at 110. Qualified immunity is plainly inapplicable on the facts of this case.

## X.

## THE NINTH CLAIM IN THE SAC IS VALID

The doctrine of unconstitutional conditions provides that the government cannot condition the receipt of a government benefit on waiver of a constitutionally protected right. The doctrine ensures that the government may not, by imposing a condition, indirectly restrict constitutional rights that are secured against direct government infringement. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). In *Koontz v. St. John River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013), the Supreme Court reiterated: "We have said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a constitutional right.'" (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983)). The Court described the unconstitutional conditions doctrine as "an overarching principle . . . that

23

vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz*, 570 U.S. at 604. Moreover, "regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Id.* at 606.

The SAC alleges that defendant Banks told plaintiff Manes and *Indig* plaintiff Robert Klein that neither Manes nor Klein would receive permits to develop or continue building projects in Pomona unless they dismissed their lawsuits against the Village. SAC ¶¶ 300-301. With this threat Banks was conditioning the plaintiffs' receipt of government benefits on their surrender of their right to pursue judicial vindication of their constitutional and statutory claims. *See Southern Pacific Co. v. Denton*, 146 U.S. 202, 207 (1892) (invalidating statute that required a petitioner to give up a constitutional right to seek redress in federal court as a condition precedent to the enjoyment of a privilege). Accordingly, the SAC's ninth claim for relief is valid and may not be dismissed.

## CONCLUSION

WHEREFORE, based upon the foregoing, Defendants' Motions to Dismiss the Second

Amended Complaint should be denied in their entirety.

Dated: November 12, 2020

By: S/ Daniel G. Ashburn
     Daniel G. Ashburn, Esq.
     ASHBURN LAW OFFICE LLC
     1300 Carolyn Drive
     Atlanta, GA 30329
     404-939-1323
     dashburn.ga@gmail.com
     *Attorney for Plaintiffs*

*Of Counsel:*

| | |
|---|---|
| Nathan Lewin, Esq. | Albert A. Levy, Esq. |
| LEWIN & LEWIN, LLP | ALBERT A. LEVY, ESQ. |
| 888 17th Street NW, 4th Floor | 17 Perlman Drive, Suite 215 |
| Washington, DC 20006 | Spring Valley, NY 10977 |
| 202-828-1000 phone | 917-589-3737 |
| 202-828-0909 fax | aalesq@gmail.com |
| nat@lewinlewin.com | *Attorney for Plaintiffs* |