# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TAL PROPERTIES OF POMONA, LLC
AND AVROHOM MANES,

                Plaintiffs,

      - against -

VILLAGE OF POMONA, BRETT YAGEL, individually
and in his official capacity as Mayor of the Village of
Pomona, DORIS ULMAN, individually and in her official
capacity as Attorney for the Village of Pomona, LOUIS
ZUMMO, individually and in his official capacity as
Building Inspector for the Village of Pomona, NOREEN
SHEA, individually and in her official capacity as Deputy
Village Clerk for the Village of Pomona, FRANCIS
ARSA-ARTHA individually and in her official capacity
as Clerk and Treasurer for the Village of Pomona,
CHRISTOPHER RILEY, individually and in his official
capacity as Special Prosecutor for the Village of Pomona;
JOSEPH CORLESS, individually and in his official
capacity as Engineer for the Village of Pomona LEON
HARRIS, individually and in his official capacity as
Deputy Mayor for the Village of Pomona, IAN BANKS,
individually and in his official capacities as Trustee, and
current Mayor for the Village of Pomona, and JOHN
DOES and JANE DOES,

                Defendants.

Case No.:    7:19-cv-06838 (PMH)

**SECOND AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

---

        Plaintiffs TAL Properties of Pomona, LLC ("TAL Properties") and Avrohom

Manes ("Plaintiff Manes" or "Manes") (collectively, "Plaintiffs"), by and through their

undersigned counsel, for their Second Amended Complaint against Defendants the Village of

Pomona (the "Village" or "Pomona"), Brett Yagel ("Yagel" or "Mayor Yagel"), Doris Ulman

("Ulman"), Louis Zummo ("Zummo"), Ian Banks ("Banks" or "Mayor Banks"), Noreen Shea

("Shea"), Joseph Corless ("Corless"), Francis Arsa-Artha ("Arsa-Artha"), Christopher Riley

("Riley") and Leon Harris ("Harris") (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.　　This action seeks redress for Defendants' longstanding and ongoing intentional discrimination against Plaintiffs Manes and TAL Properties, and against the Orthodox Jewish community. Defendants' discriminatory anti-Orthodox-Jewish intent and disparate treatment is so pervasive that it infuses the official and unofficial policy of the Village. Plaintiff Manes, an Orthodox Jewish homeowner and local real estate developer, and his company, Plaintiff TAL Properties, have suffered economic and other harm as a result of Defendants' anti-religious actions. Plaintiffs bring this action to hold Defendants accountable to Plaintiffs and to rid the Village of Pomona government of the bigotry with which it is thoroughly saturated.

2.　　Plaintiff Manes is a practicing Orthodox Jew and a resident of Pomona. As a developer-investor seeking to engage in real estate transactions in Pomona via TAL Properties, Manes sought to own and develop multiple properties. Manes has personally been damaged from Defendants' discriminatory and unlawful acts. Defendants harnessed the power of the Village's municipal authority to harass and discriminate against Manes and to damage his company, TAL Properties, which sought to attract Orthodox Jewish residents to Pomona.

3.　　Under color of law, the Village of Pomona, a local government of roughly three-thousand residents, used numerous official and non-official mechanisms – including building and zoning controls – to actively and systematically discriminate against Manes, TAL Properties, and against religiously observant Jews.

4.　　As set forth below, Defendants committed multiple federal and state constitutional and statutory wrongs against Plaintiff Manes, damaging him and his company.

Through this action, Plaintiffs seek compensation for the damage Defendants have inflicted, and seek to put an end to Defendants' discriminatory practices once and for all.

5.     Defendants Mayor Brett Yagel, Deputy Mayor Leon Harris, Village Attorney Doris Ulman, Village Clerk and Treasurer Francis Arsa-Artha, Building Inspector Louis Zummo and other Village employees (collectively, the "Yagel Administration") created and actively managed an anti-Orthodox-Jewish program in the Village of Pomona. This program enlisted various governmental departments and subdivisions, including the building department, code enforcement, Board of Trustees, zoning and planning board, village clerks, treasury, village attorney and village engineer. The Village's local government intentionally discriminated – in numerous and pervasive ways as set forth herein – against the religiously observant Jewish religious minority. It enacted new laws and ordinances and discriminatorily and disparately invoked local code enforcement and zoning laws to target Orthodox Jews, while denying basic municipal services to Orthodox Jewish residents.

6.     Defendants' illegal discriminatory acts were designed to, and did, hinder and dissuade Orthodox Jews from relocating into Pomona and prevented the integration of Orthodox Jews into Pomona's social fabric as equal citizens. The Village's goal was clear: keep them out. These discriminatory tactics were used against Plaintiffs, causing them the substantial economic harm described below. Official action by Defendants was designed to deter and prevent Orthodox Jews, such as Manes, from selling homes to Orthodox Jews.

7.     To prevent Orthodox Jews from moving into Pomona and to drive out Orthodox Jews, the Yagel Administration: (i) applied facially neutral laws in a manner that discriminates and is designed to discriminate against Orthodox Jews; (ii) discriminatorily, in a

substantial departure from normal procedure, denied and delayed services to Orthodox Jews; (iii) discriminatorily harassed and humiliated existing Orthodox Jewish residents, in public and private spaces, preventing the full use and enjoyment of the public space and their properties; (iv) obstructed and otherwise blocked lawful access to the property records of Orthodox Jews who sought such records in the ordinary course of Village business, in freedom-of-information requests, and in other litigation with the Village; and (v) interfered multiple times with efforts by Plaintiffs to buy, sell, build, and develop properties in Pomona, by enlisting non-Orthodox-Jewish residents to disrupt existing deals and thwart prospective property sales to and from Orthodox Jewish parties and interfere with the terms and conditions of previously approved real estate developments.

8.      Defendants Yagel, Harris, Ulman, Arsa-Artha and Zummo, jointly with the other Defendants and severally, have prevented and burdened Orthodox Jews, including Plaintiff Manes, from freely exercising their fundamental religious beliefs. As set forth below, Defendants have targeted core Orthodox Jewish religious practices by, among other things: (i) preventing the establishment of a minimally required infrastructure, including synagogues, ritual baths and other fundamental religious requirements; (ii) harassing Orthodox Jews, like Plaintiff Manes, while they are practicing their religion, and (iii) otherwise limiting and/or attempting to limit their religious freedoms.

9.      Plaintiffs possess recordings of unguarded conversations during working hours among Village employees at the Village's administrative offices, known as Village Hall. Members of the Yagel Administration are heard repeatedly disparaging Orthodox Jews and the religion, rituals, and way of life of Orthodox Jews.

10. Village employees, including Defendant Mayor Yagel, are heard agreeing with degrading and discriminatory remarks about individual Jews and Orthodox Jews collectively. These statements are made in the course of discussions of official decisions and actions such as: (i) ticketing and fining Orthodox Jews; (ii) denying and delaying the requests of Orthodox Jews for basic municipal services; (iii) blocking the access of Orthodox Jews to property and other public records; and (iv) intentionally discriminating in the provision of municipal services to Orthodox Jews.

11. A whistleblower complaint by Defendant Noreen Shea, a former Village clerk who participated in Defendants' unlawful program, and a scorching Human Rights Division Report also describe in detail the rampant anti-Orthodox-Jewish bias in the Village government.

12. The Village of Pomona was recently found, in a comprehensive court decision, to have enacted and enforced laws with the discriminatory intention to keep Orthodox Jews out of Pomona. *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83 (2d Cir. 2019) ("*Tartikov*").

13. The United States Court of Appeals for the Second Circuit in *Tartikov* invalidated land use regulation that is generated by "bias against the *religious faith or practices of the developer* or of likely residents of new development *whether overt or hidden* by legitimate-seeming pretext." 945 F.3d at 88 (emphasis added).

14. Hostility and bias practiced by Defendants against Orthodox Jews and their ethnicity and way of life was the "but for" cause of the damage suffered by Plaintiffs. If not

for the unlawful conduct motivated by Defendants' discrimination, Plaintiffs would not have been damaged.

15.     In the spring of 2019, then-Village Trustee Defendant Ian Banks defeated Defendant Yagel in Village elections, becoming mayor of the Village on April 1, 2019. Despite promising in his campaign to on clean up the anti-Jewish practices of the Yagel Administration, Defendant Banks, upon becoming mayor, claimed that Orthodox Jews now have too much power in the Village. As mayor he has continued many of the same practices followed by the Yagel Administration. Among other things for example, after the Village's Board of Directors voted to terminate Defendant Zummo, Defendant Banks defied the Board and re-hired Defendant Zummo to head the Village's Building Department and code enforcement. Defendant Banks has refused to remedy and has continued the discriminatory actions taken against Plaintiffs and other Orthodox Jews in Pomona.

## THE PARTIES

16.     Plaintiff Avrohom Manes is the sole owner of TAL Properties. He is an Orthodox Jew and resides in the County of Rockland. Through his company, he is also an investor in, and developer of, real estate.

17.     Plaintiff TAL Properties is a limited liability company formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district. TAL Properties was formed as a limited liability company to conduct real estate business in Pomona, with intent to purchase land and build, develop and sell homes within the Village of Pomona.

18.     Defendant Village of Pomona is a municipal corporation formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district.

19.     From 2011 until April 1, 2019, Defendant Brett Yagel was the duly elected Mayor of the Village. At all relevant times, he was and is the final policy maker for Defendant Village. He is sued in his official and individual capacities.

20.     At all relevant times, Defendant Doris Ulman was the Village Attorney. She is sued in her official and individual capacities.

21.     At all relevant times, Defendant Louis Zummo was and is the Building Inspector of Pomona. He is sued in his official and individual capacities.

22.     At all relevant times, Defendant Joseph Corless was the Acting Village Engineer of Pomona. He is sued in his official and individual capacities.

23.     At all relevant times, Defendant Francis Arsa-Artha was the Village Clerk and Treasurer of Pomona. She is sued in her official and individual capacities.

24.     At all relevant times, Defendant Noreen Shea was the Deputy Village Clerk. She is sued in her official and individual capacities.

25.     At all relevant times, Defendant Ian Banks was the Trustee and is the current Mayor of Pomona. He is sued in his official and individual capacities.

26.     At all relevant times, Defendant Leon Harris was the Deputy Mayor. He is sued in his official and individual capacities.

27.     At all relevant times, Defendant Christopher Riley was the Special Prosecutor. He is sued in his official and individual capacities.

28.     Defendants' acts alleged in this Complaint were undertaken under color of state law.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(3) & (4) and 42 U.S.C. §§ 1983 and 1988.

30.     This Court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000cc-2(a) to enforce Plaintiffs' rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, *et seq.*

31.     This Court has jurisdiction under 28 U.S.C. § 1331 to enforce Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. §§ 3601 – 3619.

32.     This Court has supplemental jurisdiction, under 28 U.S.C. § 1367(a), over Plaintiffs' state law claims.

33.     Venue is proper in this district under 28 U.S.C. § 1391(b) in that all claims arose in this district.

## PROCEDURAL HISTORY

34.     Plaintiffs filed a prior action in state court related to the Village's discriminatory conduct on March 16, 2017. That action was removed to this Court on April 21, 2017, and docketed as Civil Action No. 7:17-cv-02928 (CS) ("TAL1"). On January 10, 2018,

District Judge Seibel dismissed TAL1 for failure to adequately plead a *LeClair* disparate treatment equal protection claim or a free exercise claim.

35.    On November 2, 2018, Plaintiffs filed a motion under Fed. R. Civ. P. 60(b) to reopen the dismissal of TAL1, based upon new information and evidence as well as new developments after the original TAL1 dismissal. Among other developments, in June 2018 the New York Human Rights Division issued its report of its investigation of Defendant Noreen Shea's complaint against the Village (described below). Plaintiffs also obtained new information via admissions by Defendants Zummo and Ulman during 2018.

36.    On July 22, 2019, Judge Seibel denied the motion to reopen TAL1, and emphasized that her denial of the motion was not a determination of the merits of Plaintiffs' allegations, but was dictated by the limitations of Fed. R. Civ. P. 60(b).

37.    Judge Seibel noted in her decision that Plaintiffs had not attempted to plead a *Pyke* Equal Protection Claim (which, crucially, does not require explicit pleading of comparators who were treated more favorably). Judge Seibel also noted that she had *not* determined the merits of a potential *Pyke* equal protection claim by Plaintiffs or other possible legal claims and theories not previously pled and dismissed. Judge Seibel declared that she was *not* precluding the filing of a new action. She said:

> "Defendants should take little comfort in this outcome. The allegations presented on this motion, if even half true, are disturbing I am obliged to stay within the confines of Rule 60(b), which in my judgment does not allow for this lawsuit to be reopened, but should Plaintiffs commence a new lawsuit, they may well be able to state a claim. And I do not see how Defendants will "suffer immense prejudice" (D's Opp. at 9), if they have to defend themselves on the merits. They may well be able to do so; I have no opinion as to what the outcome of such a case would be, nor

could I at this stage. But should Plaintiffs find it in their interest to pursue a case, airing the allegations and getting to the truth would hardly be a bad thing."

*TAL Props. of Pomona, LLC v. Village of Pomona*, 2019 U.S. Dist. LEXIS 121729 * 26 (S.D.N.Y. July 22, 2019).

38.     Plaintiffs immediately commenced this action on July 23, 2019. This action was assigned to U.S. District Judge Briccetti, who at the time was presiding over a similar case alleging discrimination against the Village. *See Shmuel Indig et al. v. The Village of Pomona et al.*, S.D.N.Y No. 7:2018-cv-10204 ("*Indig*"). Both this case and the *Indig* case were re-assigned to U.S. District Judge Halpern on March 17, 2020. Plaintiffs filed their first Amended Complaint on March 27, 2020.

39.     Only recently in 2000, Plaintiffs obtained new information and evidence related to their claims and the wrongful actions of Defendants. Among other things, these include copies of certain recordings made by Defendant Shea in Village Hall in 2016 and 2017, and recently filed deposition transcripts and affidavits in Defendant Shea's federal lawsuit against the Village currently pending in this District. *See Noreen Shea v. Village of Pomona, et al.*, S.D.N.Y. No. 17:18-cv-11170 (CS) ("*Shea*").

40.     Additional evidence is now in Plaintiffs' possession as well as proof of continuing and ongoing unlawful conduct by Defendants, resulting in additional damages.

## FACTUAL ALLEGATIONS

## DISCRIMINATION AGAINST THE PLAINTIFFS

41.     Defendants' discriminatory practices have: (i) interfered with Plaintiff Manes' property rights; (ii) denied him basic services that delayed and/or prevented him from

developing and selling homes to Orthodox Jewish families who wish to freely practice their Orthodox Jewish lifestyle in their homes and community; (iii) caused Manes to suffer humiliation and discrimination when conducting business with the Village; and (iv) made it impractical and impossible to establish the minimally basic infrastructure for a functioning Orthodox Jewish lifestyle.

42.     Plaintiff Manes owns investment properties in the Village through his wholly owned company, TAL Properties of Pomona, which was formed to acquire, develop, sell, and otherwise engage in real estate development within the local Pomona market.

43.     Upon information and belief, before the arrival of Orthodox Jews in Pomona, the property values of Pomona real estate were in steady decline. As Orthodox Jews moved in, the trend promptly reversed. When Plaintiff Manes contemplated moving into and investing in Pomona, he sought to take advantage of the developmental and personal opportunities, living with his family in a bucolic setting.

44.     Manes envisioned designing and developing properties - well-built and spacious one-family homes, with modern amenities, conforming to and complementing an Orthodox Jewish lifestyle. He reasonably expected a healthy return on his investment.

45.     Such amenities include kosher kitchens; larger dining rooms to accommodate family Sabbath and holiday meals; study areas; two sinks, and other meat and dairy separations; Passover kitchens; and balconies conforming to requirements for the Sukkot holiday. In addition, certain communal resources are necessary to support fundamental Orthodox Jewish religious practices, and families often pay a premium for a home in such a community.

46.     Minimally required communal infrastructure includes synagogues, ritual baths, access to kosher food, private religious schooling and daycare. It also includes *eruvim* – a thin string or wire, often attached to elevated utility poles, symbolically integrating private and public spaces into one "private domain," thus enabling Orthodox Jews to avoid Sabbath transgressions of transferring and carrying objects in the public domain.

47.     Plaintiff Manes, standing by his religious and real estate development visions, moved with his wife and three daughters to Pomona.

48.     Defendants administer and enforce the Village's zoning ordinances.

49.     Defendants are "government" as defined by 42 U.S.C. § 2000cc-5(4)(A).

50.     The Village zoning ordinances are "land use regulation" as defined by 42 U.S.C. § 2000cc-5(5).

51.     As part of their program and plan to prevent Orthodox Jews from living in Pomona, and thereby impose a substantial burden on the religious exercise of Plaintiff Manes, as well as on the religious exercise of current and potential Orthodox Jewish residents of Pomona, Defendants harassed Plaintiffs in the administration and enforcement of the Village's zoning ordinances and other land use regulation.

52.     Manes did not anticipate, and was not prepared for, the systematic and non-stop level of official disturbance of, and resistance to, his use and enjoyment of his property, his development projects, and his and his family's Orthodox Jewish way of life.

53. As an investor-developer of properties with an Orthodox Jewish client base, Manes was victimized by the Village's denial of community-wide religious freedoms and the Village's denial of fundamental Orthodox Jewish infrastructure including the Village's resistance to synagogues and ritual baths (*mikvehs*) and harassment at places of worship and during Sabbath observances.

54. Because Defendants harassed and humiliated current Orthodox Jewish residents and invoked pretextual policy and laws to prevent Orthodox Jews from moving in, the demand for Plaintiffs' properties substantially diminished.

55. Defendants' treatment of Manes was a weaponized utilization of neutral laws and procedures driven by overt religious animus. Defendants' conduct described herein was designed to deter Orthodox Jewish people from moving to Pomona. It thereby deprived Manes of customers for his real-estate development businesses.

56. Because Defendants were hostile to Plaintiffs' development plans directed to potential Orthodox Jewish customers, they discriminated against Manes and subjected him and TAL Properties to heightened scrutiny.

A. **22 High Mountain Road**

57. In late 2015, Manes purchased a residential home at 22 High Mountain Road in Pomona ("22 High"), and other subdivided but underdeveloped properties (the "Subdivided Properties"). Manes intended to develop and market the Subdivided Properties to purchasers, including Orthodox Jews.

58.     Over the next few years, continuing to this date, Defendants conducted a concerted, multi-faceted and ongoing effort to harass Manes in order to prevent him from selling to, and attracting, Orthodox Jewish residents to reside in Pomona.

59.     In January 2016, Plaintiffs made repairs to 22 High. Defendant Zummo, the Village Building Inspector, then inspected 22 High on behalf of the Village. On concluding his inspection, Defendant Zummo advised Manes that the repairs met applicable building codes and other regulations and that a certificate of occupancy ("C of O") would issue shortly.

60.     However, at the direction of Defendants Yagel and Ulman, Defendant Zummo delayed issuance of a C of O for 22 High for several months.

61.     Defendants' actions contravened the Village's Construction Code [Chapter 47- 10], which requires prompt issuance of a C of O where, as here, the applicant has complied with applicable code requirements.

62.     Defendants' delay in issuing the C of O was a discriminatory substantial departure from normal procedure.

63.     Defendants Yagel and Ulman ordered the delay in order to prevent Plaintiffs from attracting additional Orthodox Jewish residents to Pomona.

64.     As a pretext to justify the Village's delay in issuing the C of O, Defendants Yagel and Ulman falsely asserted that a prior owner of the property owed the Village $6,379.34 and demanded Plaintiffs pay the prior property owner's alleged outstanding debt as a condition for issuing the C of O.

65. The purported debt was asserted by Defendants Yagel and Ulman, discriminatorily invoking the Village's land use regulations, to prevent and burden Orthodox Jews, including Manes, from engaging in Orthodox Jewish religious exercise in Pomona.

66. At no time did Defendants claim that Plaintiffs had incurred this alleged debt. Nor was there any basis for any such claim.

67. Defendants Yagel and Ulman did not seek to collect the alleged outstanding debt of $6,379.34 from the property's prior owner, a Village of Pomona real estate developer who was not Jewish. Defendants had permitted the prior owner's development bond to lapse without collection although he had failed to develop and complete projects within the Village of Pomona secured by the bond.

68. The Village's laws do not authorize denial of a C of O because a prior property owner failed to satisfy a debt, particularly where, as was true of 22 High, the property is purchased at a foreclosure sale from a bank.

69. The Village failed to record the prior property owner's alleged debt as a lien against 22 High before Plaintiffs purchased the property or at any time before nonpayment was asserted as a justification for delaying issuance of the C of O to Plaintiffs.

70. In August 2018 Defendant Zummo met with Manes and discussed, on tape, various discriminatory actions Defendants had taken against Manes (the "August 2018 Admissions"). In the August 2018 Admissions, Defendant Zummo admitted that Defendants discriminated against Plaintiffs and that the discriminatory treatment departed from normal Village law and policy. Defendant Zummo said that the discriminatory treatment Manes received

was directed by Defendant Yagel, who feared that Manes would bring more Orthodox Jews to Pomona through his real-estate development business.

71.     In August 2018 Admissions, Defendant Zummo admitted to Manes that the alleged bill of $6,379.34 never existed and was a fraud concocted by Defendants.

72.     Defendant Zummo also told Manes that pages had been "added" to his property's file by Defendants Yagel and Ulman, and acknowledged to Manes that Defendant Zummo had informed Ms. Ulman that if the bill had been legal, the fee should still have been no more than approximately $1,500.

73.     Upon information and belief, Defendant Ulman acknowledged to Defendant Zummo that the bill was fraudulent and excessive but that she would not retract it.

74.     Defendants continued through 2016 to invoke land use regulations discriminatorily against Plaintiffs as they sought to sell 22 High, repeatedly concocting false explanations for delay in the issuance of the C of O, which Plaintiffs needed to realize the value of their property.

75.     Plaintiffs sought to grade out steep slopes on 22 High, thereby creating useable backyard space. This would enhance the value of 22 High. Plaintiffs spent substantial time, effort, and expense, in conjunction with Defendant Joseph Corless, the Village Engineer, to develop a grading plan to address the steep slopes.

76.     Defendant Corless initially approved Plaintiffs' grading plan in an email sent to Plaintiffs' engineer. However, at the request of Defendants Yagel and Ulman, Defendant

Corless departed discriminatorily from ordinary procedure and retracted his approval. He imposed costly conditions upon Plaintiffs.

77.     At the direction of Defendants Yagel and Ulman, Defendant Corless administered the Village's land use regulations discriminatorily against Plaintiffs Manes and TAL Properties by imposing costly conditions on Plaintiffs' plan to grade out steep slopes at 22 High.

78.     These conditions were not imposed on the similarly sloped and neighboring properties at 6, 8, 10 High Mountain Road, and 2 Riverview in Pomona, owned by residents who were not Orthodox Jews.

79.     Defendant Corless departed discriminatorily from normal procedure, including but not limited to, requiring Plaintiffs: (i) to post a bond for possible damage to neighboring property; (ii) to conduct unusually complex and expensive tests of the compressed fill they used for grading; and (iii) to pay a heavy application fee in connection with obtaining the grading permit.

80.     Defendant Corless also discriminatorily demanded and required Plaintiffs to prove that Plaintiffs had obtained authorization from the original land surveyor to include a report that was publicly available in the Village property file as part of Plaintiffs' permit application. Such land surveys are routinely relied upon without such authorization. On information and belief, no other residents of Pomona were required to make such a showing.

81.    Even after Plaintiff Manes agreed to satisfy these discriminatory conditions, Defendant Corless still rejected Manes' application and denied Plaintiffs a permit for the grading work.

82.    In a February 6, 2017 conversation recorded at Village Hall, Defendant Yagel and several Village clerks admitted that they are, in fact, legally obligated to refund the exorbitant application fees Plaintiffs paid for the grading permit, but Defendant Yagel said he will not reimburse the fees to Plaintiffs because no formal request for a refund had been made by Plaintiffs' attorney.

83.    Discriminatory delays in issuing required documents and the discriminatory imposition of onerous grading requirements caused a substantial decline in the sales price for Plaintiffs' property at 22 High.

84.    If not for these delays and the incomplete nature of the work occasioned by the Village's selective requirements and enforcement, Plaintiffs would have sold 22 High in early 2016 and used the proceeds so realized for other profitable business opportunities and investments.

85.    Because of Defendants' unlawful discriminatory conduct, Plaintiffs were unable to sell 22 High for the price expected or to recoup the profit anticipated from the purchase and sale of 22 High.

86.    Defendants Zummo, Yagel, and Ulman delayed the issuance of a Certificate of Occupancy in order to delay or prevent Manes from being able to market the property for sale to potential Orthodox Jewish buyers. It was not until late fall 2016, after

Plaintiffs entered into a contract for the sale of 22 High, that Defendants dropped their false claim that Plaintiffs owed fees incurred by the prior property owner and gave Plaintiffs a C of O, without payment of this alleged debt.

87.     Defendants also tried to restrict Plaintiffs' ability to sell 22 High by threatening to retroactively revoke the C of O. Defendants also harassed Plaintiff's Orthodox Jewish buyer, Mr. Lowenbein, by denying him a permit for renovations to the property needed to accommodate his disabled children.

B.    **Subdivided Properties**

88.     In addition to 22 High, Plaintiffs also purchased the Subdivided Properties in the same area.

89.     The Subdivided Properties purchased by Plaintiffs Manes and TAL Properties had already been approved for residential use at the time they were purchased.

90.     After purchasing parcels of land in Pomona, Plaintiff Manes went to Village Hall to discuss developing the Subdivided Properties by building homes on them. Plaintiff Manes was told by Defendants Zummo and Ulman that Manes and TAL Properties would never receive permits for residences in Pomona that the Village believed would be sold to Orthodox Jews. Defendant Zummo did not even allow Manes to fill out the building permit application for the Subdivided Properties, telling Manes that it was "a waste of time" and "not happening."

91.     Defendants have denied Plaintiffs the permits necessary for building on the Subdivided Properties on multiple false grounds.

92.     Defendants denied permits and Certificates of Occupancy with respect to the Subdivided Properties in order to prevent Orthodox Jews from residing in Pomona and engaging in religious exercise of the Orthodox Jewish faith within Pomona.

93.     Following the sale of 22 High, Defendants, in a substantial departure from normal procedure, threatened to retroactively withdraw 22 High's Certificate of Occupancy, unless Plaintiffs would sign an agreement falsely acknowledging, *inter alia*, that the road accessing 22 High was not a village road and that its maintenance (and the maintenance of other roads) was the sole responsibility of the property owner.

94.     This was done in order to impede and delay Plaintiffs' ability to sell the Subdivided Properties.

95.     The road accessing 22 High and the Subdivided Properties is, and since before Plaintiffs purchased 22 High and the Subdivided Properties has always been, a public road. Defendants claimed otherwise in order to limit Plaintiffs' ability to develop and market the affected properties to sell to Orthodox Jews and thus to keep Orthodox Jews out of Pomona.

96.     Invoking Plaintiff Manes' refusal to sign such a false document, Defendants prevented Plaintiffs from selling and developing the Subdivided Properties.

97.     The signing of such an agreement was not required by Defendants for the sale and development of any other property in Pomona.

98.     In 2017, Plaintiff TAL Properties filed a lawsuit for declaratory and other relief concerning ownership of the roads in the New York Supreme Court of Rockland County,

*TAL Properties of Pomona, LLC v. Village of Pomona, et al.*, Index No. 031216/2017, which is still pending ("Plaintiffs' *Roads* Case").

99.     Upon information and belief, for at least a decade prior to Plaintiffs' purchase of the Subdivided Properties, the Village exercised dominion and control over the roads leading to the Subdivided Properties and never claimed to previous owners during this time that these were private or that the owner of the Subdivided Properties would be responsible for repairing and maintaining them.

100.     The Village had permitted the prior developer's bond to lapse in January 2007 and the developer had declared bankruptcy. The Village's documented position was that the roads were not owned by individuals.

101.     Prior to Plaintiffs' purchase of 22 High and the Subdivided Properties, Defendant Ulman, the Village Attorney, and her daughter as Assistant Village Attorney, issued a memorandum documenting the Village's legal opinion that Trustco Bank, the prior owner of the Subdivided Properties, did not own the roads. Defendant Ulman also represented to Village trustees that the previous owner, Trustco Bank, did not own the roads.

102.     Only after Plaintiffs purchased the Subdivided Properties from Trustco Bank, Defendants reversed their position and falsely claimed that Plaintiffs owned the roads due to the purchase of the Subdivided Properties. This contradicted the Village's treatment of prior and current owners of similarly situated property on the same and/or similar roads.

103.     Specifically, the Subdivided Properties were only a portion of the properties that adjoined the roads in question, yet no other owner of properties on these roads

was charged by the Village with ownership or responsibility for maintenance for these roads. Only Plaintiff TAL Properties, a company with a business plan to market to Orthodox Jews, and its Orthodox Jewish owner, Plaintiff Manes, were charged by Defendants with ownership and responsibility for these roads.

104.    A developer in a separate part of Pomona failed to complete roads adjoining his properties and defaulted on his bond. Yet the Village maintains those roads as public roads and has never charged the owners of properties adjoining those roads with ownership or responsibility for maintenance of those roads.

105.    Defendant Ulman acknowledged in a deposition that there was no difference between Plaintiffs' properties and similarly situated properties owned by persons who were not Orthodox Jews, and there was no reason to discriminate against Plaintiff Manes in the treatment of the roads. She blamed the Village's Board of Trustees for such disparate treatment.

106.    In Plaintiffs' *Roads* Case litigation the Village has refused to turn over files to Plaintiff Manes that prove Village ownership of the roads. Plaintiff Manes has requested documents under the Freedom of Information law ("FOIL") and by subpoena and other discovery demands. The Village has claimed that such documents do not exist.

107.    At enormous additional time and expense, Plaintiff Manes has tracked over 200 documents that the Village denied existed, including documentation from other villages, towns, municipalities, the highway department, sewage and utility records, to document the falsity of the Village's claims that Manes owns any Village roads.

108.    Defendants also claim falsely that Plaintiff Manes owes for a bill they claim the Village paid for snow removal on these roads. The snow removal bill is a complete fabrication.

109.    The Village has a contract with the Town of Haverstraw for snow removal services on public roads. No portion of the bill is itemized for the roads for which the Village now claims Plaintiffs are responsible.

110.    Defendant Zummo has acknowledged that he reviewed the file and found no evidence of such a snow removal bill. Defendant Zummo asserts that he learned of it from Defendant Ulman and, at the direction of Ulman, there were "notes added" to the file reflecting the supposed bill. Defendant Ulman was requested to submit the snow bill in discovery demands in Plaintiffs' *Roads* Case. She represented that she would do so. To this date, she has not.

111.    Defendants fabricated a snow-removal obligation in order to prevent and delay the use, development and sale of the Subdivided Properties by Plaintiffs and other Orthodox Jews.

112.    The Village of Pomona also submitted a document in Plaintiffs' *Roads* Case that falsely reflected the (changed) Village opinion that the ownership of its roads now belonged to Manes.

113.    Defendants' discriminatory treatment of Plaintiffs has made it impossible for them to exercise their property rights by improving and/or selling the Subdivided Properties, causing Plaintiffs continuing and ongoing harm.

114.    But for the aforesaid false and/or frivolous claims, harassment and other disturbances attributable to Defendants' animus against religious observance of Orthodox Jews, Plaintiffs would have profited from selling and developing already owned properties and purchasing additional properties.

115.    Due to the foregoing actions of Defendants, Plaintiffs lost millions of dollars in anticipated profit and other gain. Plaintiffs continue to this date to be deprived of access to, use, and enjoyment of the Subdivided Properties.

**C.    Other Discriminatory Conduct**

116.    As part and parcel of Defendants' ongoing harassment of Manes, and reflective of a broader pattern of discrimination, Plaintiffs have suffered several other acts of discrimination at the hands of Defendants.

117.    In mid-December 2017, Defendant Zummo, the Village Building Inspector, issued a baseless stop work order ("SWO") for a project on the driveway at Plaintiff Manes' home at 8 East Court in Pomona. A permit had been issued for the project, and no work was being performed when Defendant Zummo came to deliver the SWO. The SWO had already been filled out at Defendant Yagel's request before Defendant Zummo even came to the site.

118.    Upon information and belief, Defendant Zummo saw no work performed, but nonetheless served the SWO based upon hearsay from a neighbor.

119.    Upon information and belief, there was no expiration date on the original work permit, and such a date was fraudulently entered by someone in the Village administration.

Armed with a doctored "expiration date," and under the pretext that the permit issued for the driveway project had "expired," Defendant Zummo issued the SWO.

120.    Defendant Zummo has acknowledged that Defendant Mayor Yagel directed Defendant Zummo to issue the SWO against Plaintiff's property at the behest of Salman Dar, a non-Jewish neighbor of Plaintiff Manes.

121.    Upon information and belief, Mr. Dar gained considerable favor with Defendant Mayor Yagel when he expressed his intention to keep Orthodox Jews out of Pomona and attempted to purchase five lots in Pomona to achieve that end. Upon information and belief, the seller of the five lots canceled the sale after hearing of Dar's discriminatory motive.

122.    Defendants took no action when Mr. Dar constructed two large pillars with his name and address at the entrance to a road that leads to his neighbor's home, in violation of the Village Code.

123.    Defendant Zummo acknowledged that the Village Code did not permit Mr. Dar to place the pillars there, and that no permit had been issued for the pillars. At Defendant Yagel's instruction, Defendant Zummo stood by and did not issue a violation to Mr. Dar.

124.    Defendants also refused, in contrast to the state and county, to issue a property tax refund to Plaintiff Manes, even after the Village received court orders directing it to reduce the assessment on the property.

125.    Plaintiff Manes inquired by email why he had not received the court-ordered tax reassessment and refund. The Village responded that the tax grievance was

applicable only prospectively and not to current and/or past fiscal years. On information and belief, this discriminatorily contradicted previous and current practice with residents of the Village who are not Orthodox Jews.

126.    Defendants used numerous tactics as part of their discriminatory efforts to hinder and prevent Orthodox Jews from moving into Pomona and developing a larger practicing Orthodox Jewish community. Among other things, these tactics included harassing and intimidating existing Orthodox Jewish residents, discouraging Orthodox Jews from purchasing property in Pomona, interfering with real estate professionals who are Orthodox Jews or who develop or market property to Orthodox Jews, and discouraging property owners from selling property in Pomona to Orthodox Jews.

127.    Aware that Plaintiff Manes is an Orthodox Jew and that Plaintiffs' business objective was to purchase, develop and sell property in Pomona to Orthodox Jews, Defendants engaged in all of these tactics and more against Plaintiffs.

128.    At some point, Defendants learned that Plaintiffs were negotiating to purchase property in Pomona from Janet Chernikov. Plaintiffs sought to purchase the property to develop, market and sell to Orthodox Jews. When the negotiations for the property became serious were on the verge of closing, Ms. Chernikov abruptly broke off the negotiations.

129.    Ms. Chernikov explained to Plaintiff Manes that Defendant Ulman had contacted her and told her Plaintiff Manes owned certain Village roads, and that he intentionally caused land to be undervalued in order to purchase it at a lower price from Ms. Chernikov. Of course, the information Defendant Ulman conveyed to Ms. Chernikov was false. Nevertheless,

Ms. Chernikov refused to continue negotiating with Plaintiffs, and she sold her property to non-Orthodox-Jewish buyers.

130. Defendant Ulman acknowledged in a deposition of July 19, 2018 in Plaintiffs' *Roads* Case that she had contacted Ms. Chernikov about the proposed sale of property to Plaintiffs, and asserted that Defendant Ulman had never previously done this in other transactions.

131. As a result of Defendant Ulman's interference, Plaintiffs lost out on a transaction worth millions of dollars.

132. As described below, at the direction of Defendant Yagel, Defendants Arsa-Artha and Defendant Shea discriminatorily delayed and impeded Plaintiffs' and other Orthodox Jews' requests for services from the Village.

133. Defendant Yagel instructed Defendants Zummo, Arsa-Artha, and Shea to delay service to Orthodox Jewish residents, including by pushing off and rescheduling building inspections, and waiting as long as possible to release records requested by Orthodox Jews.

134. Defendant Shea testified that Defendant Arsa-Artha commented to her repeatedly that Orthodox Jewish residents were impatient and wanted service more quickly than she wished to provide it.

135. Defendants also discriminated against Plaintiffs in deliberately delaying and refusing to provide documents to Plaintiffs in response to FOIL requests needed for business and other purposes.

136. Defendant Shea testified that Defendants Yagel and Zummo repeatedly directed her to slow down the processing of applications, responses to FOIL requests or any other service she was engaged in performing for Hasidic or Orthodox Jewish people. She testified that: "In many instances, including but not limited to, [Plaintiff Avrohom] Manes, [Orthodox Jewish developer] Hirskowitz, [and Orthodox Jewish residents] Indig and Klein, Jewish applicants had to wait extensively for approval of permits."

137. Defendant Shea testified that her complaints of anti-Semitism "went to the core of the Village," and that she "understand[s] that some in the Village were deeply concerned that Pomona would be 'overtaken' by Orthodox/Hasidic families."

138. When explaining the backlog in permits at the Village, Defendant Shea testified: "You felt this anti-semitism. They're taking over. They're taking over the village. The Orthodox are taking over the village. It was a slow-down process."

139. In a March 21, 2017 recording in Village Hall, Defendants criticized Defendant Shea for being "friendly and nice" to Plaintiff Manes on one occasion when he sought documents from the Village.

140. On another occasion, Defendant Shea called Plaintiff Manes to tell him that she could not process his requests without pre-payment in person because she could not "trust [Manes] with money." Plaintiff Manes heard laughter in the background when Defendant Shea made this statement to him. Defendant Shea later told Plaintiff Manes that Defendants Yagel, Zummo, Corless and others had seen Plaintiff's FOIL request and told her to humiliate him, and that Defendant Yagel and others were laughing in the background when she made the antisemitic statement to Plaintiff that she could not trust him with money.

141.     Collectively and individually, Defendants' discriminatory actions against Plaintiffs constituted intentional unlawful discrimination under color of law motivated by religious animus against a member of a statutorily protected class.

142.     Defendants' discriminatory conduct towards Plaintiffs was part of Defendants' program of hostility to Orthodox Jews designed to suppress and burden religious exercise of Orthodox Judaism in Pomona, as described herein.

### DISCRIMINATION AGAINST POMONA'S ORTHODOX JEWISH RESIDENTS

143.     Defendants' conduct against Plaintiffs was caused and driven by anti-Orthodox Jewish animus.

**A.     The Anti-Orthodox-Jewish Agenda**

144.     Pomona is a small village nestled next to the Cheesecote Mountain in a bucolic section of Rockland County. Founded in 1967, the Village, which is located partly in the town of Ramapo and partly in the town of Haverstraw, occupies a total of approximately 2.4 square miles and has an estimated population of 3,353, of which, upon information and belief, a minority are Orthodox Jews.

145.     The Village has had a history of taking actions to discourage and prevent the building of Orthodox Jewish institutions and growth of an Orthodox Jewish community within the Village and in nearby areas.

146.     As early as 1996, the Village opposed the expansion of Bais Yaakov, an Orthodox Jewish yeshiva in Ramapo. The Village wrote a letter in opposition to the expansion,

attended a Ramapo meeting and read an opposition statement, challenged the expansion in court, and encouraged Village residents to object to the expansion.

147.    In 1999, the Village did not object to the "Anna Mann" property becoming an assisted living facility, but then when it was later proposed that the property be used for an Orthodox Jewish yeshiva, the Village did oppose the development.

148.    In 2004, when Ramapo adopted the Adult Student Housing Law ("ASHL"), which permitted married adult student multi-family housing for Orthodox/Hasidic Jews in residential zones throughout the unincorporated portion of Ramapo, the Village opposed and challenged the law, claiming that the ASHL "pandered" to Orthodox Jewish voters.

149.    The Village also opposed the development of three Orthodox Jewish yeshivot outside of the Village.

150.    Recently, District Judge Kenneth M. Karas determined that the Village intentionally discriminated against Orthodox Jews in an effort to deter them from moving into Pomona by enacting unconstitutional local laws in 2001, 2004, and 2007. *Cong. Rabbinical College of Tartikov v. Village of Pomona*, 280 F.3d. 426 (S.D.N.Y. 2017), *aff'd in part*, 945 F.3d 83 (2d Cir. 2019).

151.    Before becoming mayor of the Village of Pomona, Defendant Yagel was elected a Village trustee in 2007 on an express platform of preventing the Tartikov Orthodox Jewish rabbinical college from building in the Village. In the run-up to the election, Defendant Yagel co-authored a letter to a local newspaper lamenting the arrival of "homogeneous

individuals," meaning Orthodox Jews, which he said was not a "natural progression" for the Village.

152. After becoming mayor, Defendant Yagel used his position to implement a program and policies to discourage and deter the growth of an Orthodox Jewish community in Pomona.

153. Over the past decade, and increasingly in or around 2015, Hasidic and other Orthodox Jews have moved to Pomona from neighboring communities. This triggered a hostile reaction from the Yagel Administration. Orthodox Jews did not, and do not, receive equal treatment from Defendants, as described in detail below. Instead, they faced persistent and intentional discrimination from Yagel and other Village employees, acting at his direction.

154. As detailed in the Court of Appeals' *Tartikov* decision, Village personnel disparaged how Orthodox Jews run their businesses. Code words were employed in the Yagel Administration, such as "homogeneous individuals" and "the make-up of the village." In fact, Defendant Mayor Yagel and his associates simply did not want to see Orthodox Jews moving to, and living in, Pomona.

155. Defendant Noreen Shea, formerly Deputy Village Clerk in the Yagel Administration, was initially a participant in this anti-Orthodox-Jewish campaign, following the instructions of Defendants Yagel, Arsa-Artha and Zummo to discriminate against and delay services to Orthodox Jews.

156. Even in her own recordings, Defendant Shea frequently participated in the stereotypical and derogatory rhetoric against Orthodox Jews, and by her own admissions she

herself carried out discriminatory actions against Plaintiff Manes and other Orthodox Jews. She claims she was doing so at the direction of Defendants Yagel, Arsa-Artha and Zummo and was only following orders.

157.    Defendant Shea later became a whistleblower, revealing that code words and phrases were employed by various Defendants to describe Orthodox Jews, their property, and their religious observances. These coded references included referring to Orthodox Jews as "corporation members" and "people living on the hill," calling their properties "LLCs," and designating their prayer groups as "business meetings."

158.    Defendant Yagel referred to Orthodox Jews as "them" or "those people."

159.    Defendants distinguished between Orthodox Jewish residents and non-Jewish residents. For example, in a recording of February 6, 2017, at Village Hall, Defendants described Birch Street as a "sea of yarmulkes," while lamenting that a non-Jewish resident of that street was "the last one on the block."

160.    Defendant Yagel and other Village personnel threatened, with no factual basis, among other things: (i) to call the police, health and fire departments and send Orthodox Jews to jail; and (ii) to impose severe fines and violations against Orthodox Jews on false and frivolous code citations.

161.    Defendant Yagel himself, without any legitimate basis, contacted the United States Internal Revenue Service to request the Government to conduct an audit of Plaintiffs.

162.    The Village, under the direction of Defendant Mayor Yagel and through the actions of Yagel and the other Defendants, actively sought to prevent the increase of Orthodox Jewish residents in Pomona.

163.    Defendants Yagel and Harris often received complaints against Orthodox Jews from long-time residents of Pomona. Defendants Yagel and Harris conveyed these complaints to Defendant Zummo and other Defendants with direction to investigate and take action against the Orthodox Jews who were the subjects of the complaints. Many of these complaints related to Orthodox Jewish prayer meetings or other religious practices.

164.    The Defendants' anti-Orthodox-Jewish agenda resulted in the discriminatory application and enforcement of the laws, policies, and procedures of the Village.

165.    At Defendant Yagel's direction, Orthodox Jewish residents were subjected to discriminatory ticketing for minor, unusual and even false code violations such as leaf disposal, dog waste, and a ticket for a plastic Toys 'R' Us pool (ostensibly for constructing an illegal pool without proper approval). When two residents on the same block had the same amount of leaves on their yard, the Orthodox Jew was ticketed while the non-Orthodox-Jew was not. An Orthodox Jew ticketed for dog-waste did not even own a dog. The overall list of violations and enforcement disproportionately targeted Orthodox Jews.

166.    Village Clerk Lisa Thorsen has acknowledged that before the influx of Orthodox Jewish residents in or around 2015, the Village did not routinely enforce minor code violations.

167.    Defendant Ulman testified in Plaintiffs' *Roads* Case that the Village had no code enforcer and did not enforce tickets, and that she refused initially to prosecute such violations when the Village decided to start enforcing them and targeted Orthodox Jews.

168.    Defendant Yagel then recruited and hired Defendant Christopher Riley to prosecute code tickets as "Special Prosecutor," despite the fact that, upon information and belief, the expense of paying Defendant Riley to prosecute tickets far exceeded the sums that could be collected from the fines collected.

169.    Defendant Riley also carried out many other tasks at Defendant Yagel's direction unrelated to his official position as "Special Prosecutor." Defendant Riley effectively became Defendant Yagel's agent to engage in discriminatory tactics against Orthodox Jews, particularly the more openly dishonest tactics that Defendant Ulman was not comfortable carrying out.

170.    For example, at Defendant Yagel's direction, Defendant Riley appeared at a Pomona Zoning Board of Appeals ("ZBA") hearing in June 2018. Defendant Ulman had refused to advise the ZBA improperly and falsely to dismiss as untimely an appeal brought by Orthodox Jewish resident Robert Klein regarding a stop work order on construction at his home. As Village Attorney, Defendant Ulman was the official attorney for the ZBA, but Defendant Riley made an appearance at the hearing without prior notice to Defendant Ulman to circumvent her refusal and to falsely assert that Mr. Klein's appeal was untimely. As a result, the appeal was dismissed.

171.    [Deleted]

172.     In an "off-the-record" conversation at her deposition in Plaintiffs' *Roads Case*, Defendant Ulman conceded that there had been discriminatory acts administered by Defendant Village of Pomona and Mayor Yagel, that certain residents' lives were made miserable by Defendants' discriminatory tactics, and that Defendant Ulman had resigned from the Zoning Board because of those tactics.

173.     Defendant Zummo also personally admitted this targeted enforcement to Plaintiff Manes in a recorded conversation in or around August 2018.

174.     As the Orthodox Jewish community grew, the Village accelerated its targeted enforcement against Orthodox Jews. It enlisted and deputized Defendant Zummo, the Village Building Inspector, and deputized and hired another special code enforcer, Fred Voile, to target and harass Orthodox Jewish residents with intentionally discriminatory ticketing and prosecution.

175.     Upon information and belief, after Mr. Voile refused to continue selective enforcement against Orthodox Jews, Defendant Yagel then hired Katherine Tolf, who was also directed by Defendant Mayor Yagel to target Orthodox Jews for violations.

176.     Upon information and belief, in one instance Ms. Tolf trespassed upon the property of Orthodox Jewish resident David Horowitz on 108 Overlook, entering the house without permission. She threatened to issue violations for "illegal kitchen renovations." Ms. Tolf's "proof" was a cardboard oven box found outside the home. There was, in fact, no illegal renovation and no basis for any violation. Upon information and belief, Ms. Tolf was directed by Defendant Yagel to subject Mr. Horowitz to increased scrutiny and possible violations because he was hosting an Orthodox Jewish prayer gathering next door at 110 Overlook.

177. Upon information and belief, Ms. Tolf and Mr. Voile ultimately resigned because they did not want to continue issuing code violations against Orthodox Jews in a discriminatory fashion as Defendant Yagel had directed.

178. By making many of the amenities central to Orthodox Jewish life impractical and financially unfeasible, Defendants discouraged and hindered Orthodox Jews who would have moved to Pomona from doing so.

179. An Orthodox Jewish lifestyle depends upon being within walking distance of a synagogue and proximity to others practicing Orthodox Judaism. Orthodox Jews seek "a Torah Community" to facilitate compliance with *Halacha*, Jewish religious law.

### B.    Recorded Conversations

180. Plaintiffs possess tapes demonstrating the extent of anti-Orthodox-Jewish animus within the Yagel Administration.

181. Nearly sixty (60) hours of conversations among Defendants were recorded at Village Hall. They were recorded by whistleblower Defendant Shea and confirm the Yagel Administration's discriminatory intent and discriminatory actions vis-a-vis Orthodox Jewish residents, including Plaintiff Manes.

182. Defendant Shea testified that Defendant Yagel told her to record the Orthodox Jews when they came into the office. After doing so on several occasions, Defendant Shea also began recording the other Village employees in the office as well.

183. On October 5, 2016, Defendant Shea recorded an extensive conversation between herself, Defendant Zummo and Defendant Arsa-Artha, in which the three disparagingly

described Orthodox Jews in demeaning and stereotypical ways, denigrating not only Orthodox Jews but their religion and religious practices as well.

184.    The statements of Defendants Shea, Zummo, and Arsa-Artha in the October 5, 2016 recording include, among others, the following descriptions of Orthodox Jews:

- Orthodox Jews are referred to as having "irritating customs"; "disgusting" practices; and "many rules and obligations", due to their adherence to "ancient," "Old Testament" laws;

- Orthodox Jews are disparaged for "archaic" practices, such as: (a) men avoiding certain bodily contact with women (ritual family purity laws); (b) having two sinks in the house, for separating meat and dairy foods (Jewish dietary laws ("Kashrut")) (also discussed by Defendants with respect to an application by a Jewish family to enlarge its kitchen to conform to Kashrut, April 26, 2017); and (c) disparaging the appearance of Jewish women, who wear wigs that make them look "identical" (modest religious dress);

- Orthodox Jews are mocked for adhering to religious strictures on the Sabbath, described by Defendants as "the dumbest [expletive] thing ever heard" and "pure stupidity"; and

- Orthodox Jews are ridiculed as maintaining poor personal hygiene and needing to shower more frequently.

185.    In the October 5, 2016 recording, Defendants Shea and Arsa-Artha discussed "touching" Orthodox Jewish men. Defendant Shea remarked, "You know you can't touch, like, if I touch a Hasidic [Shea makes alarming noise]...I mean that's just crazy, but even if I just bump into them by accident..." Defendant Arsa-Artha interrupted: "They have to shower for seven days if you touch them." Defendant Shea responded: "Well they should shower every day, so we should run around and touch them all!" Defendant Arsa-Artha then stated: "I told you I had a friend who used to pay girls to go up to Hasidic men in the mall to touch them and pay them twenty bucks just to watch them freak out."

186.    In the October 5, 2016 recording, Defendant Zummo exclaimed "how stupid Jews are" and stated that "half of" the Orthodox Jews "are inbred morons with retarded babies." Defendant Arsa-Artha stated that Orthodox Jews are "genetically unstable."

187.    In the October 5, 2016 recording, Defendant Zummo bragged that he argued with a Jewish fire inspector over whether Jews are the "Chosen People," and that Defendant Zummo stated: "I'm Italian...the Italians have been around forever...the Italians came mostly from the Egyptians...your people were our slaves...didn't they live in the desert with the Egyptians whooping the [expletive] out of them?"

188.    In other recordings, Defendants described Orthodox Jews as a "sea of yarmulkes" (February 6, 2017), Defendants stated that Orthodox Jews "work in groups" to "take over and control" (April 10, 2017), and Defendants stated that Orthodox Jew are "unintelligent," and "they don't read." (March 3, 2017).

189.    In the recordings, Defendants talked about a "Jewish mentality," that they perceived as contrary to Village interests ("Jews are all interconnected and don't do anything outside the tribe") (March 3, 2017), and Defendants repeated anti-semitic canards about Jews' collective and individual love of money (October 5, 2016).

190.    The recordings reflect Defendants' hostility to Orthodox Jews and reveal Defendants' motive in discriminatorily administering the Village's laws against Orthodox Jews including Plaintiff Manes.

191.    In a February 13, 2017 recording, Defendant Zummo discussed an upcoming meeting with the United Talmudical Association ("UTA"), an Orthodox Jewish

organization that was seeking approval for a school at the site of a former camp. Defendant Zummo described himself as "the mean [expletive] stopping them from doing it," and mocked the UTA representatives in a stereotypical Orthodox Jewish accent.

192.    Defendant Zummo bragged about using his position as Building Inspector to block Jewish institutions, even stating wearing a "Hitler-was-right hat."

193.    In a recorded discussion with Defendant Yagel on March 1, 2017 concerning giving multiple violations to a Jewish woman, Defendant Zummo stated: "The Jewish mentality works that way – you can be told every day and they go back and do what they want to do anyway...you are restricting them...they are like six-year-olds."

194.    In a recording from March 3, 2017, after receiving a complaint regarding an ambulance parked in Pomona, Defendants Arsa-Artha and Zummo stated that Orthodox Jews use ambulances as a "chauffeur" to shuttle rabbis around to bring them from Brooklyn to Kiryas Joel.  Defendant Zummo stated that "they use the lights and sirens to pass everybody" and "they get away with it all the time." He stated that on certain highways on Fridays, "if you stops an ambulance and open the back, you'll find a rabbi inside."

195.    Many of the recorded conversations regarding Orthodox Jews concerned their building requests, applications for municipal services, and requests by Orthodox Jews for access to public information.

196.    Village employees "found" code violations in apartments of Orthodox Jews, stating it was "just like them" to use a residence as an "illegal apartment." Onerous tree removal ordinances were created to be enforced only against Jews (even when the trees were

diseased and a threat to safety): "Jews hate trees … do not want to maintain anything around there." (March 31, 2017 recording).

197.    Defendants' harassment of Orthodox Jewish residents was designed to dissuade Orthodox Jews from coming to Pomona. In a March 21, 2017 recording, a Village official said of one Orthodox family requesting leave to have a spa pool and trampoline in their yard: "We need to deny it or we will have 4000 Orthodox coming up from Brooklyn."

198.    Defendants invoked the Village's building and code ordinances as a means of discouraging current residents from selling their properties to Orthodox Jews. "Physical interior inspection" was introduced as a means of hindering sales of property to Orthodox Jews.

199.    Before there was an influx of interested Orthodox Jewish home purchasers, title companies or prospective buyers did only a "violation search" on property. There was only a review of records and a limited exterior inspection. Interior inspection became a condition to clear title in order to thwart or delay the sale of homes to Orthodox Jews.

200.    Defendants overlooked basements or renovations of long-term Pomona residents until they attempted to sell their property to an Orthodox Jew. At that time, they were subjected to an invasive and potentially costly code-enforcement process in order to hinder their sale to Orthodox Jews.

201.    A February 1, 2017 recording contains a discussion between Defendants Yagel and Zummo regarding the house of non-Jewish resident Peter Obey at 2 Riverview Court. Mr. Obey was in the process of selling his property to Dr. Friedman, an Orthodox Jew.

202.    Defendant Yagel directed Defendant Zummo to issue a stop work order ("SWO"). When Defendant Zummo advised that "we did not issue it to Obey," Defendant Yagel replied, "We did not know he [Obey] was selling."

203.    According to the New York State Division of Human Rights ("HRD") investigation into Defendant Shea's whistleblower complaint, a long-time resident who was not an Orthodox Jew was allowed to continue using her renovated basement so long as she does not "sell the property." Robert Klein, the Village's first Orthodox Jewish member of the Board of Trustees, was denied permission to build a basement because it would purportedly be "just like them" to use it as an "illegal apartment." (March 31, 2017 recording).

204.    Defendants enacted and applied other facially neutral laws to discriminate against Orthodox Jews.

205.    For example, Defendant Zummo saw Local Law 121 (the "Tree Law"), which prohibited any tree removal activity without obtaining a permit from the Village, as an ordinance that was particularly effective as a tool to harass and/or intimidate Orthodox Jews. In a conversation with Defendant Yagel regarding the Tree Law, Defendant Zummo stated: "Jews hate trees . . . do not want to maintain anything around there." Defendant Zummo added that Orthodox Jews "clear anything that grows," and asserted: "This is the way of the Orthodox . . . don't want anything near my house, nice big yard for kids to play in."

206.    Among other things, the Tree Law also had the effect of preventing Orthodox Jewish families from extending and/or renovating their homes to meet their families' needs, including enlarging their kitchens to conform to the dietary-law kashrut requirements of Orthodox Jewish practice. To actively enforce the Tree Law, Defendant Yagel personally drove

around the Village, searching for any potential tree violations at Orthodox Jewish homes. He threatened one such Orthodox Jewish homeowner with imprisonment.

207.    The Tree Law was motivated by discriminatory animus against Orthodox Jews and their religious observance. It deterred Orthodox Jews from residing in Pomona and thereby damaged Plaintiff's real estate development business because it depended on sales to Orthodox Jewish buyers.

208.    Another example is the Village's Local Law 104, which requires Village homeowners to declare if 10% or more of the house is owned by a limited liability company ("LLC"). The disclosure must state whether the property was being rented, and to whom.

209.    Plaintiff Manes and other Orthodox Jewish residents of Pomona viewed Local Law 104 as unconstitutional and in excess of state disclosure requirements.

210.    Local Law 104 had the intended effect of harassing Orthodox Jewish owners of homes in Pomona because the Yagel Administration believed that "LLC" was the preferred corporate form of Orthodox Jewish property ownership. The required public disclosure would enable Defendants to identify, scrutinize and prosecute Orthodox Jewish property owners and enable Defendant Zummo to impose large fines on Orthodox Jews for failure to comply.

211.    Upon information and belief, the purpose of the law was to threaten and harass Orthodox Jews, via exceedingly large fines for ongoing non-registration, to be enforced in a discriminatory way by Defendant Zummo, the Village Building Inspector. The law was designed and based on discriminatory animus and was intended to keep out, harass, and intimidate Orthodox Jews.

## C.    Impeding Sabbath Observance

212.    Maintaining the Sabbath's sanctity and tranquility, including communal prayer services and other communal observances from sundown on Friday to nightfall on Saturday, is a fundamental component of Orthodox Jewish practice and belief.

213.    Orthodox Jews may not drive (or even move their cars) on the Sabbath or use any form of motorized transportation. Pomona's Orthodox Jewish residents have to walk in the street on Saturdays because many Pomona streets have no sidewalks. Cars owned by Orthodox Jews are likely, therefore, to be parked overnight on Fridays, in violation of overnight parking ordinances in Pomona.

214.    Defendants targeted the Orthodox Jewish community for disparate treatment through selective ticketing of Orthodox Jewish residences and synagogues.

215.    The HRD report notes that the investigator reviewed emails from Defendant Yagel to Defendant Zummo ordering Defendant Zummo to issue violations on Saturdays.

216.    Defendant Zummo acknowledged to the HRD inspector that Defendant Yagel instructed him to perform garbage inspections "on the weekend." This had the desired effect of targeting Orthodox Jews for petty garbage violations because lavish Sabbath meals generate more garbage. One Orthodox Jewish resident received a ticket for a garbage/recycling violation at 4:25 am on Saturday as part of a pre-dawn ticketing blitz ordered by Defendant Mayor Yagel to target Orthodox Jewish residents.

217.    Defendant Zummo acknowledged in the August 2018 Admissions, and in a September 13, 2018 telephone conversation, that Defendant Mayor Yagel had ordered Defendant Zummo to perform "shul patrols" on Saturdays to selectively target Orthodox Jews. In an email dated Saturday, July 16, 2017, 8:43AM, Defendant Zummo reported to Defendant Yagel that he had issued 19 garbage and 18 parking violations that morning.

218.    Cars of non-Orthodox-Jewish residents, including those of Village officials, were, on information and belief, not ticketed even though they violated the parking ordinance. The Village has not engaged in *any* overnight enforcement activities in general or against any group other than Sabbath-observing Jews.

219.    Aside from "shul patrols" Defendant Zummo was a part time building inspector on contract to work only 15-17 hours per week, and never on weekends. Defendant Zummo acknowledged in the August 2018 Admissions that the Village did not have enough money to pay him for his routine building department work, but Defendant Yagel threatened to terminate his employment if he failed to harass Orthodox Jewish residents on the Sabbath.

220.    Defendant Mayor Yagel directed Village personnel to call police to cite Orthodox Jews for "jay walking" on the Sabbath even though many streets had no sidewalks or crosswalks.

221.    Defendant Zummo informed Plaintiff Manes that Defendant Yagel became extremely irritated whenever he saw Orthodox Jews walking on the streets in Pomona on Saturdays in traditional Orthodox Jewish dress, particularly when they were leaving prayer groups held in private homes.

222.    The Yagel Administration: (i) actively harassed and discriminatorily targeted Orthodox Jewish owned residences; (ii) targeted prayer groups held in Orthodox Jewish homes with selective enforcement of code violations, and (iii) asked police to intimidate Orthodox Jews walking or congregating in public space on the Sabbath with jay-walking violations.

### D.    Whistleblower's Disclosures

223.    In June 2018 the New York State HRD issued a report corroborating many allegations of this complaint.

224.    Defendant Noreen Shea is a non-Jewish former Deputy Clerk in the office of Pomona's Village Clerk. She participated initially with the Village's discriminatory treatment of Orthodox Jewish residents, but ultimately objected. Shea is seeking damages before the HRD for being fired by Defendant Mayor Yagel.

225.    The HRD found "probable cause to support" Defendant Shea's allegations and ordered the matter to proceed to a public hearing before an administrative law judge. Defendant Shea elected instead to pursue her claims in a federal employment discrimination lawsuit, currently pending in this District. *Noreen Shea v. Village of Pomona*, S.D.N.Y. No. 18-CV-11170 (CS) (filed Dec. 13, 2018).

226.    Defendant Shea revealed to the HRD what she described as Defendants' "hidden agenda against Jewish residents." She stated, "***If anyone dares tell me there is no religious discrimination in the Village of Pomona, they have not worked a day in the building department***." (emphasis added).

45

227.    Defendant Shea itemized the following:

- Defendant Mayor Yagel suggested that Defendant Shea place non-kosher pork rinds on the public counter of the Village clerk's office to deter Orthodox Jews from seeking access to municipal services;

- Village building inspector Defendant Zummo mocked Orthodox Jewish residents through "comical" imitations of them, disparaging them as "carrying on" when they were denied services; and

- The Village government targeted the Orthodox Jewish community "for disparate treatment" through "selective ticketing of Jewish residences" and prayer gatherings.

228.    Defendant Shea alleged that her refusal to further participate in such discriminatory treatment of Orthodox Jewish residents led Defendant Mayor Yagel to retaliate against her.

229.    Defendant Shea described the Village office under Yagel as being an "anti-semitic atmosphere."

230.    Defendant Shea testified that Defendant Zummo explained to her that there are four of five levels of Jews, and "the lowest are the real Hasids" and he did this "whole impression" of them.

231.    Defendant Shea testified that she heard Defendant Yagel make derogatory comments about a number of Hasidic/Orthodox developers and landowners, including but not limited to Plaintiff Avrohom Manes, Indig, Klein and Hirskowitz, including stereotypical comments that typically involved the desire to violate the law for the sake of making money.

232.    Defendant Shea alleged that Defendant Mayor Yagel disparaged her to Defendant Ian Banks as a "***Jew Lover.***"

233.    Defendant Shea and Defendant Ian Banks, previously a Village Trustee and now Mayor, acknowledged that Orthodox Jewish residents faced arbitrary and unjustified delays in the issuance of building permits and Certificates of Occupancy.

**E.    Judicial Findings**

234.    In another recent federal lawsuit alleging discrimination by the Village against Orthodox Jews, United States District Judge Kenneth M. Karas conducted a bench trial and entered factual findings that are similar to and support many of the allegations in this Complaint. *See Congregation Rabbinical College of Tartikov v. Village of Pomona*, 280 F. Supp. 3d 426 (S.D.N.Y. 2017).

235.    Judge Karas found that the Village passed local ordinances to prevent a rabbinical college from coming to Pomona, and that the purpose of the local ordinances was to prevent the growth of Pomona's Orthodox Jewish community. Judge Karas said: "There is no escaping the fact that . . . Defendants passed the Challenged Laws to thwart the spread of the Orthodox/Hasidic Jewish community" into Pomona. *Id*. at 455.

236.    Judge Karas' findings of discrimination by the Village were affirmed, in part, by the United States Court of Appeals for the Second Circuit. *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83 (2d Cir. 2019)

237.    Defendant Mayor Yagel was a named defendant in the *Tartikov* lawsuit, and Defendants Yagel and Ulman were both trial witnesses. Judge Karas found that the defendants' "intended purpose was to thwart the development of the rabbinical college because it was proposed by Orthodox/Hasidic Jews." *Congregation Rabbinical College of Tartikov*, 280 F. Supp. 3d at 493.

238.    In his ruling, Judge Karas stated that he did not credit Defendant Yagel's testimony "that the law was not adopted to discriminate against Tartikov because Yagel made discriminatory comments leading up to the adoption of the law." *Id.* at 465. Judge Karas further stated that he did not credit Defendant Yagel's testimony that he was not aware of the wetlands on the property at issue, noting that Yagel's testimony was "demonstrably false" because Yagel has discussed the existence of wetlands on the property prior to his election. *Id.*

239.    Judge Karas also found less than credible Defendant Ulman's testimony as a trial witness in *Tartikov*, claiming that the Village's motivation behind its enactment of laws was neutral and not intended to discriminate against Orthodox Jews. *Id.* at 463-465.

240.    In an earlier ruling in the *Tartikov* case, Judge Karas found that Defendant Yagel participated in directing Village employees to destroy evidence of discrimination. Judge Karas held that this was the "rare case where bad faith and a clear intent to deprive Plaintiffs of the evidence... is sufficiently clear." *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 389 (S.D.N.Y. 2015).

241.    Judge Karas' findings in the *Tartikov* action regarding Defendants' discriminatory actions towards Orthodox Jewish residents in building and code enforcement, willful destruction of evidence, and other findings of discrimination affirmed on appeal by the Court of Appeals are binding on the Defendants under the doctrine of non-mutual collateral estoppel.

242.    Decisions in other litigation also establish anti-Orthodox-Jewish animus by officials of the Village government. For example, the *Indig* case, the HRD proceedings, the *Shea* case, and Plaintiffs' *Roads* Case (collectively, the "Related Actions") all provide substantial

evidence documenting the anti-Orthodox-Jewish animus and discriminatory application of Village laws.

## DEFENDANTS' COVER-UP AND CONCEALMENT

243.    Defendants Yagel, Ulman and Zummo, assisted by other Defendants, have: (i) destroyed, falsified, hidden and otherwise denied access to incriminating information; (ii) denied meritorious building permits arbitrarily and discriminatorily, and (iii) given false testimony at depositions.

244.    The HRD investigation of Defendant Shea's complaint, discovery in Related Actions, recordings at Village Hall, and Admissions from Defendants Shea, Zummo, Ulman, Yagel, and Banks, prove that the Village maintained an unofficial standing policy of making it expensive, time consuming, burdensome and humiliating for Orthodox Jews to conduct Village business with Village Hall, including obtaining unaltered records of their public property files.

245.    The HRD findings of probable cause support the conclusion that the Yagel Administration instructed Village employees to obstruct and delay freedom-of-information requests and access to property and other Village records.

246.    Village officials (i) deleted, (ii) altered and (iii) forged public records, including Plaintiff Manes' property records.

247.    Defendants' motive was to prevent and hinder Orthodox Jews' purchase of homes or property in Pomona.

248.     In a February 24, 2017 recording at Village Hall, Defendants Yagel, Zummo, Arsa-Artha and Shea openly discussed not providing documents to Orthodox Jews in response to FOIL requests and the potential legal consequences of refusing to provide documents and lying to Orthodox Jews about whether the documents existed or regarding reasons for delays. Defendant Yagel responded: "You will be protected by the insurance and receive attorneys."

249.     Defendant Zummo acknowledged in August 2018 Admissions that Defendants Ulman and Yagel advised Defendant Zummo to delete text messages. Defendant Yagel also instructed Village personnel to delete Facebook posts by Village employees. Defendant Yagel was sanctioned by Judge Karas in the *Tartikov* litigation for spoliation of evidence by instructing employees to delete antisemitic Facebook posts.

250.     In his August 2018 Admissions, Defendant Zummo acknowledged instructions from Defendants Ulman and Yagel to destroy or otherwise alter evidence while the HRD investigation was ongoing. Defendant Zummo also acknowledged that Defendant Ulman had directed him to delete text messages from Zummo's phone anticipating that the phone might be searched for documents relevant to discrimination claims.

251.     Defendant Zummo repeated his admissions in a September 13, 2018, phone call to Plaintiffs' then-attorneys, Messrs. Bradley Nash and Solomon Klein, while Zummo's attorney, Glenn Jones, and Plaintiff Manes were listening. In the same conversation, Defendant Zummo apologized for lying at the urging and instruction of Defendants, including, lying under oath at depositions during the HRD investigation and during Plaintiff's *Roads* Case.

252.    On information and belief, before leaving office in April 2019, while in litigation on discrimination allegations, Defendant Yagel deleted data on Village computer servers. Defendant Yagel hired a cloud computing company and computer technicians to upload back-up files and official Village employee email records, and to segregate them on the "Blue Host" server, for which the Village paid but was under Yagel's dominion and control.

253.    The Blue Host server contains data and metadata that Defendant Yagel and compatriots wish to hide, including files that were intentionally made inaccessible to the incoming, and now current, Banks Administration.

254.    Defendants Yagel and Harris have refused to turn over passwords to incoming Mayor Defendant Banks in order to deny Village officials and others access to relevant and incriminating data and metadata.

255.    Trustee and now-Mayor Defendant Banks informed Plaintiff Manes that, in order to further obstruct and delay discrimination investigations of the Village, Defendant Yagel used a personal cell phone for official business so that it would not be subject to discovery as a Village record.

256.    Defendants Shea and Banks both separately informed Plaintiff Manes that Defendant Mayor Yagel, personally or with others, removed meeting minutes to a private residence down the block from Village Hall.

257.    These acts of concealment were designed to enable Defendant Yagel to claim "deniability" in responding to FOIL requests and "truthfully" declaring Village records were searched and requested documents were not found.

258.     Defendant Banks and Lisa Thorsen informed Plaintiff Manes, who had been thwarted in obtaining meeting minutes from the Village, how the Village secreted such documents. Manes was introduced to Mrs. May Pang who showed Plaintiff Manes how meeting minutes could be removed or altered.

## BURDENS PREVENTING FREE EXERCISE OF RELIGION

### A.     Harassment of Orthodox Prayer Groups

259.     Defendants interfered deliberately with the rights to assemble and worship of the Village's Orthodox Jewish residents.

260.     The Yagel Administration: (i) prevented the establishment of synagogues; (ii) actively harassed Orthodox Jewish owned residences where worshipers held prayer groups; (iii) harassed Orthodox Jewish worshippers by discriminatorily issuing tickets; and (iv) prevented the establishment of a ritual bath - *mikveh* - in Pomona.

261.     The Village's zoning law authorized synagogues on at least 3.0 acres of land. *See* Village of Pomona Zoning Regulations Article IV, Use Regulations, Section 130-10.G.

262.     The 3.0-acre minimum zoning provision was enacted with discriminatory animus against Orthodox Jews. Village authorities knew that there is no 3.0-acre lot in Pomona within walking distance of the homes of Orthodox Jews in Pomona, and that Orthodox Jews must walk to prayer services on Sabbaths and Jewish holidays.

263.     Orthodox Jewish resident Ronny Schwartz attempted to build a synagogue at 12 Beaver Dam in Pomona. In a February 1, 2017 conversation that was recorded, Defendants discussed the denial of Mr. Schwartz's permit: "Don't have to let him know every detail…Let us

bolster it with as many facts so can bury him in, so he can't have *'super shul'* on 12 Beaver Dam." (Emphasis added.)

264.    Because no synagogue could be built, Orthodox Jewish residents of Pomona held prayer groups in private homes.

265.    Plaintiff Manes regularly worshipped in a prayer group at 60 Halley Street in Pomona. Defendants Yagel, Harris and Zummo subjected that prayer group and others to much scrutiny and harassment.

266.    Referring to the prayer group at 60 Halley Street, Defendant Zummo said to Defendant Shea in a recorded conversation on March 1, 2017: "Brett wanted the shul torn down." In a recorded conversation of March 21, 2017, Defendants Yagel and Zummo acknowledged they have no right to prevent worship at that location.

267.    The recorded conversation of March 21, 2017 continues with discussion of the possibility of invoking a fire-safety law imposing restrictions if there are more than 27 occupants of a building.

268.    Defendants Yagel, Harris, and Zummo exchanged emails on February 29 - March 2, 2016, concerning an appearance ticket issued by Defendant Riley to 60 Halley Street for operating a House of Worship. Defendant Riley issued the ticket based upon a complaint reported by Defendant Harris on behalf of a resident of Pomona, but asked Defendant Zummo who should be identified in the supporting affidavit as the witness.

269.    Defendant Zummo disputed the legality of "violating" a property based solely upon hearsay and innuendo from a neighbor. He expressed concern that Defendant

Christopher Riley, the Village Special Prosecutor could not draft an affidavit for the court to prosecute such a non-violation and warned that it will "make us look stupid in the end."

270.    Defendant Yagel then told Defendant Zummo to "take a play out of Fred Viohl's playbook when he publicly reported during a BoT Mtg about an issue, which he personally observed on Route 306, where he walked in and observed some type of religious service taking place." Defendant Zummo understood Mayor Yagel to be directing him to falsely testify that Defendant Zummo himself had witnessed the alleged "violation" at 60 Halley Street, to which Defendant Zummo replied that he would not "perjure himself" for the Village of Pomona.

271.    Defendant Mayor Yagel once baselessly claimed that a commercial kitchen was being operated at 60 Halley Street. Defendant Yagel called the health department to prosecute this claim even though he had not entered the home, and no one witnessed such "business" activity.

272.    Upon information and belief, Defendant Harris directed Defendant Zummo to "violate" or ticket people walking to "shul," meaning Orthodox Jewish prayer groups or synagogues, and stated that he wanted a shul to be torn down.

**B.      Prevention of a _Mikveh_**

273.    With the invidious discriminatory purpose of hindering and preventing religious observance by the Village's Orthodox Jewish residents and deterring the purchase of property in Pomona by Orthodox Jews, Defendants tried to prevent ritual baths in Pomona.

274.     A local ritualarium – *mikveh* - is essential in an Orthodox Jewish community. The laws of ritual purity forbid sexual activity between husbands and wives during the wife's menstrual period and for seven days thereafter. Wives must then immerse in a *mikveh* before resuming contact with their husbands.

275.     Orthodox Jewish men, and particularly Hasidic men, also frequently immerse in a *mikveh* on weekday mornings prior to prayer, on Fridays before Sabbath, on the eve of Jewish holidays, and on Sabbath and holiday mornings.

276.     Orthodox Jewish residents of Pomona conducted preliminary inquiries into the possibility of building a *mikveh* in Pomona.

277.     The Village's Building Code would permit the construction of a *mikveh*.

278.     Defendant Zummo acknowledged in August 2018 Admissions that he had been instructed by Defendant Ulman to prevent construction of a *mikveh*. Defendant Zummo reported that Defendant Ulman had acknowledged that the Village's Building Code permits the building of a *mikveh* and that *mikvehs* have been constructed, used, and maintained in neighboring villages.

279.     Defendant Ulman's instructions to Defendant Zummo were designed to burden religious exercise of the Orthodox Jewish residents of Pomona, including Plaintiff Manes, and to prevent and deter Orthodox Jews from moving into Pomona.

280.     The religious exercise and observance of Plaintiff Manes and other Orthodox Jewish residents of Pomona is substantially burdened by Defendants' denial of permission to construct a *mikveh* in Pomona. Men and women who wish to use a *mikveh* during

the week must drive to a location outside Pomona, to villages in Rockland County that have such a facility.

281. On the Sabbath and many Jewish holidays, Jewish law forbids driving or riding in a vehicle, even in order to fulfill the important positive commandment of *mikveh*. Orthodox Jewish men and women who need a *mikveh* for their religious observance, including Plaintiff Manes, are totally unable to visit such a facility on Sabbaths and certain Jewish religious holidays.

282. The absence of a *mikveh* in Pomona has burdened and hindered the religious observance of Plaintiff Manes and other Orthodox Jewish residents of Pomona and deprived them of the free exercise of fundamental religious beliefs and practices.

## CONTINUATION OF UNLAWFUL DISCRIMINATION

283. Defendant Ian Banks was a member of the Board of Trustees of the Village of Pomona for approximately 20 years before he was elected to replace Defendant Yagel as mayor in the spring of 2019.

284. For several years leading up his election as mayor in 2019, Defendant Banks as Trustee publicly and privately opposed the Yagel Administration's illegal actions, including the willful destruction, alteration, and concealment of evidence.

285. Defendant Banks expressed support for Pomona's Orthodox Jewish residents in informal gatherings and in Board of Trustees meetings and objected to the Yagel Administration's actions against Orthodox Jewish residents, including Plaintiffs Manes and TAL Properties.

286. Defendant Banks told Plaintiff Manes that, to his understanding, the Village owned the roads adjoining the Subdivided Properties owned by Plaintiffs. Defendant Banks pledged that, as Mayor, he will concede longstanding Village ownership of the roads, accordingly formally dedicate the roads, and ultimately move to resolve Plaintiffs' *Roads* Case.

287. Defendant Banks advised Plaintiff Manes that the Yagel Administration had obstructed Plaintiffs' freedom-of-information requests and other discovery demands during Plaintiffs' *Roads* Case. Defendant Banks provided Plaintiffs with some of the documents that the Village had falsely claimed did not exist and documents showing discrimination and evidence-tampering that Plaintiffs could use in federal court in this lawsuit.

288. Defendant Banks, as Trustee, commenced Article 78 proceedings the New York Supreme Court of Rockland County and other administrative actions with the New York Department of State's Committee on Open Government to challenge the Yagel Administration's destruction and concealment of evidence.

289. Defendant Banks, as Trustee, had filed complaints against Defendant Zummo, and requested the Rockland County District Attorney to open an investigation of Defendant Zummo, asserting that Defendant Banks hired Defendant Zummo illegally and that Defendant Zummo could not work for the Village.

290. Defendant Banks personally sued Defendant Zummo for illegal and improper zoning tactics.

291. Seeking Orthodox Jewish support when he ran for Mayor in 2019 with Trustee Robert Klein, Defendant Banks campaigned to "drain the swamp" and to "Make Pomona

Great Again." He represented publicly and privately to Plaintiff Manes that he would, "as the first order of business," terminate the employment of Defendants Ulman, Zummo, Arsa-Artha and other personnel who had carried out the discriminatory policies against Orthodox Jews under the Yagel Administration.

292.     Defendant Ulman resigned and Defendant Zummo's employment was terminated by the Board of Trustees. Brian Nugent was democratically elected Village Attorney and a new building inspector was appointed.

293.     Defendant Banks reneged on his promises after being elected Mayor. He sought to undo personnel changes and he continued to discriminate against Orthodox Jews.

294.     Over the Board of Trustees' objections, Defendant Banks fired the new building inspector appointed by the Board of Trustees when the new building inspector made clear that he would evaluate and approve permits based solely upon merit and not in a manner that discriminates against Orthodox Jews.

295.     In defiance of the Board of Trustees, Defendant Banks re-hired Defendant Zummo to lead the Village Building Department and employed Zummo to harass, intimidate, and discriminate against Orthodox Jews with false and frivolous code violations.

296.     Defendant Banks fired Brian Nugent, who had been duly elected, and replaced him with Banks' "personal attorney," Roger Bernstein.

297.     Defendant Mayor Banks justified his about-face in recorded conversations with Plaintiff Manes and Trustee Klein, saying, "You people now have too much power."

298.    Defendant Mayor Banks has continued, under his administration, to discriminate against Orthodox Jews, including Plaintiff Manes and others.

299.    Robert Klein is a plaintiff in a separate federal-court action against the Village government. Mr. Klein is an Orthodox Jew who was an elected Village Trustee under Defendant Mayor Yagel. Mr. Klein was the only trustee denied a key to Village Hall. He was often shut out of Village government business by Defendant Yagel and others. He was excluded from performing certain government functions during the Yagel Administration that non-Orthodox Jews performed in their elected capacities and was excluded from discussions at Village Hall and denied documents needed to conduct official trustee business. Village meetings were scheduled for Saturdays and Jewish holidays, with knowledge that Mr. Klein would be unable to attend. Defendant Mayor Yagel refused, because Mr. Klein was "one of them," to show Trustee Klein the town attorney's billable hours in the *Tartikov* case.

300.    Defendant Mayor Banks threatened Plaintiff Manes and Robert Klein that Defendant Zummo would continue to enforce code and building violations against Orthodox Jewish residents of Pomona unless they dropped their lawsuits against the Village.

301.    Defendant Mayor Banks also stated that neither Plaintiff Manes nor Mr. Klein would receive permits to develop or continue building projects in Pomona unless they dismissed their lawsuits for discrimination against the Village.

302.    Defendant Mayor Banks reneged on his pre-election promise to dedicate the Village roads notwithstanding his acknowledgement to Plaintiff Manes that Manes does not own the roads, thereby continuing litigation by the Village with a defense that Defendant Banks acknowledged as unmeritorious.

303.     Defendant Mayor Banks has, with the assistance of Defendant Zummo, continued the baseless prosecution of cases that, as a trustee in the Yagel Administration, he criticized and pledged to drop as false and discriminatory against Orthodox Jewish residents of Pomona.

304.     Plaintiff Manes does not, as of this date, have access to most of his properties. He is still prevented and limited from alienating or building on his properties without a substantial loss to his investments.

305.     Plaintiffs Manes and TAL Properties continue to be injured by the acts of Defendants. As developers engaged in selling and developing properties to an Orthodox Jewish clientele in Pomona, Plaintiffs have suffered substantial financial harm by Defendants' unlawful burdens on religious exercise and by the violation of Orthodox Jews' constitutional rights, religious freedoms, and housing rights.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (VIOLATIONS OF THE EQUAL PROTECTION CLAUSE
#### UNITED STATES CONSTITUTION, FOURTEENTH AMENDMENT 42 U.S.C. § 1983)

306.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

307.     By the conduct described herein, Defendants' actions deprived and continue to deprive Plaintiffs of their right to equal protection of the laws by discriminating against and targeting Plaintiffs for disfavor in, among other things, the application of local zoning laws, and the enforcement of alleged code violations.

308. These discriminatory acts by Defendants against Plaintiffs violated the right to equal protection of the laws, guaranteed to Plaintiffs by the Fourteenth Amendment, and were motivated and caused by Defendants' animus to the religious beliefs and practices of Orthodox Judaism.

309. Defendants' discriminatory actions were taken under the color of state law and through the unlawful exercise of governmental authority assigned to them by local statutes and ordinances.

310. Plaintiffs have suffered and continue to suffer damage caused by Defendants' violations of their constitutional rights.

311. Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their constitutional rights.

## SECOND CLAIM FOR RELIEF

### (VIOLATIONS OF THE FREE EXERCISE CLAUSE
### UNITED STATES CONSTITUTION, FIRST AMENDMENT 42 U.S.C. § 1983)

312. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

313. By the conduct described herein, Defendants' actions deprived and continue to deprive Plaintiffs of their right to the free exercise of religion by targeting Plaintiffs for mistreatment and disfavor because of their religious identity as Orthodox Jews and by denying to Plaintiffs the ability to exercise the Orthodox Jewish religion and its religious observances and practices.

314.     Defendants' discriminatory actions were taken under the color of state law and through the unlawful exercise of governmental authority assigned to them by local statutes and ordinances.

315.     Plaintiffs have suffered and continue to suffer damage caused by Defendants' violations of their constitutional rights.

316.     Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their constitutional rights.

### THIRD CLAIM FOR RELIEF

### (VIOLATIONS OF THE FAIR HOUSING ACT
### 42 U.S.C. §§ 3604(A), 604(B) AND 3617)

317.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

318.     By the conduct described herein, Defendants have discriminated on the basis of Plaintiffs' religion against Plaintiffs with unjustified delays, imposition of discriminatory conditions, and refusal to provide building permits, and by making housing within Pomona unavailable to Orthodox Jews, thereby subjecting Plaintiffs to discrimination "in the provision of services or facilities" on the basis of their religion in violation of 42 U.S.C. § 3604(a) and § 3605(b).

319.     Defendants' conduct has also "interfere[d]" with Plaintiffs' "exercise or enjoyment" of rights protected by 42 U.S.C. §§ 3604(a) and 3604(b), in violation of 42 U.S.C. § 3617.

320.    Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i), and they have suffered damage as a result of Defendants' conduct.

321.    Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Fair Housing Act.

322.    Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their rights.

## FOURTH CLAIM FOR RELIEF

## (VIOLATIONS OF RLUIPA SECTION (A)(1))

323.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

324.    By the conduct described herein, Defendants have imposed and implemented the Village's land use regulations that make individualized assessments in a manner that imposes substantial burdens on the religious exercise of Plaintiff Manes, is not in furtherance of a compelling governmental interest, and is not the least restrictive means of furthering a compelling governmental interest.

325.    Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Religious Land Use and Institutionalized Persons Act.

326. Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their rights.

## FIFTH CLAIM FOR RELIEF

## (VIOLATIONS OF RLUIPA SECTION (B)(1))

327. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

328. By the conduct described herein, Defendants imposed and implemented the Village's land-use regulations on less than equal terms for Plaintiffs, who purchased property in Pomona to develop and market residences for Orthodox Jews, by delaying and denying Certificates of Occupancy and other preconditions for residences to be occupied by Orthodox Jews while not delaying or denying Certificates of Occupancy and other legal preconditions to residents of Pomona who do not engage in the religious exercise of Orthodox Jews.

329. Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Religious Land Use and Institutionalized Persons Act.

330. Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violation of their rights.

## SIXTH CLAIM FOR RELIEF

## (VIOLATIONS OF RLUIPA SECTION (B)(2))

331.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

332.    By the conduct described herein, Defendants imposed and implemented Pomona's land-use regulations on the basis of religion and the religious denomination of Plaintiff Manes and his potential customers by imposing on Manes and Orthodox Jewish purchasers and owners of property in Pomona disparate and costly conditions that were not imposed on non-Orthodox-Jewish owners of property in Pomona such as the owners of 6, 8, 10 High Mountain Road and 2 Riverview.

333.    Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Religious Land Use and Institutionalized Persons Act.

334.    Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violation of their rights.

## SEVENTH CLAIM FOR RELIEF

## (VIOLATIONS OF RLUIPA SECTION (B)(3)(B))

335.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

65

336. By the conduct described herein, Defendants have imposed and implemented the Village's land-use regulations in a manner that unreasonably limits Orthodox Jewish religious assemblies, institutions, and structures within Pomona.

337. Plaintiffs have suffered and continue to suffer damage caused by Defendants' violation of rights protected by the Religious Land Use and Institutionalized Persons Act.

338. Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violation of their rights.

## EIGHTH CLAIM FOR RELIEF
## (TORTIOUS INTERFERENCE)

339. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

340. Defendants intentionally and tortiously interfered with Plaintiffs' purchase, development and sale of property in Pomona as part of Plaintiffs' business.

341. Defendants' wrongful and tortious actions prevented Plaintiffs' from purchasing property from third parties, developing and enhancing the value of property, and realizing economic gain from selling property to third parties at a profit.

342. As a result of Defendants' wrongful actions, Plaintiffs have been damaged in an amount to be determined at trial.

343.     Plaintiffs demand damages in an amount to be determined at trial, and payment of their attorneys' fees and costs.

## NINTH CLAIM FOR RELIEF

### (IMPOSITION OF UNCONSTITUTIONAL CONDITIONS, IN VIOLATION OF DUE PROCESS, EQUAL PROTECTION, AND THE TAKINGS CLAUSE, UNITED STATES CONSTITUTION, FOURTEENTH AMENDMENT 42 U.S.C. § 1983)

344.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

345.     By the conduct described herein, Defendants' imposed unconstitutional conditions on the provision of governmental benefits and services to Plaintiffs.

346.     Defendants conduct against Plaintiffs constituted an unconstitutional taking and violated Plaintiffs' rights to due process of law and equal protection of the laws, guaranteed to Plaintiffs by the Fifth and Fourteenth Amendments.

347.     Defendants' unlawful and unconstitutional actions were taken under the color of state law and through the unlawful exercise of governmental authority assigned to them by local statutes and ordinances.

348.     Plaintiffs have suffered and continue to suffer damage caused by Defendants' violations of their constitutional rights.

349.     Plaintiffs demand damages in an amount to be determined at trial, payment of their attorneys' fees and costs, and injunctive relief to prevent further violations of their constitutional rights.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

(i)      Awarding Plaintiffs compensatory, consequential and punitive damages in an amount to be determined at trial.

(ii)     Enjoining Defendants from discriminating against Plaintiffs in the manners described in this complaint.

(iii)    Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(iv)    Granting such other and further relief to Plaintiffs as the Court deems just and proper.

Dated:   July 27, 2020

By: /S  Daniel G. Ashburn
Daniel G. Ashburn, Esq.
ASHBURN LAW OFFICE, LLC
1300 Carolyn Drive
Atlanta, GA 30329
404-939-1323
*Attorney for Plaintiffs*

OF COUNSEL:
LEWIN & LEWIN, LLP
Nathan Lewin, Esq.
888 17th Street NW, 4th Floor
Washington, DC 20006
(202) 828-1000

Albert A. Levy, Esq.
94 Roselle Court
Lakewood, NJ 08701
(917) 589-3737
*Attorney for Plaintiffs*